FILED
JUL 17 2003 TO

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
JUL 18 2003

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AMY WIGINTON and KRISTINE MORAN, individually and on behalf of all persons similarly situated, | )<br>)<br>) Case No. 02 C 6832<br>) |
| Plaintiffs, | ) Judge Andersen<br>) |
| v. | ) Magistrate Judge Ashman<br>) |
| CB RICHARD ELLIS, | )<br>) |
| Defendant. | ) |

## NOTICE OF FILING

TO: Elizabeth Fegan Hartweg
THE WEXLER FIRM
One North LaSalle Street
Suite 2000
Chicago, Illinois 60602

PLEASE TAKE NOTICE that on July 17, 2003, we caused to be filed with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois, Defendant's Brief In Opposition To Plaintiffs' "Emergency Motion To Prevent The Further Destruction Of Evidence And For Sanctions For Spoliation Of Evidence," a copy of which is attached hereto and served upon you.

Respectfully submitted,

CB RICHARD ELLIS

By _____
One of Its Attorneys

Brenda H. Feis
Sari M. Alamuddin
Deborah S. Davidson
SEYFARTH SHAW
55 East Monroe Street
Suite 4200
Chicago, Illinois 60603
(312) 346-8000

July 17, 2003

CH1 10547422.2

FILED
JUL 17 2003
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
JUL 18 2003

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AMY WIGINTON and KRISTINE MORAN, individually and on behalf of all persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CB RICHARD ELLIS, <br><br> Defendant. | Case No. 02 C 6832 <br><br> Judge Andersen <br><br> Magistrate Judge Ashman |

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS' "EMERGENCY MOTION TO PREVENT THE FURTHER DESTRUCTION OF EVIDENCE AND FOR SANCTIONS FOR SPOLIATION OF EVIDENCE"

Defendant, CB Richard Ellis ("CBRE"), by its attorneys, respectfully submits its brief in opposition to Plaintiff's "Emergency Motion to Prevent the Further Destruction of Evidence and for Sanctions for Spoliation of Evidence."

## INTRODUCTION

On September 27, 2002, two days after filing the original complaint in this action, Plaintiffs' attorneys demanded that CBRE preserve literally *all* e-mails and other electronic files throughout the entire Company for potential discovery in this case. Apart from the fact that Plaintiffs' preservation request was vastly overbroad and not properly tailored to the issues in this case, complying with Plaintiffs' preservation demand would have been prohibitively expensive, both in terms of dollars and man hours. For these reasons, CBRE did not deviate from its regular e-mail backup system. Instead, on September 30, 2002, CBRE took the more focused approach of instructing all of its employees to comply with the Company's record retention policy and to retain all documents relating to Amy Wiginton, the original Plaintiff in this action.

Plaintiffs now claim that CBRE's failure to preserve all e-mails constitutes spoliation of evidence and warrants sanctions. Plaintiffs' motion should be summarily denied. As a threshold matter, far from constituting an "emergency" motion, it is untimely. The evidence indicates that Plaintiff Kris Moran and her counsel have long been in possession of CBRE's September 30, 2002 preservation communication. Yet, Plaintiffs chose to wait nearly eight months, and only after CBRE filed a motion for a protective order, to claim that CBRE should have done more.

Plaintiffs' motion also fails on the merits. Sanctions are not available under Rule 37 of the Federal Rules of Civil Procedure because CBRE has not violated any discovery order. They are equally unwarranted under the Court's inherent authority because CBRE did not destroy documents for the purpose of hiding adverse information. Rather, back-up tapes were overwritten in the regular course of business, in accordance with CBRE's tape rotation schedule.

Moreover, CBRE did not simply ignore Plaintiffs' preservation concerns. To the contrary, once it learned of those concerns from Plaintiffs' counsel, CBRE solicited their input in promulgating a revised preservation communication to its employees. In addition, CBRE agreed to preserve monthly back-up tapes on an ongoing basis (at a cost of $12,500 per month) and to produce select back-up tapes for review by Plaintiffs' IT experts. Far from constituting bad faith, CBRE's actions were eminently reasonable given the prohibitive cost of literal compliance with Plaintiffs' preservation demands.

Finally, the Court should deny Plaintiffs' alternative request to have CBRE bear the cost of electronic discovery in this case. Given the prohibitive cost of data retrieval (by Plaintiffs' own estimates to be anywhere from $575,000 to $762,000), and the lack of any evidence that the tapes will reveal compelling evidence, Plaintiffs, not CBRE, should bear the cost of electronic data recovery in this case. For all of these reasons, Plaintiffs' "emergency" motion for spoliation of evidence should be denied in its entirety.

# KEY FACTS

## I. CBRE's Network Infrastructure.

CBRE maintains a distributed infrastructure of approximately 125 network servers assigned to various offices. In addition, four routing servers are maintained at corporate IT headquarters in Newport Beach, California which route all incoming e-mail almost instantaneously to the local office servers. CBRE redistributes up to 8,000 incoming e-mails alone each hour to its local servers. Approximately 35% to 40% of those e-mail constitute unsolicited commercial e-mail (also known as "spam") (Def. 5/14/03 Mem. Ex. K, ¶ 2).[1]

E-mails are not stored on the four routing servers. Instead, all e-mails are stored locally on each local server. CBRE uses the "Grandfather-Father-Son" method to backup data stored on CBRE's servers, i.e., data is backed up on a daily basis Monday through Thursday, on a weekly basis on Friday, and on a monthly basis on the last day of each month. Daily tapes are overwritten on a daily basis. The weekly tapes are maintained for a period of one month before they are overwritten. The monthly tapes are retained for a period of one year before they are overwritten. Separate back-ups are performed for the e-mail servers and for the print and file servers. (A print and file server is the server used to share user data, such as files). (Def. 5/14/03 Mem. Ex, K, ¶ 3; Zourkhaev 2d Decl. ¶ 4, attached hereto as Exhibit A).

CBRE's computer back-up system is not an archiving system designed to preserve all information going into CBRE's computers. Rather, it is a disaster recovery system intended to take only "snapshots" of CBRE's computer files so that if a catastrophic event occurs, the

---

[1] Citations to materials attached to Defendant's May 14, 2003 memorandum of law in support of its motion for protective order (Doc. No. 21) appear as "(Def. 5/14/03 Mem. Ex. ___)." Citations to Plaintiffs' May 19, 2003 appendix (Doc No. 24) appear as "(Pl. 5/19/03 App. Ex. ___). Citations to Plaintiffs' June 11, 2003 supplement (Doc. No. 29) appear as "(Pl. 6/11/03 Suppl. ___). Citations to Plaintiffs' June 26, 2003 supplement (Doc. No. 35) appear as "(Pl. 6/26/03 Suppl. ___)." Materials not previously introduced are attached hereto as Exhibits A through E.

3

information from the immediately preceding period can be reloaded to get CBRE running again at the most minimal cost (Ex. A, ¶ 5).

CBRE provides Internet access to its employees on a Wide Area Network through a central fire-wall (which protects the Company from hackers). CBRE does not possess software that allows it to review and catalogue each employee's access of Internet sites from a central location. The cost of purchasing an application that would allow such review would have been approximately $175,000 per year in licensing fees (Def. 5/14/03 Mem. Ex. K, ¶ 7).

## II. Plaintiff's Overbroad And Prohibitively Expensive Preservation Demand.

On September 25, 2002, Plaintiff Amy Wiginton filed the original class action complaint in this case. Two days later, on September 27, 2002, Wiginton's counsel sent a letter to Walter Stafford, CBRE's former general counsel, requesting that CBRE retain a laundry list of Company-wide paper and/or electronic data or files (Pl. 5/19/03 App. Ex. 20) (the "Preservation Demand"). The Preservation Demand was not limited to sexually inappropriate e-mail and/or the files of specifically identified alleged harassers. Instead, the Preservation Demand directed to CBRE preserve:

> *all* e-mails, both sent and received, whether internally or externally; all word-processed files, including drafts and revisions; *all* spreadsheets, including drafts and revisions; all databases; *all* word-processed files, including drafts and revisions; all spreadsheets, including drafts and revisions; *all* databases; *all* presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint); *all* graphs, charts and other data calendaring, task management and Personal Information Software (such as Microsoft Outlook or Lotus Notes); *all* data created with the use of Personal Data Assistants (PDA's) ...; *all* data crated with the use of paper and electronic mail logging and routing software; *all* Internet and Web-browser generated history files, caches and "cookie" files generated at the work station of each employee and/or agent in CBRE's employ and on any and all backup storage media; and *any and all* other files generated by users through the use of computers and/or telecommunications, including but not limited to voice mail.

(*Id.*) (emphasis added).

On its face, the Preservation Demand was vastly overbroad and not properly tailored to the issues in this sex harassment case. Moreover, complying with the Preservation Demand would have been prohibitively expensive and burdensome. For example, to preserve "all e-mails, both sent and received, whether internally and externally," CBRE would have had to refrain from over-writing its back-up tapes. Because back-up tapes cost approximately $50, it would have cost CBRE approximately $12,500 a day ($50 x 125 servers x 2 back-ups for e-mail and file and print servers) to purchase additional back-up tapes in order not to overwrite daily back-up tapes. Even preserving just the monthly back-up tapes would have cost CBRE $12,500 a month (which would have added up to $125,000 by the end of July 2003).[2]

The only other way of retrieving e-mails would have been to look one by one at each employee's computer. Within the United States alone, CBRE has about 8,500 mailboxes, and approximately 7,000 active users (including both employees, partners and consultants). Assuming e-mails have not been deleted and remain retrievable,[3] there could be anywhere from 1,000 to 10,000 e-mails in each employee's mailbox for any given month. Although mailboxes are searchable (through use of terms, authors, recipients, etc.), the large number of spam e-mail containing sexual terms would have required CBRE's network specialists to spend at least several hours combing through each employee's saved e-mail to determine whether they had sent or received non-spam e-mail that contains or alludes to any sexual, pornographic or obscene content or image. This does not even take into account that inappropriate e-mails may or may not contain such sexually explicit text. Given that CBRE employs approximately 5,800 employees nationwide, it would have taken thousands of hours to review each employee's computer to

---

[2] Moreover, these figures do not take into account additional storage and administrative costs (Ex. A, ¶ 7).

[3] E-mails that have been deleted by the employee reside on the server for five days. After that, they are no longer retrievable (Def. 5/14/03 Mem. Ex. K, ¶ 5).

5

determine whether they had sent or received -- and saved -- non-spam e-mail that contains or alludes to any sexual, pornographic or obscene content or image (Def. 51/4/03 Mem. Ex. K, ¶¶ 5-6).

As another example of its unreasonably broad and burdensome scope, Plaintiff's Preservation Demand to have CBRE make a "mirror" evidentiary image copy of "each and every personal computer (and/or workstation)" would have required CBRE to replace the hard drives of all of its computers. Given that CBRE owns approximately 4,000 computers, and it costs approximately $300 to replace a hard drive, complying with that piece of Wiginton's preservation request alone would have cost CBRE $1,200,000 (Ex. A, ¶ 8).

Yet, despite its prohibitive costs, CBRE did not wholly ignore the Preservation Demand. Instead, just three days later, CBRE's Corporate Communications department, on behalf of CBRE's General Counsel, sent the following e-mail to all United States personnel:

> On September 25, 2002 CB Richard Ellis was served with a class action lawsuit filed in federal court in Chicago entitled Amy Wiginton vs. CB Richard Ellis, Inc. The purpose of this message is to remind you that you are to comply with the record retention policy of the company and that you are not to destroy any records of any type, e.g., notes, letters, memos, e-mails, etc., which pertain to Amy Wiginton, a former employee in the Oak Brook office of the Company. Should you have any questions regarding this message please contact me to discuss the matter. (Pl. 5/19/03 App. Ex. 29).

Because the letter was sent to all personnel, it would have been received by Plaintiff Kris Moran, who still worked for CBRE at the time.[4] Moran retained the Wexler Law Firm, counsel for Wiginton, on October 9, 2002 (*See* Ex. B). Although Plaintiffs have long been in possession of the September 30, 2002 communication to all employees,[5] they never complained of any

---

[4] Moran was terminated effective October 16, 2002 (Ans. to Am. Compl. ¶ 14).

[5] The fact that the September 30, 2002 e-mail provided by Plaintiffs to the Court has no bates number reveals that it did not come from CBRE's document production (Pl. 5/19/03 App. Ex. 29; Ex. C, Davidson Decl. ¶ 2).

6

inadequacy in CBRE's preservation efforts -- much less of evidence spoliation --- until nearly eight months later, and then only in reaction to CBRE's motion to limit discovery.

### III. CBRE's Good Faith Efforts To Address Plaintiffs' Preservation Concerns.

On February 20, 2003, Plaintiff propounded thirty-one documents requests on CBRE (Pl. 5/19/03 App. Ex. 5). Among other things, those requests sought:

- All electronic e-mail that contains or alludes to any sexual, pornographic or obscene content or image, an images of or commentary on women's bodies or other physical attributes (*Id.*, Request No. 8);

- All content downloaded from the Internet to any company computer containing descriptions or depictions of a sexual or pornographic nature, including but not limited to all depictions of men or women in various states of undress (*Id.*, Request No. 9);

CBRE objected to those requests based on the same concerns raised by Plaintiffs' Preservation Demand: complying with those requests would have been unduly burdensome and prohibitively expensive to CBRE.[6] When efforts to resolve the parties' discovery disputes proved unsuccessful, CBRE filed a motion for a protective order on May 14, 2003 (Doc. No. 21). Plaintiffs responded by filing a motion to compel, an "emergency" motion for sanctions for spoliation of evidence and an "emergency" motion to restriction communications with putative class members on May 19, 2003 (Doc. Nos. 22, 23, 27).

After receiving Plaintiffs' motions, CBRE made good faith efforts to balance the parties' competing interests. CBRE's counsel worked with Plaintiffs' counsel to jointly draft the following additional preservation communication, which was sent to all CBRE employees on May 30, 2002:

> As you are aware, CB Richard Ellis has been sued in federal court by a former employee alleging that sexual harassment has occurred in our offices nationwide.

---

[6] For example, the only way CBRE could have responded to Requests Nos. 8 and 9 would have been to examine the computers of each CBRE employee -- a task that would have entailed *over 20,000 hours of manpower to retrieve just a month's worth of information* (Def. 5/14/03 Mem. Ex. K, ¶¶ 7-8).

7

On September 30, 2002 we sent a message reminding you that you must comply with our records retention policy, and specifically that you are not to destroy any records of any type, including notes, letters, memos, e-mails, etc., which pertain to Amy Wiginton.

This message is a reminder that you must also retain any records (even if not specifically related to Amy Wiginton), including e-mails, videos, internet downloads, photographs, calendars and other writings, which contain or relate to any sexually inappropriate or otherwise offensive material. In addition, you should not destroy any records which are related to inappropriate conduct of a sexual nature.

If you have knowledge of such inappropriate or offensive material, please contact Karen Whitney in Human Resources, immediately. She will instruct you regarding the appropriate action to be taken regarding the material. If you know of any such material having been deleted or destroyed since September 30, 2002, or if you have any questions whether a particular item should be retained please contact Ms. Whitney, immediately. (*See* Ex. D).

In addition, prior to the June 12, 2002 hearing on the parties' discovery motions, CBRE agreed to Plaintiffs' request to preserve all month-end backup tapes on a going forward basis. CBRE also agreed to Plaintiffs' proposal to produce backup tapes for the months of June, 2002, August 2002 and September, 2002 from select offices for examination by Plaintiffs' IT expert (6/12/03 Tr. p. 12).

On June 12, 2003, the Court denied Plaintiffs' motion to compel nationwide discovery. The Court agreed with CBRE that discovery should be conducted in stages and limited initially to the offices where harassment was alleged to have occurred (6/12/03 Tr. pp. 25-33).

## ARGUMENT

**I.  The Court Should Deny Plaintiffs' Motion For Sanctions.**

The gravamen of Plaintiff's spoliation claim is that CBRE should be sanctioned for failing to retain all electronic e-mails following its receipt of the Preservation Demand. Rhetoric aside, Plaintiffs fall far short of establishing that sanctions are justified in this case.

## A. Plaintiffs' Motion For Sanctions Is Untimely.

As a threshold matter, Plaintiffs waited far too long to bring this "emergency" motion for sanctions. Plaintiff Moran received CBRE's original preservation communication on or around September 27, 2002. Thus, Plaintiffs have long been aware that CBRE's original preservation notice was limited to Amy Wiginton.[7] Yet, Plaintiffs waited nearly eight months, until May 2003, to bring this "emergency" motion, and then only in response to CBRE's motion to limit discovery. Plaintiffs' motion should be denied on that basis alone. *See Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 (7th Cir. 1994) (unreasonable delay may render motion for sanctions untimely); *Media Communications, Inc. v. MultiMedia, Sign Up, Inc.*, 1999 WL 1212652 at *4 (N.D. Ill. Dec. 14, 1999) ("Of primary significance [in denying motion for sanctions for spoliation] is the untimeliness of Media's motion").

## B. Because CBRE Has Not Violated Any Discovery Order, Sanctions Are Not Available Pursuant To Fed. R. Civ. P. 37.

Plaintiffs' plea for sanctions also fails on the merits. Contrary to Plaintiffs' suggestion (Pl. 5/19/03 Mem. at 5), sanctions are not available pursuant to Rule 37 of the Federal Rules of Civil Procedure. "The rule's plain language limits its applicability to situations where a court order has been violated." *Brandt.*, 30 F.3d at 756. "Rule 37 sanctions, then, are appropriate here if, and only if, [CBRE] violated a discovery order." *Id.*

No preservation order was in place at the time Plaintiffs filed their motion. Moreover, Plaintiffs do not claim that CBRE has failed to comply with the Court's preservation order entered on June 12, 2003. Therefore, Plaintiffs cannot seek sanctions pursuant to Rule 37.

---

[7] Moran appears to have been forwarding all communications related to this lawsuit to her counsel. *See, e.g.*, Pl. 5/19/03 App. Ex. 30 (10/1/02 e-mail from Ms. Moran forwarding a message from corporate communications related to the filing of the original complaint).

## C. Plaintiffs Have Failed To Establish That CBRE Destroyed Any Documents In Bad Faith.

The sanctions sought by Plaintiffs are equally unavailable pursuant to the Court's inherent authority. "Because a default judgment deprives a party of a hearing on the merits, the harsh nature of this sanction should usually be employed in extreme situations where there is evidence of willfulness, bad faith, or fault by the non-complying party." *Diersen v. Walker*, 2003 WL 21317276 at *3 (N.D. Ill. June 6, 2003). *See also Long v. Steepro*, 213 F.3d 983, 986 (7th Cir. 2000) (the "ultimate" sanction of default "is reserved for cases in which the offending party had demonstrated willfulness, bad faith or fault"); accord *Aura Lamp & Lighting, Inc. v. International Trading Corp.*, 325 F.3d 903, 909 (7th Cir. 2003); *In re Golant*, 239 F.3d 931, 936 (7th Cir. 2001).

Similarly, to draw an adverse inference from the automatic deletion of electronic files, the Court must first conclude "that the documents were destroyed in 'bad faith,' i.e., that the document destruction was 'for the purpose of hiding adverse information.'" *Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553, 558 (7th Cir. 2001) (quoting *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998)); *see also Park v. City of Chicago*, 297 F.3d 606, 616 (7th Cir. 2002) ("An employer's destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse to the employer's case. ... Rather, to draw such an inference, the employer must have destroyed the documents in bad faith."). "Thus, 'the crucial element is not that evidence was destroyed but rather the reason for destruction. *Park*, 297 F.3d at 616 (quoting *S.C. Johnson & Son, Inc. v. Louisville & National Railroad*, 695 F.2d 253, 258 (7th Cir. 1982)).

There is simply no evidence that CBRE acted with the requisite willfulness or bad faith to justify the requested sanctions. To the contrary, CBRE destroyed the tapes in the regular course

10

of business, in accordance with CBRE's tape rotation schedule. "These circumstances suggest that the documents were destroyed under routine procedures, not in bad faith, and thus cannot sustain the inference that [CBRE's] agents were conscious of a weak case." *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir. 1985); *accord Diersen*, 2003 WL 21317276 at *4. Indeed, if the two sexually explicit e-mails sent by Plaintiff Moran to a male co-worker are any indication of what may have existed in her mailbox alone, the automatic deletion of her e-mails may have actually hindered CBRE's case (Ex. C, Tab 1).

Contrary to Plaintiffs' contention, sanctions are not warranted simply because CBRE did not fully comply with the Preservation Demand. First of all, the Preservation Demand was hopelessly overbroad and burdensome. Rather than requesting CBRE to preserve specific categories of e-mails, or the computers of specific individuals, it instructed CBRE to preserve *all* e-mails and copy *all* hard drives that could possibly contain relevant information. As one court has stated, "to hold that a corporation is under a duty to preserve all e-mail potentially relevant to any future litigation would be tantamount to holding that the corporation must preserve all e-mail. This would be especially burdensome where the e-mail system apparently was used for routine communication...." *Concord Boat Corp. v. Brunswick Corp.*, 1997 WL 33352579 at *4 (E.D. Ark. Aug. 29, 1997).[8]

Moreover, CBRE did not simply ignore Plaintiffs' preservation concerns. Rather, on September 30, 2002, just three days after receiving the Preservation Demand, CBRE instructed its

---

[8] Plaintiffs' claim that searching employees' mailboxes would not be burdensome simply because CBRE's IT department has the ability to search individual mailboxes (Pl. 6/11/03 Supp. at 2), is disingenuous. First, Plaintiffs ignore the time that it would require to search a particular mailbox. For example, Zourkhaev testified that, in prior searches, the large amount of spam meant that "I had to go in and manually look through every e-mail because obviously spam should not be considered. So I had to go through every mail and check to see if it's actually spam or if it's actually reply or what have you." (Ex. E, Zourkhaev Dep. 77). Second, Plaintiffs ignore the fact that literal compliance with the Preservation Demand would have required CBRE to search all 8,500 of its mailboxes, which would have taken thousands of hours (Def. 5l/4/03 Mem. Ex. K, ¶¶ 5-6).

11

employees to comply with its record retention policies and to preserve all documents relating to Ms. Wiginton, the only Plaintiff in the case at the time (Ex. B). Further, after Plaintiffs raised concerns that the September 30, 2002 letter did not adequately address their preservation concerns, CBRE worked with Plaintiffs to jointly draft and promulgate a revised preservation communication to all CBRE employees (Ex. D). Finally, at a cost of $12,500 per month, CBRE has agreed to preserve monthly tapes for the time being on a ongoing basis and to provide select monthly tapes for review by Plaintiffs' IT expert. CBRE's actions "were not abusive, contumacious, or without satisfactory explanation." *Long v. Steepro*, 213 F.3d 983, 988 (7th Cir. 2000) (setting aside sanction of dismissal for discovery abuses).

None of the authority cited by Plaintiffs dictates a contrary result. In *Dultz v. Dontech, Inc.*, 1996 U.S. Dist. LEXIS 13119 (N.D. Ill. Sep. 9, 1996), the court found the defendant at fault for failing to retain specific paper records after being notified by plaintiff's counsel that there were documents in plaintiff's desk and work area that were relevant to the lawsuit. *Id.* at *4-5.[9] Thus, plaintiff's preservation request was specific and easy to comply with. By contrast, in this case, the Preservation Demand was hopelessly overbroad and would have imposed undue burden and expense. *See, e.g., Byers v. Illinois State Police*, 2002 WL 1264004 at *10 (N.D. Ill. June 3, 2002) ("the Court is not persuaded by the plaintiffs' attempts to equate traditional paper-based discovery with the discovery of e-mail files. Several commentators have noted important differences between the two.").

Similarly, in *Rush v. Artuz, Superintendent, Green Haven Correction Facility, et al.*, 2003 U.S. Dist. LEXIS 7158 (S.D.N.Y. April 3, 2003), the magistrate judge recommended an adverse inference jury charge as a sanction because the defendant had violated a court order to preserve

---

[9] The *Dontech* court did not impose any sanctions, but instead referred the matter to Judge Gottschall to determine what, if any, sanctions should be imposed, as a result of the defendant's conduct. *Id.* at *9 & n.4

12

specific, isolated, surveillance videotapes. *Id.* at *12-19. By contrast, in this case, CBRE has violated no preservation order, and the documents Plaintiffs sought in their Preservation Demand are far more voluminous in nature.[10]

### D. There Is No Evidence That Plaintiffs Have Been Prejudiced By Any Destruction Of Evidence.

Moreover, there is simply no evidence that the loss of back-up tapes between September 2002 and June 2003 has in any way prejudiced Plaintiffs' case. While Plaintiffs have submitted affidavits containing vague assertions that pornographic e-mail was "routine," discovery thus far has revealed only four e-mails that contained sexually explicit material, *two of which were sent by Plaintiff Moran to a male co-worker* (Ex. C, Tab 1). Thus, there is simply no basis to infer that mounds of inappropriate e-mail were destroyed when the back-up tapes were overwritten. As the Court stated in *Concord Boat Corp.*:

> It would simply be inappropriate to give an adverse inference instruction based upon speculation that deleted e-mails would be unfavorable to Defendant's case. Without some evidence, direct or circumstantial, of the unfavorable content of deleted e-mails, the Court simply cannot justify giving the adverse inference instruction.

*Concord Boat Corp.*, 1997 WL 33352759 at *7). *See also Media Communications, Inc.*, 1999 WL 1212652 at *3-4 (declining request for default judgment as sanction for spoliation of evidence where Plaintiff failed to show that absence of evidence would prejudice its case).

### E. The Cost Of Producing Electronic Discovery Should Be Borne By Plaintiffs, Not Defendants.

As a last resort, Plaintiffs request that CBRE should pay for the cost of data recovery by Plaintiffs' forensic data recovery experts. Plaintiffs' IT expert, Stuart Hanley, estimates the cost

---

[10] As for plaintiffs' remaining cases, all *declined* to award any sanctions. *See Remee Products Corp. v. Sho-Me Power Electric Coopeartive*, 2002 U.S. Dist. LEXIS 19700 at *27-30 (S.D.N.Y. Oct. 17, 2002) (declining to grant summary judgment for spoliation of evidence); *Bullen et al. v. Thanasouras*, 1993 U.S. Dist. LEXIS 13944 at * *3-5 (N.D. Ill. Oct. 5, 1993) (declining to enter default judgment or for specific findings concerning alleged willful destruction of evidence).

13

of extracting and producing data from CBRE's back-up tapes to be "from approximately $23,000 to $31,000 for five offices to $46,000 to $61,000 for ten offices." (Pl. 6/26/03 Suppl. at 2).

Mr. Hanley's proposed cost estimate (even if accurate) demonstrates why cost of electronic production should be shifted to Plaintiffs in this case. As CBRE has 125 offices, Plaintiffs' request ultimately would require CBRE to pay anywhere from $575,000 ($46,000 for ten offices x 12.5) to $762,500 ($61,000 for ten offices x 12.5), on the off chance that its back-up tapes might reveal some inappropriate e-mail communication. This astronomical cost should be borne by Plaintiffs. *See, e.g., Byers*, 2002 WL 1264004 at *11 (requiring plaintiffs to bear the burden of cost of searching backup tapes where the cost of responding to plaintiffs' request would be between $20,000 and $30,000); *Rowe Entertainment Inc. v. William Morris Agency*, Inc., 205 F.R.D. 421, 431-32 (S.D.N.Y. 2002) (requiring plaintiffs to bear the cost of electronic discovery where costs to produce e-mail ran from $24,000 to $87,000), *aff'd*, 2002 WL 976713 (S.D.N.Y. May 9, 2002); *Concord Boat Corp.*, 1997 WL 33352579 at * 9 (requiring plaintiffs to pay for the cost of searching backup tapes because it "was obvious to the Court that recreating the computing environment at the time the backup tape was created would involve significant cost. Furthermore, the potential gains are questionable."). This is particularly true here, where "there has certainly been no showing that the e-mails are likely to be a gold mine." *Rowe*, 205 F.R.D. at 430. *See also Buyers*, 2002 WL 1264004 at * 11 (the less likely that archived e-mails contain relevant information, the more unjust it is to make the responding party bear the cost of production).

Plaintiffs' reliance on *Zubulake v. UBS Warburg*, 2003 U.S. Dist. LEXIS 7939 (S.D.N.Y. May 13, 2003), is misplaced. Foremost, the total cost of production in this case would far exceed the $175,000 estimated cost of production in the *Zubulake* case. More fundamentally, the Court in *Zubulake* did *not* require defendants to bear the cost of production. Instead, the court required defendant to restore and produce responsive documents from a small sample of tapes, reserving

14

the question of who would ultimately have to pay until the content of those tapes was analyzed: "by requiring a sample restoration of backup tapes, the entire cost-shifting analysis can be grounded in fact rather than guesswork." *Id.* at *48-49.

At a minimum, therefore, the Court should follow the approach set forth in *Zubulake* in this case and reserve the question of cost allocation for the restoration of electronic information until after the first batch of electronic tapes produced by CBRE has been extracted and analyzed by the parties.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' "emergency" motion for sanctions should be denied in its entirety.

                                        Respectfully submitted,

                                        CB RICHARD ELLIS

                                        By _____
                                                One of its Attorneys

Brenda H. Feis
Sari M. Alamuddin
Deborah S. Davidson
SEYFARTH SHAW
55 E. Monroe St., Suite 4200
Chicago, IL 60603
(312) 346-8000

July 17, 2003

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a true and correct copy of the foregoing Defendant's Brief In Opposition To Plaintiffs' "Emergency Motion To Prevent The Further Destruction Of Evidence And For Sanctions For Spoliation Of Evidence," was served upon the following counsel of record via messenger on this 17th day of July, 2003:

        Elizabeth Fegan Hartweg
        THE WEXLER FIRM
        One North LaSalle Street
        Suite 2000
        Chicago, Illinois 60602

_____
        Brenda H. Feis

See Case File for Exhibits