# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | Martin C. Ashman |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6832 | **DATE** | 10/24/2003 |
| **CASE TITLE** | | Amy Wiginton vs. Richard Ellis | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and recommendation recommending that plaintiffs' motion for sanctions for spoliation of evidence [22-2] be denied without prejudice is hereby entered of record.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | **4** number of notices | **Document Number** |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | OCT 2 7 2003 date docketed | 62 |
| | Notified counsel by telephone. | | | | |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | 10/24/2003 date mailed notice | |
| ✓ | Copy to judge/magistrate judge. | | | | |
| | IS | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 03 OCT 24 PM 4:21 Date/time received in central Clerk's Office | IS mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **AMY WIGINTON**, individually and on behalf of all persons similarly situated, ) ) ) | |
| Plaintiff, ) ) | Case No. 02 C 6832 |
| ) | Judge Wayne R. Andersen |
| v. ) ) | |
| **CB RICHARD ELLIS,** ) ) | Magistrate Judge Martin C. Ashman |
| Defendant. ) ) | |

## REPORT AND RECOMMENDATION

Plaintiff filed this class action complaint against Defendant CB Richard Ellis, Inc.

alleging sexual harassment. Although Plaintiff requested that Defendant retain all electronic

materials and records relevant to the lawsuit, Defendant followed its normal document retention

and destruction policies. This matter is now before the Court on Plaintiffs' Emergency Motion to

Prevent the Further Destruction of Evidence and for Sanctions for Spoliation of Evidence.[1] For

the reasons explained below, the Court finds that Plaintiffs' motion should be denied.

## I. Background

Plaintiff Amy Wiginton filed a class action complaint on September 25, 2002, alleging a

nationwide pattern and practice of sexual harassment at the offices of Defendant CB Richard

---

[1] This matter comes before this Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1 for a report and recommendation.

62

Ellis, Inc. ("CBRE"). In June of this year, Plaintiff Wiginton was granted leave to add Kristine Moran as a plaintiff.[2] Class certification has not been granted.

Two days after Plaintiff filed her class action complaint, Plaintiff's attorneys sent a four page letter (the "September 27 Letter") to CBRE's general counsel, asking that CBRE:

> not destroy, conceal or alter any paper or electronic files and other data generated by and/or stored on CBRE's computers and storage media . . . or any other electronic data, such as voice mail *that relates in any way to the subject matter of this litigation, or any information which is likely to lead to the discovery of admissible evidence.* . . . This issue is especially important here because CBRE controls virtually all of the documents that will be at issue.

(emphasis added).

The September 27 Letter described electronic data and storage media which would be subject to the discovery requests including: 1) types of files; 2) on-line data storage; 3) off-line data storage; 4) data storage devices that were replaced; 5) fixed drives on personal computers and workstations; 6) programs and utilities; 7) system modification logs; 8) personal computers; and 9) evidence created subsequent to the letter. Specifically, Plaintiff instructed CBRE:

> to preserve all e-mails, both sent and received, whether internally or externally; all word-processed files, including drafts and revisions; all spreadsheets, including drafts and revisions; all databases; all presentation data or slide shows produced by presentation software . . . all Internet and Web-browser-generated history files, caches and "cookies" files generated at the work station of each employee and/or agent in CBRE's employ and on any and all backup storage media . . . . Further, you are to preserve any log or logs of network use by employees or otherwise . . . and to preserve all copies of your backup tapes and the software necessary to reconstruct the data on those tapes, so that there can be made a complete, bit-by-bit "mirror" evidentiary image copy of the storage media of each and every personal computer (and/or workstation) and network server in CBRE's control and custody, as well as image copies of all hard drives retained and no longer in service, but in use at any time from January 1, 1990 to the present.

---

[2] For consistency, we will continue to refer to Plaintiff in the singular tense.

Plaintiff also requested that CBRE forward a copy of the September 27 Letter to all persons with custodial responsibility for any of the items referred to in the letter.

CBRE's outside counsel briefly responded on October 2, 2002, "I am in receipt of your September 27, 2002 letter to [CBRE's general counsel]." In the meantime, on September 30th, CBRE sent out an e-mail to all United States personnel, instructing them to comply with the CBRE record retention policy and to not destroy any records of any type that "pertain to Amy Wiginton." In February of 2003, Plaintiff sent out her first request for production of documents. CBRE responded that many of the requests were overbroad, but it eventually produced documents in late April. Included in the documents was the September 30th e-mail sent out by CBRE to its employees.

The parties continued their discovery disputes but eventually jointly drafted a preservation communication that was sent to CBRE employees on May 30, 2003, via e-mail. In part, the e-mail provided:

> This message is a reminder that you must also retain any records (even if not specifically related to Amy Wiginton), including e-mails, videos, internet downloads, photographs, calendars and other writings, which contain or relate to any sexually inappropriate or otherwise offensive material. In addition, you should not destroy any records which are related to inappropriate conduct of a sexual nature.

CBRE also agreed to produce June, August, and September 2002 backup tapes from select offices. Next, on June 18, 2003, this Court entered an agreed preservation order, which requires CBRE to retain and not destroy month end backup tapes, or data storage devices or fixed drives on personal computers of any employee who has been accused of sexual harassment. Prior to the June 18th agreed preservation order, however, CBRE continued its normal document retention and destruction polices, did not inform its director of network services that any electronic

- 3 -

information should be retained, and never informed its employees about the need to retain any documents that might be relevant to the lawsuit, as opposed to any documents dealing specifically with Amy Wiginton. Backup tapes of CBRE's e-mail system from September 2001 to May 2002 were destroyed and former employees' hard drives (including that of Wiginton's former supervisor) were not saved.

To understand what was destroyed, it is necessary to briefly discuss CBRE's network infrastructure. The infrastructure consists of approximately 125 network servers assigned to various offices. Four routing servers maintained at corporate IT headquarters in Newport Beach route all incoming e-mail to the local servers. The four routing servers redistribute up to 8,000 incoming e-mails each hour to local servers. An estimated 35 to 40% of those e-mails are unsolicited commercial e-mail (i.e., "spam"). CBRE uses a method called the "Grandfather-Father-Son" method to backup data stored on CBRE's servers. Under this method, data is backed up on a daily basis Monday through Thursday, on a weekly basis on Friday, and on a monthly basis on the last day of each month. Daily data tapes are overwritten on a daily basis, weekly tapes are maintained for one month before they are overwritten, and monthly tapes are retained for one year before they are rewritten. Separate backups are performed for the e-mail servers and for the print and file servers.

CBRE's backup system is not an archiving system that would preserve all information going into CBRE's computers. Rather, it is a disaster recovery system that takes only snapshots of CBRE's computer files so that if a catastrophic event occurs, the information from the immediately preceding period can be reloaded. CBRE's director of network services testified that each backup tape takes approximately six to twelve hours per server to restore. Therefore, he

estimates that to restore just the tapes for the last day of each month for all 125 local servers for one year would take between 9,000 and 18,000 hours. Each backup tape costs approximately $50, so it would cost $12,500 a day to not overwrite daily backup tapes.[3] Defendant states that besides the e-mail backup tapes, the only other way to retrieve e-mails is to look one by one at each employee's computer which would take thousands of hours.

With respect to e-mail backup tapes, Plaintiff's expert has stated that it would take between $23,000 and $31,000 for five offices and from $46,000 to $61,000 for ten offices to produce data from monthly backup tapes for three months. Specifically, the expert can restore and extract users from the archive tapes, perform searches on the data for interoffice mail messages that contain certain words, perform searches for messages that contain different file attachment types,[4] and then load the results of the searches onto an Internet-based system that will allow Plaintiff's and Defendant's counsel to access the documents. Defendant's counsel would be able to review the documents for privilege and relevance before the documents were made available to Plaintiff's counsel. (See generally Suppl. to Pl.'s Mot. to Prevent Further Destruction of Evid. at Ex. A.)

Plaintiff filed the instant motion as an emergency motion on May 19, 2003. Deeming the motion to not be an emergency, this Court allowed Plaintiff to supplement the motion with

---

[3] The figure for preserving backup tapes in all offices is calculated as follows: ($50 per tape x 125 servers x 2 backups for e-mail and file and print servers) = $12,500. (Def.'s Br. in Opp'n at 5.) It seems to follow then that the cost for preserving just e-mail backup tapes would be $6250 a day to preserve the daily tapes or $6250 a month to preserve just the monthly tapes ($50 per tape x 125 offices x 1 e-mail backup tape). This number would be substantially reduced if just backup tapes for the offices named in the complaint were the only backup tapes saved.

[4] According to the expert, pornographic material is typically contained within certain file types such as GIF or JPEG files.

additional briefing. Plaintiff originally asked the Court to required CBRE to retain all electronic evidence, including e-mails, and to cease deleting e-mails, and for sanctions for spoliation of evidence, but because the document retention issue has been dealt with in the agreed preservation order of June 18th, the only issue in front of the Court is the portion of the motion asking for sanctions. Plaintiff asks that the Court sanction CBRE for spoliation of evidence by either granting the entry of a default judgment, giving an adverse jury instruction at trial, or barring Defendant from claiming that its male employees did not circulate or show pornographic, lewd and inappropriate e-mail to members of the putative class. Plaintiff also asks that CBRE be required to pay the costs for Plaintiff's forensic data recovery expert to retrieve e-mail from the existing backup tapes.

## II.   Discussion

Courts have the inherent power to impose sanctions for abuse of the judicial system, including the failure to preserve or produce documents. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991); *Barnhill v. U.S.*, 11 F.3d 1360, 1368 (7th Cir. 1993).[5] The power is not based in rule or statute, but rather in the ability of the courts to manage their own dockets and ensure the

---

[5] Courts are also authorized to sanction parties for discovery violations pursuant to Rule 37. However, such sanctions are only available where a court order or discovery ruling of some sort has been violated. *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 n.7 (7th Cir. 1994) (noting that what constitutes an "order" for purposes of imposing sanctions has been broadly interpreted). In this case, no order was in place directing CBRE to preserve any electronic evidence. For this reason, we proceed under the court's inherent authority to sanction for failure to preserve documents, noting that the analysis is essentially the same under either alternative. *See Danis v. USN Communications, Inc.*, No. 98 C 7482, 2000 WL 1694325, at *30 (N.D. Ill. Oct. 20, 2000) (quoting *Cobell v. Babbit*, 37 F. Supp. 2d 6, 18 (D.D.C. 1999)).

expeditious resolution of cases. *Barnhill*, 11 F.3d at 1367 (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)).

## A.    CBRE's Duty to Preserve Relevant Information

Before imposing sanctions on CBRE for spoliation or destruction of evidence, we first must determine what its obligation to preserve the electronic data entailed. A party has a duty to preserve evidence over which it had control and "reasonably knew or could reasonably foresee was material to a potential legal action." *China Ocean Shipping (Group) Co. v. Simone Metals Inc.*, 1999 WL 966443, at *3 (N.D. Ill. Sept. 30, 1999) (collecting cases). Federal Rule of Civil Procedure 26 states that "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). A party must preserve evidence that is properly discoverable under Rule 26. Discoverable evidence includes electronic data such as e-mail. *Byers v. Illinois State Police*, No. 99 C 8105, 2002 WL 1264004, at *10 (N.D. Ill. June 3, 2002).

A party does not have to go to "extraordinary measures" to preserve all potential evidence. *China*, 1999 WL 966443, at *3. It does not have to preserve every single scrap of paper in its business. *Danis v. USN Communications, Inc.*, No. 98 C 7482, 2000 WL 1694325, at *32 (N.D. Ill. Oct. 20, 2000). But a party must preserve evidence that it has notice is reasonably likely to be the subject of a discovery request even before a request is actually received. *Cohn v. Taco Bell Corp.*, No. 92 C 5852, 1995 WL 519968, at *5 (N.D. Ill. Aug. 30, 1995); *Wm. T. Thompson, Co. v. Gen. Nutrition Corp.*, 593 F. Supp 1443, 1455 (D.C. Cal. 1984);. Notice may be received before a complaint is filed if a party knows that litigation is likely to begin, or a party

may be alerted by the complaint that certain information is likely to be sought in discovery. *Cohn*, 1995 WL 519968, at *5.

In their discussion of what documents CBRE should have preserved, the parties spend much of their time discussing the September 27 Letter. CBRE argues that the September 27 Letter reminding it to preserve evidence was "hopelessly overbroad and burdensome," and therefore it did not have to comply with it. Plaintiff argues that CBRE had some type of duty to respond to the letter if did not intend to comply with it. Both parties miss the mark.

First, the September 27 Letter was not as broad as CBRE would have us believe. The letter referred to documents that relate "in any way to the subject matter of this litigation, or any information which is likely to lead to the discovery of admissible evidence. . ." and then it discussed every category of electronic data that might contain relevant documents. It did not request that CBRE keep every single e-mail or copy every single computer, just that CBRE retain relevant documents.

Next, CBRE did not have a duty respond to or to comply with the September 27 Letter. Rather, the September 27 Letter is significant because it alerted CBRE to the types of electronic information (within the realm of all relevant documents) that were likely to be requested during discovery. Ultimately, CBRE's duty was not to comply with the September 27 Letter, but to preserve evidence that it had notice would likely be the subject of discovery requests. CBRE cannot now claim that it did not know that electronic data (such as e-mails or Internet use records) were likely to be the subject of discovery requests.

CBRE also argues that it complied with the spirit of the September 27 Letter (again missing the point that its duty is to preserve all documents that it has notice are relevant) because

- 8 -

it sent out one e-mail requiring its employees follow normal record retention policies and to keep all documents relating to Amy Wiginton, the only plaintiff in the case at the time. CBRE's decision to only retain documents relating to Amy Wiginton, however, lacked the appropriate scope. *See Diersen v. Walker*, No. 00 C 2437, 2003 WL 21317276, at *5 (N.D. Ill. June 6, 2003) ("A party cannot destroy documents based solely on its own version of the proper scope of the complaint.") Prior to this case being filed, CBRE was served with Wiginton's charge of discrimination filed with the Illinois Department of Human Rights which detailed the alleged harassment that Wiginton was subjected to which included allegations relating to e-mail. CBRE thus had notice that electronic evidence would be requested. Next, the class action complaint was filed. Although CBRE emphasizes the fact that Wiginton was the only plaintiff named in the complaint, the complaint discussed the names of supervisors who were alleged harassers and gave details about alleged harassment in offices other than the one in which Wiginton was employed. CBRE acknowledges this in its motion for a protective order filed on May 14, 2003, when it asked the court to limit discovery to a small number of offices: "Plaintiff's class complaint identifies, at most, ten alleged harassers (five managers) in four offices." (Def.'s Mem. in Supp. of its Mot. For Protective Order). CBRE thus had notice that more people than Wiginton and her supervisor were involved, and that more offices than just the office in which Wiginton worked were at issue. Therefore, it was on notice that documents relating to people other than Wiginton would be requested. Plaintiff's September 27 Letter and February 2003 document requests further notified CBRE of the types of documents (e-mail and Internet downloads) that it expected would be produced.

At the very least, CBRE should have initially retained all relevant documents relating to the ten alleged harassers. And it should have retained relevant documents in the Oak Brook office (where Wiginton worked), and the other identified offices, not just documents that "pertain[ed] to Amy Wiginton." While we do not want to discourage parties from entering into agreements for fear they could later be used against them, in this case, the agreed preservation communication sent to all CBRE employees at the end of May reflects CBRE's duty to preserve documents: "you must also retain any records (even if not specifically related to Amy Wiginton), including e-mails, videos, internet downloads . . . which contain or relate to any sexually inappropriate or otherwise offensive material. . . ." Additionally, CBRE had a duty to preserve the computer hard drives, e-mail accounts, and internet records of anyone who left the company who had been accused (formally or informally) of sexual harassment or misconduct. Or, if this were cost prohibitive, it could have searched the computer for sexually inappropriate or otherwise offensive material before destroying the other data it contained and reusing the computer.

CBRE's argument that preserving relevant data would be too cost prohibitive is not entirely persuasive. As discussed, CBRE did not have the duty to preserve every electronic record, only relevant information. We find not credible CBRE's claims that it would require thousands and thousands of hours to search through electronic data for relevant documents. For example, with respect to e-mails, certainly filters exist to separate spam from non-spam e-mails. And within the remaining non-spam e-mails, CBRE's IT representative testified that the IT department can conduct searches for e-mails containing particular key "sexual" words when requested to do so by the human resources department. They could also search certain file types

that are likely to contain images, some of which may be pornographic or sexually explicit. Plaintiff's expert also testified that it is possible to search through e-mails to find sexually explicit terms and images. The fact that such searches might not have turned up *all* sexually explicit e-mails does not excuse CBRE from looking for *any* e-mails.

We find that CBRE had the duty to preserve relevant electronic documents that were likely to be the subject of discovery requests, had knowledge of this duty, and that it wilfully and intentionally did not fulfill this duty.

## B. Sanctions

CBRE gives a variety of reasons why Plaintiff's request for sanctions should not be granted. Curiously enough, it never argues that the documents it destroyed were not discoverable, were not relevant, or would not have been reasonably calculated to lead to the discovery of admissible evidence had they been requested.

CBRE argues that Plaintiff's motion for sanctions for spoliation of evidence should be denied because it was not filed in a timely manner. *See c.f. Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 (7th Cir. 1994) (motion for sanctions under Rule 37 must be brought in timely manner); *Media Communications v. Multimedia, Sign Up, Inc.*, No. 99 C 5009, 1999 WL 1212652, at *3 (N.D. Ill. Dec. 14, 1999) (citing Illinois state law). CBRE states that Plaintiff knew that the September 29 e-mail instructed its employees to follow normal document retention policies and to not destroy documents pertaining to only to Wiginton and that if this was insufficient, Plaintiff should have objected sooner. We find, however, that even if Plaintiff was aware of CBRE's e-mail of September 29th, Plaintiff had no reason to think that CBRE was not taking other

affirmative steps to fulfill its duty to preserve relevant information, such as informing its computer department to search for relevant material before deleting backup tapes. We find that this motion for sanctions was timely brought for this reason, and because after becoming aware of the situation, Plaintiff tried to resolve these issues with Defendant before bringing the motion to prevent the further destruction of documents and for sanctions.

Turning then to the question of whether sanctions are warranted, we first find that a default judgment is not warranted. A default judgment, or conversely, dismissal of an action, are harsh sanctions that should only be employed "in extreme situations where there is evidence of willfulness, bad faith or fault by the noncomplying party." *Danis*, 2000 WL 1694325, at *33. Wilfulness, like bad faith, is "associated with conduct that is intentional or reckless. . . ." *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 1997). Fault does not refer to the noncomplying party's subjective motivation, but rather describes the reasonableness of the conduct. *Langley v. Union Elec. Co.*, 107 F.3d 510, 514 (7th Cir. 1997). Fault may be evidenced by negligent actions or a flagrant disregard of the duty to preserve potentially relevant evidence. *Diersen*, 2003 WL 21317276, at *5. CBRE's actions do not constitute an extreme situation which would require such a harsh sanction. This case is distinguishable from cases in which the only existing piece of evidence was destroyed. *See e.g. Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224-25 (7th Cir. 1992) (affirming directed verdict for plaintiffs where defendant was at fault for failing to preserve evidence and plaintiffs were irreparably prejudiced). Justice is best served by hearing cases on their merits except in limited circumstances. *Schilling v. Walworth County Park & Planning Comm'n*, 805 F.2d 272, 275 (7th Cir. 1986). This case should be heard on its merits.

Next, in order to draw an inference that the documents favored Plaintiff, we must first find that the documents were destroyed in "bad faith."[6] *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998). "Thus, '[t]he crucial element is not that evidence was destroyed but rather the reason for the destruction.'" *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002) (quoting *S.C. Johnson & Son, Inc. v. Louisville & Nahsville R.R. Co.*, 695 F.2d 253, 258 (7th Cir. 1982)). The court should look to the "facts surrounding [the] destruction" to determine if they "support an inference of bad faith." *S.C. Johnson & Son, Inc.*, 695 F.2d at 259.

In this case, the facts surrounding the destruction of the documents indicate that the documents were destroyed in bad faith. First, whether the documents were destroyed according to regular document retention procedures has been used as a factor to determine the reason for the destruction of the documents. *See Jeffries v. Chicago Transit Auth.*, 770 F.2d 676, 681 (7th Cir. 1985) (finding that destruction of documents through a business retention schedule did not impute any bad faith or consciousness of guilt where the destruction did not violate federal regulations and defendant was not on notice that lawsuit would be filed against it). However, once a party is on notice that specific relevant documents are scheduled to be destroyed according to a routine document retention policy, and the party does not act to prevent that destruction, at some point it has crossed the line between negligence and bad faith. At that point,

---

[6] Effectively, the bad faith destruction of documents means that the documents were destroyed "for the purpose of hiding adverse information." *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998). More than mere speculation is necessary to find that the documents contained adverse information, *Rummery v. Illinois Bell Tele. Co.*, 250 F.3d 553, 558 (7th Cir. 2001), but the court may look at the circumstances surrounding the destruction to determine if the non-producing party acted in bad faith. *S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R. Co.*, 695 F.2d 253, 259 (7th Cir. 1982). Because the documents were destroyed, evidence that they contained adverse evidence is generally lost also, which is the reason for the adverse inference.

we must find that the reason for the destruction becomes because the party knew that relevant evidence was contained in the documents and wanted to hide the adverse information, rather than because the documents were scheduled to be destroyed. In this case, the facts surrounding the destruction of the documents are evidence that CBRE knew that it had a duty to preserve relevant documents. Its failure to change its normal document retention policy, knowing that relevant documents would be destroyed if it did not act to preserve these documents, is evidence of bad faith.

Next, as discussed, CBRE did not have the duty to preserve every single piece of electronic data in the entire company. But its failure to make an adequate search for relevant documents before destroying non-relevant documents is further evidence of its bad faith. *See Danis*, 2000 WL 1694325, at \*38 (noting that the "question of intent and/or bad faith . . . may encompass not only direct destruction, but also 'willful blindness,'" i.e., that the party knew that discoverable data was available but allowed it to be destroyed). CBRE knew that electronic evidence would be requested at least as early as January 2002 when Wiginton's EEOC charge was filed. Later, the class action complaint was filed, then Plaintiff sent the September 27 Letter to Defendant, and finally, document requests were sent to CBRE. And yet CBRE claims that its failure to search for any documents, such as e-mails, is innocent because such a search would have been too burdensome and would not have revealed any relevant documents. Perhaps if CBRE had attempted to perform such a search and had evidence that it was unsuccessful we would find its assertion credible. But its complete failure to perform any search rises above the

level of mere negligence, and this willful blindness in the context of the facts surrounding the destruction of the documents, leads us to find that the documents were destroyed in bad faith.[7]

In this case, unlike most cases in which documents have been destroyed, there is a way to determine the effect that CBRE's actions have had on Plaintiff's case. *See c.f. Langley*, 107 F.3d at 515 (award of sanctions must be proportionate to the circumstances); *Danis*, 2000 WL 1694325, at *34-35 (prejudice to the case or effect on the course of the litigation may help a court determine the appropriate level of sanctions). While the entire scope and extent of the lost documents is not known, the backup tapes for the three months of June, August and September 2002 that have been produced by CBRE may give some evidence into what was destroyed. For this reason, the Court recommends that Plaintiff's motion for sanctions be denied without prejudice. If Plaintiff's expert is able to discover relevant documents on the backup tapes then Plaintiff should be allowed to renew its motion for appropriate sanctions based on the destroyed evidence.

### III. Conclusion

For the foregoing reasons, the Court respectfully recommends that Plaintiff's motion for sanctions for spoliation of evidence be denied without prejudice.

_____
**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: October 24, 2003.

_____

[7] Bad faith is not a precondition to the imposition of sanctions. *See e.g. Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661, 671 (7th Cir. 1996) and *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992).

- 15 -

Written objections to any finding of fact, conclusion of law, or the recommendation for disposition of this matter must be filed with the Honorable Wayne R. Andersen within ten (10) days after service of this Report and Recommendation. *See* Fed. R. Civ. P. 72(b). Failure to object will constitute a waiver of objections on appeal.

Copies have been mailed to:

KENNETH A. WEXLER, Esq.
ELIZABETH FEGAN HARTWEG, Esq.
JENNIFER FOUNTAIN CONNOLLY, Esq.
The Wexler Firm
One North LaSalle Street
Suite 2000
Chicago, IL 60602

BRENDA H. FEIS, Esq.
SARI M. ALAMUDDIN, Esq.
DEBORAH S. DAVIDSON, Esq.
Seyfarth Shaw
55 East Monroe Street
Suite 4200
Chicago, IL 60603

JENIPHR A. E. BRECKENRIDGE, Esq.
Hagens Berman, L.L.P.
1301 Fifth Avenue
Suite 2929
Seattle, WA 98101

JoDEE FAVRE, Esq.
Favre & Allen
121 East Main Street
Belleville, IL 62220

Attorneys for Plaintiff

Attorneys for Defendant