# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

JAN 0 9 2004

WAYNE R. ANDERSEN
U. S. DISTRICT COURT JUDGE

DOCKETED
FEB 0 6 2004

|  |  |
|---|---|
| AMY WIGINTON, KRISTINE MORAN, DONDI PLANK, ANDREA COREY and OLIVIA KNAPP, individually and on behalf of all persons similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) ) ) |
| CB RICHARD ELLIS, Inc. | ) ) ) |
| Defendant. | ) |

Case No.: 02 CV 6832

Judge Andersen
Magistrate Judge Ashman

JURY TRIAL DEMANDED

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Amy Wiginton, Kristine Moran, Dondi Plank, Andrea Corey, and Olivia Knapp, on behalf of themselves and all other similarly situated employees of CB Richard Ellis ("CBRE" or the "company"), by their attorneys, allege the following as their Second Amended Class Action Complaint:

1.      This is a class action brought by plaintiff Amy Wiginton ("Ms. Wiginton"), plaintiff Kristine Moran ("Ms. Moran"), plaintiff Dondi Plank ("Ms. Plank"), plaintiff Andrea Corey ("Ms. Corey") and plaintiff Olivia Knapp ("Ms. Knapp") on behalf of themselves and other similarly situated women (the "Class") against CBRE, to remedy discrimination and harassment on the basis of sex, in violation of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiffs seek declaratory and injunctive relief, compensatory and punitive damages, attorneys fees and other appropriate legal and equitable relief.

2. Plaintiff Wiginton is a female who was constructively terminated from her position as a CBRE employee. Plaintiff was subjected to a hostile, offensive and intimidating work environment at the offices maintained by CBRE in the Chicago area (collectively, "Chicago Office"), in addition to various other locations maintained by CBRE throughout the United States. The hostile work environment, which exists company-wide, altered the terms and conditions of plaintiff's employment.

3. Plaintiff Moran is a female who was terminated from her position as a CBRE employee because she became pregnant with her first child. Plaintiff was also subjected to a hostile, offensive and intimidating work environment at the office maintained by CBRE in its Phoenix, Arizona office.

4. Plaintiff Plank is a female who was constructively terminated from her position as a technical support specialist at the Beverly Hills office of CBRE. Plaintiff was subjected to a hostile, offensive and intimidating work environment while working for CBRE. The hostile work environment, which exists company-wide and pervades the corporate culture, altered the terms and conditions of plaintiff's employment.

5. Plaintiff Corey is a female who was constructively terminated from her position at the St. Louis office of CBRE. Plaintiff was subjected to a hostile, offensive and intimidating work environment while working for CBRE. The hostile work environment, which exists company-wide and pervades the corporate culture, altered the terms and conditions of plaintiff's employment.

6. Plaintiff Knapp is a female who was illegally terminated from her position as Transaction Coordinator for the Apartment Team at the Sacramento office of CBRE. Plaintiff was subjected to a hostile, offensive and intimidating work environment while working for CBRE. The

hostile work environment, which exists company-wide and pervades the corporate culture, altered the terms and conditions of plaintiff's employment. Shortly after expressing her support for this class action lawsuit due to the hostile work environment in which Ms. Knapp was forced to work, Ms. Knapp was terminated. This termination was retaliatory, in violation of Title VII.

7.      Plaintiffs and numerous other female CBRE employees have been subjected to persistent unwelcome and offensive touching and groping; they have had their breasts, buttocks and genitals grabbed; they have been flashed by their male colleagues and supervisors in various states of undress; they have had vulgar comments and degrading references about themselves and women generally directed at them on a daily basis; they have been subjected to discussions among male colleagues and superiors about women's sexual performances, their own sexual performances, and the size, shape and relative merits of women's body parts; they have been allowed – or not allowed – to interface with customers based on an individual woman's sex quotient; they have been subjected to the circulation of lewd, offensive and pornographic e-mails and the display of pornographic websites and videotapes; and their claims of harassment have been ignored or rejected by their office administrators who have been designated as the human resources designees in each office.

8.      CBRE management, including but not limited to supervisors and members of the General Counsel's office, at CBRE offices nationwide, is responsible for not only condoning but also perpetuating a hostile work environment at CBRE. On numerous occasions, members of Company management have harassed Ms. Wiginton, Ms. Moran, Ms. Plank, Ms. Corey and Ms. Knapp and members of the Class and permitted male employees to harass plaintiffs and members of the Class without reprimand. CBRE management has observed sexually explicit behavior in its offices and at company events and has consistently failed to report it or stop it, allowing the offensive and

-3-

oppressive environment in which plaintiffs and members of the Class have worked or continue to work to persist. CBRE has been and continues to be aware of the existence of the hostile work environment, and the other discriminatory acts committed against female employees on a regular basis.

9.      Plaintiffs and members of the Class have requested that the harassing conduct stop and complained to CBRE's Human Resources Department, but management has either been unresponsive, waited an unreasonable amount of time before responding, or forced plaintiffs and members of the Class to confront their harassers directly, causing intimidation and retaliation, without any repercussions to the harassers. Moreover, the office administrators in each of defendant's offices nationwide, who are also supposed to act as the human resources designees in each office, have failed to stop or prevent the sexual harassment occurring nationwide and, in some instances, take part in the sexually-explicit and inappropriate behavior.

10.     Furthermore, while CBRE does maintain a written sexual harassment policy or written procedure for employee complaints of sexual harassment, it involves reporting to the very same management personnel who have expressly engaged in behavior to sexually harass and denigrate plaintiffs and members of the Class or have otherwise ignored the harassment they see on a daily basis, thus rendering the policy completely ineffective and meaningless.

## JURISDICTION AND VENUE

11.     Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of Civil Rights; and (ii) under 42 U.S.C. § 2000e, *et seq.*

-4-

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as the unlawful employment practices are alleged to have been committed in the Northern District of Illinois and the defendant, CBRE, can be found in the Northern District of Illinois.

13.     At all relevant times, defendant constitutes an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e-(b).

## PROCEDURAL REQUIREMENTS

14.     Ms. Wiginton filed timely charges of sex discrimination with the EEOC, on her own behalf and on behalf of similarly situated individuals. In September 2002, the EEOC issued a Notice of Right to Sue to Ms. Wiginton. Ms. Wiginton has complied with all statutory prerequisites to the filing of this action.

15.     Ms. Moran filed timely charges of sex discrimination and pregnancy discrimination with the EEOC, on her own behalf (for her claim of pregnancy discrimination) and on behalf of similarly situated individuals (for her claim of sex discrimination). On May 13, 2003, the EEOC issued a Notice of Right to Sue to Ms. Moran. Ms. Moran has complied with all statutory prerequisites to the filing of this action.

16.     Ms. Plank will file timely charges of sex discrimination with the EEOC, on her own behalf and on behalf of similarly situated individuals. As a member of the class represented by Ms. Wiginton and Ms. Moran, Ms. Plank is entitled to join this Title VII class action litigation at this time because her claims arise out of the same discriminatory conduct that occurred over the same time period.

17.     Ms. Knapp will file timely charges of sex discrimination with the EEOC, on her own behalf and on behalf of similarly situated individuals. As a member of the class represented by Ms.

Wiginton and Ms. Moran, Ms. Knapp is entitled to join this Title VII class action litigation at this time because her claims arise out of the same discriminatory conduct that occurred over the same time period.

18.     Ms. Corey is entitled to join this Title VII class action litigation despite not filing a timely charge with the EEOC because Ms. Wiginton and Ms. Moran filed a timely charge that alleged classwide discrimination and that claimed to represent a class of employees that include Ms. Corey.

### PARTIES

19.     Plaintiff Amy Wiginton is a resident of Brookfield, Illinois and was employed as a Marketing Director at CBRE's Oak Brook, Illinois office, at which she worked from December 7, 1997 until the time she was constructively discharged from CBRE as a result of the hostile work environment on December 31, 2001.

20.     Plaintiff Kristine Moran is a resident of Destin, Florida and was employed as a marketing specialist at CBRE's Phoenix office, at which she worked from September 1998 until June 2001. After June 2001, Ms. Moran moved to Midlothian, Virginia and later to Destin, Florida, where she telecommuted and continued to work for her supervisors located in Phoenix at their request. She continued telecommuting from Destin, Florida until the time she was terminated by CBRE for becoming pregnant on October 2, 2002.

21.     Plaintiff Dondi Plank is a resident of North Hollywood, California, and was employed at CBRE's Beverly Hills/Century City office, at which she worked from February 2000 until the time she was constructively discharged from CBRE as a result of the hostile work environment in October 2003.

22. Plaintiff Andrea Corey is a resident of Olathe, Kansas and was employed at CBRE's St. Louis office, at which she worked from July 2000 until the time she was constructively discharged from CBRE as a result of the hostile work environment on June 27, 2002.

23. Plaintiff Olivia Knapp is a resident of Citrus Heights, California, and was employed as a Transaction Coordinator for the Apartment Team at the St. Louis office of CBRE. Ms. Knapp worked at the Sacramento office from October 1, 2002 until CBRE retaliated against her for complaining about sexual harassment by terminating her employment on September 29, 2003.

24. Defendant CBRE is a worldwide commercial real estate services company organized under the laws of the State of Delaware and is engaged in property sales, leasing, and management; corporate services; facilities and project management; mortgage banking; investment management; capital markets; appraisal and valuation; research and consulting. CBRE has approximately 10,000 employees in more than 250 offices, maintaining its corporate headquarters in Los Angeles, California. CBRE also maintains five offices in the Chicago metropolitan area. In 2001, CBRE reported $1.17 billion in net revenues.

## ALLEGATIONS OF INDIVIDUAL AND CLASSWIDE DISCRIMINATION

25. Plaintiffs and the Class have been and continue to be victims of a pattern and practice of sexual harassment, other forms of sex discrimination and other forms of abuse while employed at CBRE.

26. Specifically, plaintiffs and the Class have been subjected to severe and pervasive sexual harassment, as follows:

(a) There is and was a sexually hostile, intimidating and offensive work environment at CBRE directed at plaintiffs and the Class;

-7-

(b)     The work environment at CBRE has been, and remains, sufficiently severe so as to alter the terms and conditions of plaintiffs' and the Class members' employment, and unreasonably interfere with their work performance;

(c)     A reasonable person would experience the work environment at the CBRE as hostile, and plaintiffs and the Class perceived and continue to perceive their work environment as hostile and abusive;

(d)     The abusive and hostile work environment has been and continues to be pervasive throughout CBRE; and

(e)     Plaintiffs and the Class have suffered severe emotional distress as well as other physical and economic injury as a result of the sexual harassment.

27.     Plaintiffs and the Class have also been subjected to sexual harassment as a result of supervisors' conditioning the awarding of favorable job assignments and other job related benefits on submission to their sexual demands.  The rejection of such demands has resulted in an alteration in the terms and conditions of plaintiffs' and the Class' employment, and has unreasonably interfered with their work performance.

28.     Plaintiffs have repeatedly complained to management about the hostile work environment in which they were forced to work.  Moreover, members of CBRE management observed the harassment of plaintiffs and members of the Class.  These complaints and instances of harassment were ignored or rejected.  Further, CBRE failed to exercise reasonable care in preventing sexual harassment or to correct any of the sexually harassing behavior.

29.     In addition, plaintiffs and the Class have been subjected to a pattern and practice of discrimination on the basis of sex as a result of a company-wide anti-female attitude and this pattern

-8-

and practice has had a significant effect on the terms, conditions and privileges of their employment.

30.     Among the evidence of the abusive and harassing work environment at the company are the sexually-explicit and pornographic material disseminated at CBRE, including: lewd, degrading and pornographic e-mail; the display of pornographic websites, videotapes, calendars and photographs; and birthday cards portraying naked women and the inclusion of pornographic materials, such as a book entitled "101 Nights of Great Sex," as "White Elephant" gifts at the annual CBRE office holiday parties.

31.     In addition, plaintiffs and similarly situated women have been subjected to a daily barrage of lewd remarks, propositions and sexist insults, as well as leering glances and "elevator eyes" directed their way from co-workers and supervisors. A small sampling of the types of unwanted and offensive comments made to plaintiffs and the Class on a daily basis include:

(a)     "She's got a real nice rack;" "I love your breasts;" "Her breasts are huge;" "How big are your breasts now?" (during a telephone conversation); and "You have beautiful breasts;"

(b)     Male employees openly ask women about their orgasms, their sexual history, and their sexual interests;

(c)     Male employees openly "rate" the figures of women with whom they do business, commenting on their size, their shape, their breasts, their "asses" and their sexuality;

(d)     Jeff Barrett, the managing director of CBRE's Oak Brook, Illinois office, among others, routinely gives birthday cards to male brokers, to be opened in front of the female employees, that display nude or bikini-clad women with prominently displayed

breasts, at which time the male employees engage in lewd talk;

(e)     Scott Stubblefield ("Stubblefield"), a broker who worked from CBRE's Columbus, Ohio office and, on information and belief, now manages the St. Louis, Missouri office, has been overheard asking his male colleagues, "Does your assistant give good head?";

(f)     Specific examples of these types of comments include: males routinely asked their pregnant female co-workers whether they intended to breast feed and routinely commented on the size and shape of their changing figures; male brokers openly discuss how to best get their female co-workers pregnant; Gary Fazzio, a broker in Oak Brook, openly asked a pregnant female employee in front of numerous males, "So, how far are you dilated?"; Pete Adamo, another CBRE broker who works in the Oak Brook office asked a female employee "Do you shave your crotch?"; David Justh, a broker in Oak Brook, openly commented on an assistant's breasts and told his assistant (in front of others) that she should be working in a factory after berating her in front of others and causing her to cry;

Each of these comments and topics of conversation were not isolated incidents but are examples of the types of lewd and sexually charged comments by male employees and members of management that are an everyday occurrence at CBRE.

32.     Plaintiffs and members of the Class have also been subject to unwanted touching, kissing, groping, staring and other forms of harassing attention by co-workers or supervisors. For example:

(a)     Jim Hochman, in-house counsel at CBRE, pulled his pants down and flashed company personnel in South Beach, Florida while on a CBRE Corporate Services trip. On a

-10-

different trip to Key West, Florida, Hochman and Steve Kozarits, among other management personnel, took company employees to a bar where women's naked bodies are painted. Both Hochman and Kozarits later returned to their CBRE offices and recounted, separately, the naked women they saw to female CBRE employees. On still other occasions, Hochman openly told jokes that were derogatory to women, including jokes referring to "blonde pussy;"

(b)    Hochman's "flashing" incident is not isolated. At firm parties, male colleagues routinely remove their clothes, engage in stripteases and rub themselves against their female colleagues, take female and male employees to strip clubs and encourage female employees to strip naked and dance on stage; and

(c)    For office camping and other overnight trips, male management personnel explicitly direct that the male spouses of female employees are not to be invited and advise female employees that "they're not married" while on the road because "they are separated from their spouses" and are "allowed" to engage in inappropriate sexual behavior with their male colleagues. Women are also encouraged to take off their underwear during canoeing and swimming activities. During these trips, male employees, including management, openly touch women's breasts, groins and bodies, rub their groins against women's bodies, and explicitly proposition women for sex.

33.    In addition to being present for degrading comments and sexual jokes regarding women generally, Ms. Wiginton, like the members of the Class, was subjected on a daily basis to harassment that included: i) verbal comments regarding her breasts, her body, her sexual history, her husband's sexual interests, her orgasms; ii) verbal propositions for sex; and iii) unwanted touching,

-11-

including being rubbed by men's penises and having her breasts groped and grabbed. Examples include:

(a)     At a Special Properties Group ("SPG") outing at a bar in St. Simons Island, Georgia, Steve Kozarits ("Kozarits"), Ms. Wiginton's supervisor, encouraged her to dance with Stubblefield, stating "Go dance with Stubby. You'll make his night"" Ms. Wiginton repeatedly stated that she was not interested. When Ms. Wiginton finally did at Kozarits' behest, Stubblefield rubbed his body, including his erect penis, against Ms. Wiginton, over her protests and struggles to get away;

(b)     George Relias, Ms. Wiginton's former supervisor, grabbed her breasts (about which Ms. Wiginton complained to management and Human Resources). After this incident, Relias continually stared at Ms. Wiginton's breasts and denied her the opportunity to move her cubicle away from his office to an open cubicle on the other side of the office when she requested.

(c)     Kozarits, Ms. Wiginton's supervisor at the time she was constructively discharged, propositioned Ms. Wiginton constantly; required Ms. Wiginton to have close physical contact with him while sitting in meetings and while traveling; commented on a daily basis about her breasts, her legs, and her clothes; questioned her regarding her sexual life, including asking every Monday "So, did you have sex this weekend?" and called her "Wiggles" in front of colleagues and clients referencing her breasts. Ms. Wiginton constantly requested that Kozarits stop his harassing behavior. Kozarits' response to Ms. Wiginton's request that he stop harassing her was always, "No, you love it" or "You know I love you."

(d)     Chuck Finney, a broker in CBRE's Dallas, Texas office, openly commented on Ms. Wiginton's figure during a CBRE World Conference at Mandalay Bay, stating, "My, don't you just have the prettiest little figure," while looking her body up and down;

(e)     Having heard that Ms. Wiginton had suffered a miscarriage, David Hinchman, a CBRE broker from the Kansas City office, asked Ms. Wiginton, "So, how's the baby-making going?" at a firm dinner in front of male colleagues. When Ms. Wiginton failed to provide details, Hinchman proceeded to tell Ms. Wiginton that he practiced Tantra Sex, which he explained as creating longer-lasting orgasms and a heightened state of awareness during orgasms. Hinchman further explicitly described the orgasms he had experienced and directly asked Ms. Wiginton whether she had orgasms;

(f)     At a later date, after Ms. Wiginton had a baby, her supervisor, Kozarits, asked, "Does [your husband] like the size of your breasts?" and "Does [your husband] love your breasts?" and further stated "Tell [your husband] he should get all he can of them now." Kozarits commented on and inquired whether Ms. Wiginton would be having sex with her husband after the six-week check-in after giving birth. Kozarits further told Ms. Wiginton he loved her "voluptuous figure," in response to which Ms. Wiginton called Kozarits a pig.

(g)     While Ms. Wiginton was on maternity leave, her male supervisor, Kozarits, circulated an e-mail to the 45 men for whom Ms. Wiginton worked implying that the father of the child was a male colleague as the result of an illicit sexual affair;

(h)     After returning from the company trip in Key West, Florida, where employees went to the bar where naked women's bodies are painted, Hochman and Kozarits separately recounted, in detail, their experiences to Ms. Wiginton. Further, Kozarits stated, "If you were

wearing a wet t-shirt, you would have fit in perfect," referring to Ms. Wiginton's breasts; and

(i)     When Hochman ran into Ms. Wiginton in a parking lot while accompanied by two male management personnel, Hochman called out to Ms. Wiginton, "Hey Aimless." Ms. Wiginton sent Hochman an e-mail complaining about the derogatory nature of the nickname and later discussed the issues with Hochman in person. Hochman responded: "That's a pet name. That's what I call all my ex-girlfriends." (Of course, Ms. Wiginton never was his girlfriend).

34.     Plaintiff Wiginton was told that her life could be made easier if she submitted and played along with the sexual advances of her colleagues.

35.     Plaintiff Moran also was, like the members of the Class, subjected on a daily basis to harassment that included: (a) receiving lewd emails; (b) comments about the sexual attributes of her body parts; and (c) sexual and derogatory jokes about women. Examples include:

(a)     At a conference in Mandalay Bay, a male broker told Ms. Moran that "You have the nicest boobs of anyone in the office. If I could touch anyone's boobs, in the office, they would be yours."

(b)     Jim Fijan, a broker from the Phoenix office, and his team circulated an invitation to a "Suite Party" to be held in connection with a conference held by CBRE. That invitation contained pictures of four male brokers in the CBRE Phoenix office in silk robes surrounded by women with large breasts in bikinis.

(c)     On Valentine's Day 2001, Ms. Moran received flowers from her boyfriend (now husband), John. John had enclosed a card that said "Happy Valentine's Day. Love, John." When Jim Fijan, a top broker in CBRE's Phoenix office whom Ms. Moran hardly

knew, learned that Ms. Moran had received flowers, he removed the card containing the message from John, turned it over, and wrote "Can't wait for some hot sex with oral benefits. Love, John." on the back of the card. Mr. Fijan then placed his message face up back in envelope. Ms. Moran knew that her boyfriend could not have written this message and was humiliated that one of her co-workers had written it. Instead of fully investigating this incident, CBRE coerced Ms. Moran into signing an acknowledgement that CBRE's proposed remedy of placing a reprimand in Mr. Fijan's file was acceptable to her.

36.     On at least one occasion, Ms. Moran complained to human resources. However, her complaints went unnoticed because the contact in human resources, Diana Granieri, participated in the sexual harassment in the office, including making comments at office parties such as "I give great blow jobs; let's go back to your car" and loudly describing her sexual exploits with male employees on a weekly basis to CBRE staff. During a business trip, Ms. Granieri flashed her breasts and crotch at a female employee to attempt to encourage her to "lighten up" and participate in sexual games on the plane. Even though employees complained about Ms. Granieri's behavior, she was never removed, nor were CBRE employees provided another human resources representative to contact.

37.     Moreover, Ms. Granieri's actions were similar to the actions of other office administrators (the majority of which are female) in defendant's offices. Despite the fact that these office administrators were supposed to be the human resources designee for each office, the administrators did not have the training or the authority to effectively administer grievance procedures or the defendant's "zero tolerance" sexual harassment policy. For example,

    (a)     Ms. Granieri participated in the inappropriate and sexual behavior in the office, offering to give male employees "blow jobs" at office parties, dirty dancing with male

-15-

brokers, and otherwise ignoring or participating in the inappropriate behavior of the male supervisors and employees;

(b)     The administrator in the St. Louis, Missouri office simulated sex acts at office parties, laughed when she observed women being pawed and groped in the office by male supervisors and employees, and told women employees that "this was how offices were" and ignoring their pleas for help.

(c)     The administrators in the Chicago, Illinois and Kansas City, Missouri offices ignored the sexual harassment around them because they did not have the authority to reprimand, discipline, suspend, terminate, or otherwise confer repercussions on the male brokers in their office for their inappropriate actions. In fact, certain administrators have stated that they could not take action to stop the sexual harassment and were hesitant to hire attractive young female employees because the male brokers make too much money for the defendant, and thus have too much power, for the administrators to take any actions against them.

38.     Thus, at all times relevant to this action, the existence and severity of the sexually harassing environment was fully known by CBRE management.

39.     As part of the hostile work environment at CBRE, Plaintiff Moran was a victim of pregnancy discrimination. Ms. Moran worked as a marketing specialist in the Phoenix, Arizona office of CBRE from September 1998 to June 2001. In June 2001, Ms. Moran and her husband moved to Midlothian, Virginia. When Ms. Moran attempted to resign, her supervisors encouraged her to telecommute, which Ms. Moran agreed to do. CBRE continued to support Ms. Moran's telecommuting when she moved to Destin, Florida.

40. Before she was terminated for becoming pregnant on October 2, 2002, Ms. Moran's performance was exemplary and she received positive performance evaluations.

41. In October 2001, Ms. Moran told her supervisors, Jim Trobaugh, Rob Marsh, and Chris Hook, that she was pregnant. Ms. Moran also informed two human resource representatives that she was pregnant. First, Ms. Moran contacted Cyndi Dimel in Human Resources to fully understand her maternity benefits and FMLA. Second, Ms. Moran informed Denis Magee that she was pregnant and arranged the details of her maternity leave at the same time. CBRE therefore had knowledge that Ms. Moran was pregnant as early as October 2001.

42. In anticipation of her maternity leave, Ms. Moran spent a great deal of time training a new member of her team and ensuring that her team would have everything it needed in her absence.

43. Despite Ms. Moran's efforts, as the commencement of Ms. Moran's maternity leave approached, her supervisors stopped returning her calls and emails and did not attempt to contact her at all. Eventually, just one week before Ms. Moran's maternity leave, Rob Marsh called Ms. Moran and asked "Haven't you noticed that we have been treating you differently these last two weeks and ignoring you?" Mr. Marsh thereafter made comments to Ms. Moran that he was disappointed to learn that her maternity leave would last 12 weeks and implied that this was the reason he was no longer speaking to Ms. Moran. Mr. Marsh stated that he did not want Ms. Moran to take 12 weeks of leave because, by the time she returned from maternity lave, the real estate year would already be over. He also stated, for the first time ever, that he was unhappy with Ms. Moran's work performance and tried to get her to quit.

44. Later that day Mr. Marsh called Ms. Moran back with a member of HR in the room. At that point, Mr. Marsh stated that, in order to make sure Ms. Moran contributed to the "team"

before the year was over, Ms. Moran needed to "hit the ground running" when she returned from her maternity leave and asked Ms. Moran to complete some marketing initiatives during her leave. Despite the fact that Ms. Moran repeatedly requested those initiatives, she never received them. While Ms. Moran was on maternity leave, only one of her supervisors made any attempt to contact her; instead, they attempted to find her replacement.

45. Ms. Moran returned to work on August 20, 2002. From that date until October 2, she only received one project. Her supervisors rarely spoke to her and did not respond to her calls or emails. Whereas prior to her maternity leave she had been invited to meetings, they thereafter failed to include her in meetings.

46. On October 2, 2002, Ms. Moran was contacted by her supervisor and terminated because "the telecommuting wasn't working out." This excuse was a pretext for terminating Ms. Moran because she was pregnant.

47. Plaintiff Dondi Plank was also subjected to sexual harassment and forced to work in a hostile environment on a daily basis before being constructively discharged.

48. When Ms. Plank first began working at CBRE, she discovered pornographic material on the office server on a regular basis. Male brokers would ask Ms. Plank to show them how to download pornographic material onto their hard drives. For example, Marc Pollock, a broker in the office, had Ms. Plank archive his pornographic email.

49. The brokers attempted to hide pornographic materials from Ms. Plank after she expressed her disgust with this type of material. However, Ms. Plank still found pornographic material on the company computers and on the two office servers. Some examples of the sexual harassment Ms. Plank experienced as the result of this pornographic material and other incidents of sexual

-18-

harassment include:

(a)     On one male broker's computer Ms. Plank recently viewed a video of what to look for in hiring a secretary that was pornographic in nature. Ms. Plank also viewed another email with pictures of women in sexual poses with donkeys.

(b)     Just a few weeks before Ms. Plank's constructive discharge from CBRE she found a partially naked picture of Pamela Anderson on a networked office printer. Ms. Plank found these types of materials since the beginning of her employment at the Beverly Hills office of CBRE and continued to find similar materials until the last day of her employment there.

(c)     Approximately three years ago Ms. Plank attended a company holiday party and one of the male employees touched her in an inappropriate and unwanted way. Ms. Plank complained to the office manager, Jane Mutz, but nothing was done. When Ms. Plank spoke to Ellis Reiter, CBRE's General Counsel, Mr. Reiter asked Ms. Plank what should be done about the incident. Mr. Reiter then told Ms. Plank that there was nothing he could do about her complaint.

(d)     On numerous occasions Ms. Plank also witnessed the male brokers "rate" women and make sexually inappropriate comments on a regular basis. One male broker also used an inappropriate pet name, "Dondalicious," when he addressed Ms. Plank.

50.     Ms. Plank complained about the pornographic material on the office server and on brokers' computers several times. However, the only thing that management did was suspend several support staff people (and not the brokers) for two weeks.

51.     At one point, Ms. Plank even complained about the pornography in the office to

-19-

CBRE's General Counsel, Ellis Reiter. As Mr. Reiter did when Ms. Plank complained about being inappropriately touched at a CBRE holiday party, Mr. Reiter again asked Ms. Plank what she thought should be done about the pornography circulating in CBRE's Beverly Hills/Century City office. Ms. Plank recommended that the company purchase auditing software that would monitor any pornographic material that was accessed from company computers. Mr. Reiter rejected Ms. Plank's recommendation and told her that it was not worth the cost to purchase this software. Mr. Reiter also said that he thought my recommendation would be "Big Brother" in nature.

52.     The sexual harassment experienced by Ms. Plank is pervasive throughout the office. Women who work in the office, especially the women brokers, have complained to Ms. Plank about this environment but are afraid to complain to management because they know it is tolerated and fear retaliation. Therefore, these women brokers feel they simply have to put up with this type of behavior.

53.     Ms. Plank is aware of female brokers who have been sexually harassed and physically sexually assaulted by male brokers in the office. When those women have complained they have been told that there is nothing that the management can do because the women cannot prove that anything happened to them.

54.     Ms. Plank has knowledge that the then Managing Director at the Beverly Hills office knew this type of conduct was occurring but did nothing to stop it.

55.     The sexual harassment and the company's failure to prevent it interfered with and made it impossible for Ms. Plank to perform her job responsibilities.

56.     Plaintiff Andrea Corey was also subjected to sexual harassment and forced to work in a hostile environment at CBRE's St. Louis office on a daily basis before being constructively

discharged. Examples of the sexual harassment Ms. Corey experienced include:

(a)     A male broker said to a woman working in the St. Louis office (in hearing range of others) on one occasion: "Hey, I had a dream about you last night. You were lying on the ground with your butt in the air and you were injured."  At this point, Ms. Corey interjected and stated: "What are you talking about? That is not appropriate discussion in an office." On another occasion, the same male broker said to the same woman, "It's obvious you want me."

(b)     Ms. Corey was told in complete detail a story about how, on a work trip, the male brokers got a female assistant drunk and asked her to engage in sexual acts.

(c)     In early 2002, a male broker, Jeffrey Hawley, rubbed his body against Ms. Corey's back and bottom, then turned her around and rubbed up against her front. Ruth Braun, the office manager and human resources designee in the St. Louis office, laughed about it in front of Ms. Corey.

(d)     Male supervisors and employees routinely circulate pornographic and lewd e-mail to women in the office.  An example of the type of e-mail that male employees circulated was one that displayed a sorority house full of naked girls performing sex acts with one another.  Male employees also would pull up pornographic pictures on their computers and show them to the women in the office.

(e)     Male employees routinely watch porn movies in the office, within earshot and sight of female employees. One male broker watches porn tapes in his office all the time.

57.     Ms. Corey talked to Ruth Braun, the office manager and human resources designee in the St. Louis office, over a period of time in multiple meetings about the sexual harassment

problems in the office. Ms. Corey complained numerous times about how the women were treated by the brokers. Ms. Braun's response was: "This is how offices are or can be."

58.     In fact, Ms. Braun, who was supposed to be the person to whom women complained of sexual harassment and discrimination issues, participated in the sexual acts that pervaded the office. At one office party, Ms. Braun and a female broker, Eileen George, climbed up on a table, put a beer bottle between them in crab-like positions and simulated having sex with one another. This was done in full view of both male supervisors and employees and female employees.

59.     Ms. Corey also complained to the managing director of the St. Louis office, Steve Kozarits, about the sexual harassment of the women in the office. On one occasion, Ms. Corey had a meeting with Steve Kozarits about how women in the office were treated, and specifically about the treatment of the female assistant. On another occasion, Ms. Corey told Mr. Kozarits that, because of the harassment, the "men in this office would not let the women work."

60.     Mr. Kozarits said that it didn't matter how the guys were acting, it only mattered how the women were receiving the attention and whether CBRE was going to get sued.

61.     Mr. Kozarits knew of and tolerated the harassment by the male brokers. Neither Ms. Braun nor Mr. Kozarits ever took any action based on Ms. Corey's complaints or complaints of any other women in the office. After Ms. Corey would complain to Ms. Braun or Mr. Kozarits, the male brokers would retaliate, refusing to speak to the women and making snide jokes about them within earshot.

62.     Plaintiff Olivia Knapp, in addition to being subjected on a daily basis to lewd and offensive jokes, was forced to work in a hostile environment in the Sacramento CBRE office where male brokers constantly degraded women and displayed pornographic material on their computers.

Examples of the sexual harassment Ms. Knapp experienced and witnessed at the Sacramento CBRE office include:

      (a)     On numerous occasions, Ms. Knapp's supervisors told her that women should only work as secretaries, commented on women's looks and referred to women as "eye candy" and openly managed the workplace so that only "sexy" women were allowed to meet with clients.

      (b)     On at least one occasion, Ms. Knapp's supervisors made sexual comments to her telling her to "bend over" while laughing at her.

      (c)     On several occasions Ms. Knapp complained to her Office Services Manager ("OSM"), the Human Resources contact in the Sacramento office. On more than one of these occasions Ms. Knapp was crying because of how she was being harassed. Human Resources never took any action based on Ms. Knapp's numerous complaints. When Ms. Knapp asked the OSM why no action was taken, she told Ms. Knapp that the support staff was here to please the brokers and "that's just how it is." Further, the OSM personally witnessed sexual harassment in the office and took no action to stop or prevent it.

      (d)     Ms. Knapp is also aware of and has witnessed harassment of a sexual and derogatory nature directed at other women in the office. She is aware that other women in the office find the behavior offensive and intimidating but have said they cannot complain for fear of losing their jobs.

63.     Plaintiff Knapp was also terminated in violation of Title VII. Just before CBRE terminated Ms. Knapp, CBRE hired a woman to review and analyze the structure of Ms. Knapp's team. Ms. Knapp told this woman that she was extremely unhappy with the way she was treated,

including the sexual harassment and derogatory behavior. Ms. Knapp also told this woman that she supported the actions that the women were taking in this class action lawsuit to halt harassment. Immediately after this, Ms. Knapp was terminated under the pretext of excessive absenteeism.

64.     Thus, at all times relevant to this action, the existence and severity of the sexually harassing environment was fully known by CBRE management.

65.     As set forth herein, there is a pervasive and severe pattern and practice of sexual discrimination at CBRE, including a hostile work environment, individual instances of harassment, denial of job benefits to women because of their sex, retaliation and other forms of abuse. Each paragraph above describes a pattern and practice of sex discrimination.

## CLASS ALLEGATIONS

66.     Plaintiffs sue on their own behalf and on behalf of a class of persons under Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure defined as follows:

> All women employed by CB Richard Ellis at any time between January 1, 1999 and the present (the "Class Period").

67.     CBRE has employed more than 1,000 women nationwide during the Class Period. Therefore, the Class is so numerous that joinder of all members is impracticable.

68.     All members of the Class have been damaged by the same common course of conduct alleged herein, and this common course of conduct has affected the Class as a whole. This common course of conduct presents questions of law and fact which are common to the Class, and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

(a)     whether CBRE engages in a pattern and practice of discrimination against

-24-

female employees by allowing and promoting a hostile, intimidating and offensive work environment directed toward its female employees at its offices;

(b)     whether CBRE otherwise engages in a common course of conduct that discriminates against plaintiffs and other members of the Class on the basis of sex with respect to the terms and conditions of their employment;

(c)     whether members of CBRE management condone and participate in the sexual harassment and sexual discrimination of its female employees;

(d)     whether CBRE has exercised reasonable care to prevent and correct promptly any sexually harassing behavior;

(e)     whether CBRE has retaliated against any or all of the Class members for complaining about the sexual harassment and/or discrimination;

(f)     whether the members of the Class have sustained damages, and, if so, the proper measure of damages; and

(g)     whether CBRE's discriminatory policies and practices should be eliminated, and, if so, the proper procedure for doing so.

69.     The claims of the individual named plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that all have suffered from the same wrongful common course of conduct of the Company and its agents.

70.     The individual named plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs' attorneys are qualified to pursue this litigation and have extensive experience in class actions, including employment discrimination actions.

71.     A class action is superior to other methods for the fast and efficient adjudication of

-25-

this controversy. A class action regarding the issues in this case creates no problems of manageability.

## COUNT I
## DISCRIMINATION IN VIOLATION OF TITLE VII
### (On Behalf of Plaintiffs and the Class)

72.     Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

73.     Defendant has discriminated against plaintiffs and the Class by subjecting them to a hostile, offensive and intimidating work environment based on sex.

74.     In addition, defendant has discriminated against plaintiffs and the Class by permitting job related benefits to be granted to those women who submitted to its agents' requests for sexual favors, and by refusing job benefits to and otherwise retaliating against women who refused its agents' requests for sexual favors.

75.     Defendant has also discriminated against women on the basis of sex by treating them differently than their male co-workers in the terms, conditions and privileges of their employment. Defendant failed to exercise reasonable care to prevent and correct promptly the sexually harassing behavior.

76.     Defendant was aware of the above conduct at all relevant times.

77.     Plaintiffs and members of the Class have suffered damages as a result of defendant's common course of conduct alleged above.

## COUNT II
## DISCRIMINATION IN VIOLATION OF PREGNANCY DISCRIMINATION ACT
### (On behalf of Plaintiff Kristine Moran)

78.     Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

79.     Plaintiff Moran was pregnant during her employment at CBRE.

-26-

80. Beginning in October 2001, CBRE knew that Ms. Moran was pregnant because Ms. Moran told Jim Trobaugh, Rob Marsh, and Chris Hook, her three supervisors, that she was pregnant. In addition, Ms. Moran contacted two human resources representatives, Cyndi Dimel and Denise Magee, regarding her pregnancy.

81. Throughout her employment at CBRE, Ms. Moran performed her duties satisfactorily.

82. Ms. Moran was discharged from her employment at CBRE because of her pregnancy.

83. Women who performed as well as Ms. Moran who did not become pregnant were not discharged.

84. CBRE had no legitimate, non-discriminatory reason to terminate Ms. Moran.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs and the Class respectfully request that this Court grant the following relief:

A. Certify this case as a class action, the named plaintiffs herein as adequate Class representatives and plaintiffs' counsel as counsel for the Class;

B. Enter a judgment that the acts and practices of defendant complained of herein are in violation of the laws of the United States and the State of Illinois;

C. Grant a permanent injunction enjoining CBRE, its agents and employees from (i) continuing to discriminate against plaintiffs and Class members because of their sex; (ii) engaging in the sexual harassment of female employees; (iii) creating, facilitating or permitting the existence of a work environment that is hostile to female employees; (iv) retaliating against employees who complain, in whatever manner, about sex discrimination, including sexual harassment; and (v) otherwise depriving plaintiffs and the Class of their rights and privileges secured by federal law;

D.     Order CBRE to ensure that appropriate remedial action is taken to avoid the occurrence of further incidents of sexual harassment or sex discrimination against its female employees;

E.     Order CBRE to adopt and enforce a policy for the prevention of sexual harassment and any other forms of discrimination based on sex, which shall include (i) the presence of independent personnel to whom complaints of sexual harassment, or other forms of sex discrimination may be directed; (ii) provisions for the confidentiality of any such complaints; and (iii) provisions requiring the complete and impartial investigation of any such complaint filed;

F.     Order CBRE to impose substantial discipline, such as suspension without pay, demotion or termination, upon any supervisor or manager who engages in sexual harassment or sex discrimination or permits any such conduct to occur in his or her work area or among employees under his or her supervision, or who retaliates against any person who complains or participates in any investigation or proceeding arising out of any such conduct;

G.     Order CBRE to revise its supervisory appraisal process and include performance evaluations for the handling of equal employment opportunity issues as an element in supervisor appraisals and to link such evaluations directly to supervisor salary/bonus structure;

H.     Order CBRE to provide annual sexual harassment training to all employees, managers, supervisors and other management personnel, and to provide such training to all persons charged with the handling of complaints of sexual harassment and other forms of sex discrimination;

I.     Award plaintiffs and the Class all back pay, front pay, benefits, and any other remuneration to which they would have been entitled but for defendant's discrimination;

J.     Award plaintiffs and the Class compensatory and punitive damages;

-28-

K.    Award plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

L.    Grant plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues of fact and damages so triable in this action.

DATED: January 9, 2004

AMY WIGINTON, KRISTINE MORAN, DONDI PLANK, ANDREA COREY, and OLIVIA KNAPP, individually and on behalf of the Class, Plaintiffs

By: _____
        One of Their Attorneys

Kenneth A. Wexler
Elizabeth Fegan Hartweg
Jennifer Fountain Connolly
THE WEXLER FIRM
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Tel: (312) 346-2222
Fax: (312) 346-0022

Steve Berman
Nicholas Styant-Browne
HAGENS BERMAN LLP
1301 Fifth Avenue
Suite 2929
Seattle, WA 98101
(206) 623-7292

JoDee Favre
FAVRE & ALLEN
121 East Main Street
Belleville, IL 62220
(618) 236-7736

Daniel E. Gustafson
Karla M. Gluek
GUSTAFSON GLUEK PLLC
725 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
(612) 333-8844