**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**



**FILED**

OCT 0 4 2007
OCT 4 2007
WAYNE R. ANDERSEN
**U. S.** DISTRICT COURT JUDGE

AMY WIGINTON, KRISTINE MORAN,
NORMA PLANK FETHLER, as Successor in
Interest to Dondi Plank, ANDREA COREY
and OLIVIA KNAPP, individually and on
behalf of all persons similarly situated,

            Plaintiffs,

    v.

CB RICHARD ELLIS, INC.,

            Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 02 CV 6832

Judge Wayne Andersen

Magistrate Judge Ashman

## SETTLEMENT AGREEMENT AND CONSENT DECREE

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................1

II.  DEFINITIONS .............................................................................................................3
2.1.   "Appropriate Disciplinary and/or Remedial Action" ........................................3
2.2.   "Best Efforts" ....................................................................................................4
2.3.   "CBRE" .............................................................................................................4
2.4.   "Claim Form" or "Claim Forms" ......................................................................4
2.5.   "Claim Form Deadline" .....................................................................................4
2.6.   "Claimant" ........................................................................................................4
2.7.   "Claims Administrator" or "Settlement Administrator" ....................................4
2.8.   "Claims Process" ...............................................................................................4
2.9.   "Claims Standard(s)" .........................................................................................4
2.10.  "Class" or "Plaintiff Class" ..............................................................................4
2.11.  "Class Counsel" ................................................................................................5
2.12.  "Class Member" ................................................................................................5
2.13.  "Class Period", .................................................................................................5
2.14.  "Consent Decree" or "Decree" .........................................................................5
2.15.  "Court" ..............................................................................................................6
2.16.  "EEOC Guidance" ............................................................................................6
2.17.  "Effective Date" ...............................................................................................6
2.18.  "Eligible Claim" ...............................................................................................6
2.19.  "Expiration Date" .............................................................................................7
2.20.  "Final Approval" ..............................................................................................7
2.21.  "Liability Period" .............................................................................................7
2.22.  The "Litigation" and/or "This Case" ................................................................7
2.23.  "Named Plaintiffs" ...........................................................................................8
2.24.  "Notice" ............................................................................................................8
2.25.  "Parties" ............................................................................................................8
2.26.  "Preliminary Approval" ....................................................................................8
2.27.  "Released Claims" .............................................................................................8
2.28.  "Settlement" ......................................................................................................9
2.29.  "Settlement Class Member" ..............................................................................9
2.30.  "Service" ...........................................................................................................9
2.31.  "Sexual Harassment" ........................................................................................9
2.32.  "Special Master" ...............................................................................................9
2.33.  "Tier 1 Claim Standard" ...................................................................................9
2.34.  "Tier 2 Claim Standard" .................................................................................10
2.35.  "Tier 3 Claim Standard" .................................................................................10
2.36.  "Tier Program" ...............................................................................................10
2.37.  "Title VII" .......................................................................................................10

III.   GOALS OF THE SETTLEMENT ................................................................................ 11
       3.1.   Goals Of The Consent Decree and Settlement Agreement ...................... 11

IV.    JURISDICTION ............................................................................................................ 11

V.     EFFECTIVE DATE AND DURATION OF THE CONSENT DECREE ........................ 12
       5.1.   Effect Of Consent Decree .......................................................................... 12
       5.2.   Joint Request For A Court Order ............................................................... 12
       5.3.   Period of Force and Effect .......................................................................... 12

VI.    SCOPE OF THE CONSENT DECREE ........................................................................ 12
       6.1.   Scope Of The Consent Decree .................................................................... 12
       6.2.   Persons Covered .......................................................................................... 13
       6.3.   On-Going Best Efforts To Ensure The Effectuation Of The Settlement ...... 13
       6.4.   No Requirement To Violate Any Law ........................................................ 13

VII.   EQUITABLE RELIEF ................................................................................................. 13
       7.1.   No Automatic Injunction ............................................................................ 13
       7.2.   Sexual Harassment ...................................................................................... 13
       7.3.   Retaliation .................................................................................................... 14
       7.4.   Statement of Intolerance of Sexual Harassment ....................................... 14
       7.5.   Harassment-Free Workplace Policy .......................................................... 15
       7.6.   Distribution of Harassment-Free Workplace Policy ................................ 16
       7.7.   Complaint Procedures ................................................................................. 16
       7.8.   Policies Designed to Promote Supervisor Accountability ....................... 19
       7.9.   Consistency of Policies ............................................................................... 20
       7.10.  Sexual Harassment Training ....................................................................... 20

VIII.  APPOINTMENT OF SPECIAL MASTER AND REPORTING
       OBLIGATIONS ............................................................................................................ 21
       8.1.   Special Master ............................................................................................. 21
       8.2.   Content of Reports ...................................................................................... 21
       8.3.   Timetable for Reports ................................................................................. 22
       8.4.   Special Master's Follow-Up on Reports .................................................... 22
       8.5.   Class Counsel's Follow-Up on Reports ..................................................... 23

IX.    MONETARY RELIEF ................................................................................................. 23
       9.1.   Tier Program ................................................................................................ 23

X.     CHARITABLE CONTRIBUTION ............................................................................... 37
       10.1.  Charitable Contribution .............................................................................. 37

XI.    RELEASE AND COVENANT NOT TO SUE ............................................................. 37
       11.3.  Covenant Not to Sue ................................................................................... 38

CH1 11323590.1

XII. GENERAL PROVISIONS ........................................................................................38
    12.1. No Admission Of Liability ...............................................................................38
    12.2. No Court Findings As to Liability .....................................................................39
    12.3. Not Admissible In Any Other Proceeding..........................................................39
    12.4. Responsibility of Settlement Class Members and Named Plaintiffs for Tax
           Liabilities ......................................................................................................40

XIII. INCENTIVE AWARDS TO NAMED PLAINTIFFS. ..................................................41

XIV. ATTORNEYS' FEES AND COSTS...........................................................................42

XV. PRELIMINARY APPROVAL HEARING.....................................................................45

XVI. NOTICE.................................................................................................................46

XVII. OPT-OUTS ...........................................................................................................47

XVIII. OBJECTIONS/COMMENTS TO SETTLEMENT .........................................................48

XIX. FAIRNESS HEARING ............................................................................................49

XX. EXCESSIVE NUMBER OF OPT-OUTS ...................................................................50

XXI. ENFORCEMENT PROCEDURE................................................................................50
    21.1. Resolution Of Parties' Disputes .......................................................................50
    21.2. Court Intervention..........................................................................................51
    21.3. Fees Incurred to Enforce the Decree ................................................................51
    21.4. No Third-Party Rights .....................................................................................52
    21.5. Status of Allegedly Injured Individuals..............................................................52
    21.6. No Individual or Independent Right to Seek Enforcement ...................................52

XXII. CONSTRUCTION ..................................................................................................52
    22.1. Governing Law..............................................................................................52
    22.2. Entire Agreement...........................................................................................52
    22.3. Severability...................................................................................................53
    22.4. Joint Document Of The Parties ........................................................................53
    22.5. Agreed Modifications.....................................................................................53
    22.6. Headings ......................................................................................................54
    22.7. Non-Waiver ..................................................................................................54
    22.8. Calculation Of Time .......................................................................................54
    22.9. Notice To The Parties .....................................................................................54
    22.10. Counterparts.................................................................................................55

CH1 11323590.1

XXIII. STATEMENTS TO THE MEDIA OR GENERAL PUBLIC............................................55

XXIV. REPRESENTATIONS BY CLASS COUNSEL................................................................57

XXV. VOLUNTARY DISMISSAL WITH PREJUDICE............................................................57

iv

## I.    INTRODUCTION

On September 25, 2002, Plaintiff Amy Wiginton filed the lawsuit entitled *Wiginton v. CB Richard Ellis, Inc.*, 02 CV 6832 (the "Litigation"), on behalf of a class of current and former female employees (the "Class"), alleging that CBRE subjected female employees to Sexual Harassment as defined herein, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Subsequently, Kristine Moran, Andrea Corey, Dondi Plank, and Olivia Knapp (collectively with Amy Wiginton, the "Named Plaintiffs") joined the Litigation as additional Named Plaintiffs. CBRE denied, and continues to deny, all allegations of wrongdoing and liability in the Litigation. More particularly, CBRE categorically denies that it subjected female employees to sexual harassment or condoned or tolerated any such conduct, denies any and all liability to the Named Plaintiffs and the Class, and denies that it has violated Title VII or any applicable statute.

This Consent Decree resolves all Class and individual Sexual Harassment Claims (as defined herein) raised in the Litigation as defined in Section 2.27 below ("Released Claims"). No finding of liability has been made.

The Parties, as defined below in Paragraph 2.25, engaged in extensive motion practice and Class discovery for more than two years, including scores of depositions nationwide and the exchange of thousands of documents, as well as significant electronic and third-party discovery. Through this exhaustive process, the Parties developed a thorough understanding of the facts and applicable law, which enabled them to assess the relative merits of the claims and defenses asserted by each side. On August 31, 2004, the Named Plaintiffs filed a Motion for Class Certification seeking to certify the following class:

> All female employees who have been employed by defendant CB Richard Ellis,
> Inc. or its predecessors from January 1, 1999 to the present.

After extensive evidentiary submissions by the Parties, including expert reports, the Named Plaintiffs' motion was fully briefed as of January 21, 2005.

Immediately following the close of briefing on class certification, the parties retained a professional mediator for the purpose of assisting in settlement discussions. Hard-fought and extremely difficult, these mediated settlement negotiations required extensive thought and discussion on both sides. Ultimately, the settlement discussions, which were conducted at arms-length, gained traction and consistency in December 2005 with the aid of the United States Magistrate Judge and the United States District Court Judge presiding over This Case. During the course of those discussions and specifically at the Court's request, the Motion for Class Certification was withdrawn without prejudice on September 15, 2006, pending the outcome of settlement discussions. Therefore, the Court did not rule on the Motion for class certification.

Thereafter, the parties continued to engage in settlement negotiations. Throughout, the negotiations were conducted at arms-length with the assistance of, at various times, a professional mediator, as well as the Honorable Judge Wayne Andersen and Magistrate Judge Martin Ashman. These efforts ultimately resulted in an agreement to settle this action prior to a ruling on class certification, subject to this Court's review and approval after notice, an opportunity for members of the Class to object or opt out of the settlement, and a fairness hearing as required by Rule 23 of the Federal Rules of Civil Procedure. The Parties intend to seek certification of a settlement class under Rule 23(e) for monetary and injunctive relief as part of the process for seeking approval of this Consent Decree. However, if this settlement fails to be

2

approved, the Named Plaintiffs retain all rights to seek class certification, and Defendant retains all rights to object and to oppose Plaintiffs' motion for class certification.

This Consent Decree is entered into by the Named Plaintiffs, individually and on behalf of the Settlement Class Members, and by Defendant. The Parties agree that, after carefully considering the facts and applicable law and the uncertainty of continued litigation, and as a result of having engaged in extensive arm's-length negotiations, it would be in their best interests to finally resolve the Class' Sexual Harassment Claims (including individual and class Sexual Harassment Claims) by entry of this Consent Decree. The Parties anticipate that upon its entry by this Court, this Consent Decree shall be final and binding upon the Settlement Class, the Parties, their successors, and assigns and shall release all Released Claims to the extent allowed under Rule 23. The Parties, by and through their respective undersigned counsel, have agreed to this Consent Decree on the terms and conditions set forth below and subject to the approval of this Court.

## II. DEFINITIONS

The following terms, when used in this Consent Decree, shall have the following meanings as set forth below. All terms defined in the singular shall have the same meaning when used in the plural, and all terms defined in the plural shall have the same meaning when used in the singular.

2.1. **"Appropriate Disciplinary and/or Remedial Action"** means the amount of disciplinary and/or remedial action that CBRE believes in good faith to be necessary in order to prevent an alleged harasser from engaging in any further harassment or retaliation, taking into account any prior offenses under the harassment policy then in effect.

3

**2.2.** **"Best Efforts"** means steps taken in good faith and reasonably designed to achieve compliance with specified objectives to which the best efforts are directed.

**2.3.** **"CBRE"** means CB Richard Ellis, Inc., and each and all of current and former employees, salespeople classified as independent contractors, supervisors, officers, and directors during the Class Period (except where otherwise specified).

**2.4.** **"Claim Form"** or **"Claim Forms"** shall mean, individually or collectively, the respective claim forms entitled "Claim Form for Tier 1 Claims" (also known as the "Form-T1") or the "Claim Form for Tier 2 and Tier 3 Claims" (also known as the "Form-T2/3").

**2.5.** **"Claim Form Deadline"** shall mean the deadline by which Claim Forms must be post-marked as being sent to the Claims Administrator, which deadline will be 120 days from the date that Notice is post-marked as having been mailed to Class Members.

**2.6.** **"Claimant"** means any Settlement Class Member who submits a Claim Form pursuant to Section IX below. "Claimant" specifically excludes any Settlement Class Member who previously executed a valid and enforceable release of her Sexual Harassment Claims, unless such release specifically provides for recovery under this Consent Decree.

**2.7.** **"Claims Administrator"** or **"Settlement Administrator"** means Rust Consulting or another person or entity agreed upon by Class Counsel and CBRE's Counsel to conduct certain tasks, as described herein.

**2.8.** **"Claims Process"** means the Tier Program described in Section IX below.

**2.9.** **"Claims Standard(s)"** shall mean the Claims Standards as defined in Paragraphs 2.33 and 2.34, respectively, below.

**2.10.** **"Class"** or **"Plaintiff Class"** means the class certified by the Court solely for purposes of effectuating and entering this Consent Decree:

All female employees who were or have been employed by CBRE at any time during the Class Period.

**2.11.** **"Class Counsel"** means the law firms of Wexler Toriseva Wallace LLP, Hagens Berman Sobol Shapiro LLP, Favre Law Offices LLC and Gustafson Gluek PLLC.

**2.12.** **"Class Member"** means any female who was or has been employed by CBRE at any time during the Class Period.

**2.13.** **"Class Period"**, for purposes of settlement only, shall mean the period between January 1, 1999 and the date of Preliminary Approval of the settlement by the Court.

**2.14.** **"Consent Decree" or "Decree"** means this document, which has been signed by the Named Plaintiffs and by counsel of record for the Parties, subject to final approval and adoption by the Court, and which contains the following attached exhibits:

EXHIBIT A: PRELIMINARY APPROVAL ORDER

EXHIBIT B: NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF CLASS ACTION

EXHIBIT B-1: SUMMARY OF THE PROCEDURES AND CLAIMS STANDARDS FOR EACH OF THE THREE TIERS

EXHIBIT B-2: CLAIM FORM FOR TIER 1 CLAIMS (FORM-T1)

EXHIBIT B-3: CLAIM FORM FOR TIER 2 AND TIER 3 CLAIMS (FORM-T2/3)

EXHIBIT C: REQUEST FOR EXCLUSION

EXHIBIT D: EEOC'S POLICY GUIDANCE

EXHIBIT E: [PROPOSED] FINAL ORDER AND JUDGMENT AS TO CLASS CLAIMS GRANTING FINAL APPROVAL, APPROVING THE IMPLEMENTATION OF THE TIER PROGRAM, AND APPROVING CLASS COUNSEL'S APPLICATION FOR ATTORNEYS FEES AND LITIGATION EXPENSES AND INCENTIVE AWARDS TO CLASS REPRESENTATIVES

EXHIBIT F: JOINT PUBLICITY STATEMENT

EXHIBIT G: WOMEN SCHOLARS PROGRAM OVERVIEW

**2.15.** "**Court**" means the United States District Court for the Northern District of Illinois, and the Judge thereof having been assigned to preside over the Litigation, or proceedings relevant to the Case.

**2.16.** "**EEOC Guidance**" shall mean the EEOC's Policy Guidance on Employer Liability Under Title VII for Sexual Favoritism, N-915-048, dated January 12, 1990; EEOC'S Policy Guidance On Current Issues Of Sexual Harassment, N-915-050, dated March 19, 1990; EEOC's Enforcement Guidance on Harris v. Forklift Sys., Inc., N-915-002, dated March 8, 1994; and EEOC's Enforcement Guidance: Vicarious Liability For Unlawful Harassment By Supervisors, N-915-002, dated June 18, 1999, attached to this Decree as Exhibit C. EEOC Guidance may include additional published EEOC Policy or Enforcement Guidance if agreed upon in writing by all Parties.

**2.17.** "**Effective Date**" means the date on which the time for filing an appeal from the Court's final approval of this Consent Decree has either expired without an appeal being filed, or if later, after any appeal has been fully resolved upholding the Decree (including requests for rehearing, rehearing *en banc*, and petitions for *certiorari*), at which time the obligations set forth in this Consent Decree and the terms of this Consent Decree become binding on CBRE, the Named Plaintiffs, the Settlement Class, Class Counsel, and anyone else who has undertaken an obligation under this Decree.

**2.18.** "**Eligible Claim**" means any Sexual Harassment Claim of a Settlement Class Member, including class and individual claims, against CBRE that arose or could have arisen at any time between January 1, 1999 and the date of Preliminary Approval based upon alleged

6

sexual harassment experienced at CBRE (and not at a predecessor company that was subsequently acquired by CBRE).

**2.19.** **"Expiration Date"** means the date on which this Consent Decree and any order of the Court related to the Consent Decree and these settlement proceedings shall expire and shall be without any force or effect. The Expiration Date shall be two (2) years from the Effective Date, with the caveat that the Parties may thereafter conclude any enforcement proceedings post-delivery of CBRE's second annual report to the Special Master pursuant to Section VIII below, for which sole purpose the Court would retain jurisdiction following the Expiration Date. Regardless of whether such enforcement proceedings continue past the Expiration Date, no substantive obligations assumed by CBRE would survive past the Expiration Date (beyond those that Class Counsel seek to enforce after the Expiration Date *vis-à-vis* CBRE's obligations prior to the Expiration Date).

**2.20.** **"Final Approval"** means the entry of the Court's order granting final approval of this Consent Decree, which reflects that the Court concludes that the terms of this Consent Decree are fair, reasonable and adequate to the Class as a whole.

**2.21.** **"Liability Period"** means the Class Period.

**2.22.** The **"Litigation"** and/or **"This Case"** means all proceedings relating to or arising from *Wiginton, et al. v. CB Richard Ellis, Inc.*, 02 CV 6832 (N.D. Ill.), specifically excluding any and all individual claims under the Pregnancy Discrimination Act, 42 U.S.C. §2000e(k), as amended, the Equal Pay Act of 1963, 29 S.C. § 201, as amended, or claims of retaliation.

7

**2.23.** **"Named Plaintiffs"** means the individual plaintiffs who brought suit in This Case, including Amy Wiginton, Kristine Moran, Norma Plank Fethler, as successor in interest to Dondi Plank, Andrea Corey n/k/a Andrea Scott, and Olivia Knapp.

**2.24.** **"Notice"** shall mean the Notice Of Pendency And Proposed Settlement Of Class Action together with its exhibits, including the Claim Form For Tier 1 Claims (Form-T1), and the Claim Form For Tier 2 And Tier 3 Claims (Form-T2/3).

**2.25.** **"Parties"** means the Named Plaintiffs, individually and on behalf of the Class, and CBRE.

**2.26.** **"Preliminary Approval"** means the entry of the Court's Order granting preliminary approval of this Consent Decree, which reflects that the Court concludes that the terms of this Consent Decree appear sufficiently fair, reasonable, and adequate to the Class as a whole to warrant notice to the Class, an opportunity for Class Members to object or opt out, and a fairness hearing to consider Final Approval of the Consent Decree.

**2.27.** **"Released Claims"** means all Sexual Harassment Claims that were made or could have been made by the Named Plaintiffs or by any Class Members individually and/or on behalf of the Class against CBRE in this action under Title VII, 42 U.S.C. §2000 *et seq.*, as amended. Released Claims expressly does not include: (i) any and all individual or class claims under Title VII that any person, including any member of the Settlement Class and/or any Claimant has, whether known or unknown, against any company acquired by or merged with CBRE with respect to any acts or occurrences that occurred prior to the effective dates for the acquisition or merger; (ii) any and all individual or class claims under the Pregnancy Discrimination Act, 42 U.S.C. §2000e(k), as amended; (iii) any and all individual or class claims under the Equal Pay

8

Act of 1963, 29 U.S.C. § 201, as amended; or (iv) any and all individual or class claims for retaliation.

**2.28.** **"Settlement"** means the settlement terms embodied in this Consent Decree.

**2.29.** **"Settlement Class Member"** means any Class Member who does not opt out of the claims process of the Settlement, and **"Settlement Class"** means that group of individuals as a whole.

**2.30.** **"Service"** means delivery of notice and/or papers, and shall be defined as service as specified in the Federal Rules of Civil Procedure.

**2.31.** **"Sexual Harassment"** means unlawful sexual harassment in violation of Title VII, including hostile work environment and quid pro quo sexual harassment, and **"Sexual Harassment Claims"** or **"Claims of Sexual Harassment"** means claims of hostile work environment and/or quid pro quo sexual harassment that were or could have been asserted by female employees or ex-employees of CBRE against CBRE.

**2.32.** **"Special Master"** means the individual chosen by agreement of the Parties to administer the Tier Program set forth in Section XI and to serve as the Special Master as set forth in Section IX.

**2.33.** **"Tier 1 Claim Standard"** means that, for a Claimant to receive an award under Tier 1, she must allege to the satisfaction of the Special Master, based on the individual detail provided by the Claimant in her Claim Form and the class-wide evidence as set forth in Section 9.1.4, that she was subjected to Sexual Harassment. The Special Master shall use the EEOC Guidance as a guide in evaluating Tier 1 Claims and, specifically, whether the Claimant has alleged Sexual Harassment. By express agreement of the Parties, the Special Master must accept the allegations of the Tier 1 Claimant as true, Tier 1 Claimants are not required to identify the

9

alleged harassers by name or exact dates of the harassment, and CBRE is not permitted to know of or rebut the allegations of any Tier 1 Claimant.

2.34. **"Tier 2 Claim Standard"** means that, for a Tier 2 Claimant to receive an award under Tier 2, she must demonstrate to the satisfaction of the Special Master that she was subjected to Sexual Harassment, based on the complete Form T2/3, the information provided by CBRE in its response, the class-wide evidence as set forth in Section 9.1.4, and as otherwise permitted by the Special Master. The Special Master shall also use the EEOC Guidance as a guide in evaluating Tier 2 Claims, in resolving credibility conflicts and in determining whether the Claimant has demonstrated to the satisfaction of the Special Master that she was subjected to Sexual Harassment.

2.35. **"Tier 3 Claim Standard"** means that, for a Tier 3 Claimant to receive an award under Tier 3, she must demonstrate to the satisfaction of the Special Master that she was subjected to Sexual Harassment, based on the complete Form-T2/3, information presented by CBRE in its written response and position statement, any evidence collected during the Special Master's additional investigation of that Claimant's allegations, the evidence presented at the Tier 3 Claimant's Hearing, and the class-wide evidence as set forth in Section 9.1.4. The Special Master shall also use the EEOC Guidance as a guide in evaluating Tier 3 Claims, in resolving credibility conflicts and in determining whether the Claimant has demonstrated to the satisfaction of the Special Master that she was subjected to Sexual Harassment.

2.36. **"Tier Program"** means the three-tiered claims process/procedure for seeking and awarding monetary payments defined and set forth in Section IX.

2.37. **"Title VII"** means the Civil Rights Act of 1964, as amended in 1991 42 U.S.C. § 2000e, *et seq*.

10

### III.    GOALS OF THE SETTLEMENT

**3.1.    Goals Of The Consent Decree and Settlement Agreement.** The Parties enter into this Consent Decree and Settlement Agreement to achieve the following goals: (a) to resolve all Released Claims; (b) to ensure that Settlement Class Members are fairly compensated for release of the Released Claims; and (c) to ensure that effective mechanisms are in place to prevent and remedy unlawful Sexual Harassment.

**3.2    Court Findings.** If the Court approves this Consent Decree, the Court will have found, and the Parties agree, as follows: (a) the terms of this Consent Decree are adequate, fair, and reasonable to the Class as a whole; (b) this Consent Decree conforms with the Federal Rules of Civil Procedure and is not in derogation of the rights or privileges of any person, any party, or the Class; and (c) the final approval of this Consent Decree will be in the best interests of the Parties and, in particular, the Class.

### IV.    JURISDICTION

**4.1.** The Parties agree that the Court has jurisdiction over the Parties and the subject matter of the Litigation. The Litigation asserts claims under Title VII that, if proven, would authorize the Court to grant the monetary and equitable relief set forth in this Consent Decree. Venue is proper in this District. The Parties agree that this Court shall retain jurisdiction of the Litigation during the duration of this Consent Decree for the purpose of entering all orders, judgments and decrees that may be necessary to implement the relief provided herein. The procedures described below are not intended to diminish this Court's inherent power to enforce any provision of this Consent Decree. All Released Claims shall be dismissed with prejudice upon the Effective Date of this Consent Decree, provided that the Court retains jurisdiction to enforce the terms of this Consent Decree as described in Paragraph 2.19.

11

**4.2.** A copy of the Preliminary Approval Order as well as the [Proposed] Final Order And Judgment As To Class Claims Granting Final Approval, Approving The Implementation Of The Tier Program, And Approving Class Counsel's Application For Attorneys Fees And Litigation Expenses And Incentive Awards To Class Representatives to be entered are attached hereto as Exhibits A and D.

## V.    EFFECTIVE DATE AND DURATION OF THE CONSENT DECREE

**5.1.    Effect Of Consent Decree.** Upon its entry by the Court following Final Approval, the Consent Decree shall constitute an order of the Court and all of its provisions will become enforceable by the Parties in the manner set forth in this Consent Decree. The Parties, including CBRE, the Named Plaintiffs, and Class Counsel on behalf of the Class, agree that they shall not appeal from the Consent Decree or the Court's Order.

**5.2.    Joint Request For A Court Order.** The Parties agree that they will seek entry of the Orders in the form attached hereto and fully incorporated herein as Exhibits A and D, which dismisses the Released Claims against CBRE with prejudice, and without costs to any Party except as expressly provided herein, and which incorporates a Release of the Released Claims on behalf of the Named Plaintiffs and the Settlement Class as set forth in Paragraph XI.

**5.3.    Period of Force and Effect.** This Consent Decree shall become effective on the Effective Date and expire, by its own terms, on the Expiration Date.

## VI.    SCOPE OF THE CONSENT DECREE

**6.1.    Scope Of The Consent Decree.** This Consent Decree resolves the Released Claims.

12

**6.2.    Persons Covered.**

**a.    Settlement Class.** For settlement purposes only, the Court will certify the following class:

> All female employees who have been employed by defendant CB Richard Ellis, Inc. during the Class Period.

**b.    Opt–Out Rights.** If this Consent Decree is approved by the Court, at the Effective Date, all persons within the Class are bound by its terms, except those Class Members who effectively exercise a right to opt out of the Class and the settlement. Class Members who elect to opt out must complete the Request for Exclusion attached hereto as Exhibit C.

**6.3.    On-Going Best Efforts To Ensure The Effectuation Of The Settlement.** The Parties agree to make and undertake their best efforts on an on-going basis to effectuate, as well as to seek entry of this Consent Decree, or if applicable, to defend, this Consent Decree from any legal challenge by appeal, collateral attack, objection, or otherwise.

**6.4.    No Requirement To Violate Any Law.** Nothing in this Consent Decree shall require CBRE to violate any applicable law, ordinance, or regulation.

**VII.    EQUITABLE RELIEF**

**7.1.    No Automatic Injunction.** This Consent Decree shall not operate in any way as an automatic injunction. CBRE agrees to abide by the terms of this Consent Decree and all applicable federal and state employment laws including, but not limited to, Title VII of the Civil Rights Act of 1964.

**7.2.    Sexual Harassment.** CBRE agrees to and, to the extent it already is, agrees to continue to comply with the provisions of Title VII of the Civil Rights Act of 1964, as amended, and, specifically, agrees not to engage in any action, policy or practice that is intended to or is

13

known by CBRE to have the effect of sexually harassing any female employee, and agrees not to create, facilitate, or tolerate the existence of a work environment that is sexually hostile to female employees.

**7.3.** **Retaliation.** CBRE agrees to and, to the extent it already is, agrees to continue to comply with the provisions of Title VII of the Civil Rights Act of 1964, as amended, and specifically agrees not to engage in, implement, or tolerate any action, policy, or practice with the purpose or effect of retaliating against any current or former employee for: opposing Sexual Harassment, filing a Charge of Discrimination, testifying or participating in any investigation (including internal investigations), proceeding, or hearing in connection with This Case and/or relating to any claim of Sexual Harassment, being identified as a witness in this action, asserting any rights under this Consent Decree, or seeking and/or receiving any monetary or non-monetary relief under this Consent Decree.

**7.4.** **Statement of Intolerance of Sexual Harassment.** CBRE affirms the following "Statement of Intolerance of Sexual Harassment:"

> CB Richard Ellis, Inc. is firmly committed to, and reaffirms its commitment to, maintaining a policy of intolerance of Sexual Harassment and retaliation against individuals who report Sexual Harassment or retaliation in the Company's workplace; to swiftly and firmly responding to any acts of Sexual Harassment or retaliation of which the Company becomes aware; to maintaining a disciplinary system that is designed to strongly deter future acts of Sexual Harassment or retaliation; to promoting and maintaining a work environment free of behavior or objects that are hostile to women; and to monitoring its workplace in order to ensure tolerance, respect, and dignity for all employees.

This Paragraph does not create any contractual causes of action or other rights that would not otherwise exist.

14

**7.5.**     **Harassment-Free Workplace Policy**.  CBRE agrees that, within 90 days of the Effective Date of the agreement, it shall revise its Harassment-Free Workplace Policy, as necessary, in order to:

**7.5.1.**     provide examples to supplement the definition of Sexual Harassment and sex-based harassment;

**7.5.2.**     include strong non-retaliation language (for making complaints of Sexual Harassment) with examples to supplement the definition of retaliation;

**7.5.3.**     provide for Appropriate Disciplinary and/or Remedial Action for incidents of Sexual Harassment, sex-based harassment and/or retaliation (for making complaints of Sexual Harassment);

**7.5.4.**     provide that complaints of Sexual Harassment and/or retaliation (for making complaints of Sexual Harassment) will be accepted by CBRE in writing and orally, with oral complaints being documented in compliance with CBRE's complaint-documentation obligations (addressed in Paragraphs 7.7.7-7.7.9);

**7.5.5.**     establish a timetable that requires CBRE: (a) to assign the Sexual Harassment complaints to an investigator within two (2) business days; (b) to complete investigations within 45 days, with any exceptions being noted and the circumstances explained in the report to the Special Master; and (c) to implement Appropriate Disciplinary and/or Remedial Action promptly upon conclusion of an investigation, where appropriate;

**7.5.6.**     indicate that, promptly upon the conclusion of its investigation of a Sexual Harassment complaint, CBRE will notify the complainant that the investigation has been concluded and closed, whether a violation of CBRE's Harassment-Free Workplace Policy was substantiated, and that Appropriate Disciplinary and/or Remedial Action, if any, has been taken.

15

CBRE will also encourage the complainant to notify the Company of any further problems. The complainant will not receive details of the Appropriate Disciplinary and/or Remedial Action, if any, unless it directly affects her (*e.g.*, change in reporting relationship, location move, *etc.*);

**7.5.7.** reflect that the revised Harassment-Free Workplace Policy supersedes all existing Sexual Harassment policies;

**7.5.8.** ensure that the Harassment-Free Workplace Policy is contained in a single document, distributed among CBRE's offices, posted and accessible on the Intranet, and made part of any organized training on Sexual Harassment and/or workplace conduct (except that, to the extent other policies relate to the subject matter of the Harassment-Free Workplace Policy, CBRE shall direct employees to that policy).

**7.6. Distribution of Harassment-Free Workplace Policy.** CBRE agrees to electronically circulate its Harassment-Free Workplace Policy annually. The acknowledgement accompanying the Harassment-Free Workplace Policy will confirm that the recipient received and read the policy, and that the recipient knows where and how to report a harassment complaint. The acknowledgment will notify the recipient that, if she does not know where and how to report a complaint, she can ask CBRE for additional information and CBRE will provide such information before she signs or otherwise completes the acknowledgement.

**7.7. Complaint Procedures.** CBRE agrees that, within 90 days of the Effective Date of the agreement, it shall revise its complaint procedures to the extent necessary to ensure that they provide CBRE's employees with convenient, confidential, and reliable mechanisms for reporting incidents of Sexual Harassment and retaliation to the extent set forth and permitted under this Section. More specifically, CBRE agrees as follows:

16

**7.7.1.** CBRE shall notify employees by routinely and continuously posting on CBRE's internal website that specific individuals/positions have been designated as persons who may be contacted to report any incidents of Sexual Harassment and retaliation, and shall provide the name, office, where applicable, title, work location, and all available contact information for each such person. These individuals shall include:

**7.7.1.1.** Within each office, the Senior Office Operations Manager or Office Operations Manager (or equivalent position, if any, that does not report to the Managing Director within such office) and Managing Director shall be designated as and will serve as two (2) contacts authorized to receive harassment and retaliation complaints from employees in that office.

**7.7.1.2.** CBRE further agrees to designate the "General Counsel – Employment" as an individual authorized to receive Sexual Harassment and retaliation complaints; CBRE will also advise employees that a complaint may be made to any Human Resources Director, Human Resources Manager, Human Resources Specialist, or the Human Resources Service Center, any member of senior management, any lawyer in the Legal Department, the Chief Compliance Officer, or its anonymous whistleblower hotline.

**7.7.2.** CBRE agrees to continue to maintain a whistleblower hotline (an "Ethics Hotline") operated by a third-party that will accept anonymous complaints, document such complaints as received, and promptly route those complaints to the Human Resources Department to be investigated consistent with the principles otherwise discussed herein.

**7.7.3.** CBRE agrees that it shall revise its policies to the extent necessary to enable complaining parties to be interviewed by CBRE about their complaints, at the complaining party's election, in a confidential manner, including allowing the complainant to

17

provide the information in a location outside of the employee's work area and/or at an off-site location.

**7.7.4.** CBRE agrees that its complaint procedure shall not impose upon individuals seeking to make a complaint alleging Sexual Harassment and/or retaliation (for making complaints of Sexual Harassment) any requirements that are undue or more burdensome than those imposed upon individuals who make other complaints of comparable gravity.

**7.7.5.** CBRE agrees that information regarding complaints and investigations will only be shared with individuals who have a business need to know in connection with the investigation or for purposes of any personnel action with respect to the alleged Sexual Harassment.

**7.7.6.** CBRE agrees that it shall revise its complaint handling and disciplinary procedures to the extent necessary to ensure that all complaints of Sexual Harassment and/or retaliation are investigated and addressed promptly, and in accordance with the timetable described in Paragraph 7.5.5, *supra*.

**7.7.7.** CBRE agrees that it will instruct and require the original designated recipient of a complaint to document the complaint and related information received from a complainant as soon as practicable.

**7.7.8.** CBRE agrees that it will instruct and require the original designated recipient of a complaint to provide written copies of the documentation of the complaint to designees in the Legal Department and the Human Resources Department. In the event that the complaint is about a member of either of the Legal Department or Human Resources Department, the complaint recipient will provide copies of the documented complaint to the designee in the other department as well as the Chief Operating Officer.

18

**7.7.9.** CBRE agrees to maintain complaint investigation records in a centralized and secure location – specifically, CBRE's computer system – and to do so in a manner that preserves the integrity of the records. Pursuant to this agreement, CBRE agrees to:

**7.7.9.1.** scan and upload all original paper documents relating to an investigation under the policy into the computer system in a pdf format (or another format that makes the documents non-alterable); and

**7.7.9.2.** maintain a computerized audit trail sufficient to demonstrate that the integrity of the files has been maintained.

**7.7.10.** CBRE agrees to include in the personnel files of alleged harassers both: (1) records of any disciplinary and/or remedial actions actually implemented; and (2) records of any disciplinary recommendation which is made for the purpose of effecting an ultimate decision and prepared by a person with knowledge of the investigation and with authority to make such recommendation, even if the recommendation is not ultimately implemented.

**7.7.11.** CBRE agrees that it will not maintain records related to Sexual Harassment complaints or their investigations in complainants' personnel files (or any similar files pertaining specifically to complainants).

**7.7.12.** CBRE will also maintain the information necessary to comply with its reporting obligations, as set forth in Section VIII.

**7.8. Policies Designed to Promote Supervisor Accountability.**

**7.8.1.** CBRE agrees to impose Appropriate Remedial and/or Disciplinary Action -- up to and including termination, suspension without pay, or demotion -- upon any supervisor or manager who is found, at the conclusion of an investigation, to have engaged in Sexual Harassment, to have knowingly tolerated Sexual Harassment of one employee by another

19

in his or her work area, or to have retaliated against an individual for engaging in protected activity *vis-à-vis* alleged Sexual Harassment. CBRE shall communicate this policy to all of its supervisors and managers.

**7.8.2.** CBRE agrees to and, to the extent that it already is, agrees to continue to advise all managers and supervisors of their duty to monitor their work areas to ensure employees' compliance with the Harassment-Free Workplace Policy and to report any incidents and/or complaints of Sexual Harassment and/or retaliation (for complaining of alleged Sexual Harassment) of which they become aware consistent with the procedures set forth herein.

**7.8.3.** CBRE agrees, where applicable, to consider supervisors' and managers' deficiencies in maintaining a harassment-free workplace and/or in responding to harassment complaints in evaluating their performance, and agrees further that the resulting evaluations will have the same consequences for them as normally flow from their evaluations. CBRE agrees to include "commitment to harassment-free workplace" as a criterion for qualification for supervisory positions.

**7.9.** **Consistency of Policies.** CBRE agrees to ensure the consistency of its Harassment-Free Workplace Policy among all internal publications.

**7.10.** **Sexual Harassment Training**.

**7.10.1.** CBRE agrees to provide Company-wide Sexual Harassment training to all employees on two (2) occasions during the period from one year prior to the Effective Date and the end of the two-year term of this Consent Decree.

**7.10.2.** CBRE agrees to provide Sexual Harassment training to all new employees within one year of their hire or, alternatively, to provide DVD or web-based training in a shorter time period.

20

**7.10.3.** If the Company-wide training takes place at a new hire's office within one (1) year of hire, the Company-wide training will serve as the new-hire training for that individual.

**7.10.4.** To the extent practicable in a given instance, a senior management official shall introduce Sexual Harassment training.

## VIII. APPOINTMENT OF SPECIAL MASTER AND REPORTING OBLIGATIONS

**8.1.** **Special Master.** Prior to the Fairness Hearing, the Parties shall select a mutually agreeable independent third-party who is knowledgeable and experienced in Title VII law as the Special Master to administer the Tier Program set forth in Section IX and to serve as the Special Master as set forth in Section VII. The fees and costs of the Special Master will be assumed by CBRE.

**8.2.** **Content of Reports.** CBRE agrees to submit two fact-based annual reports to the Special Master during the term of the Consent Decree that demonstrate to the satisfaction of the Special Master CBRE's compliance with the terms of the Consent Decree. The Report shall include:

**8.2.1.** for each Sexual Harassment complaint received during the relevant cycle: (a) date of any Sexual Harassment complaint; (b) a factual description of complaint; (c) the office from which the complaint originated; (d) the date the investigation began; (e) the date the investigation closed; (f) whether the complaint was substantiated; (g) the disciplinary and/or remedial action taken, if any; (h) whether any subsequent complaints were reported in that office after the close of the investigation; and (i) for any investigation that lasted longer than 45 days, an explanation of the reasons the investigation was not completed within 45 days.

21

**8.2.2.**    the schedule of Sexual Harassment training that took place during the preceding reporting cycle; and

**8.2.3.**    in the event CBRE is unable in good faith to provide Sexual Harassment training in compliance with the schedule set forth in this Consent Decree, a detail of the reasons therefor.

**8.3.    Timetable for Reports.**

**8.3.1.**    Provided that the Effective Date of the Consent Decree occurs on or before November 30, 2007, the first annual reporting period shall begin on December 1, 2007, with the annual report covering the next twelve (12) months due on December 31, 2008; and the second annual reporting period shall begin on December 1, 2008, with the annual report covering the next twelve (12) months due on December 31, 2009.

**8.3.2.**    If the Effective Date of the Consent Decree is after November 30, 2007, then the first annual reporting period shall begin on the first day of the month following the Effective Date, with the annual report covering the next twelve (12) months due to the Special Master 90 days after the end of the first annual reporting period; the second annual reporting period shall begin on the first day of the month following the end of the first annual reporting period, with the annual report covering the next twelve (12) months due 90 days after the end of the second reporting period.

**8.3.3.**    The due dates for the annual reports may be extended by written agreement of the Parties and the Special Master.

**8.4.    Special Master's Follow-Up on Reports.**  The Parties further agree that:  (a) CBRE will provide the annual report to the Special Master only, (b) the Special Master will have 45 days to review the annual reports to ensure compliance with this Consent Decree and to

22

identify any issues; (c) within that 45 day period, the Special Master must identify in writing for CBRE any areas in the report which require further attention or otherwise appear to demonstrate non-compliance with this Consent Decree, (d) CBRE will have 30 days thereafter to address and/or correct any areas noted by the Special Master, and (e) if the issues raised by the Special Master are not resolved within this 30-day period, the Special Master will share with Class Counsel any unresolved areas.

**8.5.** **Class Counsel's Follow-Up on Reports.** To the extent the Special Master shares unresolved areas or issues of non-compliance (if any) with Class Counsel as provided in Paragraph 8.4, Class Counsel must seek to resolve any disputes arising therefrom according to the procedures set forth in Section XXI.

## IX. MONETARY RELIEF

### 9.1. Tier Program.

#### 9.1.1. Tier Program Generally

##### 9.1.1.1.
The Parties have agreed to a tiered claims process ("Tier Program") to which all Settlement Class Members will have access and by which participating Settlement Class Members will adjudicate any individual Eligible Claims for certain monetary relief related to the Litigation. The Tier Program contemplates that Claimants will elect one of the three procedural tracks or "Tiers" under which their claims will be evaluated. Each of the three Tiers is subject to an award cap proportional to the degree of process to which each Claimant's claim is subjected.

##### 9.1.1.2.
The Tier Program will be administered by the agreed-upon Special Master who shall use the standards and procedures described hereafter to process and decide the appropriate remuneration, if any, for each Claimant's Eligible Claim. To the extent

23

any procedural or administrative issue is not specifically addressed below, the Special Master shall have the discretion to develop such procedures, rules and systems to execute the Tier Program in a way that is consistent with this Agreement and promotes the timely and fair disposition of any claim. In any event or Tier however, the Special Master shall not submit written findings of fact or conclusions of law.

**9.1.2.    No Right to Appeal.** Neither any Claimant nor CBRE has the right to appeal any decision by the Special Master in any Tier; the Special Master's decision is final.

**9.1.3.    Claimant Tier Election.** Each Settlement Class Member seeking to participate in the Tier Program must complete a Claim Form, *i.e.* either a Tier 1 (Form-T1) or Tier 2 / Tier 3 (Form-T2/3) Claim Form.

**9.1.3.1.**    The Claim Forms will be mailed to each Class Member as attachments to the Notice. This Consent Decree, the Notice and the Claim Forms will also be made available on the home page of the website entitled www.cbrichardellislawsuit.com.

**9.1.3.2.**    All Claim Forms must be sent directly by the Claimants or their agents or representatives to the Claims Administrator and post-marked by the Claim Form Deadline. Within three (3) business days of receipt, or the Effective Date, whichever comes later, the Claims Administrator must forward the Claim Forms to the Special Master. If the Claims Administrator receives any form post-marked after the Claim Form Deadline, s/he shall return the untimely form to the Class Member attached to a standard letter developed by the Special Master explaining that the Claim Form Deadline has passed and that the Class Member is no longer eligible for the Tier Program, unless the Claimant can demonstrate to the satisfaction of the Special Master proof of timely delivery (such as receipt for certified mail) or there was good cause for delay.

24

**9.1.4. Presentation Of Class-Wide Evidence.** During the 90-day period after the Effective Date, CBRE and Class Counsel shall provide the Special Master with copies of their respective class certification briefs and exhibits filed in This Case in connection with Plaintiffs' Motion for Class Certification. The Special Master may, at his/her discretion, request that CBRE and Class Counsel provide a live presentation concerning class-wide allegations of harassment and the defenses thereto (as to both liability and/or damages). The Special Master will decide the length, forum and format of any live presentation concerning class-wide evidence. Any class presentations shall be delivered by counsel for CBRE and Class Counsel; no live testimony of any witness, Named Plaintiff or Class Member is allowed. Class-wide evidence will not be permitted or considered in any form other than as expressly provided in this Consent Decree. With respect to the evaluation of whether any individual Claimant can meet the relevant Claim Standard, the Special Master shall give whatever credence and weight to the class-wide evidence she deems reasonable and appropriate, provided, however, that the class-wide evidence will not have any presumptive effect.

**9.1.5. Administration Of Tier Program.** Once the Claim Form Deadline has passed, the Special Master shall begin the Tier Program Administration stage. The Tier Program will operate along three tracks: Tier 1, Tier 2, and Tier 3, each described below.

**9.1.5.1.** The Special Master has the discretion to conduct/schedule Tier Program proceedings, subject to the rules established herein. All steps in the Tier Program, however, from individual Tier proceedings to the payment of any Tier Program awards, must be completed within 365 days from the Claim Form Deadline date or within another time agreed upon in writing by the Parties and the Special Master.

25

**9.1.5.2.** The Tier Program requires the Special Master to (a) verify that each Claimant is a Class Member; (b) analyze each Claimant's claim based on the Claim Standards as defined herein and the materials provided by the Parties as permitted herein; and (c) determine whether, to the Special Master's satisfaction, the Claimant has met the Claim Standard.

**9.1.5.3.** Within 10 days of Preliminary Approval of the Settlement, for verification that a Claimant is a Class Member, CBRE will provide the Special Master a list of all female employees during the Class Period, and the locations and dates of their first and last, if applicable, dates of employment with CBRE. After the Claim Form Deadline, the Special Master shall compare the Claim Forms to the employee list to confirm that each Claimant is a Class Member. In the event that a Claimant's name does not match the employee list, the Special Master shall request additional information from the Claimant including the Claimant's social security number (if not already provided). The Special Master shall then implement appropriate procedures to compare this additional information with information maintained by CBRE while protecting the applicable confidentiality of the Claimant's claim if submitted in Tier 1.

**9.1.5.4.** Within 10 days of Preliminary Approval of the Settlement, CBRE will also provide the Special Master and Class Counsel a list of all CBRE employees who have executed releases of harassment claims under Title VII, along with copies of each executed release so that the Special Master may confirm that the release covers the Released Claims. Settlement Class Members who have executed releases of the Released Claims are ineligible for the Tier Program.

26

### 9.1.6. Tier 1 Claims.

**9.1.6.1.** A Tier 1 Claimant must complete a Form-T1. In or with the Form-T1, the Tier 1 Claimant must provide under penalty of perjury:

(a) Her name, employment dates, office of employment, and a summary of the harassment the Claimant allegedly experienced;

(b) A statement concerning the approximate dates (or time period) of the alleged harassment demonstrating that the alleged harassment occurred during the Class Period (although the Claimant does not have to specify the name of the harasser or provide specific dates for the underlying incident(s)).

**9.1.6.2.** The Special Master must accept the allegations of the Tier 1 Claimants as true. CBRE will not be permitted to rebut the allegations asserted in any Tier 1 claims.

**9.1.6.3.** The information submitted in the Form T-1s will be kept confidential by the Special Master, including from CBRE.

**9.1.6.4.** If, based on the allegations in a Tier 1 Claimant's Form T-1 and subject to the limited information required to be provided therein, the Special Master determines that a Tier 1 Claimant meets the Tier 1 Claim Standard, s/he shall award that Tier 1 Claimant the amount of $1,500.

**9.1.6.5.** If the Special Master determines in her discretion that a Tier 1 Claimant has not met the Tier 1 Claim Standard, she shall not receive a monetary award.

27

**9.1.6.6.** All Form T-1s shall be reviewed and retained exclusively by the Special Master. Once all Tier 1 claims have been processed, the Special Master shall notify:

    (a) Class Counsel and the Claims Administrator as to each Tier 1 claimant's award and the total amount allocated for Tier 1;

    (b) CBRE only as to the aggregate amount of all Tier 1 awards.

**9.1.6.7.** CBRE shall then deposit the total Tier 1 award into an escrow account specified by the Claims Administrator within 30 days of service of notice of the total Tier 1 award from the Special Master or 10 days from the Effective Date of the Decree, whichever comes later.

**9.1.6.8.** Within 30 days of deposit of the total Tier 1 award into the escrow account, the Claims Administrator shall:

    (a) distribute individual Tier 1 awards to each successful Tier 1 Claimant; and

    (b) file and serve the appropriate Form 1099s with the Internal Revenue Service and the Claimants.

**9.1.6.9.** Any Tier 1 award that is unclaimed as of the Expiration Date or six months after the Claims Administrator has issued the award to the Claimant, whichever is later, shall be paid to the charitable organization described in Paragraph 10.1 below.

**9.1.7.** **Tier 2 Claims.**

**9.1.7.1.** A Tier 2 Claimant must complete a Form-T2/3, designating that she wishes to proceed in Tier 2. This form identifies the Tier 2 Claimant by name and requires the Tier 2 Claimant to specify under penalty of perjury her Sexual Harassment allegations, including the detail of the hostile work environment which she allegedly

28

experienced, the identification of any individual who participated in the alleged Sexual Harassment, a detailed description of the alleged sexually harassing conduct, whether the alleged harassing conduct was welcome or unwelcome, a detailed description of how the alleged Sexual Harassment affected her and what injuries she alleges based on the alleged Sexual Harassment, the approximate time period when any alleged incidents occurred, whether each alleged incident was reported (and if so, to whom, how, and when it was reported) and, if not reported, the reasons why not. In determining whether a Tier 2 Claimant meets the Claim Standard, the Special Master shall treat vague or speculative allegations consistent with EEOC's Policy Guidance.

**9.1.7.2.** The Form-T2/3 will include a statement assuring the Claimant that CBRE is prohibited from retaliating against her for participating in the Tier Program.

**9.1.7.3.** Within 14 days of the Claim Form Deadline, the Special Master shall collect and submit all Form-T2/3s for the Tier 2 Claimants to CBRE.

**9.1.7.4.** Within 90 days of receiving the Tier 2 forms from the Special Master, CBRE shall provide a written response to each Form-T2/3, including information concerning steps taken to respond to the alleged harassment, if it was reported or known to CBRE. CBRE's response (including any position statement) shall be limited to 15 pages with writing and/or typing on only one side of each page, unless otherwise authorized by the Special Master.

**9.1.7.5.** The Special Master shall then determine whether each Tier 2 Claimant meets the Claim Standard. If the Special Master is unable to determine, based on the submissions described in Paragraphs 9.1.7.1 and 9.1.7.4, whether a Tier 2 Claimant meets the

29

Claim Standard, then the Special Master may make one request for additional information of Claimant and/or one request for additional information of CBRE for the purpose of enabling her to make such determination.

**9.1.7.6.** If the Special Master determines that a Tier 2 Claimant meets the Claim Standard, the Special Master shall consider the damages available to litigants under Title VII and 42 USCS § 1981a and determine the appropriate monetary award, if any, for such Claimant within a range of $0 to $15,000.00. In the event the Special Master determines that the Claimant does not satisfy the Claim Standard, the Claimant shall be awarded no money.

**9.1.7.7.** The Special Master shall make quarterly reports to Class Counsel, the Claims Administrator and CBRE concerning the Tier 2 awards for the preceding quarter.

**9.1.7.8.** Within 60 days of each quarterly award report or 10 days from the Effective Date of the agreement, whichever comes later, CBRE shall deposit the total of the Tier 2 awards into the escrow account designated by the Claims Administrator.

**9.1.7.9.** Within 30 days of deposit, the Claims Administrator shall tender to each successful Tier 2 Claimant her award check and file and serve the appropriate Form 1099 with the Internal Revenue Service and the Tier 2 Claimants.

**9.1.7.10.** Any Tier 2 award that is unclaimed as of the Expiration Date or six months after the Claims Administrator has issued the award to the Claimant, whichever is later, shall be paid to the charitable organization described in Paragraph 10.1 below.

**9.1.8. Tier 3 Claims.**

**9.1.8.1.** A Tier 3 Claimant must complete a Form-T2/3, designating that she wishes to proceed in Tier 3. This form identifies the Tier 3 Claimant by name and

30

requires the Tier 3 Claimant to specify under penalty of perjury her Sexual Harassment allegations, including the detail of the hostile work environment which she allegedly experienced, the identification of any individual who participated in the alleged Sexual Harassment, a detailed description of the alleged sexually harassing conduct, whether the alleged sexually harassing conduct was welcome or unwelcome, a detailed description of how the alleged Sexual Harassment affected her and what injuries she alleges based on the alleged Sexual Harassment, the approximate time period when any alleged incidents occurred, whether each alleged incident was reported (and if so, to whom, how, and when it was reported) and, if not reported, the reasons why not. A Tier 3 Claimant's written submission shall be limited to 15 pages with writing and/or typing on only one side of each page; however, a Tier 3 Claimant may submit as exhibits pre-existing documents (*i.e.*, documents that were not created for purposes of submitting her Tier 3 Claim) that provide some or all of the basis for her Claim, including, by way of example only, inappropriate e-mails circulated in the workplace, photographs of inappropriate conduct in her office, *etc.*

**9.1.8.2.** The Form-T2/3 includes a statement assuring the Claimant that CBRE is prohibited from retaliating against her for participating in the Tier Program.

**9.1.8.3.** In determining whether a Tier 3 Claimant meets the Claims Standard, the Special Master is entitled to follow up and ask the Claimant to be more specific. If the Claimant is not able to provide more specifics to the satisfaction of the Special Master, the Special Master may take that into account when adjudicating the claim.

**9.1.8.4.** Within 14 days of the Claim Form Deadline, the Special Master shall provide copies of all Forms-T2/3 for the Tier 3 Claimants to CBRE.

31

**9.1.8.5.** Within 90 days of receiving each Tier 3 form from the Special Master, CBRE shall provide a response and/or position statement to the allegations in the Form-T2/3, including information concerning steps taken to respond to the alleged harassment, if it was reported or otherwise known by CBRE, additional areas of inquiry it believes are needed, and the names of persons it believes are necessary for resolving the claim, as well as any rebuttal to class-wide evidence cited by any individual claimant. CBRE's written response (including any position statement) shall be limited to 15 pages with writing and/or typing on only one side of each page. CBRE shall return its response to the Special Master; however, CBRE may submit as exhibits pre-existing documents (*i.e.*, documents that were not created for purposes of its response to the Tier 3 Claim) that provide some or all of the basis for its defense, including, by way of example only, an executed release by the Claimant.

**9.1.8.6.** Within 30 days of receipt, the Special Master shall provide copies of CBRE's response and position statement to each Tier 3 Claimant together with a standard cover letter prepared by the Special Master setting forth the rights that the Claimant has to respond as follows: Each Tier 3 Claimant shall have 60 days to prepare, if she so chooses, any rebuttal to the issues raised in CBRE's response or position statement, including but not limited to the identification of any additional areas of inquiry and the names of persons necessary for resolving the claim.

**9.1.8.7.** Within 90 days after the deadline for the rebuttal statement, the Special Master may, at his/her discretion, conduct additional investigation into a given Tier 3 Claimant's claims. The Special Master's investigation can include a request for additional documentation or written response to specific questions from CBRE or the Claimant. Neither CBRE nor the Claimant may object to the additional investigation, unless compliance with the

32

request would cost the responding party more than $5,000 (exclusive of attorneys' fees) to address. However, in the event that CBRE or the Claimant refuses to cooperate or provide the additional information requested from the Special Master, the Special Master may make an adverse inference regarding the requested information against that party.

**9.1.8.8.** Once the Special Master has conducted any additional investigation, s/he shall schedule a Tier 3 Hearing.

**9.1.8.9.** Tier 3 Hearings shall be conducted in Chicago, Illinois at dates and times scheduled by the Special Master. The Special Master has the discretion to reschedule Tier 3 Hearings at the Claimant's or CBRE's request. The Special Master shall decide the venue of the hearings.

**9.1.8.10.** Tier 3 Hearings will be directed and conducted at the discretion of the Special Master, subject to the following guidelines:

    (a) Both CBRE and the Claimant (except for the Named Plaintiffs and CBRE with respect to the Named Plaintiffs' claims only) shall have an opportunity to provide an oral presentation if they choose, including but not limited to a review of any alleged facts or documents;

    (b) Tier 3 Claimants who live more than 100 miles from the hearing venue may attend telephonically or, after being duly sworn, provide testimony telephonically. Alternatively, CBRE has the right to require a Tier 3 Claimant to testify in person (unless the Claimant can demonstrate to the Special Master extraordinary circumstances precluding her in-person attendance) provided that it

33

pays the Claimant's reasonable transportation and lodging expenses;

(c)    Each side may, at her or its option and subject only to the Special Master's discretion, identify one or more witnesses, including but not limited to CBRE employees, who have personal knowledge of the facts or circumstances alleged in or related to the Claim to testify;

(d)    The Special Master has the discretion, informed by the written materials, to identify and request additional individuals, including CBRE employees and third-party witnesses that are in the control of the Claimant or CBRE, to attend the hearing and testify (and, in the event said witnesses are not produced, may draw reasonable inferences therefrom, taking into account all relevant circumstances including cost);

(e)    Subject to the discretion of the Special Master, the Special Master may ask questions of the witnesses, and may provide CBRE and the Claimant the opportunity to present and cross-examine the witnesses attending the hearing pursuant to the guidelines above;

(f)    A Tier 3 Hearing shall be completed in one, eight-hour day (exclusive of breaks), but the Special Master may extend this limit and may conclude the hearing at any time in less than eight hours, both either in his or her sole discretion and/or upon the request of either CBRE or the Claimant;

34

(g)   The Special Master has discretion as to how each Tier 3 Hearing will be conducted, including the order of witnesses, time limits for the presentation of CBRE's and the Claimant's cases, and rules of evidence that apply, subject to the rule that CBRE and the Claimant shall be allocated equal amounts of time of that ultimately permitted for the hearing.

**9.1.8.11.**   The Special Master shall then determine whether each Tier 3 Claimant meets the Claim Standard.

**9.1.8.12.**   If the Special Master determines that a Tier 3 Claimant meets the Claim Standard, the Special Master shall consider the damages available to litigants under Title VII and 42 USCS § 1981a and determine the appropriate monetary award, if any, for such Claimant within a range of $0 to $150,000. In the event the Special Master determines that the Claimant does not satisfy the Claim Standard, the Claimant shall be awarded no money.

**9.1.8.13.**   The Special Master shall make quarterly reports to Class Counsel, the Claims Administrator and CBRE concerning the Tier 3 awards for the preceding quarter.

**9.1.8.14.**   Within 60 days of each quarterly award report or 10 days from the Effective Date of the Agreement, whichever comes later, CBRE shall deposit the total of the Tier 3 awards into the escrow account established by the Claims Administrator.

**9.1.8.15.**   Within 30 days of deposit, the Claims Administrator shall tender to each successful Tier 3 Claimant her award check and file and serve the appropriate Form 1099 with the Internal Revenue Service and the Tier 3 Claimants.

35

**9.1.8.16.** Any Tier 3 award that is unclaimed as of the Expiration Date or six months after the Claims Administrator has issued the award to the Claimant, whichever is later, shall be paid to the charitable organization described in Paragraph 10.1 below.

**9.1.9.** **Return/Destruction Of Tier Program Materials.** At the conclusion of the Tier Program, the Special Master shall return all materials submitted during the Program to the producing party or (with that party's agreement) shall destroy those materials.

**9.1.10.** **The Named Plaintiffs' Participation in The Tier Program.** The Named Plaintiffs may participate in the Tier Program to the same extent as any Class Member, except as to the scope of the evidence the Named Plaintiffs are allowed to present if they elect to participate in the Tier Program, as set forth in Paragraph 9.1.8.10(a). Specifically, if any of the Named Plaintiffs participate in the Tier Program, the Parties agree that:

**9.1.10.1.** the evidence CBRE and the Named Plaintiff may submit in support of or in opposition to a Tier 3 claim will be limited to the documentary evidence already developed in This Case (including, but not limited to, depositions, declarations, other summary judgment brief materials, and summary judgment briefs);

**9.1.10.2.** for any Named Plaintiff who elects to submit a Tier 3 Claim, the Special Master will not conduct a Tier 3 hearing.

**9.1.11.** **No Entitlement to Attorneys' Fees or Costs in Connection with Tier Program.** Nothing in this Section (or this Consent Decree) shall permit individual Claimants or their attorneys, including but not limited to Class Counsel, to seek or recover from CBRE attorneys' fees or other costs associated with representing an individual Claimant with respect to the Tier Program. CBRE shall not be obligated to compensate individual Claimants or their attorneys for any such fees or costs.

36

## X.     CHARITABLE CONTRIBUTION

### 10.1.   Charitable Contribution.

**10.1.1.** CBRE agrees to make a contribution of $400,000 to the Commercial Real Estate Women (CREW) Network, an industry advocate for the success of women in commercial real estate, for the establishment and administration of a scholarship fund pursuant to the Women Scholars' Program described in Exhibit G. The purpose of the program is to provide annual scholarships over the next four years to junior and/or senior female undergraduate students concentrating their field of study in the real estate area in order to promote the entry and advancement of women in the real estate services industry.

## XI.     RELEASE AND COVENANT NOT TO SUE

**11.1.** In consideration of the promises contained in, and the benefits provided or to be provided hereunder, upon the Effective Date this Consent Decree shall resolve, extinguish, and finally forever bar any and all Released Claims which any of the Named Plaintiffs, or their respective representatives, agents, heirs, executors, administrators, successors, or assigns have, may have, may have had, or in the future may have against CBRE arising from or related to events that occurred during the Liability Period.

**11.2.** Except with respect to any persons who have effectively exercised a right to opt out of this Decree (which is permissible as to claims for monetary relief only), in consideration of the promises contained in, and the benefits, processes and procedures provided or to be provided to the Settlement Class Members hereunder, upon the Effective Date this Consent Decree shall resolve, extinguish, and finally and forever bar any and all Released Claims for monetary relief or for equitable relief which any of the Settlement Class Members, or their representatives, agents, heirs, executors, administrators, successors, or assigns have, may have,

37

may have had, or in the future may have against CBRE arising from or related to events that occurred during the Liability Period. As used in this Section, the phrase "monetary relief" shall include economic or non-economic monetary damages of any kind arising from the Released Claims, including, without limitation, back pay, employment benefits (including, without limitation, retirement, life insurance, and 401(k) savings plan benefits, and the monetary equivalent of various forms of leave), and/or interest (including both pre-judgment interest and post-judgment interest), compensatory damages and punitive damages. Upon the Effective Date, to the extent permitted by law, the doctrines of res judicata and collateral estoppel shall bind all Settlement Class Members with respect to the Released Claims (and shall also bar all Class Members with respect to claims for equitable relief released hereunder). The Consent Decree may be pled as a full and complete defense to any subsequent action or other proceeding involving any person or party which arises out of the Released Claims and any other claims released and discharged by the Consent Decree (*i.e.*, the claims for equitable relief released as to all Class Members).

**11.3. Covenant Not to Sue**. In consideration of the promises contained in this Consent Decree and the benefits, processes and procedures provided or to be provided hereunder, the Settlement Class Members also agree never to sue Defendant in any forum for any of the Released Claims. They additionally agree that any such claim, if filed by any one or more of them, shall be dismissed with prejudice. Excluded from this covenant not to sue are any claims that cannot be waived by law.

## XII. GENERAL PROVISIONS

**12.1. No Admission Of Liability**. This Consent Decree does not and is not intended to constitute and shall not be deemed to constitute an admission by CBRE as to the merits, validity,

38

or accuracy of any of the allegations, claims, or defenses in the Litigation, nor shall it be used as a means to require the continuation of any program or action beyond the term of this Consent Decree, except as may be necessary to enforce the terms of this Consent Decree. By entering into this Consent Decree, CBRE does not admit or concede, expressly or impliedly, but instead denies, that it has in any way violated Title VII, the common law of any jurisdiction, any federal, state, or local law, statute, ordinance, regulation, rule, or executive order, or any obligation or duty at law or in equity.

**12.2. No Court Findings As to Liability.** In agreeing to the terms of this Consent Decree, the Parties acknowledge that this Court has not made any findings or expressed any opinion concerning the merits, validity, or accuracy of any of the allegations, claims, or defenses in the Litigation.

### 12.3. Not Admissible In Any Other Proceeding.

**12.3.1.** The Parties shall not introduce or use or cause to be introduced or used anything in this Consent Decree, nor any action taken in implementation thereof, nor any statements, discussions, or communications, nor any materials prepared, exchanged, issued, or used during the course of the Litigation or in negotiations leading to this Consent Decree, in this Litigation or in any other judicial, arbitral, administrative, investigative, or other proceeding of whatsoever kind or nature, as evidence of Sexual Harassment, or as evidence of any violation of Title VII; the common law of any jurisdiction; any federal, state, or local law, statute, ordinance, regulation, rule, or executive order; or any obligation or duty at law or in equity.

**12.3.2.** Notwithstanding the foregoing, the Consent Decree may be used by the Plaintiff Class or CBRE in any proceeding in this Court to enforce or implement the Consent Decree or any orders or judgments of this Court entered into in connection herewith.

39

**12.3.3. Effect Of Failure Of Consent Decree.** In the event this Consent Decree does not become final or effective (for whatever reason), this entire Consent Decree shall become null and void and of no force or effect at the option of Class Counsel, on behalf of the Named Plaintiffs or the Class, or CBRE. The Parties further agree that the Litigation shall be reinstated if CBRE exercises its option to void the Consent Decree pursuant to any of the conditions enumerated in Section XX below.

**12.4. Responsibility of Settlement Class Members and Named Plaintiffs for Tax Liabilities.**

**12.4.1.** Each Settlement Class Member and Named Plaintiff who receives a payment from CBRE in connection with this Consent Decree and the procedures/payments provided for herein shall be fully and ultimately responsible for payment of any and all federal, state or local taxes (excluding the employer share of employment taxes, if any, and unemployment taxes and excluding amounts properly withheld from the payment, if any) resulting from or attributable to the payment received by such Settlement Class Member or Named Plaintiff.

**12.4.2.** Further, each Settlement Class Member and Named Plaintiff shall indemnify and hold harmless CBRE, Class Counsel, the Depository Bank, and the Settlement Administrator from any tax liability, including penalties and interests and costs of any proceedings, related in any way to any acts or omissions on the part of the Settlement Class Member or Named Plaintiff.

**12.4.3.** In all cases in which the tax liability that arises is not attributable to any acts or omissions on the part of a Settlement Class Member or Named Plaintiff, the Settlement Class Member or Named Plaintiff shall indemnify and hold harmless CBRE, Class Counsel, the

40

Depository Bank, and the Settlement Administrator from any tax liability, but not penalties, interest, or the costs of any proceedings related to such tax liability.

## XIII. INCENTIVE AWARDS TO NAMED PLAINTIFFS.

**13.1.** CBRE agrees to pay the Named Plaintiffs an aggregate award of $350,000 for the services they provided to the Class, and the risks they assumed on behalf of the Class.

**13.2.** Subject to the Court's approval, the Parties have valued the services provided and the risks undertaken by each of the Named Plaintiffs by taking into account the following factors:

    (a)   the length of each of their tenures as Named Plaintiffs in the litigation and the concomitant obligations as a result thereof;

    (b)   the service of all Named Plaintiffs in the strategic components of the litigation, in which they gave direction to, and regularly consulted with, Class Counsel about the case strategy and direction and later about litigation plans and settlement issues; and

    (c)   assistance by each of the Named Plaintiffs in designing and undertaking discovery and responding to discovery undertaken by CBRE, as well as submitting to depositions and providing declarations.

**13.3.** Subject to the Court's approval, the allocation of the Service Award, based on the recommendation of Class Counsel and the Named Plaintiffs, shall be as follows:

41

| Amy Wiginton | $125,000 |
| Kristine Moran | $100,000 |
| Andrea Corey | $75,000 |
| Norma Plank Fethler, as successor in interest to Dondi Plank | $25,000 |
| Olivia Knapp | $25,000 |

**13.4.** CBRE will tender separate checks to Class Counsel for delivery to each Named Plaintiff in the respective amounts, within 30 days of the Effective Date of the agreement, after which CBRE shall file a Form 1099 in that amount for each Named Plaintiff.

## XIV. ATTORNEYS' FEES AND COSTS

**14.1.** Upon final approval of this Decree, CBRE shall establish an interest-bearing escrow account at Charter One Bank in Chicago, Illinois into which it shall deposit the sum of Three Million Four Hundred Thousand Dollars ($3,400,000.00), as payment to Class Counsel for all fees and litigation costs and expenses they incurred on behalf of Plaintiffs and the Class up to and including the date this Consent Decree obtains final approval by the Court. Such funds, including accrued interest, will be released and made payable to Class Counsel on the Effective Date of the Decree.

**14.2.** CBRE shall not be responsible for the payment of any other attorneys' fees and expenses incurred by Class Counsel, the Named Plaintiffs or the Class, except as follows:

> (a) the Special Master's fees for administering the Tier Program and monitoring compliance with the Consent Decree as described herein;

42

(b)     the travel and lodging expenses for live testimony of Tier Program claimants, described in Paragraph 11.1.8.11, above;

(c)     demonstrable fees incurred by Class Counsel in jointly working with CBRE to respond to an appeal from the final order approving the Consent Decree, but only in the following limited categories: (1) reviewing and commenting on CBRE's brief, (2) preparation of portions of an appellate brief which raises arguments that CBRE has refused to make after having been advised to do so by Class Counsel, but only if the arguments asserted by Class Counsel ultimately constitute one of the bases relied on by the Court of Appeals for upholding the consent decree, and (3) necessary preparation for and attendance of up to two attorneys at hearings related to the appeal;

(d)     demonstrable fees up to $20,000, incurred by Class Counsel for necessary preparation for and attendance of up to two attorneys at any class-wide oral argument requested by the Special Master pursuant to Paragraph 11.1.4, with the understanding that class-wide evidence is otherwise limited to the class briefs and exhibits already submitted to the Court in connection with Plaintiffs' motion for class certification and that CBRE will not pay fees incurred in the preparation of any additional written materials;

43

(e)    any fees and expenses incurred by Class Counsel where Class Counsel represents the prevailing party in the enforcement of this Decree as set forth and limited by Section XXI;

(f)    any fees owed by CBRE under sub-paragraphs (c) and (d) shall be limited to and shall under no circumstances exceed $100,000;

(g)    the costs and expenses for administering the employment practices in Section VII of the Decree shall be paid by CBRE.

Notwithstanding the foregoing, this section in no way limits the right of Class Counsel to do additional work not enumerated above; this section is only intended to reflect the limitations on CBRE's payments to Class Counsel for future work.

**14.3.** The Parties acknowledge that neither Class Counsel, the Named Plaintiffs nor CBRE is responsible for any fees and costs associated with a Claimant's participation in the Tier Program described in Section IX above. CBRE will not compensate Class Counsel for any fees or costs incurred in assisting any individual Class Members, including, but not limited to, responding to Class Member inquiries regarding the Settlement and/or performing ancillary tasks related to Class Members' access to the Tier Program.

**14.4.** CBRE shall have no obligation under this Consent Decree to pay any money for attorneys' fees and costs to Class Counsel, except as expressly set forth herein. Except as otherwise provided herein, CBRE shall not be liable for any of the Named Plaintiffs' costs or attorneys' fees, statutory or otherwise, incurred in the Litigation or during the term of the Consent Decree.

**14.5.** The costs and expenses for administering the employment practices in Section IX of the Agreement shall be paid by CBRE.

44

## XV.  PRELIMINARY APPROVAL HEARING

**15.1.**  Subject to approval by the Court, the Parties hereby agree to the following procedures and schedule for Notice and submission of this Consent Decree for final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

**15.2.**  The Court shall conduct a Preliminary Approval Hearing on October 4, 2007 at 1:30 p.m. to determine whether the Court should approve the compromise of the Litigation in the manner set forth herein.

**15.3.**  The Parties agree that they shall jointly file this Consent Decree with the Court seeking entry of an Order in the form attached hereto and fully incorporated herein at Exhibit A.

**15.4.**  At the Preliminary Approval Hearing, the Parties agree to opine to the Court that the Consent Decree is fair, reasonable, and adequate to the Class as a whole, within the meaning of that phrase as contemplated by Rule 23(e) of the Federal Rules of Civil Procedure. Counsel of Record shall request prompt judicial approval of this Consent Decree as written and agree further to use their best efforts on a joint basis to obtain prompt entry of the Order. The Parties, through their respective counsel, also agree to recommend to the Court on a joint basis that, in their respective professional opinions, the Consent Decree is reasonable and appropriate, in the best interests of the Class, that the Parties have bargained for the terms in the Consent Decree, and that no section or subsection of this Consent Decree should be modified or stricken. If the Court does not execute the Order in the form attached and fully incorporated herein at Exhibit D in any material part, the Parties agree that this Consent Decree shall be null and void. If this Consent Decree is terminated or fails to become effective for any reason, the Court's establishment of a provisional settlement process shall be void, and the respective rights of the Parties in This Case

45

or in any other case shall not be prejudiced in any way by the Consent Decree or the Court's refusal to enter an Order approving the Consent Decree.

## XVI. NOTICE

**16.1.** The Parties have agreed to retain Rust Consulting, an independent Claims Administrator, to be paid by CBRE, to administer and implement the plan set forth herein to distribute monetary awards to Claimants, including the following powers:

> (a) to distribute Notice to Class Members, including by U.S. mail to their last known addresses;
>
> (b) to conduct a trace on Class Members whose Claim Forms are returned as undeliverable, identify current addresses for those Class Members and distribute Notice to those Class Members by U.S. Mail;
>
> (c) to receive and forward to the Court and Counsel of Record any Requests for Exclusion;
>
> (d) to forward Claim Forms to the Special Master; and
>
> (e) to distribute monetary awards to Claimants and file and serve the appropriate Form 1099s.

**16.2.** Within fourteen (14) days after the entry of the Preliminary Approval Order, CBRE shall provide to Class Counsel and the Claims Administrator the names and last known addresses of Class Members.

**16.3.** Within thirty (30) days after receipt of the list, the Claims Administrator shall issue Notice to the last-known address of each Class Member by first-class mail postage prepaid.

46

**16.4.** Upon receipt of any Notices returned to the Claims Administrator because the Class Member no longer resides at the last known address provided by CBRE, the Claims Administrator shall run a trace on the Class Member (at a cost to CBRE of $1 per trace); if an updated address is located, the Claims Administrator shall mail a new notice to the Class Member. In the event that the trace program, which will be based on last known names and addresses of Class Members, results in more than five percent (5%) of Claim Forms being returned as undeliverable, CBRE and Class Counsel will meet and confer regarding the appropriate methods by which to trace Class Members, including the use of social security numbers (under a Court-ordered Protective Order) for tracing purposes, and implement an additional round of mailing Notice.

## XVII. OPT-OUTS

**17.1.** Any Class Member may request exclusion from the Class ("Opt-Out") only for purposes of recovering individual monetary relief as described in Section IX (*i.e.*, through participation in the Tier Program).

**17.2.** No Class Member may opt out of the equitable relief provisions in Section VII of this Consent Decree.

**17.3.** Class Members who wish to opt-out of the individual monetary relief portion of the settlement will be required to file a completed and signed Request for Exclusion with the Court.

**17.4.** To opt-out of the Settlement, the Class Member will be required to submit a form signed personally by the Class Member or her attorney or other representative (unless otherwise authorized by law or approved in advance by the Court) containing her full name, address, day and evening telephone numbers, Social Security number and the following statement:

47

"I am a Settlement Class Member in the lawsuit of Wiginton v. CB Richard Ellis, Inc. Case No. 02 CV 6832. I wish to opt-out of the monetary portion of the settlement of This Case. I understand that by requesting to be excluded from the monetary portion of the Settlement, I will receive no money whatsoever from CB Richard Ellis, Inc. under the Settlement entered into by Defendant and Class Members and preliminarily approved by the Court as fair and reasonable on October 4, 2007. I understand that I may bring a separate lawsuit, in which I will not be represented by Class Counsel, and I understand that in any separate lawsuit I may receive nothing, or, I may receive less than I would have if I had filed a claim under the Tier Program. I also understand that I cannot seek exclusion from the Class for purposes of non-monetary relief, and I will be bound by the class-wide equitable relief provisions of the Settlement entered into by Defendant and Class if the Court gives final approval to the Settlement."

**17.5.** Requests for Exclusion will be made available to Class Members upon request to the Claims Administrator at the following address: Rust Consulting, Inc., 625 Marquette Avenue, Minneapolis, MN 55402.

**17.6.** Those who choose to opt-out of this lawsuit (a) will have no right to file a claim for or to receive any money under the settlement of This Case; and (b) may bring a separate lawsuit against CBRE.

**17.7.** Requests for Exclusion must be mailed to the Claims Administrator and postmarked by January 2, 2008. The Settlement Administrator must, in turn, forward completed Requests for Exclusion to Counsel of Record.

## XVIII. OBJECTIONS/COMMENTS TO SETTLEMENT

**18.1.** Any Class Member has the right to submit written objections to or comments in support of the proposed Settlement, the proposed award of attorneys' fees and expenses, or the proposed payment of service awards to the Representative Plaintiffs.

**18.2.** To do so, the Class Member must submit a written statement setting forth: (1) her name, address, and telephone number; (2) the reference "Wiginton v. CB Richard Ellis, Inc., No. 02 C 6832"; (3) the approximate dates and location of employment with CBRE; and (4) her

48

objections, comments and any supporting arguments, to: Clerk of the Court, Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois 60604.

**18.3.** The Class Member must also mail copies of her entire written submission to Plaintiffs' Co-Lead Counsel and CBRE's counsel at the addresses listed in Paragraph 22.9, below.

**18.4.** To be considered by the Court, any objections or supporting comments must be actually received by the Clerk of the Court, Plaintiffs' Co-Lead Counsel, and CBRE's counsel, and not merely postmarked, no later than January 2, 2008.

**18.5.** Only Class Members who remain in the Class may make an objection. Class Members who opt-out may not object to the proposed Settlement.

**18.6.** Any Class Member may also attend the Fairness Hearing, either personally or through an attorney retained by her, at her own expense, and ask to be heard by the Court on her objections or comments. To be heard however, the Class Member must submit her objections or comments in writing in compliance with this Section and include in her objections or comments a statement that she intends to appear and requests to be heard at the Fairness Hearing.

## XIX. FAIRNESS HEARING

**19.1.** Class Counsel shall file the date-stamped originals for any opt-out statement with the Court not later than seven (7) days before the date set for the Fairness Hearing, at which the Consent Decree shall be presented to the Court for final approval.

**19.2.** Class Members who have timely requested exclusion from the Class may not participate at the Fairness Hearing.

**19.3.** Settlement Class Members who wish to object to this Consent Decree or any part of it may be heard at the Fairness Hearing only:

49

(a)    if they file with this Court and serve on Counsel of Record a written statement of their objections and the basis for such objections;

(b)    where such statement is received by the Court and Counsel of Record at least ten (10) days prior to the date set for the final approval hearing; and

(c)    where such statement indicates whether they intend to appear at the Fairness Hearing.

Such objectors must appear at the Fairness Hearing either in person or by counsel. Failure to perform any of these requirements shall be deemed a waiver of any objections. The Parties may, but need not, respond in writing to objections by filing a response with the Court.

## XX.    EXCESSIVE NUMBER OF OPT-OUTS

**20.1.** CBRE shall have the unilateral right to revoke the Consent Decree prior to the Effective Date in the event that ten percent (10%) or more of Class Members opt-out of the Consent Decree.

## XXI.    ENFORCEMENT PROCEDURE

**21.1. Resolution Of Parties' Disputes.** In the event that Class Counsel or any Party to this Consent Decree believes that a Party has failed to comply with any material provision of this Consent Decree, he, she, or it shall first attempt to resolve the issue by good faith negotiations.

**21.1.1.** To that end, he, she, or it shall immediately, and no later than ten (10) business days after becoming aware of the issue, notify the other party in writing via e-mail and first class mail of the particulars of the dispute and the term or terms of the Consent Decree that are involved.

50

**21.1.2.** The recipient of the written communication must respond in writing to the sender within ten (10) business days with an explanation of its position.

**21.1.3.** If such correspondence does not resolve the dispute between the Parties, then the Parties shall meet in person or, if necessary, by telephone through representatives authorized to resolve the dispute on at least one (1) occasion within the next ten (10) business days and attempt to resolve the dispute in good faith.

**21.2. Court Intervention.** After complying with Paragraph 21.1, above, if the Parties are unable to resolve their dispute, then the Parties may seek Court intervention. The moving papers shall explain the facts and circumstances that allegedly necessitate immediate action by the Court. If any such matter is brought before the Court requesting immediate Court action, the opposing party shall be provided with appropriate actual notice, and an opportunity to be heard in opposition to the motion, pursuant to the Local Rules of the Court and the Federal Rules of Civil Procedure. The Court in its discretion may set such procedures for emergency consideration as are appropriate to the particular facts and circumstances, but no such matter may be conducted on an *ex parte* basis.

**21.3. Fees Incurred to Enforce the Decree.** The Parties will bear their own fees and costs in connection with any and all actions taken to enforce this Decree in the District Court, except that if Class Counsel represents the prevailing party in any such proceeding, they shall be entitled to recover their reasonable fees and costs for all work reasonably necessary to enforce the provisions of this Decree through the presentation of disputed issues for decision by the Court. Compensable time and expenses hereunder shall not include any work involved in investigating the alleged non-compliance, in providing notice of the alleged non-compliance, or in seeking to resolve the dispute pursuant to Paragraph 16.1 above, all of which are considered

51

part of the monitoring responsibilities of Class Counsel for which they are already being compensated through the provisions of this Decree.

**21.4. No Third-Party Rights.** Nothing in this Consent Decree shall be deemed to create any rights on the part of any third party beneficiaries to enforce this Consent Decree. The right to seek enforcement of this Consent Decree is vested exclusively in the Parties. In the event that a third party challenges this Consent Decree or brings a lawsuit or files an administrative charge with a governmental agency, such as the U.S. Equal Employment Opportunity Commission or a similar state or local agency, against CBRE for liability resulting from any actions required by this Consent Decree, Class Counsel agrees that it will not intervene to challenge the Consent Decree (or otherwise take any affirmative steps to challenge or undermine the Consent Decree directly or indirectly).

**21.5. Status of Allegedly Injured Individuals.** For purposes of interpreting this Consent Decree, allegedly injured individuals who are not Class Members shall not be deemed to be third-party beneficiaries of this Consent Decree and shall have no right to enforce its terms.

**21.6. No Individual or Independent Right to Seek Enforcement.** Nothing in this Consent Decree is intended to confer upon any person or entity other than the Plaintiff Class, as a whole and by Class Counsel, and CBRE the right to seek enforcement of its terms.

## XXII. CONSTRUCTION

**22.1. Governing Law.** This Consent Decree shall be construed and interpreted in accordance with and governed by the laws of the State of Illinois.

**22.2. Entire Agreement.** This Consent Decree, including Exhibits, comprises the full and exclusive agreement and understanding of the Parties with respect to this settlement, and supersedes all prior written or oral agreements (including, without limitation, any and all term

52

sheets previously agreed to by the Parties). No representations or inducements to compromise this action have been made, other than those recited in this Decree. This Decree does not impose any obligations on the parties beyond the terms and conditions stated herein. Accordingly, this Decree shall not prevent or preclude CBRE from revising its employment practices and policies or taking other personnel actions during the term of the Decree that do not violate the requirements of the Decree. Rather, subject to the terms of this Consent Decree, CBRE retains all managerial discretion over personnel decisions and actions, terms and conditions of employment, and human resources functions, programs, policies, practices, and procedures, in accordance with applicable law.

**22.3. Severability.** Subject to and independent from Paragraph 4.6 herein, if any clause, sentence, paragraph, or part of this Consent Decree or the application of it to any person or circumstances, is, for any reason, judged by the Court to be totally or partially unenforceable or contrary to law or if the enactment or amendment of any federal or state statute, order, ordinance, regulation renders any provision of this Consent Decree totally or partially unenforceable or contrary to law, such ruling, judgment, enactment, or amendment shall not effect, impair, or invalidate the remainder of this Consent Decree, except as otherwise provided herein.

**22.4. Joint Document Of The Parties.** The terms of this Consent Decree are the product of joint negotiation and are not to be construed as having been authored by one Party or another.

**22.5. Agreed Modifications.** Should either the Named Plaintiffs or CBRE determine that modifications, additions, or deletions to this Consent Decree are necessary, the counsel for the Parties shall meet in good faith and on reasonable notice to discuss any such changes. No

53

modification, deletion, or addition to this Consent Decree shall be adopted unless it is agreed upon in writing, signed by the Parties, and so ordered by the Court.

**22.6. Headings.** The headings in this Consent Decree are for the convenience of the Parties only and shall not limit, expand, modify, amplify, or aid in the interpretation or construction of this Consent Decree.

**22.7. Non-Waiver.** The waiver in any one instance by any Party hereto of any term, condition, or covenant in this Consent Decree or of the breach of any term, condition, covenant, or representation herein shall not operate as or be deemed to be a waiver of the right to enforce any other term, condition, or representation, nor shall any failure by any Party at any time to enforce or require performance of any provision hereof operate as a waiver of or affect in any manner such Party's right at a later time to enforce or require performance of such provisions or of any other provision hereof.

**22.8. Calculation Of Time.** In computing any period of time prescribed or allowed by this Consent Decree, unless otherwise stated, such computation or calculation shall be made consistent with the Federal Rules of Civil Procedure.

**22.9. Notice To The Parties.** All notices and other communications required under this Consent Decree shall be in writing and delivered either personally or by depositing the same, postage prepaid, in the United States Mail, addressed to the party hereto to whom the same is directed at the following addresses:

54

**To Plaintiffs:**

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Blvd.
Suite B
Oak Park, IL 60301
beth@hbsslaw.com

Kenneth A. Wexler
Jennifer Fountain Connolly
Amber M. Nesbitt
WEXLER TORISEVA WALLACE LLP
55 West Monroe St., Ste. 3300
Chicago, IL 60603
kaw@wtwlaw.com
jfc@wtwlaw.com
amn@wtwlaw.com

**To CBRE:**

Brenda H. Feis
Christopher J. DeGroff
Anne E. Duprey
SEYFARTH SHAW LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000
(312) 460-7000 (facsimile)
bfeis@seyfarth.com
cdegroff@seyfarth.com
aduprey@seyfarth.com

The Parties or their counsel may from time to time change their addresses or representatives for purposes of this Section by providing written notice, return receipt requested, of such changes to the other Party.

**22.10. Counterparts.** This Consent Decree may be executed in one or more counterparts and each executed copy shall be deemed an original, which shall be binding upon all Parties hereto.

## XXIII. STATEMENTS TO THE MEDIA OR GENERAL PUBLIC

**23.1. Publicity.** CBRE, Class Counsel, and the Named Plaintiffs shall agree to a media statement ("Public Statement"), attached hereto as Exhibit F, to be issued jointly on the day after the Court's preliminary approval of the settlement. Furthermore, CBRE, Class Counsel, and the Named Plaintiffs agree that all communications with the media and other non-parties to This Case regarding This Case shall be limited to the Public Statement. CBRE, Class Counsel, and the Named Plaintiffs agree that they will not engage in any unauthorized publicity regarding This

CH1 11323590.1

Case and that neither Class Counsel nor Named Plaintiffs, nor any of their agents, will take any steps to encourage any Class Members or other third parties from engaging in unauthorized publicity regarding This Case. To the extent that any unauthorized publicity occurs that is not approved by CBRE or Class Counsel per the above, CBRE and Class Counsel will retain the right to respond, subject to conferring with the other. CBRE, Class Counsel and the Named Plaintiffs further agree to refrain from engaging in any disparaging remarks or comments about each other, and agree that neither CBRE, Class Counsel nor Named Plaintiffs, nor any of their agents, will take any steps to encourage any Class Members or other third parties to engage in disparaging remarks or comments about each other. Moreover, Class Counsel and the Named Plaintiffs will inform any inquiring Class Members not to disparage CBRE and not to discuss this Case with the media or other non-parties to this Case beyond the parameters of the Public Statement.

**23.2.** Class counsel agrees that, within two (2) business days of the Court's granting of preliminary approval of the Consent Decree, they will modify any web site and/or any other publicly-available postings they control that relate to the Litigation as necessary to conform to the parameters of the Public Statement and this Consent Decree.

**23.3.** Notwithstanding the foregoing, Class Counsel retain the right to communicate with Class Members about the terms of this Consent Decree for the purpose of enforcing the terms of the Consent Decree, and CBRE retains the right to communicate with its employees about the terms of this Consent Decree for the purpose of enforcing the terms of the Consent Decree.

## XXIV. REPRESENTATIONS BY CLASS COUNSEL

**24.1.** Class Counsel warrants and represents that: (1) with the exception of Named Plaintiffs, each does not now represent any individual who may have a claim against CBRE; and (2) each does not now retain any present knowledge of any individual who intends to assert any claim, charge, complaint, action, cause of action, suit, grievance, controversy, dispute or demand against CBRE.

## XXV. VOLUNTARY DISMISSAL WITH PREJUDICE

**25.1.** The Parties agree that the Released Claims shall be dismissed with prejudice upon the Effective Date, provided that the Court retains jurisdiction to enforce the terms of this Consent Decree as described in Section 4.1.

CH1 11323590.1

Agreed to in form:

FOR THE NAMED PLAINTIFFS &
SETTLEMENT CLASS:

By: _____
Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Blvd, Suite B
Oak Park, IL 60301

By: _____
Kenneth A. Wexler
Jennifer Fountain Connolly
Amber M. Nesbitt
WEXLER TORISEVA WALLACE LLP
55 West Monroe St., Ste. 3300
Chicago, IL 60603

Amy Wiginton

_____

Kristine Moran

_____

Andrea Scott f/k/a Andrea Corey

_____

Norma Plank Fehler as Successor in Interest to
Dondi Plank

_____

Olivia Knapp

_____

Dated: _____

Agreed to in form:

FOR THE DEFENDANT:

**CB RICHARD ELLIS, INC.**

By: _____
Brenda H. Feis
Christopher J. DeGroff
Anne E. Duprey
SEYFARTH SHAW LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000
(312) 460-7000 (facsimile)

Dated: _____

*Final Agreement 9/18/07*

CHI 11323590.1

Agreed to in form:

FOR THE NAMED PLAINTIFFS &
SETTLEMENT CLASS:

By:_____
Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Blvd, Suite B
Oak Park, IL 60301

By:_____
Kenneth A. Wexler
Jennifer Fountain Connolly
Amber M. Nesbitt
WEXLER TORISEVA WALLACE LLP
55 West Monroe St., Ste. 3300
Chicago, IL 60603

Amy Wiginton

_____

Kristine Moran

_____

Andrea Scott f/k/a Andrea Corey

_____

Norma Plank Fehler as Successor in Interest to
Dondi Plank

_____

Olivia Knapp

_____

Agreed to in form:

FOR THE DEFENDANT:

**CB RICHARD ELLIS, INC.**

By:_____
Brenda H. Feis
Christopher J. DeGroff
Anne E. Duprey
SEYFARTH SHAW LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000
(312) 460-7000 (facsimile)

Agreed to in form:

FOR THE NAMED PLAINTIFFS &
SETTLEMENT CLASS:

By:_____
Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Blvd, Suite B
Oak Park, IL 60301

By:_____
Kenneth A. Wexler
Jennifer Fountain Connolly
Amber M. Nesbitt
WEXLER TORISEVA WALLACE LLP
55 West Monroe St., Ste. 3300
Chicago, IL 60603

Amy Wiginton
_____

Kristine Moran

_____

Andrea Scott f/k/a Andrea Corey

_____

Norma Plank Fehler as Successor in Interest to
Dondi Plank

_____

Olivia Knapp

_____

Agreed to in form:

FOR THE DEFENDANT:

**CB RICHARD ELLIS, INC.**

By:_____
Brenda H. Feis
Christopher J. DeGroff
Anne E. Duprey
SEYFARTH SHAW LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000
(312) 460-7000 (facsimile)

Fax to:
708 776-
5601
attention: Beth

58

Agreed to in form:

FOR THE NAMED PLAINTIFFS &
SETTLEMENT CLASS:

By:_____
Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Blvd, Suite B
Oak Park, IL 60301

By:_____
Kenneth A. Wexler
Jennifer Fountain Connolly
Amber M. Nesbitt
WEXLER TORISEVA WALLACE LLP
55 West Monroe St., Ste. 3300
Chicago, IL 60603

Amy Wiginton

_____

Kristine Moran
*Kristine Moran*

_____

Andrea Scott f/k/a Andrea Corey

_____

Norma Plank Fehler as Successor in Interest to
Dondi Plank

_____

Olivia Knapp

_____

Agreed to in form:

FOR THE DEFENDANT:

**CB RICHARD ELLIS, INC.**

By:_____
Brenda H. Feis
Christopher J. DeGroff
Anne E. Duprey
SEYFARTH SHAW LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000
(312) 460-7000 (facsimile)

58

Agreed to in form:

FOR THE NAMED PLAINTIFFS &
SETTLEMENT CLASS:

By:_____
Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Blvd, Suite B
Oak Park, IL 60301

By:_____
Kenneth A. Wexler
Jennifer Fountain Connolly
Amber M. Nesbitt
WEXLER TORISEVA WALLACE LLP
55 West Monroe St., Ste. 3300
Chicago, IL 60603

Amy Wiginton

_____

Kristine Moran

_____

Andrea Scott f/k/a Andrea Corey

_____

Norma Plank Fehler as Successor in Interest to
Dondi Plank

_____

Olivia Knapp

_____

Agreed to in form:

FOR THE DEFENDANT:

**CB RICHARD ELLIS, INC.**

By:_____
Brenda H. Feis
Christopher J. DeGroff
Anne E. Duprey
SEYFARTH SHAW LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000
(312) 460-7000 (facsimile)

58

Agreed to in form:                                    Agreed to in form:

FOR THE NAMED PLAINTIFFS &                            FOR THE DEFENDANT:
SETTLEMENT CLASS:

                                                      CB RICHARD ELLIS, INC.
By:_____
Elizabeth A. Fegan                                    By:_____
HAGENS BERMAN SOBOL SHAPIRO LLP                       Brenda H. Feis
820 North Blvd, Suite B                               Christopher J. DeGroff
Oak Park, IL 60301                                    Anne E. Duprey
                                                      SEYFARTH SHAW LLP
                                                      131 S. Dearborn Street, Suite 2400
By:_____                          Chicago, Illinois 60603
Kenneth A. Wexler                                     (312) 460-5000
Jennifer Fountain Connolly                            (312) 460-7000 (facsimile)
Amber M. Nesbitt
WEXLER TORISEVA WALLACE LLP
55 West Monroe St., Ste. 3300
Chicago, IL 60603

Amy Wiginton

_____

Kristine Moran

_____

Andrea Scott f/k/a Andrea Corey

_____

Norma Plank Fehler as Successor in Interest to
Dondi Plank
*Norma Plank Fehler (Fethler) as Successor in Interest to Dondi Plank —*

Olivia Knapp

_____

58

Agreed to in form:

FOR THE NAMED PLAINTIFFS &
SETTLEMENT CLASS:

By:_____
Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Blvd, Suite B
Oak Park, IL 60301

By:_____
Kenneth A. Wexler
Jennifer Fountain Connolly
Amber M. Nesbitt
WEXLER TORISEVA WALLACE LLP
55 West Monroe St., Ste. 3300
Chicago, IL 60603

Amy Wiginton

_____

Kristine Moran

_____

Andrea Scott f/k/a Andrea Corey

_____

Norma Plank Fehler as Successor in Interest to
Dondi Plank

_____

Olivia Knapp

Agreed to in form:

FOR THE DEFENDANT:

CB RICHARD ELLIS, INC.

By:_____
Brenda H. Feis
Christopher J. DeGroff
Anne E. Duprey
SEYFARTH SHAW LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000
(312) 460-7000 (facsimile)

58

**EXHIBITS TO CONSENT DECREE**

CHI 1D260018.1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMY WIGINTON, KRISTINE MORAN, )
NORMA PLANK FETHLER, as Successor in )
Interest to Dondi Plank, ANDREA COREY )
and OLIVIA KNAPP, individually and on )
behalf of all persons similarly situated, )
                                    )        Case No. 02 CV 6832
             Plaintiffs, )
                                    )        Judge Andersen
                                    )        Magistrate Judge Ashman
      v. )
                                      )
CB RICHARD ELLIS, INC., )
                                      )
             Defendant. )

## PRELIMINARY APPROVAL ORDER

WHEREAS, this matter has come before the Court pursuant to the Parties' Joint Motion for Certification of a Settlement Class Preliminary Approval of the Settlement Agreement, and Approval of Notice Plan (the "Motion");

WHEREAS, the parties to the above-captioned action have jointly moved the Court for certification of a settlement class pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

WHEREAS, the parties to the above-captioned action have jointly moved for preliminary approval of a Consent Decree pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, and for permission to disseminate Preliminary Notice to absent Class Members of the Consent Decree, and good cause having been shown,

**EXHIBIT A - 1**

WHEREAS, this Court finds that it has jurisdiction over the subject matter of this Litigation and over all parties to this Litigation, including all Settlement Class Members for purposes of settlement, and that venue is proper in this district; and

WHEREAS, this Court has conducted a preliminary approval hearing on October 4, 2007 and is otherwise fully advised in the premises;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:**

**A.     Certification of Settlement Class, and Appointment of Class Representatives, Class Counsel, Lead Class Counsel, and Settlement Administrator**

1.     The Court preliminarily finds that the proposed nationwide Settlement Class meets all the applicable requirements of Fed. R. Civ. P. 23(a) and (b).

      a.     *Numerosity*:  The Settlement Class is sufficiently numerous that joinder of all Class Members into one suit would be impracticable;

      b.     *Commonality*:  Common questions of law and fact with regard to alleged sexual harassment in violation of Title VII exist for the Settlement Class.  These issues are central to this case and are sufficient to establish commonality.

      c.     *Typicality*:  Plaintiffs' claims are typical of those of the Settlement Class.

      d.     *Adequate Representation*:     Plaintiffs' interests vis-à-vis the settlement of The Litigation do not conflict with absent members of the Settlement Class and are co-extensive with them.  Additionally, the Court recognizes the experience of Class Counsel and finds that the requirement of adequate representation of the Settlement Class has been fully met.

CH1 11323917.1

e. *Rule 23(b)(2)*: Plaintiffs allege that CBRE acted in a manner that is applicable to the Class, making the equitable relief afforded by the Settlement Agreement appropriate for certification under Rule 23(b)(2).

f. *Rule 23(b)(3)*:

   i. *Predominance of Common Issues*: The issues raised by Plaintiffs' common allegations predominate over any individual questions in the context of the settlement of The Litigation favoring class treatment at this juncture.

   ii. *Superiority of the Class Action Mechanism*: the class action mechanism is ideally suited for treatment of the settlement of this matter, as it promotes efficiency and uniformity of judgment.

2. Accordingly, pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) and (c), this Court hereby certifies the following Settlement Class:

> All female employees who were or have been employed by CBRE at any time during the period from January 1, 1999 to the date of Preliminary Approval of the Consent Decree

3. The Court preliminarily appoints the following individuals as class representatives for purposes of the certification of the Settlement Class: Amy Wiginton, Kristine Moran, Norma Plank Fethler, as Successor in Interest to Dondi Plank, Andrea Scott f/k/a/ Andrea Corey, and Olivia Knapp.

4. The Court preliminarily finds that the following counsel fairly and adequately represent the interests of the putative Class and hereby appoints the following law firms as Class Counsel pursuant to Rule 23(g): Wexler Toriseva Wallace LLP; Hagens Berman Sobol Shapiro LLP; Gustafson Gluek PLLC; and Favre Law Offices LLC. Wexler Toriseva

Wallace LLP and Hagens Berman Sobol Shapiro LLP are hereby designated as Lead Class Counsel. The Court further confirms the appointment of Rust Consulting to act as the Settlement Administrator, whose tasks including implementing and carrying out the Notice Plan..

**B.    Preliminary Approval of the Settlement Agreement**

5.    Pursuant to Fed. R. Civ. P. 23(e), the terms of the Consent Decree dated October 4, 2007, including all Exhibits thereto, attached to the Motion, are hereby preliminarily approved, subject to further consideration thereof at the Fairness Hearing provided for below. All terms used herein shall have the same meaning as defined in the Consent Decree, and all exhibits referenced herein have been attached to the Consent Decree.

6.    The Court finds that the Consent Decree has been reached as a result of intensive, serious, and non-collusive arms-length negotiations. The Court finds that counsel for the Parties are able to reasonably evaluate their respective positions. The Court also finds that settlement at this time will avoid additional substantial costs, as well as the uncertainty and risks that would be presented to the parties by the further litigation of the claims covered by the Consent Decree. The Court has reviewed the relief granted as part of the Consent Decree and recognizes the significant value to the Settlement Class of both the equitable and the monetary relief.

**C.    Approval of Notice**

7.    The Court finds that direct notice to Class members is feasible through mailings to their last known addresses as maintained by CB Richard Ellis, Inc. as of the date of this Order. The Court further finds that the Notice Plan set forth in the Consent Decree (Section XVI), which includes mailed notice and a requirement that the Claims Administrator trace the addresses of any Class Members whose Notices are returned as undeliverable at their last-known

**EXHIBIT A - 4**

address, meets the requirements of due process and Fed. R. Civ. P. 23 (c) and (e), is the best notice practicable under the circumstances, and constitutes sufficient notice to all persons entitled to notice.

**8.** The Court further finds that the Notice itself is appropriate, and complies with Rules 23(b)(2), 23(c)(2)(B), and 23(e) because it describes in plain language the nature of the action, the definition of the class certified, the class claims/issues/defenses, that a class member may enter an appearance through counsel if the member desires, that the Court will exclude from the class any member requesting exclusion, and the binding effect of a class judgment on Settlement Class Members.

**9.** Accordingly, the Court approves the Notice Plan in all respects, and the Parties are directed immediately to disseminate Notice in substantial conformity with the form of Notice annexed thereto as Exhibit B.

**D.    Fairness Hearing**

**10.** The Court directs that a hearing be scheduled for January 9, 2008 at 9:30 a.m., on final settlement approval (the "Fairness Hearing") before this Court, at the United States District Court for the Northern District of Illinois, 219 South Dearborn, Chicago, Illinois, to consider, *inter alia*, the following (a) whether the Class should be certified, for settlement purposes only; and (b) the fairness, reasonableness and adequacy of the Settlement.

**11.** Objectors to the Proposed Settlement shall attend and be heard at the Fairness Hearing, however, no objector shall be heard and no papers or briefs submitted will be accepted or considered by the Court unless on or before January 2, 2008, any such objector (1) has filed with the Clerk of the Court in writing a notice of any such objector's intention to appear personally, or, if such objector intends to appear by counsel, such counsel files a notice of

**EXHIBIT A** - 5

CH1 11323917.1

appearance, (2) has submitted a written statement providing her name, address and telephone number; noting the approximate dates and location of employment with CBRE; and describing in full the basis for such objector's opposition, and attaches any supporting documentation and a list of any and all witnesses or experts whom such objector shall present to the Court, and (3) has served, on or before January 2, 2008, copies of such notice(s), statement(s), documentation, and list(s) together with copies of any other papers or brief(s) that objector files with the Court or wishes the Court to consider at the Fairness Hearing, upon: (i) Elizabeth A. Fegan, Hagens Berman Sobol Shapiro LLP, 820 North Blvd., Suite B, Oak Park, Illinois 60301, Class Counsel, (ii) Kenneth A. Wexler, Wexler Toriseva Wallace LLP, 55 W. Monroe St., Suite 3300, Chicago, Illinois 60603, Class Counsel, and (iii) Brenda H. Feis, Seyfarth Shaw LLP, 131 South Dearborn St., Suite 2400, Chicago, IL 60603-5577, Counsel for CB Richard Ellis, Inc.

## F. Request For Exclusion From the Class

12. The Court further directs that any putative Class member wishing to exclude herself from the proposed Class for purposes of recovering individual monetary relief must complete the Opt-Out Form attached to the Notice, as well as the Consent Decree as Exhibit C and mail the same to the Claims Administrator, Rust Consulting, Inc., 625 Marquette Avenue, Suite 880, Minneapolis, MN 55402, with a postmark (no metered postmarks) on or before January 2, 2008.

13. Valid class opt-outs shall not be bound by this Consent Decree or the Final Order and Judgment, except as to the equitable relief provisions of the Consent Decree.

**EXHIBIT A - 6**

CH1 11323917.1

SO ORDERED:

_____   ___ __ _____

Wayne R. Andersen
United States District Judge

Dated: October 4, 2007

UNITED STATES DISTRICT COURT – NORTHERN DISTRICT OF ILLINOIS

## NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF CLASS ACTION AND SETTLEMENT HEARING

---

**If you are a *female* who:**
- ☐ Worked at *any CB Richard Ellis, Inc.* office in the United States;
- ☐ From *January 1, 1999 to the Present*; and
- ☐ Experienced *sexual harassment*
- ☐ **You may be eligible to receive up to $150,000 through a Proposed Class Action Settlement**

---

**You must complete and return one of the attached Tier 1 or Tier 2/3 Claim Forms by _____, 2007 in order to be eligible to receive money.**

Judge Wayne Andersen of The United Stated District Court for the Northern District of Illinois ("the Court") has authorized this Notice. It is not a solicitation from a lawyer.
*You are not being sued.*

→ There is a Proposed Settlement with CB Richard Ellis, Inc. ("CBRE") resulting from a class action lawsuit pending in federal court in Chicago. The name of the lawsuit is *Wiginton, et al. v. CB Richard Ellis, Inc.*, 02 CV 6832 ("The Lawsuit").

→ The lawsuit claims that female employees at CBRE were subjected to sexual harassment in violation of Title VII. CBRE has always denied, and continues to deny, all allegations of wrongdoing and liability in The Lawsuit.

→ The Proposed Settlement allows eligible female employees to submit a claim in one of three different Tiers, which are described in detail on the following pages. The Parties have agreed to appoint a Special Master, which is an independent third party who is affiliated with neither CBRE nor Plaintiffs, who will review each claim and determine how much money each claimant is entitled to receive, if any.

→ You can decide to submit a claim in *one* of the three following tiers:
- Tier 1 (awards of $0 or $1,500) requires you to submit a short claim form about the sexual harassment you experienced. If you submit a form under this Tier, your identity will be kept completely confidential from CBRE.
- Tier 2 (award range of $0 to $15,000) requires you to submit a more comprehensive claim form with more specific information about the sexual harassment you experienced. If you submit a form under this Tier, CBRE will have an opportunity to respond in writing.
- Tier 3 (award range of $0 to $150,000) requires the same type of claim form and response from CBRE as in Tier 2, but also requires you to appear in person before the

Special Master to offer evidence through witnesses and testimony. CBRE will also be allowed to present evidence supporting its position.

*YOUR LEGAL RIGHTS ARE AFFECTED EVEN IF YOU DO NOT ACT.*
*READ THIS NOTICE CAREFULLY.*

## What This Notice Contains:

### Basic Information

1. Why did I get this Notice?..................................................................................................
2. What is the lawsuit about?................................................................................................
3. Why is this a class action?...............................................................................................
4. How do I know if I am included in the Settlement?.......................................................
5. Can CBRE retaliate against me for participating in this Settlement?...........................

### Benefits Of The Settlement – What You may Get

6. What does the Proposed Settlement provide? ................................................................
7. What are the basic differences between the three Tiers?...............................................
8. Will The Special Master Consider Any Evidence Aside From The Information Included in the Claims Process?
9. How do I decide which Tier I should file my claim under?
10. How do I file a claim? ...................................................................................................

### Summary of the Equitable and Charitable Aspects of the Settlement

11. What is equitable relief and what will CBRE have to do?
12. Who will get the $400,000 Charitable Contribution?

### Your Options as a Class Member

13. What are my options as a Class Member?
14. How do I remain a Class Member, and what does that mean?
15. Can I request exclusion ("Opt-Out") of the Settlement and, if so, how do I opt-out?
16. Can I object to, or comment on, the proposed settlement and, if so, how do I object or comment?

### The Lawyers Representing You

17. Do I have a Lawyer representing my interests in this case?...........................................
18. How are Class Counsel being paid?
19. Are the Named Plaintiffs receiving anything for the time and effort they contributed to the lawsuit?
20. What Else Does CBRE Have To Pay?
21. Should I get my own lawyer? .......................................................................................

### The Court's Final Approval Hearing and the Future of the Lawsuit

22. When and where will the Court decide on whether to grant final approval of the Proposed Settlement?..................................................................................................
23. May I speak at the hearing?..........................................................................................
24. If the Court approves the Settlement, will that end the lawsuit?
25. What happens if the Court decides not to grant Final Approval of the Proposed Settlement?

26. Where do I obtain more information / who can answer my questions?

27. What are the deadlines I need to know about?

## BASIC INFORMATION

### 1. WHY DID I GET THIS NOTICE?

You were mailed this notice because, according to CBRE's records, you are a female that has been employed at one of CBRE's offices in the United States between January 1, 1999 to the present.

The purpose of this Notice is to inform you, as a potential Class Member, of (a) the existence of The Lawsuit; (b) a proposed Class Action Settlement of The Lawsuit, described below; and (c) your rights with respect to the proposed settlement. Those rights include the right to be excluded from the Class and the settlement. If you are a Class Member and do not request to be excluded in compliance with the procedures and deadline set forth below, you will remain in the Class and be bound by the terms of the settlement.

### 2. WHAT IS THE LAWSUIT ABOUT?

The five Named Plaintiffs, all former CBRE employees, filed this lawsuit on September 25, 2002 on behalf of a class of female employees, alleging that CBRE subjected them to sexual harassment in violation of Title VII.

Throughout this Lawsuit CBRE has denied, and continues to deny any wrongdoing or liability on its part, and denies specifically that it subjected female employees to sexual harassment or condoned or tolerated any such conduct.

Class Counsel have investigated and evaluated the claims asserted in The Lawsuit and have determined that the proposed settlement is fair, reasonable, and adequate for the Class as a whole, in light of the benefits of the settlement and the disadvantages of continuing The Lawsuit. The proposed settlement is a compromise of disputed claims and does not mean that CBRE has any liability or admitted any wrongdoing alleged in The Lawsuit.

### 3. WHY IS THIS A CLASS ACTION SETTLEMENT?

Plaintiffs filed their lawsuit as a class action, which is a lawsuit where one or more people called "class representatives" sue on behalf of people who have similar claims. The people together are a "class" or "class members." A court must determine if it will allow a lawsuit to proceed as a class action.

In 2004, the Named Plaintiffs in this case filed a motion for class certification seeking to certify a class of female employees who were allegedly sexually harassed during their employment with CBRE. The Court did not rule on that motion. However, as part of the Settlement, the Parties asked the Court to certify a Settlement Class solely for purposes of the settlement. The Court

agreed, and certified a class only for purposes of this settlement.

### 4. HOW DO I KNOW IF I AM INCLUDED IN THE PROPOSED SETTLEMENT?

You are a member of the Settlement Class if you fall into this definition:

> All female employees who were or have been employed by CBRE at any time during the period January 1, 1999 to the date of Preliminary Approval of the Settlement Agreement (the "Class").

If you are a member of the Settlement Class, you may be entitled to recover money if you were sexually harassed at CBRE during the period January 1, 1999 to the present.

However, you are not entitled to recover any money out of this settlement if (1) you previously released all claims (including sexual harassment claims) against CBRE for the period January 1, 1999 to October 4, 2007, or (2) you were sexually harassed at a company or any of its subsidiaries that was acquired by CBRE for the time period prior to the acquisition. Such predecessor companies include but may not be limited to: Eberhart Co.; Boston Mortgage; Insignia Financial Group, LLC f/k/a Insignia Financial Group, Inc.; Trione & Gordon LLC; Welsh Ohio, LLC d/b/a Columbus Commercial Realty; CB Richard Ellis - Charlotte, LLC; Advocate Consulting Group, Inc.; Project Advantage Group, Ltd.; The Polacheck Company, Inc.; Management Co. and PAC, Inc.; CB Richard Ellis Hawaii, Inc.; Marshall & Stevens Incorporated; Trammell Crow Company; Krombach II, LLC; Krombach III, LLC; CBRE Technical Services, LLC a/k/a Emcor. However, if you experienced sexual harassment at CBRE after the effective date of acquisition, you can recover for the sexual harassment you experienced at CBRE.

If you are unsure whether you are entitled to any money out of this settlement, you may submit a claim and should provide the Special Master with all relevant information, including, by way of example only, a copy of the signed release or the identity of the companies for which you worked, so that the Special Master can determine your eligibility.

You do not need to do anything to become part of the Settlement Class, **but you must complete one of the attached Claim Forms in order to be eligible to receive any money under the Proposed Settlement. If you *do not* want to part of the Settlement Class, you must complete an Opt-Out Form (which is found on page ___).**

### 5. CAN CBRE RETALIATE AGAINST ME FOR PARTICIPATING IN THIS SETTLEMENT?

**Absolutely not.** CBRE IS PROHIBITED FROM RETALIATING AGAINST YOU FOR PARTICIPATING IN OR RECEIVING ANY BENEFITS FROM THIS SETTLEMENT.

## BENEFITS OF THE PROPOSED SETTLEMENT – WHAT YOU MAY GET

### 6.    WHAT DOES THE PROPOSED SETTLEMENT PROVIDE?

The Proposed Settlement has three parts: (1) a 3-tiered claim structure that provides for potential monetary payments to former and current employees who file claims that satisfy the applicable Claim Standards, as defined in Paragraphs 2.33, 2.34 and 2.35 of the Consent Decree, pursuant to the procedures for doing so; (2) changes to CBRE's policies and procedures for responding to and dealing with claims of sexual harassment; and (3) a $400,000 charitable contribution to provide annual scholarships over the next four years to junior and/or senior female undergraduate students concentrating their field of study in the real estate area in order to promote the entry and advancement of women in the real estate services industry.

The Tier Program will be administered by an independent and neutral expert called a "Special Master." As part of the settlement process, the Parties will agree on a Special Master and then the Court must approve him or her. The Special Master will be responsible for collecting, reviewing, and ultimately determining each female employee's claim and how much each person will receive, if anything, for her claim.

### 7.    WHAT ARE THE BASIC DIFFERENCES BETWEEN THE THREE TIERS?

The following chart provides an overview of the similarities and differences between the three Tiers. For detailed information on each Tier and its Claim Standards, see Page ___.

| TIER | Confidentiality | Summary of Claims Process | Money Available Under Each Tier |
|---|---|---|---|
| Tier 1 | CBRE will not know that you have submitted a claim | You must submit a brief claim form called a Tier 1 Form including your name, employment dates, office of employment, and a summary of the harassment you believe you experienced. The Special Master will review the claim and make sure that it meets certain criteria, explained further on page ___. CBRE will have no opportunity to respond. If you meet the criteria, you will receive an automatic payment of $1,500. On the other hand, if the Special Master determines that you do not meet the Tier 1 Claim Standard, you will receive nothing. | $0 or $1,500<br><br>Any award received will be reported to the IRS by the Claims Administrator and a 1099 form will be issued. |
| Tier 2 | CBRE will know that you have submitted a claim and will know the nature of your claim. | You must provide the details of the sexual harassment that you believe you experienced at CBRE, including the "who, what, where, why, and when."<br><br>CBRE will have a chance to review your claim and respond in writing to your allegations.<br><br>If the Special Master determines that you meet the Tier 2 Claim Standard, then he/she shall determine the appropriate amount of money to award, if any. | $0 - $15,000<br><br>Any award received will be reported to the IRS by the Claims Administrator and a 1099 form will be issued. |
| Tier 3 | CBRE will know that you have submitted a claim and will know the nature of your | You must provide the details of the sexual harassment that you believe you experienced at CBRE, including the "who, what, where, why, and when."<br><br>CBRE will have a chance to review your claim and | $0 - $150,000<br><br>Any award received will be reported to the IRS by the Claims Administrator |

| claim. | respond in writing to your allegations. You may then submit a written rebuttal to CBRE's written response. | and a 1099 form will be issued. |
|---|---|---|
| | The Special Master may conduct additional investigation if s/he chooses. | |
| | There will be a mandatory in-person hearing on your claim in Chicago, Illinois (with limited exceptions). Both you and CBRE may submit evidence and call witnesses. If the Special Master determines that you meet the Tier 3 Claim Standard, then he/she shall determine the appropriate amount of money to award, if any. | |

### 8. WILL THE SPECIAL MASTER CONSIDER ANY EVIDENCE ASIDE FROM THE INFORMATION INCLUDED IN THE CLAIMS PROCESS?

Yes. Prior to reviewing any individual claims submitted under the tier process, the Special Master will review the class-wide materials and arguments submitted by Plaintiffs and CBRE in connection with briefing Plaintiffs' motion for class certification. In addition, the Special Master may, at his/her discretion, request that the attorneys for CBRE and for the Class give a live presentation about the Plaintiffs' claims and CBRE's defenses. *You would not be required to attend or otherwise participate in this presentation.*

### 9. HOW DO I DECIDE WHICH TIER I SHOULD FILE MY CLAIM UNDER?

That is a personal decision, one which you must make on your own based on your own experiences, whether you want CBRE to know about your claim, the extent to which you would like to participate in the claims process, whether CBRE will have the opportunity to respond to your claim, the level of scrutiny your claim will receive by the Special Master, and how much money you want to seek taking into account the ranges of possible monetary recovery and the caps on recovery in each tier.

You can only select one Tier. Once you select a Tier, you cannot change it.

### 10. HOW DO I FILE A CLAIM?

Attached to this Notice are Tier 1 and Tier 2/3 Claim Forms. If you want to be eligible to recover money under the Proposed Settlement, you *MUST FILL OUT the Claim Form* and submit it to the Claims Administrator, *postmarked by _____, 2007,* and addressed to:

<div style="text-align:center">

**Rust Consulting, Inc.**
**625 Marquette Avenue, Suite 880**
**Minneapolis, MN 55402**

</div>

## SUMMARY OF THE EQUITABLE AND CHARITABLE ASPECTS OF THE SETTLEMENT

### 11.    WHAT IS EQUITABLE RELIEF AND WHAT WILL CBRE HAVE TO DO?

Equitable relief is relief ordered by the Court that requires CBRE to change its conduct in the future. It does not involve the payment of money.

Here, CBRE has agreed to, among other things, certain changes in its policies and procedures to ensure that effective mechanisms are in place to prevent unlawful sexual harassment in the future, to conduct additional training for its supervisors and employees on sexual harassment, to conduct effective investigations of sexual harassment complaints, to improve its documentation policies and procedures, and to implement appropriate disciplinary and/or remedial action with respect to violations of its harassment policy.

CBRE must report its compliance with these terms to the Special Master for two years following Final Approval of the Proposed Settlement.

### 12.    WHO WILL GET THE $400,000 CHARITABLE CONTRIBUTION?

If the Proposed Settlement is approved, CBRE will donate $400,000 to the Commercial Real Estate Women (CREW) Network, an industry advocate for the success of women in commercial real estate, for the creation of a Women Scholars' Program. The purpose of the program is to provide annual scholarships over the next four years to junior and/or senior female undergraduate students concentrating their field of study in the real estate area in order to promote the entry and advancement of women in the real estate services industry.

## YOUR OPTIONS AS A CLASS MEMBER

### 13.    WHAT ARE MY OPTIONS AS A CLASS MEMBER?

You have three options as a Class Member: (1) you may remain a Class Member; (2) you may file an objection to or comments in support of the Proposed Settlement; or (3) you may request exclusion from the monetary part of the Settlement (which is known as "Opting-Out").

### 14.    HOW DO I REMAIN A CLASS MEMBER, AND WHAT DOES THAT MEAN?

To remain a Class Member, you need not do anything. You must, however, submit a written claim form by the due date in order to be eligible to seek money from the Settlement.

Being a Class Member means that if the Settlement is approved by the Court and the judgment becomes final, you will be entitled to the benefits of the Settlement and, if you submit a claim form and the Special Master determines your entitlement to it, you may receive money. In exchange for those benefits, you and your heirs, executors, administrators, representatives, agents, partners, successors, and assigns will be bound by any release, judgment or other disposition of this Litigation.

15. **CAN I OBJECT TO, OR COMMENT ON, THE PROPOSED SETTLEMENT, AND, IF SO, HOW DO I OBJECT OR COMMENT?**

Yes. As a Class Member, you have the right to object to or comment in support of the proposed Settlement, the proposed award of attorneys' fees and expenses, or the proposed payment of service awards to the Representative Plaintiffs, described in Paragraph 19 below. For more details on your rights if you file an objection or comments, see Paragraph 23 below.

To file an objection to or comments on the Proposed Settlement, you must submit a written statement setting forth: (1) your name, address, and telephone number; (2) the reference "*Wiginton v. CB Richard Ellis, Inc.,* No. 02 C 6832"; (3) your approximate dates and location of employment with CBRE and any other names under which you were employed at CBRE (if not the same as your present name); and (4) your objections, comments and any supporting arguments, to:

> Clerk of the Court
> United States District Court for the
> Northern District of Illinois
> 219 South Dearborn Street
> Chicago, Illinois 60604

You must also mail copies of your entire written submission to attorneys for the Class and CBRE's attorneys at the following addresses:

| *Lead Counsel for the Class* | *CBRE's counsel:* |
|---|---|
| Kenneth A. Wexler<br>Jennifer Fountain Connolly<br>Amber M Nesbitt<br>Wexler Toriseva Wallace LLP<br>55 West Monroe St., Ste. 3300<br>Chicago, IL 60603 | Brenda H. Feis<br>Christopher J. DeGroff<br>Anne E. Duprey<br>Seyfarth Shaw LLP<br>131 South Dearborn St., Suite 2400<br>Chicago, IL 60603-5577 |
| Elizabeth A. Fegan<br>Hagens Berman Sobol Shapiro LLP<br>820 North Blvd., Suite B<br>Oak Park, Illinois 60301 | |

To be considered by the Court, your objections or supporting comments must be actually received by the Clerk of the Court, Attorneys for the Class, and CBRE's attorneys no later than _____, 2007.

See Paragraphs 22-23 below for information on attending the Fairness Hearing to voice your objection to of comment on the Proposed Settlement.

16. **CAN I REQUEST EXCLUSION ("OPT-OUT") OF THE SETTLEMENT AND, IF SO, HOW DO I OPT-OUT?**

If you want to pursue your own case against CBRE for damages based on the conduct Plaintiffs have alleged in The Lawsuit, you have the right to request exclusion from the Class. If you request exclusion from the Class, you will not receive any money from the Settlement and may pursue your own claims for money damages. You may **not** opt-out of the equitable relief provisions of the settlement. **If you wish to be excluded from the money damages part of the Class for any reason,** you must complete the attached Opt-Out Form and submit it to the Claims Administrator, ***postmarked by _____, 2007,*** and addressed to:

<div style="border:1px solid black; text-align:center">

**Rust Consulting, Inc.**
**625 Marquette Avenue, Suite 880**
**Minneapolis, MN 55402**

</div>

### THE LAWYERS REPRESENTING YOU

17. **DO I HAVE A LAWYER REPRESENTING MY INTERESTS IN THIS CASE?**

Yes. The Court has appointed the following law firms to represent you and other Settlement Class Members:

| | |
|---|---|
| Elizabeth A. Fegan<br>Hagens Berman Sobol Shapiro LLP<br>820 North Blvd., Suite B<br>Oak Park, Illinois 60301 | Kenneth A. Wexler<br>Jennifer Fountain Connolly<br>Amber M Nesbitt<br>Wexler Toriseva Wallace LLP<br>55 West Monroe St., Ste. 3300<br>Chicago, IL 60603 |
| Daniel Gustafson<br>Gustafson Gluek, PLLC<br>650 Northstar East<br>608 Second Avenue South<br>Minneapolis, MN 55402 | JoDee Favre<br>Favre Law Office, LLC<br>5005 W. Main Street<br>Belleville, IL 62226 |

These lawyers are called Class Counsel. You won't be charged personally for these lawyers, but they will ask the Court to award them a fee that CBRE has agreed to pay. More information is provided in Paragraph 18 below. However, these lawyers are not submitting your individual claim forms for you; you must take steps to submit your own claim form and may retain your own attorney to do so if you wish.

18. **HOW ARE CLASS COUNSEL BEING PAID?**

Since they filed this case in 2002, Class Counsel have not received any payment for their services in prosecuting the lawsuit, nor have they been reimbursed for any out-of-pocket expenses. If the Court approves the proposed settlement, Class Counsel will ask the Court to award them attorneys' fees and out-of-pocket expenses in the amount of $3,400,000. This sum is

considerably less than the actual attorneys' fees and expenses actually incurred by these lawyers. Any award of attorneys' fees will be paid separately from and will not reduce the benefits provided to Class Members under the settlement. CBRE has agreed not to oppose an award that does not exceed $3,400,000.

***As a Class Member, you do not have to pay Class Counsel for the work that they performed on behalf of the Class.***

### 19. ARE THE NAMED PLAINTIFFS RECEIVING ANYTHING FOR THE TIME AND EFFORT THEY CONTRIBUTED TO THE LAWSUIT?

As part of the Settlement, and subject to the Court's final approval of the Settlement, the Parties have agreed that CBRE will pay service payments to each of the Class representatives for the extensive time and effort they contributed to the prosecution of The Lawsuit in the following amounts: Amy Wiginton $125,000; Kristine Moran $100,000; Andrea Scott f/k/a Andrea Corey $75,000; Norma Plank Fethler, as successor in interest to Dondi Plank $25,000; and Olivia Knapp $25,000.

### 20. WHAT ELSE DOES CBRE HAVE TO PAY?

CBRE has agreed to pay all costs of sending this notice to the Class, as well as the costs of administering the Settlement. CBRE has also agreed to pay Class Counsel certain amounts in the event certain fees are incurred for specified work performed after final approval of the Settlement, pursuant to Paragraph 14.2 of the Consent Decree.

### 21. SHOULD I GET MY OWN LAWYER?

You don't need to get your own lawyer, but you do have the right to consult and/or retain an attorney of your choice, at your own expense, to advise you regarding the Settlement and your rights in connection with the Settlement. CBRE will not be responsible for any attorneys' fees incurred by you, except as described in Paragraph 18 above.

### THE COURT'S FINAL APPROVAL HEARING AND THE FUTURE OF THE LAWSUIT

### 22. WHEN AND WHERE WILL THE COURT DECIDE ON WHETHER TO GRANT FINAL APPROVAL OF THE PROPOSED SETTLEMENT?

The Court will hold a Fairness Hearing on _____day, _____, 2007, at ____.m., before the Honorable Wayne Andersen, United States District Court Judge, at the United States District Court for the Northern District of Illinois, 219 S. Dearborn, Room 1403, Chicago, Illinois 60604, to determine: (1) whether the proposed settlement of The Lawsuit on the terms set forth in the Consent Decree is fair, reasonable, and adequate for the Class as a whole and should be granted final approval; (2) whether the certification of the Class for settlement purposes only should be made final; (3) whether the Court should enter the proposed judgment dismissing The Lawsuit with prejudice; (4) whether the Court should grant the application of Class Counsel for attorneys' fees and reimbursement of expenses and, if so, in what amount; and (5) whether the Court should grant the request for incentive awards to the Representative Plaintiffs and, if so, in what amount.

### 23. DO I HAVE TO ATTEND THE FINAL APPROVAL HEARING, AND IF SO, MAY I SPEAK?

You do not have to attend the Fairness Hearing, unless you filed an objection or comment to the Proposed Settlement. If you decide to attend, you must do so at your own expense.

*If you filed an objection to or comments on the Proposed Settlement* (see Paragraph 15 above), you must appear at the Fairness Hearing either in person or through your own counsel. Failure to attend shall be deemed a waiver of any comments and/or objections. You may ask to be heard by the Court on your objection or comments. The Court will not permit you to be heard unless you first submit your objections or comments in writing in compliance with Paragraph 15 above and include in your comments a statement that you intend to appear and wish to be heard at the Fairness Hearing.

If you want your own lawyer to speak on your behalf at the Fairness Hearing, you must give the Court a paper that is called a "Notice of Appearance." The Notice of Appearance should use the following Civil Action Number: 02 CV 6832, and should include the name of the lawsuit, and state that you wish to enter an appearance at the Fairness Hearing. It also must include your name, address, telephone number and signature. Your "Notice of Appearance" **must** be postmarked no later than _____, **2007** and must be mailed to or filed in person at the following address:

> Clerk of the Court
> United States District Court for the
> Northern District of Illinois
> 219 South Dearborn Street
> Chicago, Illinois 60604

Class members who have timely requested exclusion ("opted out") from the Class may not participate at the Fairness Hearing.

### 24. IF THE COURT APPROVES THE SETTLEMENT, WILL THAT END THE LAWSUIT?

Yes. If the Court approves the proposed settlement, it will enter a judgment that will dismiss with prejudice the sexual harassment claims of Class Members, except those Class Members who request to be excluded from the settlement.

### 25. WHAT HAPPENS IF THE COURT DECIDES NOT TO GRANT FINAL APPROVAL OF THE PROPOSED SETTLEMENT?

If the Settlement is not granted final approval, or if the Settlement is granted final approval but the judgment does not become final, the certification of the Class will be vacated and The Lawsuit will proceed as though no proposed Settlement had been reached.

### 26. WHERE DO I OBTAIN MORE INFORMATION / WHO CAN ANSWER MY QUESTION(S)?

Any questions you may have about the matters described in this Notice should be directed in writing to any of the Class Counsel listed in Paragraph 17 above or to the Settlement Administrator, Rust Consulting, 625 Marquette Avenue, Suite 880, Minneapolis, MN 55402. You may also send questions by e-mail to Class Counsel at CBRESettlement@wtwlaw.com. Further, the documents referenced in this Notice are available at www.cbrichardellislawsuit.com.

Copies of the Settlement Agreement and the pleadings and other documents filed in The Lawsuit are on file at the United States District Court for the Northern District of Illinois, and may be examined and copied during regular office hours at the Office of the Clerk of the Court, Northern District of Illinois, 219 South Dearborn Street, Chicago, Illinois 60604.

*Do not direct any questions to the Court.*

### 27. HOW ARE THE PARTIES HANDLING PUBLICITY REGARDING THE LAWSUIT OR THE SETTLEMENT?

The parties have agreed to a Joint Public Statement that will govern all communications with the media regarding The Lawsuit and the Settlement.

Furthermore, CBRE, Class Counsel, the Named Plaintiffs and their respective agents have agreed that all communications with the media and other non-parties to This Case regarding This Case shall be limited to the Public Statement. CBRE, Class Counsel, and the Named Plaintiffs and their respective agents have agreed that they will not engage in any unauthorized publicity regarding This Case and to refrain from making any disparaging remarks or comments about each other. You should refrain from engaging in any unauthorized publicity regarding This Case.

### 28. WHAT ARE THE DEADLINES I NEED TO KNOW ABOUT?

If you wish to **submit a claim**, the deadline for submitting a claim by electronic or U.S. mail is _____, 2007. If you are submitting your Claim by U.S. mail, it must be postmarked by this date.

If you wish to be **excluded from the Class**, you must mail your written request for exclusion [Exhibit ____], postmarked no later than ___, 2007, to both of Plaintiffs' Co-Lead Counsel at the addresses listed in section ___ above.

If you wish to submit **objections or supportive comments**, you must submit them in writing to the Clerk of the Court at the address listed in section ___, with copies to both of Plaintiffs' Co-Lead Counsel and CBRE's counsel at the addresses listed in section ___ above, such that they are received no later than ____, 2007.

# EXHIBIT B-1

## SUMMARY OF THE PROCEDURES AND CLAIMS STANDARDS FOR EACH OF THE 3 TIERS

## Tier 1 (awards of $0 or $1,500) With Complete Confidentiality

If you elect Tier 1, you must complete the attached Form-T1 under penalty of perjury and submit it to the Special Master post-marked by _____, 2007. The Form-T1 provides the Special Master with basic information including your name, employment dates, office of employment, and a summary of the harassment you allegedly experienced. Under Tier 1, you do not have to specify the name of the harasser or provide specific dates for the incident(s) of when you were harassed.

The information you submit in the Form-T1 will be kept confidential by the Special Master, including from CBRE. As a Tier 1 Claimant, your name will not be shared with anyone at CBRE. Your Tier 1 Form, and the fact that you even filed such a form, will be kept strictly confidential by the Special Master. **CB Richard Ellis is prohibited from retaliating against you in any way for your participation in the Tier Program.**

Based on the statements you make in this form, the Special Master will evaluate your claim. If the Special Master determines that, based on the limited information you are required to submit per the Settlement, you meet the Tier 1 Claim Standard, s/he will award you $1,500.00 to compensate you for your claim. On the other hand, if the Special Master determines that you do not meet the Tier 1 Claim Standard, you will receive nothing.

**Please note that the award you receive will be reported to the Internal Revenue Service with a Form 1099 by the Claims Administrator, but CBRE will still not be made aware of your name.**

## Tier 2 (award range of $0-$15,000.00 with written exchange of positions)

If you elect Tier 2, you must complete the attached Form-T2/3 under penalty of perjury and submit it to the Special Master by _____, 2007. The Form-T2/3 provides the Special Master with information including your name and your harassment allegations, including a detailed description of the harassing conduct which you allegedly experienced, the identification of any individual who participated in the alleged harassment, the identification of any supervisors or managers who witnessed the alleged harassment, the time period when the alleged incidents occurred, whether the alleged conduct was welcome or unwelcome, a detailed description of how the alleged harassment affected you and what injuries you allege based on the alleged harassment, whether each alleged incident was reported (and if so, to whom, how, and when it was reported) and, if not reported, the reasons why not.

Thereafter, CBRE shall be entitled to submit a written response to the Special Master. The Special Master will review your claim solely based on the written submissions from the parties.

The actual amount that you receive, if any, is up to the discretion of the Special Master. If, based on the information provided by the parties, the Special Master determines that you meet the Tier 2 Claim Standard, s/he will award you an amount to compensate you for your claim, within a

range of $0 to $15,000 per Claimant. On the other hand, if the Special Master determines that you do not meet the Tier 2 Claim Standard, you will receive nothing.

**CB Richard Ellis is prohibited from retaliating against you in any way for your participation in the Tier Program.**

**Please note that the award you receive will be reported by the Claims Administrator to the Internal Revenue Service with a Form 1099.**

> ## Tier 3 (award range of $0-$150,000.00 with right to a hearing before the Special Master):

If you elect Tier 3, you must complete a Form-T2/3 under penalty of perjury and submit it to the Special Master by _____, 2007. The Form-T2/3 provides the Special Master with information including your name and your harassment allegations, including a detailed description of the harassing conduct which you allegedly experienced, the identification of any individual who participated in the alleged harassment, the identification of any supervisors or managers, who witnessed the alleged harassment, whether the alleged conduct was welcome or unwelcome, a detailed description of how the alleged harassment affected you and what injuries you allege based on the alleged harassment, the approximate time period when the alleged incidents occurred, whether each incident was reported (and if so, to whom, how, and when it was reported) and, if not reported, the reasons why not.

Thereafter, CBRE shall be entitled to submit a written response to the Special Master. The Special Master will then provide you with a copy of CBRE's response, and you shall have 60 days to prepare any rebuttal to the issues raised in CBRE's position statement as well as identify any additional areas of investigation or witnesses for the Special Master. However, you are not required to submit a rebuttal.

The Special Master can conduct additional investigation if s/he chooses. Once the Special Master completes his/her investigation, s/he will schedule a live hearing on your claim in Chicago, Illinois. Each side may, at her or its option and subject only to the Special Master's discretion, identify one or more witnesses, including but not limited to CBRE employees, who may have personal knowledge of the facts or circumstances related to the Claim to testify at the hearing.

If you live more than 100 miles from Chicago, you may provide testimony by telephone, but CBRE has the right to request that you attend the hearing if it pays for your reasonable travel and lodging costs. Under very limited, extenuating circumstances as described in the Consent Decree, the Special Master may excuse your attendance.

The actual amount that you receive, if any, is up to the discretion of the Special Master. If, based on the information provided by the parties, the Special Master determines that you meet the Tier 3 Claim Standard, s/he can award you an amount to compensate you for your claim, within a

range of $0 to $150,000 per Claimant. On the other hand, if the Special Master determines that you do not meet the Claim Standard, you will receive nothing.

**CB Richard Ellis is prohibited from retaliating against you in any way for your participation in the Tier Program.**

Please note that the award you receive will be reported by the Claims Administrator to the Internal Revenue Service with a Form 1099.

# EXHIBIT B-2
# T-1 claim form

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AMY WIGINTON, KRISTINE MORAN, )
NORMA PLANK FETHLER, as Successor in )
Interest to Dondi Plank, ANDREA COREY )
and OLIVIA KNAPP, individually and on )
behalf of all persons similarly situated, )
                                           )     Case No. 02 CV 6832
                                           )
        Plaintiffs, )
                                           )
    v. )
                                           )
CB RICHARD ELLIS, INC., )
                                           )
        Defendant. )

## CLAIM FORM FOR TIER 1 CLAIMS
## FORM T-1

**TO CLAIMANT: PLEASE BE ASSURED THAT THE INFORMATION YOU SUBMIT WITH THIS FORM T-1 WILL BE KEPT STRICTLY CONFIDENTIAL FROM CBRE.** It will **not** be shared with anyone at CB Richard Ellis. The information you provide will be viewed only by a neutral Special Master for the purposes of verifying that you are (or were) a CB Richard Ellis employee, that you worked at the facility you identify above and whether your claim is eligible for an award. **CB Richard Ellis is prohibited from retaliating against you in any way for your participation in the Tier Program.**

| Name: | Daytime Phone Number | Alternate Phone Number |
|---|---|---|
| **Mailing Address** | | E-mail address (if this is a convenient way to reach you): |
| If you are represented by an attorney, the name and contact information for your attorney: | | |

| If you have used any other name during or since your employment at CBRE (i.e. maiden or married name), please provide that here: | Social Security Number: |
|---|---|
| | |

CB Richard Ellis location where you currently work and/or any CB Richard Ellis location where you have worked since January 1, 1999. Specify the approximate dates you were employed at each location.

Location         From (mm/dd/yyyy)  To (mm/dd/yyyy)

[PLEASE USE ADDITIONAL SHEETS OF PAPER AS NECESSARY]

## READ THE INSTRUCTIONS FOR THIS FORM CAREFULLY

**FIRST**: Complete the identification section above.

**SECOND**: Describe in detail the alleged harassment you experienced, how the harassment affected you, and any complaints you made to CBRE about the harassment. **BE AS SPECIFIC AS POSSIBLE IN YOUR ANSWERS.** Please use additional sheets of paper as necessary. Note that the harassment you claim to have experienced must have taken place while you were working at CB Richard Ellis.

You are not entitled to recover any money if: (1) you previously released all claims (including sexual harassment claims) against CBRE for the period January 1, 1999 to October 4, 2007, or (2) you were sexually harassed at a company or any of its subsidiaries that was acquired by CBRE for the time period prior to the effective date of acquisition. Such predecessor companies include but may not be limited to: Eberhart Co.; Boston Mortgage; Insignia Financial Group, LLC f/k/a Insignia Financial Group, Inc.; Trione & Gordon LLC; Welsh Ohio, LLC d/b/a Columbus Commercial Realty; CB Richard Ellis - Charlotte, LLC; Advocate Consulting Group, Inc.; Project Advantage Group, Ltd.; The Polacheck Company, Inc.; Management Co. and PAC, Inc.; CB Richard Ellis Hawaii, Inc.; Marshall & Stevens Incorporated; Trammell Crow Company; Krombach II, LLC; Krombach III, LLC; CBRE Technical Services, LLC a/k/a Emcor. However, if you experienced sexual harassment at CBRE after the effective date of acquisition, you can recover for the sexual harassment you experienced at CBRE.

If you are unsure whether you are entitled to any money out of this settlement, you may submit a claim and should provide the Special Master with all relevant information, including, by way of example only, a copy of the signed release or the identity of the companies for which you worked, so that the Special Master can determine your eligibility.

**Describe the alleged harassment.**

- You must provide approximate dates / time periods during which the alleged harassment took place; these do not have to be specific, just your best guess.

- You do not have to specify the name of your harasser, however you may if you chose to do so.

**Indicate whether the alleged harassment affected your ability to do your job and/or whether it affected you personally. If so, describe how.**

**Identify any complaints you made about the alleged harassment.**

For each incident of alleged harassment identified above, state whether you made a complaint to a supervisor, CBRE management or human resources. If so, identify when you made the report(s), to whom, how you made the complaint (for example, in person, in writing, via e-mail), and the result(s). If you did not complain, please detail the reasons why you did not.

**THIRD:** Sign and date the form.

*I declare, under penalty of perjury, that the foregoing statements are true and correct to the best of my personal knowledge and belief.*

*I further certify that , to the best of my personal knowledge and belief, I have not previously released all claims (including sexual harassment claims) against CBRE for the period January 1, 1999 to October 4, 2007.*

_____
Date

_____
Signature

**FOURTH:** Mail your claim form to Rust Consulting, Inc. 625 Marquette Avenue, Suite 880, Minneapolis, MN 55402. **Your mailing must be post-marked no later than _____, 2007 to be valid for consideration.** It is recommended that you send your claim form by certified or registered mail so that you have proof of delivery.

# EXHIBIT B-3
## T-2/3 Claim Form

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AMY WIGINTON, KRISTINE MORAN,  )
NORMA PLANK FETHLER, as Successor in  )
Interest to Dondi Plank, ANDREA COREY  )
and OLIVIA KNAPP, individually and on  )
behalf of all persons similarly situated,  )          Case No. 02 CV 6832
                                     )
         Plaintiffs,  )
                                     )
     v.  )
                                     )
CB RICHARD ELLIS, INC.,  )
                                     )
        Defendant.  )

## CLAIM FORM FOR TIER 2 and TIER 3 CLAIMS
## FORM T-2/3

### TO CLAIMANT: PLEASE BE ASSURED THAT CB RICHARD ELLIS IS PROHIBITED FROM RETALIATING AGAINST YOU IN ANY WAY FOR YOUR PARTICIPATION IN THE TIER PROGRAM.

| Name: | Daytime Phone Number | Alternate Phone Number |
|---|---|---|
| **Mailing Address** | | E-mail address (if this is a convenient way to reach you): |
| If you are represented by an attorney, the name and contact information for your attorney: | | |
| If you have used any other name during or since your employment at CBRE (i.e. maiden or married name), please provide that here: | Social Security Number: | |

CB Richard Ellis location where you currently work and/or any CB Richard Ellis location where you have worked from January 1, 1999 to the present. Specify the dates you were employed at each location.

| Location | Position Held | From (mm/dd/yyyy) | To (mm/dd/yyyy) |
|----------|---------------|-------------------|-----------------|
|          |               |                   |                 |
|          |               |                   |                 |
|          |               |                   |                 |

[PLEASE USE ADDITIONAL SHEETS OF PAPER AS NECESSARY]

## READ THE INSTRUCTIONS FOR THIS FORM CAREFULLY

**FIRST:** Complete the identification section above.

**SECOND:** Decide whether you wish to participate in Tier 2 or Tier 3 (if you wish to participate in Tier 1, do not complete this form. You must complete Form T-1).

> Tier 2 will be decided on the written submissions of the parties. If the Special Master determines that you meet the Tier 2 Claim Standard, then he/she can award you money in an amount ranging from $0 to $15,000.00. If the Special Master determines that you do not meet the Tier 2 Claim Standard, then you will not receive any money.

> Tier 3 requires an in-person hearing in Chicago, IL (except under very limited, extenuating circumstances), and you have the option of filing a rebuttal to CBRE's response and position statement. If the Special Master determines that you meet the Tier 3 Claim Standard, then he/she can award you money in an amount ranging from $0 to $150,000.00. If the Special Master determines that you do not meet the Tier 3 Claim Standard, then you will not receive any money. For additional information on the differences between Tiers 2 and 3, refer back to Paragraph 7 of the Notice of Pendency and Approval of Class Action Settlement or the Consent Decree.

**Select only one of the following two options:**

☐    I want to participate in **Tier 2**

- OR -

☐    I want to participate in **Tier 3**

**THIRD:** Describe in detail the alleged harassment you experienced, how the harassment affected you, and any complaints you made to CBRE about the harassment. **BE AS SPECIFIC AS POSSIBLE IN YOUR ANSWERS.** Please use additional sheets of paper as necessary.

Note that the harassment you claim to have experienced must have taken place while you were working at CB Richard Ellis. You are not entitled to recover any money if (1) you previously released all claims (including sexual harassment claims) against CBRE for the period January 1, 1999 to October 4, 2007, or (2) you were sexually harassed at a company or any of its subsidiaries that was acquired by CBRE for the time period prior to the effective date of acquisition. Such predecessor companies include but may not be limited to: Eberhart Co.; Boston Mortgage; Insignia Financial Group, LLC f/k/a Insignia Financial Group, Inc.; Trione & Gordon LLC; Welsh Ohio, LLC d/b/a Columbus Commercial Realty; CB Richard Ellis - Charlotte, LLC; Advocate Consulting Group, Inc.; Project Advantage Group, Ltd.; The Polacheck Company, Inc.; Management Co. and PAC, Inc.; CB Richard Ellis Hawaii, Inc.; Marshall & Stevens Incorporated; Trammell Crow Company; Krombach II, LLC; Krombach III, LLC; CBRE Technical Services, LLC a/k/a Emcor. However, if you experienced sexual harassment at CBRE after the effective date of acquisition, you can recover for the sexual harassment you experienced at CBRE.

If you are unsure whether you are entitled to any money out of this settlement, you may submit a claim and should provide the Special Master with all relevant information, including, by way of example only, a copy of the signed release or the identity of the companies for which you worked, so that the Special Master can determine your eligibility.

---

### Describe the alleged harassment.

Describe in detail the alleged harassment you experienced or observed, including each incident of harassment and type of harassment that you recall experiencing or observing. You should specify, to the best of your recollection each of the following:

- a detailed description of the sexually harassing conduct or incident(s),

- the identity of those who participated in the harassment,

- the identity of any supervisors or managers who witnessed the alleged harassment (even if they did not directly participate in it),

- the location(s) of the harassment;

- the approximate date(s) of the harassment.

**State whether the alleged harassment was welcome or unwelcome and detail the reasons why.**

**Indicate whether the alleged harassment affected your ability to do your job and/or whether it affected you personally. If the harassment affected your ability to do your job or your personally, describe how.**

**Identify any complaints you made about the alleged harassment.**

For each incident of alleged harassment identified above, state whether you made a complaint to a supervisor, CBRE management or human resources. If so, identify when you made the report(s), to whom, how you made the complaint (for example, in person, in writing, via e-mail), and the result(s). If you did not complain, please detail the reasons why you did not.

**FOR TIER 3 CLAIMANTS ONLY:** You may also, but do not have to, submit pre-existing documents that support the basis for your Claim with this Form.

Please list below any documents you are submitting with this Claim Form that support your claim. You may only submit pre-existing documents, which are defined as documents that were not created for purposes of submitting your Tier 3 Claim, including, by way of example only, inappropriate e-mails circulated in the workplace, photographs of inappropriate conduct in the office, etc.

*Note:* The Special Master who evaluates your claim has the discretion to follow up with you for additional information regarding any vague or speculative statements that you make, but also may take the lack of specificity into account when making the final determination. Thus, you should be as specific as possible when submitting your initial claim. If you need additional room, you may attach additional separate pages.

**FOURTH:** Sign and date the form.

*I declare, under penalty of perjury, that the foregoing statements are true and correct to the best of my personal knowledge and belief.*

*I further certify that, to the best of my personal knowledge and belief, I have not previously released all claims (including sexual harassment claims) against CBRE for the period January 1, 1999 to October 4, 2007.*

_____          _____
Date                                       Signature

**FIFTH**: Mail your claim form to Rust Consulting, Inc., 625 Marquette Avenue, Suite 880 Minneapolis, MN 55402. **Your mailing must be post-marked no later than _____, 2007 to be valid for consideration.** It is recommended that you send your claim form by certified or registered mail so that you have proof of delivery.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMY WIGINTON, KRISTINE MORAN, NORMA PLANK FETHLER, as Successor in Interest to Dondi Plank, ANDREA COREY and OLIVIA KNAPP, individually and on behalf of all persons similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 02 CV 6832 Judge Andersen Magistrate Judge Ashman |
| v. | ) ) | |
| CB RICHARD ELLIS, INC., | ) ) | |
| Defendant. | ) | |

# <u>REQUEST FOR EXCLUSION</u>

## Only Complete this Form if You <u>DO NOT</u> Want to be Included in the Settlement Class and DO NOT Want to Submit a Claim For an Award of Money

*By Completing This Form You Are Excluding Yourself From The Settlement Class For Purposes of the Tier Program and You Will Not Be Able to File a Claim For A Money Award in the Tier Program.*

If you do NOT wish to participate in the Tier Program described in the Consent Decree, then you must sign below and send this form, *postmarked by January 2, 2008,* to:

EXHIBIT C - 1

CHI 11323917.1

> **Rust Consulting, Inc.**
>
> **625 Marquette Avenue, Suite 880**
>
> **Minneapolis, MN 55402**

If the Administrator receives your Request for Exclusion after January 2, 2008, your Request For Exclusion will not be considered and you will be bound by the terms of the Consent Decree. You may also direct any questions to Rust Consulting at the address above.

If you decide to exclude yourself from the Consent Decree, then:

- you will not be eligible to participate in the Tier Program and as a result, will not be eligible for a monetary award;

- you will not be permitted to object to this Consent Decree or otherwise participate in any further proceedings in the Litigation;

- you may pursue any of your own individual claims for monetary damages against CBRE.

I am a Settlement Class Member in the lawsuit of Wiginton v. CB Richard Ellis, Inc. Case No. 02 CV 6832. I wish to opt-out of the monetary portion of the settlement of This Case. I understand that by requesting to be excluded from the monetary portion of the Settlement, I will receive no money whatsoever from CB Richard Ellis, Inc. under the Settlement entered into by Defendant and the Class and preliminarily approved by the Court as fair and reasonable on October 4, 2007. I understand that I may bring a separate lawsuit, in which I will not be represented by Class Counsel, and I

**EXHIBIT C - 2**

understand that in any separate lawsuit I may receive nothing, or, I may receive less than I would have if I had filed a claim under the Tier Program. I also understand that I cannot seek exclusion from the Class for purposes of non-monetary relief, and I will be bound by the class-wide equitable relief provisions of the Settlement entered into by Defendant and Class if the Court gives final approval to the Settlement."

By signing below, I acknowledge that I have read and understood all of the above language. I am signing this form voluntarily and knowingly.

Date: _____

_____
Print Name

_____
Signature

_____
Contact information

**EXHIBIT C - 3**

# Policy Guidance on Employer Liability Under Title VII for Sexual Favoritism

**U.S. Equal Employment Opportunity Commission Notice Number 915.048**

1. *Subject:* Policy Guidance on Employer Liability under Title VII for Sexual Favoritism.

2. *Purpose:* This policy document is intended to provide guidance on the extent to which an employer should be held liable for discriminating against individuals who are qualified for but are denied an employment opportunity or benefit, where the individual who is granted the opportunity or benefit received it because that person submitted to sexual advances or requests.

3. *Effective Date:* On receipt.

4. *Expiration Date:* As an exception to EEOC Order 205.001, Appendix B, Attachment 4, § a(5), this Notice will remain in effect until rescinded or superseded.

5. *Originator:* Title VII/EPA Division, Office of Legal Counsel.

6. *Instructions:* File after page 615-10, in Section 615 of Volume II of the Compliance Manual (*Harassment*).

7. *Subject Matter:*

## Background

The Commission and the courts have declared that sexual harassment violates Section 703 of Title VII. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 40 EPD ¶ 31,159 [40 FEP Cases 1822] (1986); EEOC's Guidelines on Discrimination Because of Sex, 29 C.F.R. §§ 1604.11(a). EEOC's Guidelines define two kinds of sexual harassment: "quid pro quo," in which "submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual," and "hostile environment," in which unwelcome sexual conduct "unreasonably interfer[es] with an individual's job performance" or creates an "intimidating, hostile or offensive working environment." 29 C.F.R. §§ 1604.11(a)(2) and (3).

Subsection (g) of EEOC's Guidelines provides:

> where employment opportunities or benefits are granted because of an individual's submission to the employer's sexual advances or requests for sexual favors, the employer may be held liable for unlawful sex discrimination against other persons who were qualified for but were denied that employment opportunity or benefit.

As discussed below, sexual favoritism in the workplace which adversely affects the employment opportunities of third parties may take the form of implicit "quid pro quo" harassment and/or "hostile work environment" harassment.

## Discussion

### A. Isolated Instances of Favoritism Towards a "Paramour" Not Prohibited

Not all types of sexual favoritism violate Title VII.[1] It is the Commission's position that Title VII does not prohibit isolated instances of preferential treatment based upon consensual romantic relationships. An isolated instance of favoritism toward a "paramour" (or a spouse, or a friend) may be unfair, but it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders.[2] A female charging party who is denied an employment benefit because of such sexual favoritism would not have been treated more favorably had she been a man nor, conversely, was she treated less favorably because she was a woman. *See Miller v. Aluminum Co. of America,* 679 F.Supp. 495, 47 EPD ¶ 38,112 [45 FEP Cases 1775] (W.D. Pa.), *aff'd mem.,* 856 F.2d 184 (3d Cir. 1988);[3] *DeCintio v. Westchester County Medical Center,* 807 F.2d 304, 42 EPD ¶ 36,785 [42 FEP Cases 921] (2d Cir. 1986), *cert. denied,* 108 S.Ct. 89, 44 EPD ¶ 37,425 [44 FEP Cases 1672] (1987).[4] *But see King v. Palmer,* 778 F.2d 878, 39 EPD ¶ 35,808, [39 FEP Cases 877]

---

[2] *See Benzies v. Illinois Dept. of Mental Health,* 810 F.2d 146, 148, 39 EPD ¶ 35,870 [42 FEP Cases 1537] (7th Cir.), *cert. denied,* 107 S.Ct. 3261 [43 FEP Cases 1896] (1987) (denial of promotion to woman is not violation if motivated by personal or political favoritism or a grudge); *Bellissimo v. Westinghouse Electric Corp.,* 764 F.2d 175, 180, 37 EPD ¶ 35,315 [37 FEP Cases 1862] (3d Cir. 1985), *cert. denied,* 475 U.S. 1035, 39 EPD ¶ 35,875 [40 FEP Cases 192] (1986) (discharge of female employee violates Title VII only if it is done on a basis that would not result in the discharge of a male employee).

[3] The plaintiff in *Miller* alleged that her supervisor treated her less favorably than her co-worker because the supervisor knew that the co-worker was engaged in a romantic relationship with the plant manager. *Miller,* 679 F.Supp. at 500-01. The lower court held that in order to establish a Title VII claim, the plaintiff would have to show that her employer would have or did treat males differently. *Id.* at 501. Since the plaintiff's male co-workers shared with her the same disadvantage relative to the co-worker who was engaged in the affair with the manager, the plaintiff could not show that she was treated differently than males. *Id.* On appeal to the Third Circuit, the Commission filed an amicus brief supporting the ruling of the district court on the basis that favoritism toward a female employee because of a consensual romantic relationship with a male supervisor is not sex discrimination against other female employees within the meaning of Title VII. The Court of Appeals summarily affirmed.

[4] In *DeCintio,* seven male respiratory therapists claimed that they were unlawfully disqualified for a promotion that went to a woman who was engaged in a romantic relationship with the department administrator. The court held that the department administrator's conduct, though unfair, did not violate Title VII. *DeCintio,* 807 F.2d at 308. The court reasoned that the prohibition of sex discrimination in Title VII refers to discrimination on the basis of one's sex, not on the basis of one's sexual affiliations; the therapists' claims were not cognizable under the Act since they were denied promotion because the administrator preferred his "paramour," rather than because of their status as males. *Id.* The court distinguished EEOC's Guidelines by stating that they address the granting of employment benefits because of an individual's "submission" to sexual advances or requests, and the word "submission" connotes a lack of consent. Since the department administrator did not force anyone to submit to sexual advances in order to win promotion, his conduct was not within the purview of the Guidelines. *Id.* at 307-08. *Accord, Handley v. Phillips,* 715 F.Supp. 657, 676, [52 FEP Cases 195] (M.D. Pa. 1989).

---

[1] The material in § 615 of the Compliance Manual on subsection (g) of the Guidelines (at pp. 615-10 and 11) is superseded by this Policy Guidance.

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-940-5

*reh'g denied,* 39 EPD ¶ 36,036 [40 FEP Cases 190] (D.C. Cir. 1985).[5]

## B. Favoritism Based Upon Coerced Sexual Conduct May Constitute Quid Pro Quo Harassment

If a female employee[6] is coerced into submitting to unwelcome sexual advances in return for a job benefit, other female employees who were qualified for but were denied the benefit may be able to establish that sex was generally made a condition for receiving the benefit.[7] Thus, in order for a woman to have obtained the job benefit at issue, it would have been necessary to grant sexual favors, a condition that would not have been imposed on men. This is substantially the same as a traditional sexual harassment charge alleging that sexual favors were implicitly demanded as a "quid pro quo" in return for job benefits.[8] For example, in *Toscano v. Nimmo,* 570 F.Supp. 1197, 1199-1201, 32 EPD ¶ 33,848 [42 FEP Cases 1401] (D. Del. 1983), the court found a violation of Title VII based on the fact that the granting of sexual favors was a condition for promotion. Although the individual who was granted preferential treatment was engaged in a consensual affair with her supervisor, there was evidence that the supervisor made telephone calls to proposition several female employees at home, phoned employees at work to describe his supposed sexual encounters with female employees under his supervision, and engaged in suggestive behavior at work.[9]

Many times, a third party female will not be able to establish that sex was generally made a condition for the benefit in question. For example, a supervisor may have been interested in only one woman and, thus, have coerced only her. Nevertheless, in such a case, both women and men who were qualified for but were denied the benefit would have standing to challenge the favoritism on the basis that they were injured as a result of the discrimination leveled against the woman who

was coerced. *See* EEOC amicus brief (filed Sept. 30, 1988) in *Clayton v. White Hall School District,* 875 F.2d 676, 50 EPD ¶ 39,048 [49 FEP Cases 1618] (8th Cir. 1989), in which the Commission argued that a white employee had standing under Title VII to challenge her employer's decision to deny her an employment benefit pursuant to an employment policy which it allegedly enforced for the purpose of denying the same benefit to a black employee; although the plaintiff was not the object of racial discrimination, she was injured as a result of the race discrimination practiced against the black employee.[10] *See also DeCintio v. Westchester County Medical Center,* 807 F.2d at 307-08 (by implication) (male plaintiffs' claims of favoritism rejected not because of lack of standing but because the woman who received the favorable treatment was not coerced into submitting to sexual advances); *EEOC v. T.I.M.E.-D.C. Freight, Inc.,* 659 F.2d 690 n.2, 27 EPD ¶ 32,202 [27 FEP Cases 10] (5th Cir. 1981) (white plaintiffs could challenge discrimination against blacks provided that they could establish a personal injury); *Allen v. American Home Foods, Inc.,* 644 F.Supp. 1553, 42 EPD ¶ 36,911 [42 FEP Cases 407] (N.D. Ind. 1986) (males who lost their jobs due to their employer's discrimination against female coworkers suffered an injury as a result of the discrimination, and therefore had standing to sue under Title VII).

## C. Widespread Favoritism May Constitute Hostile Environment Harassment

If favoritism based upon the granting of sexual favors is widespread in a workplace, both male and female colleagues who do not welcome this conduct can establish a hostile work environment in violation of Title VII regardless of whether any objectionable conduct is directed at them and regardless of whether those who were granted favorable treatment willingly bestowed the sexual favors. In these circumstances, a message is implicitly conveyed that the managers view women as "sexual playthings," thereby creating an atmosphere that is demeaning to women. Both men and women who find this offensive can establish a violation if the conduct is "sufficiently severe or pervasive 'to alter the conditions of [their] employment and create an abusive working environment.' " *Vinson,* 477 U.S. at 67, [quoting *Henson v. City of Dundee,* 682 F.2d 897, 904, 29 EPD ¶ 32,993 [29 FEP Cases 787] (11th Cir. 1982)].[11] An analogy can be made to a situation in which supervisors in an office regularly make racial, ethnic or sexual jokes. Even if the targets of the humor "play along" and in no way display that they object, co-workers of any race, national origin or sex can claim that this conduct, which communicates a bias against protected class members, creates a hostile work environment for them. *See Rogers v. EEOC,* 454 F2d 234, 4 EPD ¶ 7597 [4 FEP Cases 92] (5th Cir. 1971), *cert. denied,* 406

---

[5] In *King,* the plaintiff claimed she had been denied a promotion that went to a less qualified co-worker who was engaged in an intimate relationship with the selecting official. Although the issue of whether Title VII applied to preferential treatment was not raised on appeal, the court stated that it agreed with the lower court's conclusion that the case was within the purview of Title VII. *King,* 778 F.2d at 880. The court ruled in favor of the plaintiff on the basis of its finding that her co-worker was promoted because of the sexual relationship. *Id.* at 882. In a concurring opinion to the decision denying a suggestion for rehearing *en banc,* it was emphasized that the issue of whether Title VII applied to the facts of the case was not raised on appeal or in the petition for rehearing. 39 EPD ¶ 36,036.

[6] Although this Policy Guidance uses female pronouns to refer to individuals who are treated favorably because they engage in sexual conduct, it also covers situations in which men are granted favorable treatment based on sexual conduct.

[7] The employer would also be liable for "quid pro quo" harassment with regard to the individual who was coerced into submitting to the advances.

[8] *See* Section 1604.11(1) of EEOC's Guidelines on Sexual Harassment, which states that a violation will be found when submission to unwelcome sexual conduct is made "either explicitly or implicitly" a term or condition of an individual's employment.

[9] *See also DeCintio v. Westchester County Medical Center,* 807 F.2d at 307, in which the court stated that the claim in *Toscano* was premised on the coercive nature of the employer's acts, and therefore that the case lent no support to the contention that a voluntary amorous involvement may form the basis of a Title VII claim.

[10] In *Clayton,* the court ruled that the plaintiff did have standing, but it based that standing on her allegation of a hostile work environment. 875 F.2d at 679.

[11] *See* EEOC's Policy Guidance on Current Issues of Sexual Harassment (10/25/88) at 13-18 for standards governing the determination of whether a work environment is "hostile." That Policy Guidance makes clear that the Commission will evaluate the totality of circumstances on a case-by-case basis, employing the objective perspective of a "reasonable person" in the context in which the challenged conduct took place. Some factors that could be considered in determining whether a hostile environment is established are the number of incidents of favoritism, the egregiousness of the incidents, and whether or not other employees in the office were made aware of the conduct.

EEOC Compliance Manual
ISBN 0-8779-040-5

U.S. 957, 4 EPD ¶ 7838 [4 FEP Cases 771] (1972) (discriminatory treatment of medical patients created hostile work environment for plaintiff employee); Commission Decision No. 71-969, CCH EEOC Decisions (1973) ¶ 6193 (supervisor's habitual use of racial epithet in referring to Black employees created discriminatory work environment for White Charging Party); Compliance Manual Volume II, Section 616.3(a)(3) Examples (1) and (2) (sexual harassment of females may create hostile work environment for other male and female employees).

Managers who engage in widespread sexual favoritism may also communicate a message that the way for a woman to get ahead in the workplace is by engaging in sexual conduct or that sexual solicitations are a prerequisite to their fair treatment.[12] This can form the basis of an implicit "quid pro quo" harassment claim for female employees, as well as a hostile environment claim for both women and men who find this offensive.[13]

The case of *Broderick v. Ruder*, 685 F.Supp. 1269, 46 EPD ¶ 37,963 [48 FEP Cases 232] (D.D.C. 1988) illustrates how widespread sexual favoritism can be found to violate Title VII. In *Broderick* a staff attorney at the Securities and Exchange Commission alleged that two of her supervisors had engaged in sexual relationships with two secretaries who received promotions, cash awards, and other job benefits. Another of her supervisors allegedly promoted the career of a staff attorney with whom he socialized extensively and to whom he was noticeably attracted. In addition, there were isolated instances of sexual harassment directed at the plaintiff herself, including an incident in which her supervisor became drunk at an office party, untied the plaintiff's sweater, and kissed her. The court found that the conduct of these supervisors "created an atmosphere of hostile work environment" offensive to the plaintiff and several other witnesses. It further stated that the supervisors' conduct in bestowing preferential treatment upon those who submitted to their sexual advances undermined the plaintiff's motivation and work performance and deprived her and other female employees of promotions and job opportunities. *Broderick*, 685 F.Supp. at 1278. While the court in *Broderick* grounded its ruling on the hostile environ-

ment theory, it is the Commission's position that these facts could also support an implicit "quid pro quo" harassment claim since the managers, by their conduct, communicated a message to all female employees in the office that job benefits would be awarded to those who participated in sexual conduct. *See also Spencer v. General Electric*, 697 F.Supp. 204 [51 FEP Cases 1696] (E.D. Va. 1988).[14]

> *Example 1* — Charging Party (CP) alleges that she lost a promotion for which she was qualified because the co-worker who obtained the promotion was engaged in a sexual relationship with their supervisor. EEOC's investigation discloses that the relationship at issue was consensual and that the supervisor had never subjected CP's co-worker or any other employees to unwelcome sexual advances. The Commission would find no violation of Title VII in these circumstances, because men and women were equally disadvantaged by the supervisor's conduct for reasons other than their genders. Even if CP is genuinely offended by the supervisor's conduct, she has no Title VII claim.
>
> *Example 2* — Same as above, except the relationship at issue was *not* consensual. Instead, CP's supervisor regularly harassed the co-worker in front of other employees, demanded sexual favors as a condition for her promotion, and then audibly boasted about his "conquest." In these circumstances, CP may be able to establish a violation of Title VII by showing that in order to have obtained the promotion, it would have been necessary to grant sexual favors. In addition, she and other qualified men and women who were denied the promotion would have standing to challenge the favoritism on the basis that they were injured as a result of the discrimination levelled against their co-worker.
>
> *Example 3* — Same as Example 1, except CP's supervisor and other management personnel regularly solicited sexual favors from subordinate employees and offered job opportunities to those who complied. Some of those employees willingly consented to the sexual requests and in turn received promotions and awards. Others consented because they recognized that their opportunities for advancement would otherwise be limited. CP who did not welcome this conduct, was not approached for sexual favors. However, she and other female and male co-workers may be able to establish that the conduct created a hostile work environment. She can also claim

---

[12] *See, e.g., Priest v. Rotary*, 634 F.Supp. 571, 39 EPD ¶ 35,897 [40 FEP Cases 208] (N.D. Cal. 1986), in which the defendant gave preferential treatment to his consensual sexual partner and to those female employees who reacted favorably to his sexual advances and other conduct of a sexual nature, and he disadvantaged those employees, including the plaintiff, who reacted unfavorably to his conduct. The court found a violation of Title VII in part because the defendant's conduct implied that job benefits would be conditioned on an employee's good-natured endurance of his sexually-charged conduct or sexual advances. *Id.* at 581.

[13] In *Miller v. Aluminum Co. of America*, 679 F.Supp. at 501-502, the court rejected a claim that sexual favoritism based on a consensual relationship can create a hostile environment for others in the workplace. The court found that the favoritism itself did not violate Title VII since it was voluntary, and that "[h]ostile behavior that does not bespeak an unlawful motive cannot support a hostile work environment claim." *Id.* at 502. However, it is the Commission's position that had the sexual favoritism been widespread, the fact that it was exclusively voluntary and consensual would not have defeated a claim that it created a hostile environment for other people in the workplace. As indicated above in n.11, the question of whether actions complained of are sufficiently widespread or egregious to constitute a hostile environment must be decided case-by-case.

[14] In *Spencer*, the supervisor of an office engaged in virtually daily horseplay of a sexual nature with female subordinates. This behavior included sitting on their laps, touching them in an intimate manner, and making lewd comments. The subordinates joined in and generally found the horseplay funny and inoffensive. With the exception of one incident (which may have been time-barred and was not critical to the court's decision), none of the horseplay was directed at the plaintiff. The supervisor additionally engaged in consensual relations with at least two of his subordinates. The court found that the supervisor's conduct would have interfered with the work performance and would have seriously affected the psychological well-being of a reasonable employee, and on that basis it found a violation of Title VII. 697 F.Supp. at 218. Although *Spencer* did not involve sexual favoritism, the case supports the proposition that pervasive sexual conduct can create a hostile work environment for those who find it offensive even if the targets of the conduct welcome it and even if no sexual conduct is directed at the persons bringing the claim.

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-940-5

that by their conduct, the managers communicated to all female employees that they can obtain job benefits only by acquiescing in sexual conduct.

Date: 1/12/90

Approved: /s/
Clarence Thomas, Chairman

EEOC Compliance Manual
ISBN 0-87179-540-5

No. 289

615:0061

# Policy Guidance on Current Issues of Sexual Harassment

### U.S. Equal Employment Opportunity Commission
### Policy Guidance N-915-050

1. *SUBJECT:* Policy Guidance on Current Issues Of Sexual Harassment.

2. *EFFECTIVE DATE:* Upon receipt.

3. *EXPIRATION DATE:* As an exception to EEOC Order 295.001, Appendix B, Attachment 4, § a(5), this notice will remain in effect until rescinded or superseded.

4. *SUBJECT MATTER:*

This document provides guidance on defining sexual harassment and establishing employer liability in light of recent cases.

Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a) provides:

> It shall be an unlawful employment practice for an employer —
>
> ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

In 1980 the Commission issued guidelines declaring sexual harassment a violation of Section 703 of Title VII, establishing criteria for determining when unwelcome conduct of a sexual nature constitutes sexual harassment, defining the circumstances under which an employer may be held liable, and suggesting affirmative steps an employer should take to prevent sexual harassment. *See* Section 1604.11 of the Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.11 ("Guidelines"). The Commission has applied the Guidelines in its enforcement litigation, and many lower courts have relied on the Guidelines.

The issue of whether sexual harassment violates Title VII reached the Supreme Court in 1986 in *Meritor Savings Bank v. Vinson*, 106 S.Ct. 2399, 40 EPD ¶ 36,159 [40 FEP Cases 1822] (1986). The Court affirmed the basic premises of the Guidelines as well as the Commission's definition. The purpose of this document is to provide guidance on the following issues in light of the developing law after *Vinson*:

— determining whether sexual conduct is "unwelcome";

— evaluating evidence of harassment;

— determining whether a work environment is sexually "hostile";

— holding employers liable for sexual harassment by supervisors; and

— evaluating preventive and remedial action taken in response to claims of sexual harassment.

## Background

### A. Definition

Title VII does not proscribe all conduct of a sexual nature in the workplace. Thus it is crucial to clearly define sexual harassment: only unwelcome sexual conduct that is a term or condition of employment constitutes a violation. 29 C.F.R. § 1604.11(a). The EEOC's Guidelines define two types of sexual harassment: "quid pro quo" and "hostile environment." The Guidelines provide that "unwelcome" sexual conduct con-

stitutes sexual harassment when "submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment," 29 C.F.R. § 1604.11(a)(1). "Quid pro quo harassment" occurs when "submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual," 29 C.F.R. § 1604.11(a)(2).[1] The EEOC's Guidelines also recognize that unwelcome sexual conduct that "unreasonably interfer[es] with an individual's job performance" or creates an "intimidating, hostile, or offensive working environment" can constitute sex discrimination, even if it leads to no tangible or economic job consequences. 29 C.F.R. § 1604.11(a)(3).[2] The Supreme Court's decision in *Vinson* established that both types of sexual harassment are actionable under section 703 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), as forms of sex discrimination.

Although "quid pro quo" and "hostile environment" harassment are theoretically distinct claims, the line between the two is not always clear and the two forms of harassment often occur together. For example, an employee's tangible job conditions are affected when a sexually hostile work environment results in her constructive discharge.[3] Similarly, a supervisor who makes sexual advances toward a subordinate employee may communicate an implicit threat to adversely affect her job status if she does not comply. "Hostile environment" harassment may acquire characteristics of "quid pro quo" harassment if the offending supervisor abuses his authority over employment decisions to force the victim to endure or participate in the sexual conduct. Sexual harassment may culminate in a retaliatory discharge if a victim tells the harasser or her employer she will no longer submit to the harassment, and is

---

[1] *See, e.g., Miller v. Bank of America*, 600 F.2d 211, 20 EPD ¶ 30,086 [20 FEP Cases 462] (9th Cir. 1979) (plaintiff discharged when she refused to cooperate with her supervisor's sexual advances); *Barnes v. Costle*, 561 F.2d 983, 14 EPD ¶ 7755 [15 FEP Cases 345] (D.C. Cir. 1977) (plaintiff's job abolished after she refused to submit to her supervisor's sexual advances); *Williams v. Saxbe*, 413 F.Supp. 665, 11 EPD ¶ 10,840 [12 FEP Cases 1093] (D.D.C. 1976), *rev'd and remanded on other grounds sub nom. Williams v. Bell*, 587 F.2d 1240, 17 EPD ¶ 8605 [17 FEP Cases 1662] (D.C. Cir. 1978), *on remand sub nom. Williams v. Civiletti*, 487 F.Supp. 1387, 23 EPD ¶ 30,916 [22 FEP Cases 1311] (D.D.C. 1980) (plaintiff reprimanded and eventually terminated for refusing to submit to her supervisor's sexual demands).

[2] *See, e.g., Katz v. Dole*, 709 F.2d 251, 32 EPD ¶ 33,630 [31 FEP Cases 1521] (4th Cir. 1983) (plaintiff's workplace pervaded with sexual slur, insult and innuendo and plaintiff subjected to verbal sexual harassment consisting of extremely vulgar and offensive sexually related epithets); *Henson v. City of Dundee*, 682 F.2d 897, 29 EPD ¶ 32,993 [29 FEP Cases 787] (11th Cir. 1982) (plaintiff's supervisor subjected her to numerous harangues of demeaning sexual inquiries and vulgarities and repeated requests that she have sexual relations with him); *Bundy v. Jackson*, 641 F.2d 934, 24 EPD ¶ 31,439 [24 FEP Cases 1155] (D.C. Cir. 1981) (plaintiff subjected to sexual propositions by supervisors, and sexual intimidation was "standard operating procedure" in workplace).

[3] To avoid cumbersome use of both masculine and feminine pronouns, this document will refer to harassers as males and victims as females. The Commission recognizes, however, that men may also be victims and women may also be harassers.

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-940-5

then fired in retaliation for this protest. Under these circumstances it would be appropriate to conclude that both harassment and retaliation in violation of section 704(a) of Title VII have occurred.

Distinguishing between the two types of harassment is necessary when determining the employer's liability (see infra Section D). But while categorizing sexual harassment as "quid pro quo," "hostile environment," or both is useful analytically these distinctions should not limit the Commission's investigations,[4] which generally should consider all available evidence and testimony under all possibly applicable theories.[5]

### B. Supreme Court's Decision in Vinson

*Meritor Saving Bank v. Vinson* posed three questions for the Supreme Court:

(1) Does unwelcome sexual behavior that creates a hostile working environment constitute employment discrimination on the basis of sex;

(2) Can a Title VII violation be shown when the district court found that any sexual relationship that existed between the plaintiff and her supervisor was a "voluntary one"; and

(3) Is an employer strictly liable for an offensive working environment created by a supervisor's sexual advances when the employer does not know of, and could not reasonably have known of, the supervisor's misconduct.

1) **Facts** — The plaintiff had alleged that her supervisor constantly subjected her to sexual harassment both during and after business hours, on and off the employer's premises; she alleged that he forced her to have sexual intercourse with him on numerous occasions, fondled her in front of other employees, followed her into the women's restroom and exposed himself to her, and even raped her on several occasions. She alleged that she submitted for fear of jeopardizing her employment. She testified, however, that this conduct had ceased almost a year before she first complained in any way, by filing a Title VII suit; her EEOC charge was filed later (see infra at n.34). The supervisor and the employer denied all of her allegations and claimed they were fabricated in response to a work dispute.

2) **Lower Courts' Decisions** — After trial, the district court found the plaintiff was not the victim of sexual harass-

ment and was not required to grant sexual favors as a condition of employment or promotion. *Vinson v. Taylor*, 22 EPD ¶ 30,708 [23 FEP Cases 37] (D.D.C. 1980). Without resolving the conflicting testimony, the district court found that if a sexual relationship had existed between plaintiff and her supervisor, it was "a voluntary one . . . having nothing to do with her continued employment." The district court nonetheless went on to hold that the employer was not liable for its supervisor's actions because it had no notice of the alleged sexual harassment; although the employer had a policy against discrimination and an internal grievance procedure, the plaintiff had never lodged a complaint.

The court of appeals reversed and remanded, holding the lower court should have considered whether the evidence established a violation under the "hostile environment" theory. *Vinson v. Taylor*, 753 F.2d 141, 36 EPD ¶ 34,949, [36 FEP Cases 1423] denial of rehearing en banc, 760 F.2d 1330, 37 EPD ¶ 35,232 [37 FEP Cases 1266] (D.C. Cir. 1985). The court ruled that a victim's "voluntary" submission to sexual advances has "no materiality whatsoever" to the proper inquiry: whether "toleration of sexual harassment [was] a condition of her employment." The court further held that an employer is absolutely liable for sexual harassment committed by a supervisory employee, regardless of whether the employer actually knew or reasonably could have known of the misconduct, or would have disapproved of and stopped the misconduct if aware of it.

3) **Supreme Court's Opinion** — The Supreme Court agreed that the case should be remanded for consideration under the "hostile environment" theory and held that the proper inquiry focuses on the "unwelcomeness" of the conduct rather than the "voluntariness" of the victim's participation. But the Court held that the court of appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisory employees.

a) **"Hostile Environment" Violates Title VII** — The Court rejected the employer's contention that Title VII prohibits only discrimination that causes "economic" or "tangible" injury: "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult" whether based on sex, race, religion, or national origin. 106 S.Ct. at 2405. Relying on the EEOC's Guidelines' definition of harassment,[6] the Court held that a plaintiff may establish a violation of Title VII "by proving that discrimination based on sex has created a hostile or abusive work environment." *Id.* The Court quoted the Eleventh Circuit's decision in *Henson v. City of Dundee*, 682 F.2d 897, 902, 29 EPD ¶ 32,993 [29 FEP Cases 787] (11th Cir. 1982):

> Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as

---

[4] For a description of the respective roles of the Commission and other federal agencies in investigating complaints of discrimination in the federal sector, see 29 C.F.R. § 1613.216.

[5] In a subsection entitled "Other Related Practices," the Guidelines also provide that where an employment opportunity or benefit is granted because of an individual's "submission to the employer's sexual advances or requests for sexual favors," the employer may be liable for unlawful sex discrimination against others who were qualified for but were denied the opportunity or benefit. 29 C.F.R. § 1604.11(g). The law is unsettled as to when a Title VII violation can be established in these circumstances. See *DeCintio v. Westchester County Medical Center*, 807 F.2d 304, 42 EPD ¶ 36,785 [42 FEP Cases 921] (2d Cir. 1986), cert. denied, 108 S.Ct. 89, 44 EPD ¶ 37,425 (1987); *King v. Palmer*, 778 F.2d 878, 39 EPD ¶ 35,808 [39 FEP Cases 877] (D.C. Cir. 1985), decision on remand, 641 F.Supp. 186, 40 EPD ¶ 36,245 (D.D.C. 1986); *Broderick v. Ruder*, 46 EPD ¶ 37,963 [48 FEP Cases 232] (D.D.C. 1988); *Miller v. Aluminum Co. of America*, 679 F.Supp. 495, 500-01 [45 FEP Cases 1775] (W.D. Pa.), aff'd mem., No. 88-3099 (3d Cir. 1988). However, the Commission recently analyzed the issues in its "Policy Guidance on Employer Liability Under Title VII for Sexual Favoritism" dated January 1990.

[6] The Court stated that the Guidelines, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' " *Vinson*, 106 S.Ct. at 2405 (quoting *General Electric Co. v. Gilbert*, 429 U.S. 125, 141-42, 12 EPD ¶ 11,240 [13 FEP Cases 1657] (1976), quoting in turn *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

demeaning and disconcerting as the harshest of racial epithets.
106 S.Ct. at 2406. The Court further held that for harassment to violate Title VII, it must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Id.* (quoting *Henson*, 682 F2d at 904).

b) **Conduct Must Be "Unwelcome"** — Citing the EEOC's Guidelines, the Court said the gravamen of a sexual harassment claim is that the alleged sexual advances were "unwelcome." 106 S.Ct. at 2406. Therefore, "the fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII ... The correct inquiry is whether [the victim] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary." *Id.* Evidence of a complainant's sexually provocative speech or dress may be relevant in determining whether she found particular advances unwelcome, but should be admitted with caution in light of the potential for unfair prejudice, the Court held.

c) **Employer Liability Established under Agency Principles** — On the question of employer liability in "hostile environment" cases, the Court agreed with EEOC's position that agency principles should be used for guidance. While declining to issue a "definitive rule on employer liability," the Court did reject both the court of appeals' rule of automatic liability for the actions of supervisors and the employer's position that notice is always required. 106 S.Ct. at 2408–09.

The following sections of this document provide guidance on the issues addressed in *Vinson* and subsequent cases.

**Guidance**

A. **Determining Whether Sexual Conduct Is Unwelcome**

Sexual harassment is "unwelcome ... verbal or physical conduct of a sexual nature. ..." 29 C.F.R. § 1604.11(a). Because sexual attraction may often play a role in the day-to-day social exchange between employees, "the distinction between invited, uninvited-but-welcome, offensive-but-tolerated, and flatly rejected" sexual advances may well be difficult to discern. *Barnes v. Costle*, 561 F.2d 983, 999, 14 EPD ¶ 7755 [15 FEP Cases 345] (D.C. Cir. 1977) (MacKinnon J., concurring). But this distinction is essential because sexual conduct becomes unlawful only when it is unwelcome. The Eleventh Circuit provided a general definition of "unwelcome conduct" in *Henson v. City of Dundee*, 682 F.2d at 903: the challenged conduct must be unwelcome "in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive."

When confronted with conflicting evidence as to welcomeness, the Commission looks "at the record as a whole and at the totality of circumstances. ..." 29 C.F.R. § 1604.11(b), evaluating each situation on a case-by-case basis. When there is some indication of welcomeness or when the credibility of the parties is at issue, the charging party's claim will be considerably strengthened if she made a contemporaneous complaint or protest.[7] Particularly when the alleged harasser

may have some reason (e.g., a prior consensual relationship) to believe that the advances will be welcomed, it is important for the victim to communicate that the conduct is unwelcome. Generally, victims are well-advised to assert their right to a workplace free from sexual harassment. This may stop the harassment before it becomes more serious. A contemporaneous complaint or protest may also provide persuasive evidence that the sexual harassment in fact occurred as alleged (*see infra* Section B). Thus, in investigating sexual harassment charges, it is important to develop detailed evidence of the circumstances and nature of any such complaints or protests, whether to the alleged harasser, higher management, coworkers or others.[8]

While a complaint or protest is helpful to a charging party's case, it is not a necessary element of the claim. Indeed, the Commission recognizes that victims may fear repercussions from complaining about the harassment and that such fear may explain a delay in opposing the conduct. If the victim failed to complain or delayed in complaining, the investigation must ascertain why. The relevance of whether the victim has complained varies depending upon "the nature of the sexual advances and the context in which the alleged incidents occurred." 29 C.F.R. § 1604.11(b).[9]

*Example* — Charging Party (CP) alleges that her supervisor subjected her to unwelcome sexual advances that created a hostile work environment. The investigation into her charge discloses that her supervisor began making intermittent sexual advances to her in June, 1987, but she did not complain to management about the harassment. After the harassment continued and worsened, she filed a charge with EEOC in June, 1988. There is no evidence CP welcomed the advances. CP states that she feared that complaining about the harassment would cause her to lose her job. She also states that she initially believed she could resolve the situation herself, but as the harassment became more frequent and severe, she said she realized that intervention by EEOC was necessary. The investigator determines CP is credible and concludes that the delay in complaining does not undercut CP's claim.

---

[7] For a complaint to be "contemporaneous," it should be made while the harassment is ongoing or shortly after it has ceased. For example, a victim of "hostile environment" harassment who re-

signs her job because working conditions have become intolerable would be considered to have made a contemporaneous complaint if she notified the employer of the harassment at the time of her departure or shortly thereafter. The employer has a duty to investigate and, if it finds the allegations true, to take remedial action including offering reinstatement (*see infra* Section E).

[8] Even when unwelcomeness is not at issue, the investigation should develop this evidence in order to aid in making credibility determinations (*see infra* p. 12).

[9] A victim of harassment need not always confront her harasser directly so long as her conduct demonstrates the harasser's behavior is unwelcome. *See, e.g., Lipsett v. University of Puerto Rico*, 864 F.2d 881, 898, 48 EPD ¶ 38,393 (1st Cir. 1988) ("In some instances a woman may have the responsibility for telling the man directly that his comments or conduct is unwelcome. In other instances, however, a woman's consistent failure to respond to suggestive comments or gestures may be sufficient to communicate that the man's conduct is unwelcome"); Commission Decision No. 84–1, CCH EEOC Decisions ¶ 6839 (although charging parties did not confront their supervisor directly about his sexual remarks and gestures for fear of losing their jobs, evidence showing that they demonstrated through comments and actions that his conduct was unwelcome was sufficient to support a finding of harassment).

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-910-5

When welcomeness is at issue, the investigation should determine whether the victim's conduct is consistent, or inconsistent, with her assertion that the sexual conduct was unwelcome.[10]

In *Vinson*, the Supreme Court made clear that voluntary submission to sexual conduct will not necessarily defeat a claim of sexual harassment. The correct inquiry "is whether [the employee] *by her conduct* indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary." 106 S.Ct. at 2406 (emphasis added). *See also* Commission Decision No. 84–1 ("acquiescence in sexual conduct at the workplace may not mean that the conduct is welcome to the individual").

In some cases the courts and the Commission have considered whether the complainant welcomed the sexual conduct by acting in a sexually aggressive manner, using sexually-oriented language, or soliciting the sexual conduct. Thus, in *Gan v. Kepro Circuit Systems*, 27 EPD ¶ 32,379 [28 FEP Cases 639] (E.D. Mo. 1982), the plaintiff regularly used vulgar language, initiated sexually-oriented conversations with her co-workers, asked male employees about their marital sex lives and whether they engaged in extramarital affairs, and discussed her own sexual encounters. In rejecting the plaintiff's claim of "hostile environment" harassment, the court found that any propositions or sexual remarks by co-workers were "prompted by her own sexual aggressiveness and her own sexually-explicit conversations." *Id.* at ¶ 23,648.[11] And in *Vinson*, the Supreme Court held that testimony about the plaintiff's provocative dress and publicly expressed sexual fantasies is not *per se* inadmissible but the trial court should carefully weigh its relevance against the potential for unfair prejudice. 106 S.Ct. at 2407.

Conversely, occasional use of sexually explicit language does not necessarily negate a claim that sexual conduct was unwelcome. Although a charging party's use of sexual terms or off-color jokes may suggest that sexual comments by others in that situation were not unwelcome, more extreme and abusive or persistent comments or a physical assault will not be excused, nor would "quid pro quo" harassment be allowed.

Any past conduct of the charging party that is offered to show "welcomeness" must relate to the alleged harasser. In *Swentek v. USAir, Inc.*, 830 F.2d 552, 557, 44 EPD ¶ 37,457 [44 FEP Cases 1808] (4th Cir. 1987), the Fourth Circuit held the district court wrongly concluded that the plaintiff's own past conduct and use of foul language showed that "she was the kind of person who could not be offended by such comments and therefore welcomed them generally," even though she had told the harasser to leave her alone. Emphasizing that the proper inquiry is "whether plaintiff welcomed the particular conduct in question from the alleged harasser," the court of appeals held that "'Plaintiff's use of foul language or sexual innuendo in a consensual setting does not waive "her legal protections against unwelcome harassment."'" 830 F.2d at 557 (quoting *Katz v. Dole*, 709 F.2d 251, 254 n.3, 32 EPD ¶ 33,639 [31 FEP Cases 1521] (4th Cir. 1983)). Thus, evidence concerning a charging party's general character and past behavior toward others has limited, if any, probative value and does not substitute for a careful examination of her behavior toward the alleged harasser.

A more difficult situation occurs when an employee first willingly participates in conduct of a sexual nature but then ceases to participate and claims that any continued sexual conduct has created a hostile work environment. Here the employee has the burden of showing that any further sexual conduct is unwelcome, work-related harassment. The employee must clearly notify the alleged harasser that his conduct is no longer welcome.[12] If the conduct still continues, her failure to bring the matter to the attention of higher management or the EEOC is evidence, though not dispositive, that any continued conduct is, in fact, welcome or unrelated to work.[13] In any case, however, her refusal to submit to the sexual conduct cannot be the basis for denying her an employment benefit or opportunity; that would constitute a "quid pro quo" violation.

---

[10] Investigators and triers of fact rely on objective evidence, rather than subjective, uncommunicated feelings. For example, in *Ukarish v. Magnavox Electron*, 33 EPD ¶ 34,087 [31 FEP Cases 1315] (D.N.J. 1983), the court rejected the plaintiff's claim that she was sexually harassed by her co-worker's language and gestures; although she indicated in her personal diary that she did not welcome the banter, she made no objection and indeed appeared to join in "as one of the boys." *Id.* at ¶ 32,118. In *Sardigal v. St. Louis National Stockyards Co.*, 41 EPD ¶ 36,613 [42 FEP Cases 497] (S.D. Ill. 1986), the plaintiff's allegation was found not credible because she visited her alleged harasser at the hospital and at his brother's home, and allowed him to come to her home alone at night after the alleged harassment occurred. Similarly, in the *Vinson* case, the district court noted the plaintiff had twice refused transfers to other offices located away from the alleged harasser. (In a particular charge, the significance of a charging party's refusing an offer to transfer will depend upon her reasons for doing so.)

[11] *See also Ferguson v. E.I DuPont deNemours and Co.*, 560 F.Supp. 1172, 33 EPD ¶ 34,131 [31 FEP Cases 795] (D. Del. 1983) ("sexually aggressive conduct and explicit conversation on the part of the plaintiff may bar a cause of action for [hostile environment] sexual harassment"); *Reichman v. Bureau of Affirmative Action*, 536 F.Supp. 1149, 1172, 30 FEP Cases 1644 (M.D. Pa. 1982) (where plaintiff behaved "in a very flirtatious and provocative manner" around the alleged harasser, asked him to have dinner at her house on several occasions despite his repeated refusals, and continued to conduct herself in a similar manner after the alleged harassment, she could not claim the alleged harassment was unwelcome).

[12] In Commission Decision No. 84–1, CCH Employment Practices Guide ¶ 6839, the Commission found that active participation in sexual conduct at the workplace, e.g., by "using dirty remarks and telling dirty jokes," may indicate that the sexual advances complained of were not unwelcome. Thus, the Commission found that no harassment occurred with respect to an employee who had joined in the telling of bawdy jokes and the use of vulgar language during her first two months on the job, and failed to provide subsequent notice that the conduct was no longer welcome. By actively participating in the conduct, the charging party had created the impression among her co-workers that she welcomed the sort of sexually oriented banter that she later asserted was objectionable. Simply ceasing to participate was insufficient to show the continuing activity was no longer welcome to her. *See also Loftin-Boggs v. City of Meridian*, 633 F.Supp. 1323, 41 FEP Cases 532 (S.D. Miss. 1986) (plaintiff initially participated in and initiated some of the crude language that was prevalent on the job; if she later found such conduct offensive, she should have conveyed this by her own conduct and her reaction to her co-workers' conduct).

[13] However, if the harassing supervisor engages in conduct that is sufficiently pervasive and work-related, it may place the employer on notice that the conduct constitutes harassment.

## B. Evaluating Evidence of Harassment

The Commission recognizes that sexual conduct may be private and unacknowledged, with no eyewitnesses. Even sexual conduct that occurs openly in the workplace may appear to be consensual. Thus the resolution of a sexual harassment claim often depends on the credibility of the parties. The investigator should question the charging party and the alleged harasser in detail. The Commission's investigation also should search thoroughly for corroborative evidence of any nature.[14] Supervisory and managerial employees, as well as co-workers, should be asked about their knowledge of the alleged harassment.

In appropriate cases, the Commission may make a finding of harassment based solely on the credibility of the victim's allegation. As with any other charge of discrimination, a victim's account must be sufficiently detailed and internally consistent so as to be plausible, and lack of corroborative evidence where such evidence logically should exist would undermine the allegation.[15] By the same token, a general denial by the alleged harasser will carry little weight when it is contradicted by other evidence.[16]

Of course, the Commission recognizes that a charging party may not be able to identify witnesses to the alleged conduct itself. But testimony may be obtained from persons who observed the charging party's demeanor immediately after an alleged incident of harassment. Persons with whom she discussed the incident — such as co-workers, a doctor or a counselor — should be interviewed. Other employees should be asked if they noticed changes in charging party's behavior at work or in the alleged harasser's treatment of charging party. As stated earlier, a contemporaneous complaint by the victim would be persuasive evidence both that the conduct occurred and that it was unwelcome (see supra Section A). So too is evidence that other employees were sexually harassed by the same person.

The investigator should determine whether the employer was aware of any other instances of harassment and if so what was the response. Where appropriate the Commission will expand the case to include class claims.[17]

> *Example* — Charging Party (CP) alleges that her supervisor made unwelcome sexual advances toward her on frequent occasions while they were alone in his office. The supervisor denies this allegation. No one witnessed the alleged advances. CP's inability to produce eyewitnesses to the harassment does *not* defeat her claim. The resolution will depend on the credibility of her allegations versus that of her supervisor's. Corroborating, credible evidence will establish her claim. For example, three co-workers state that CP looked distraught on several occasions after leaving the supervisor's office, and that she informed them on those occasions that he had sexually propositioned and touched her. In addition, the evidence shows that CP had complained to the general manager of the office about the incidents soon after they occurred. The corroborating witness testimony and her complaint to higher management would be sufficient to establish her claim. Her allegations would be further buttressed if other employees testified that the supervisor propositioned them as well.

If the investigation exhausts all possibilities for obtaining corroborative evidence, but finds none, the Commission may make a cause finding based solely on a reasoned decision to credit the charging party's testimony.[18]

In a "quid pro quo" case, a finding that the employer's asserted reasons for its adverse action against the charging party are pretextual will usually establish a violation.[19] The investigation should determine the validity of the employer's reasons for the charging party's termination. If they are pretextual and if the sexual harassment occurred, then it should be inferred that the charging party was terminated for rejecting the employer's sexual advances, as she claims. Moreover, if the termination occurred because the victim complained, it would be appropriate to find, in addition, a violation of section 704(a).

## C. Determining Whether A Work Environment Is "Hostile"

The Supreme Court said in *Vinson* that for sexual harassment to violate Title VII, it must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " 106 S.Ct. at 2406 (quoting *Henson v. City of Dundee*, 682 F.2d at 904. Since "hostile environment" harassment takes a variety of forms, many factors may affect this determination, including: (1) whether the conduct was verbal or physical, or both; (2) how frequently it was repeated; (3) whether the conduct was hostile and patently offensive; (4) whether the alleged

---

[14] As the court said in *Henson v. City of Dundee*, 682 F.2d at 912 n.25, "In a case of alleged sexual harassment which involves close questions of credibility and subjective interpretation, the existence of corroborative evidence or the lack thereof is likely to be crucial."

[15] In *Sardigal v. St. Louis National Stockyards Co.*, 41 EPD ¶ 36,613 at 44,694 [42 FEP Cases 497] (S.D. Ill. 1986), the plaintiff, a waitress, alleged she was harassed over a period of nine months in a restaurant at noontime, when there was a "constant flow of waitresses or customers" around the area where the offenses allegedly took place. Her allegations were not credited by the district court because no individuals came forward with testimony to support her.

It is important to explore all avenues for obtaining corroborative evidence because courts may reject harassment claims due to lack of corroborative evidence. See *Hall v. F.O. Thacker Co.*, 24 FEP Cases 1499, 1503 (N.D. Ga. 1980) (district judge did not credit plaintiff's testimony about sexual advances because it was "virtually uncorroborated"); *Neidhart v. D.H. Holmes Co.*, 21 FEP Cases 452, 457 (E.D. La. 1979), *aff'd mem.*, 624 F.2d 1097 (5th Cir. 1980) (plaintiff's account of sexual harassment rejected because "there is not a scintilla of credible evidence to corroborate [plaintiff's version]").

[16] See Commission Decision No. 81–17, CCH EEOC Decisions (1983) ¶ 6757 (violation of Title VII found where charging party alleged that her supervisor made repeated sexual advances toward her, although the supervisor denied the allegations, statements of other employees supported them).

[17] Class complaints in the federal sector are governed by the requirements of 29 C.F.R. § 1613 Subpart F.

[18] In Commission Decision No. 82–13, CCH EEOC Decisions (1983) ¶ 6832, the Commission stated that a "bare assertion" of sexual harassment "cannot stand without some factual support." To the extent this decision suggests a charging party can never prevail based solely on the credibility of her own testimony, that decision is overruled.

[19] See, e.g., *Bundy v. Jackson*, 641 F.2d 934, 953, 24 EPD ¶ 31,439 [24 FEP Cases 1155] (D.C. Cir. 1981).

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-940-5

harasser was a co-worker or a supervisor; (5) whether others joined in perpetrating the harassment; and (6) whether the harassment was directed at more than one individual.

In determining whether unwelcome sexual conduct rises to the level of a "hostile environment" in violation of Title VII, the central inquiry is whether the conduct "unreasonably interfer[es] with an individual's work performance" or creates "an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a)(3). Thus, sexual flirtation or innuendo, even vulgar language that is trivial or merely annoying, would probably not establish a hostile environment.

1) Standard for Evaluating Harassment — In determining whether harassment is sufficiently severe or pervasive to create a hostile environment, the harasser's conduct should be evaluated from the objective standpoint of a "reasonable person." Title VII does not serve "as a vehicle for vindicating the petty slights suffered by the hypersensitive." *Zabkowicz v. West Bend Co.*, 589 F.Supp. 780, 784, 35 EPD ¶ 34,766 [35 FEP Cases 610] (E.D. Wis. 1984). *See also Ross v. Comsat*, 34 FEP Cases 260, 265 (D. Md. 1984), *rev'd on other grounds*, 759 F.2d 355 (4th Cir. 1985). Thus, if the challenged conduct would not substantially affect the work environment of a reasonable person, no violation should be found.

> *Example* — Charging Party alleges that her co-worker made repeated unwelcome sexual advances toward her. An investigation discloses that the alleged "advances" consisted of invitations to join a group of employees who regularly socialized at dinner after work. The co-worker's invitations, viewed in that context and from the perspective of a reasonable person, would not have created a hostile environment and therefore did not constitute sexual harassment.

A "reasonable person" standard also should be applied to the more basic determination of whether challenged conduct is of a sexual nature. Thus, in the above example, a reasonable person would not consider the co-worker's invitations sexual in nature, and on that basis as well no violation would be found.

This objective standard should not be applied in a vacuum, however. Consideration should be given to the context in which the alleged harassment took place. As the Sixth Circuit has stated, the trier of fact must "adopt the perspective of a reasonable person's reaction to a similar environment under similar or like circumstances." *Highlander v. K.F.C. National Management Co.*, 805 F.2d 644, 650, 41 EPD ¶ 36,675 [42 FEP Cases 654] (6th Cir. 1986).[29]

The reasonable person standard should consider the victim's perspective and not stereotyped notions of acceptable behavior. For example, the Commission believes that a workplace in which sexual slurs, displays of "girlie" pictures, and other offensive conduct abound can constitute a hostile work environment even if many people deem it to be harmless or insignificant. Cf. *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 626, 41 EPD ¶ 36,643 [42 FEP Cases 631] (6th Cir. 1986)

(Keith, C.J., dissenting), *cert. denied*, 107 S.Ct. 1983, 42 EPD ¶ 36,984 (1987). *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 898 48 EPD ¶ 38,393 (1st Cir. 1988).

2) Isolated Instances of Harassment — Unless the conduct is quite severe, a single incident or isolated incidents of offensive sexual conduct or remarks generally do not create an abusive environment. As the Court noted in *Vinson*, "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not affect the conditions of employment to a sufficiently significant degree to violate Title VII." 106 S.Ct. at 2406 (quoting *Rogers v. EEOC*, 454 F.2d 234, 4 EPD ¶ 7597 [4 FEP Cases 92] (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 4 EPD ¶ 7838 (1972)). A "hostile environment" claim generally requires a showing of a pattern of offensive conduct.[21] In contrast, in "quid pro quo" cases a single sexual advance may constitute harassment if it is linked to the granting or denial of employment benefits.[22]

But a single, unusually severe incident of harassment may be sufficient to constitute a Title VII violation; the more severe the harassment, the less need to show a repetitive series of incidents. This is particularly true when the harassment is physical.[23] Thus, in *Barrett v. Omaha National Bank*, 584 F.Supp. 22, 35 FEP Cases 585 (D. Neb. 1983), *aff'd*, 726 F.2d 424, 33 EPD ¶ 34,132 (8th Cir. 1984), one incident constituted actionable sexual harassment. The harasser talked to the plaintiff about sexual activities and touched her in an offensive manner while they were inside a vehicle from which she could not escape.[24]

---

[29] In *Highlander* and also in *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 41 EPD ¶ 36,643 [42 FEP Cases 631] (6th Cir. 1986), *cert. denied*, 107 S.Ct. 1983, 42 EPD ¶ 36,984 (1987), the Sixth Circuit required an additional showing that the plaintiff suffered some degree of psychological injury. *Highlander*, 805 F.2d at 650; *Rabidue*, 805 F.2d at 620. However, it is the Commission's position that it is sufficient for the charging party to show that the harassment was unwelcome and that it would have substantially affected the work environment of a reasonable person.

[21] *See, e.g., Scott v. Sears, Roebuck and Co.*,798 F.2d 210, 214, 41 EPD ¶ 36,439 [41 FEP Cases 805] (7th Cir. 1986) (offensive comments and conduct of co-workers were "too isolated and lacking the repetitive and debilitating effect necessary to maintain a hostile environment claim"); *Moylan v. Maries County*, 792 F.2d 746, 749, 40 EPD ¶ 36,228 [40 FEP Cases 1788] (8th Cir. 1986) (single incident or isolated incidents of harassment will not be sufficient to establish a violation; the harassment must be sustained and nontrivial); *Downes v. Federal Aviation Administration*, 775 F.2d 288, 293, 38 EPD ¶ 35,590 [39 FEP Cases 70] (D.C. Cir. 1985) (Title VII does not create a claim of sexual harassment "for each and every crude joke or sexually explicit remark on the job. . . . [A] *pattern* of offensive conduct must be proved. . . ."); *Sapp v. City of Warner-Robins*, 655 F.Supp. 1043, 43 FEP Cases 486 (M.D. Ga. 1987) (co-worker's single effort to get the plaintiff to go out with him did not create an abusive working environment); *Freedman v. American Standard*, 41 FEP Cases 471 (D.N.J. 1986) (plaintiff did not suffer a hostile environment from the receipt of an obscene message from her coworkers and a sexual solicitation from one co-worker); *Hollis v. Fleetguard, Inc.*, 44 FEP Cases 1527 (M.D. Tenn. 1987) (plaintiff's co-worker's requests, on four occasions over a four-month period, that she have a sexual affair with him, followed by his coolness toward her and avoidance of her did not constitute a hostile environment; there was no evidence he coerced, pressured, or abused the plaintiff after she rejected his advances).

[22] *See Neville v. Taft Broadcasting Co.*, 42 FEP Cases 1314 (W.D.N.Y. 1987) (one sexual advance, rebuffed by plaintiff, may establish a prima facie case of "quid pro quo" harassment but is not severe enough to create a hostile environment).

[23] The principles for establishing employer liability, set forth in Section D below, are to be applied to cases involving physical contact in the same manner that they are applied in other cases.

[24] *See also Gilardi v. Schroeder*, 672 F.Supp. 1043, 45 FEP Cases 283 (N.D. Ill. 1986) (plaintiff who was drugged by employer's owner and raped while unconscious, and then was terminated at

EEOC Compliance Manual
ISBN 0-87179-040-5

The Commission will presume that the unwelcome, intentional touching of a charging party's intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII. More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment. If an employee's supervisor sexually touches that employee, the Commission normally would find a violation. In such situations, it is the employer's burden to demonstrate that the unwelcome conduct was not sufficiently severe to create a hostile work environment.

When the victim is the target of both verbal and non-intimate physical conduct, the hostility of the environment is exacerbated and a violation is more likely to be found. Similarly, incidents of sexual harassment directed at other employees in addition to the charging party are relevant to a showing of hostile work environment. *Hall v. Gus Construction Co.,* 842 F.2d 1010, 46 EPD ¶ 37,905 [46 FEP Cases 573] (8th Cir. 1988); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 44 EPD ¶ 37,542 [45 FEP Cases 608] (10th Cir. 1987); *Jones v. Flagship International,* 793 F.2d 714, 721 n.7, 40 EPD ¶ 36,392 [41 FEP Cases 358] (5th Cir. 1986), *cert. denied,* 107 S.Ct. 952, 41 EPD ¶ 36,708 (1987).

**3) Non-Physical Harassment** — When the alleged harassment consists of verbal conduct, the investigation should ascertain the nature, frequency, context, and intended target of the remarks. Questions to be explored might include:

- — Did the alleged harasser single out the charging party?
- — Did the charging party participate?
- — What was the relationship between the charging party and the alleged harasser(s)?
- — Were the remarks hostile and derogatory?

No one factor alone determines whether particular conduct violates Title VII. As the Guidelines emphasize, the Commission will evaluate the totality of the circumstances. In general, a woman does not forfeit her right to be free from sexual harassment by choosing to work in an atmosphere that has traditionally included vulgar, anti-female language. However, in *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 42 FEP Cases 631 [ (6th Cir. 1986), *cert. denied,* 107 S.Ct. 1983, 42 EPD ¶ 36,984 (1987), the Sixth Circuit rejected the plaintiff's claim of harassment in such a situation.[25] One of the factors the court found relevant was "the lexicon of ob-

---

insistence of owner's wife, was awarded $113,000 in damages for harassment and intentional infliction of emotional distress); Commission Decision No. 83-1, CCH EEOC Decisions (1983) ¶ 6834 (violation found where the harasser forcibly grabbed and kissed charging party while they were alone in a storeroom); Commission Decision No. 84-3, CCH Employment Practices Guide ¶ 6841 (violation found where the harasser slid his hand under the charging party's skirt and squeezed her buttocks).

[25] The alleged harasser, a supervisor of another department who did not supervise plaintiff but worked with her regularly, "was an extremely vulgar and crude individual who customarily made obscene comments about women generally, and, on occasion, directed such obscenities to the plaintiff." 805 F.2d at 615. The plaintiff and other female employees were exposed daily to displays of nude or partially clad women in posters in male employees' offices. 805 F.2d at 623–24 (Keith, J., dissenting in part and concurring in part). Although the employees told management they were disturbed and offended, the employer did not reprimand the supervisor.

scenity that pervaded the environment of the workplace both before and after the plaintiff's introduction into its environs, coupled with the reasonable expectations of the plaintiff upon voluntarily entering that environment." 805 F.2d at 620. Quoting the district court, the majority noted that in some work environments, " 'humor and language are rough hewn and vulgar. Sexual jokes, sexual conversations, and girlie magazines may abound. Title VII was not meant to — or can — change this.' " *Id.* at 620-21. The court also considered the sexual remarks and poster at issue to have a "de minimis effect on the plaintiff's work environment when considered in the context of a society that condones and publicly features and commercially exploits open displays of written and pictorial erotica at the newsstands, on prime-time television, at the cinema, and in other public places." *Id.* at 622.

The Commission believes these factors rarely will be relevant and agrees with the dissent in *Rabidue* that a woman does not assume the risk of harassment by voluntarily entering an abusive, anti-female environment. "Title VII's precise purpose is to prevent such behavior and attitudes from poisoning the work environment of classes protected under the Act." 805 F.2d at 626 (Keith, J., dissenting in part and concurring in part). Thus, in a decision disagreeing with *Rabidue,* a district court found that a hostile environment was established by the presence of pornographic magazines in the workplace and vulgar employee comments concerning them; offensive sexual comments made to and about plaintiff and other female employees by her supervisor; sexually oriented pictures in a company-sponsored movie and slide presentation; sexually oriented pictures and calendars in the workplace; and offensive touching of plaintiff by a co-worker. *Barbetta v. Chemlawn Services Corp.,* 669 F.Supp. 569, 45 EPD ¶ 37,568 [44 FEP Cases 1563] (W.D.N.Y. 1987). The court held that the proliferation of pornography and demeaning comments, if sufficiently continuous and pervasive, "may be found to create an atmosphere in which women are viewed as men's sexual playthings rather than as their equal coworkers." *Barbetta,* 669 F.Supp. at 573. The Commission agrees that, depending on the totality of circumstances, such an atmosphere may violate Title VII. *See also Waltman v. International Paper Co.,* 875 F.2d 468, 50 EPD ¶ 39,106. Commission's position in its amicus brief that evidence of ongoing sexual graffiti in the workplace, not all of which was directed at the plaintiff, was relevant to her claim of harassment. *Bennett v. Corroon & Black Corp.,* 845 F.2d 104, 46 EPD ¶ 37,955 (5th Cir. 1988) (the posting of obscene cartoons in an office men's room bearing the plaintiff's name and depicting her engaged in crude and deviant sexual activities could create a hostile work environment).

**4) Sex-based Harassment** — Although the Guidelines specifically address conduct that is sexual in nature, the Commission notes that sex-based harassment — that is, harassment not involving sexual activity or language — may also give rise to Title VII liability (just as in the case of harassment based on race, national origin or religion) if it is "sufficiently patterned or pervasive" and directed at employees because of their sex. *Hicks v. Gates Rubber Co.,* 833 F.2d at 1416; *McKinney v. Dole,* 765 F.2d 1129, 1138, 37 EPD ¶ 35,339 [38 FEP Cases 364] (D.C. Cir. 1985).

Acts of physical aggression, intimidation, hostility or unequal treatment based on sex may be combined with incidents of sexual harassment to establish the existence of discriminatory terms and conditions of employment. *Hall v. Gus Construction Co.,* 842 F.2d at 1014; *Hicks v. Gates Rubber Co.,* 833 F.2d at 1416.

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-940-5

5) **Constructive Discharge** — Claims of "hostile environment" sexual harassment often are coupled with claims of constructive discharge. If constructive discharge due to a hostile environment is proven, the claim will also become one of "quid pro quo" harassment.[26] It is the position of the Commission and a majority of courts that an employer is liable for constructive discharge when it imposes intolerable working conditions in violation of Title VII when those conditions foreseeably would compel a reasonable employee to quit, whether or not the employer specifically indicated its intent to force the victim's resignation. *See Derr v. Gulf Oil Corp.*, 796 F.2d 340, 343–44, 41 EPD ¶ 36,463 [41 FEP Cases 166] (10th Cir. 1986); *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 888, 35 EPD ¶ 34,768 [36 FEP Cases 344] (3d Cir. 1984); *Nolan v. Cleland*, 686 F.2d 806, 812-15, 30 EPD ¶ 33,029 [29 FEP Cases 1732] (9th Cir. 1982); *Held v. Gulf Oil Co.*, 684 F.2d 427, 432, 29 EPD ¶ 32,968 [29 FEP Cases 837] (6th Cir. 1982); *Clark v. Marsh*, 665 F.2d 1168, 1175 n.8, 26 EPD ¶ 32,082 (D.C. Cir. 1981); *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 65, 23 EPD ¶ 30,891 [22 FEP Cases 1191] (5th Cir. 1980); Commission Decision 84-1, CCH EEOC Decision ¶ 6839. However, the Fourth Circuit requires proof that the employer imposed the intolerable conditions with the intent of forcing the victim to leave. *See EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 672, 30 EPD ¶ 33,269 (4th Cir. 1983). But this case is not a sexual harassment case and the Commission believes it is distinguishable because specific intent is not as likely to be present in "hostile environment" cases.

An important factor to consider is whether the employer had an effective internal grievance procedure. (*See* Section E, Preventive and Remedial Action). The Commission argued in its *Vinson* brief that if an employee knows that effective avenues of complaint and redress are available, then the availability of such avenues itself becomes a part of the work environment and overcomes, to the degree it is effective, the hostility of the work environment. As Justice Marshall noted in his opinion in *Vinson*, "Where a complainant without good reason bypassed an internal complaint procedure she knew to be effective, a court may be reluctant to find constructive termination. . . ." 106 S.Ct. at 2411 (Marshall, J., concurring in part and dissenting a part). Similarly, the court of appeals in *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 44 EPD ¶ 37,557 [44 FEP Cases 1604] (5th Cir. 1987), held the plaintiff was not constructively discharged after an incident of harassment by a co-worker because she quit immediately, even though the employer told her she would not have to work with him again, and she did not give the employer a fair opportunity to demonstrate it could curb the harasser's conduct.

[D. Deleted 6/1999. See Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors]

E. **Preventive and Remedial Action**

1) *Preventive Action* — The EEOC's Guidelines encourage employers to:

take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their rights to raise and how to raise the issue of harassment under Title VII, and developing methods to sensitize all concerned.

23 C.F.R. § 1604.11(f). An effective preventive program should include an explicit policy against sexual harassment that is clearly and regularly communicated to employees and effectively implemented. The employer should affirmatively raise the subject with all supervisory and non-supervisory employees, express strong disapproval, and explain the sanctions for harassment. The employer should also have a procedure for resolving sexual harassment complaints. The procedure should be designed to "encourage victims of harassment to come forward" and should not require a victim to complain first to the offending supervisor. *See Vinson*, 106 S.Ct. at 2408. It should ensure confidentiality as much as possible and provide effective remedies, including protection of victims and witnesses against retaliation.

2) **Remedial Action** — Since Title VII "affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult" (*Vinson*, 106 S.Ct. at 2405), an employer is liable for failing to remedy known hostile or offensive work environments. *See, e.g., Garziano v. E.I. DuPont deNemours & Co.*, 818 F.2d 380, 43 EPD ¶ 37,171 [43 FEP Cases 1790] (5th Cir. 1987) (*Vinson* holds employers have an "affirmative duty to eradicate 'hostile or offensive' work environments"); *Bundy v. Jackson*, 641 F.2d 934, 947, 21 EPD ¶ 31,439 [24 FEP Cases 1155] (D.C. Cir. 1981) (employer violated Title VII by failing to investigate and correct sexual harassment despite notice); *Tompkins v. Public Service Electric & Gas Co.*, 568 F.2d 1044, 1049, 15 EPD ¶ 7954 [16 FEP Cases 22] (3rd Cir. 1977) (same); *Henson v. City of Dundee*, 682 F.2d 897, 905, 15 EPD ¶ 32,993 [29 FEP Cases 787] (11th Cir. 1982) (same); *Munford v. James T. Barnes & Co.*, 441 F.Supp. 459, 466, 16 EPD ¶ 8233 [17 FEP Cases 107] (E.D. Mich. 1977) (employer has an affirmative duty to investigate complaints of sexual harassment and to deal appropriately with the offending personnel; "failure to investigate gives tacit support to the discrimination because the absence of sanctions encourages abusive behavior").[28]

When an employer receives a complaint or otherwise learns of alleged sexual harassment in the workplace, the employer should investigate promptly and thoroughly. The employer should take immediate and appropriate corrective action by doing whatever is necessary to end the harassment, make the

---

[26] However, while an employee's failure to utilize effective grievance procedures will not shield an employer from liability for "quid pro quo" harassment, such failure may defeat a claim of constructive discharge. *See* discussion of impact of grievance procedures later in this section, and section D(2)(c)(2), below.

[28] The employer's affirmative duty was first enunciated in cases of harassment based on race or national origin. *See, e.g., United States v. City of Buffalo*, 457 F.Supp. 612, 632–36, 18 EPD ¶ 8899 [19 FEP Cases 776] (W.D.N.Y. 1978), *modified in part*, 633 F.2d 643, 24 EPD ¶ 31,333 [24 FEP Cases 313] (2d Cir. 1980) (employer violated Title VII by failing to issue strong policy directive against racial slurs and harassment of black police officers, to conduct, full investigations, and to take appropriate disciplinary action); *EEOC v. Murphy Motor Freight Lines, Inc.*, 488 F.Supp. 381, 385–86, 22 EPD ¶ 30,888 [22 FEP Cases 892] (D. Minn. 1980) (defendant violated Title VII because supervisors knew or should have known of co-workers' harassment of black employees, but took inadequate steps to eliminate it).

victim whole by restoring lost employment benefits or opportunities, and prevent the misconduct from recurring. Disciplinary action against the offending supervisor or employee, ranging from reprimand to discharge, may be necessary. Generally, the corrective action should reflect the severity of the conduct. See *Waltman v. International Paper Co.*, 875 F.2d at 479 (appropriateness of remedial action will depend on the severity and persistence of the harassment and the effectiveness of any initial remedial steps). *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 309-10, 44 EPD ¶ 37,557 [44 FEP Cases 1604] (5th Cir. 1987) (the employer's remedy may be "assessed proportionately to the seriousness of the offense"). The employer should make follow-up inquiries to ensure the harassment has not resumed and the victim has not suffered retaliation.

Recent court decisions illustrate appropriate and inappropriate responses by employers. In *Barrett v. Omaha National Bank*, 726 F.2d 424, 33 EPD ¶ 34,132 [35 FEP Cases 593] (8th Cir. 1984), the victim informed her employer that her co-worker had talked to her about sexual activities and touched her in an offensive manner. Within four days of receiving this information, the employer investigated the charges, reprimanded the guilty employee, placed him on probation, and warned him that further misconduct would result in discharge. A second co-worker who had witnessed the harassment was also reprimanded for not intervening on the victim's behalf or reporting the conduct. The court ruled that the employer's response constituted immediate and appropriate corrective action, and on this basis found the employer not liable.

In contrast, in *Yates v. Avco Corp.*, 819 F.2d 630, 43 EPD ¶ 37,086 [43 FEP Cases 1595] (6th Cir. 1987), the court found the employer's policy against sexual harassment failed to function effectively. The victim's first-level supervisor had responsibility for reporting and correcting harassment at the company, yet he was the harasser. The employer told the victims not to go to the EEOC. While giving the accused harasser administrative leave pending investigation, the employer made the plaintiffs take sick leave, which was never credited back to them and was recorded in their personnel files as excessive absenteeism without indicating they were absent because of sexual harassment. Similarly, in *Zabkowicz v. West Bend Co.*, 589 F.Supp. 780, 35 EPD ¶ 34,766 [35 FEP Cases

610] (E.D. Wis. 1984), co-workers harassed the plaintiff over a period of nearly four years in a manner the court described as "malevolent" and "outrageous." Despite the plaintiff's numerous complaints, her supervisor took no remedial action other than to hold occasional meetings at which he reminded employees of the company's policy against offensive conduct. The supervisor never conducted an investigation or disciplined any employees until the plaintiff filed an EEOC charge, at which time one of the offending co-workers was discharged and three others were suspended. The court held the employer liable because it failed to take immediate and appropriate corrective action.[39]

When an employer asserts it has taken remedial action, the Commission will investigate to determine whether the action was appropriate and, more important, effective. The EEOC investigator should, of course, conduct an independent investigation of the harassment claim, and the Commission will reach its own conclusion as to whether the law has been violated. If the Commission finds that the harassment has been eliminated, all victims made whole, and preventive measures instituted, the Commission normally will administratively close the charge because of the employer's prompt remedial action.[40]

Date 3/19/90

Approved: /s/

R. Gaull Silberman, Vice Chairman

_____

[39] *See also Delgado v. Lehman*, 665 F.Supp. 460, 44 EPD ¶ 37,517 [43 FEP Cases 593] (E.D. Va. 1987) (employer failed to conduct follow-up inquiry to determine if hostile environment had dissipated); *Salazar v. Church's Fried Chicken, Inc.*, 44 FEP Cases 472 (S.D. Tex. 1987) (employer's policy inadequate because plaintiff, as a part-time teenage employee, could have concluded a complaint would be futile because the alleged harasser was the roommate of her store manager); *Brooms v. Regal Tube Co.*, 44 FEP Cases 1119 (N.D. Ill. 1987) (employer liable when a verbal reprimand proved ineffective and employer took no further action when informed of the harasser's persistence).

[40] For appropriate procedures, see §§ 4.4(e) and 15 of Volume I of the Compliance Manual.

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-946-8

# Enforcement Guidance on *Harris v. Forklift Systems*

## U.S. Equal Employment Opportunity Commission
## Notice Number 915.002

1. *SUBJECT*: Enforcement Guidance on *Harris v. Forklift Sys., Inc.*, No. 92-1168 slip op. (Nov. 9, 1993)

2. *PURPOSE*: This enforcement guidance analyzes the Supreme Court's decision in *Harris* and its effect on Commission investigations involving harassment.

3. *EFFECTIVE DATE*: Upon issuance.

4. *EXPIRATION DATE*: As an exception to EEOC Order 205.001, Appendix B, Attachment 4, § a(5), this notice will remain in effect until rescinded or superseded.

5. *ORIGINATOR*: Title VII/EPA Division, Office of Legal Counsel.

6. *INSTRUCTIONS*: File behind Section 615 of Volume II of the Compliance Manual.

7. *SUBJECT MATTER*:

In *Harris v. Forklift Sys., Inc.*, No. 92-1168 slip op. (Nov. 9, 1993) (63 FEP Cases 225], the Supreme Court considered whether a plaintiff was required to prove psychological injury in order to prevail on a cause of action alleging hostile environment sexual harassment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* A unanimous Court held that if a workplace is permeated with behavior that is severe or pervasive enough to create a discriminatorily hostile or abusive working environment, Title VII is violated regardless of whether the plaintiff suffered psychological harm. The Court's decision reaffirms *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 40 EPD ¶36,159 [40 FEP Cases 1822] (1986), and is consistent with existing Commission policy on hostile environment harassment. Consequently, the Commission will continue to conduct investigations in hostile environment harassment cases in the same manner as it has previously.

## Background

In *Harris*, the plaintiff, Teresa Harris, brought a Title VII action against her former employer, Forklift Systems, Inc. ("Forklift"), an equipment rental company, alleging that Forklift had created a sexually hostile work environment. Harris had worked for Forklift as a manager from April 1985 to October 1987.

The case was heard by a Magistrate who found that during the period of Harris' employment, Forklift's President, Charles Hardy, subjected Harris to numerous offensive remarks and unwanted sexual innuendos. Specifically, the court found that Hardy had, on a number of occasions, asked plaintiff and other female employees to retrieve coins from his front pants pocket, asked plaintiff and other female employees to retrieve objects that he had thrown on the ground in front of them and commented, using sexual innuendo, about plaintiff's and other female employees' attire. On other occasions, he remarked to plaintiff in the presence of other employees, "You're a woman, what do you know," "You're a dumb ass woman," and "We need a man as the rental manager." In addition, he once remarked in the presence of other employees, as well as a client, that he and Harris should "go to the Holiday Inn to negotiate [Harris'] raise." *Harris*, slip op. at 1.

In August 1987, Harris complained to Hardy that she found his behavior offensive. Although Hardy apologized and promised to desist, in September 1987 he suggested in the presence of other employees that plaintiff had promised sexual favors to

a customer in order to secure an account. Shortly thereafter, Harris tendered her resignation and filed a Title VII action against Forklift alleging hostile environment sexual harassment.

The district court dismissed the case, concluding that Harris had failed to support her claim of sexual harassment. The court found, however, that "Hardy is a vulgar man [who] demeans the female employees at his work place." *Harris v. Forklift Sys., Inc.*, 60 EPD ¶42,070 [61 FEP Cases 240] (M.D. Tenn. 1991). Moreover, the court stated that "[a] reasonable woman manager under like circumstances would have been offended by Hardy." *Id.* Nevertheless, the court concluded that this was not enough to support a claim of sexual harassment. Applying the standard set forth in *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 620, 41 EPD ¶36,643 [42 FEP Cases 631] (6th Cir. 1986), *cert. denied*, 481 U.S. 1041 [43 FEP Cases 1056] (1987), the court asserted that "the test for whether or not sexual harassment rises to the level of a hostile work environment is whether the harassment is 'conduct which would interfere with that hypothetical reasonable individual's work performance and affect seriously the psychological well-being of that reasonable person under like circumstances.'" *Harris*, 60 EPD ¶42,070 [61 FEP Cases 240] (quoting *Rabidue*, 805 F.2d at 620). The district court concluded that Hardy's comments were not "so severe as to be expected to seriously affect [Harris'] psychological well-being," *id.*, and dismissed the complaint. In the court's view, "[a] reasonable woman manager under like circumstances would have been offended by Hardy, but his conduct would not have risen to the level of interfering with that person's work performance." *Id.* In a brief *per curiam* opinion, the Sixth Circuit affirmed the judgment for Forklift upon the Magistrate's reasoning. *See Harris v. Forklift Sys., Inc.*, 60 EPD ¶42,071 [61 FEP Cases 272] (6th Cir. 1992) (per curiam).

The Supreme Court granted *certiorari*, 507 U.S. (1993), to resolve a conflict among the circuits regarding whether a plaintiff must show psychological injury in order to prevail on a hostile environment sexual harassment claim.

## The Opinion

At the outset, Justice O'Connor, writing for a unanimous Court, reaffirmed the standard set forth in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 40 EPD ¶36,159 [40 FEP Cases 1822] (1986), that sexual harassment is actionable if it is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment. The Court noted that an "objectively hostile or abusive work environment" is created when "a reasonable person would find [it] hostile or abusive," and the victim subjectively perceives it as such. *Harris*, slip op. at 4.

Rejecting the Sixth Circuit's psychological injury requirement, the Court noted that even though discriminatory incidents may not seriously affect an employee's psychological well-being,[1] a discriminatorily abusive work environment may, among other things, affect an employee's job performance or advancement. The Court concluded that even if harassing conduct produces no "tangible effects," a plaintiff may assert a Title VII cause of action if the "discriminatory conduct was

---

[1] Prior to oral argument, the respondent conceded that psychological injury was not required in order to support a hostile environment cause of action under Title VII.

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-840-5

so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin." *Id.* According to the Court, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.* (quoting *Meritor,* 477 U.S. at 65, 67) (citations omitted).

In an attempt to clarify *Meritor,* the Court noted that *Meritor*'s reference to environments that completely destroy the emotional and psychological stability of members of minority groups was intended to illustrate egregious cases and was not intended to "mark the boundary of what is actionable." *Id.* at 5. The Court stated: "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious." *Id.* (citation omitted).

Noting that the test for hostile environment is not "mathematically precise," the Court concluded that in assessing a hostile environment claim, the totality of the circumstances must be examined, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* While psychological injury may be relevant, it is not required. *See id.* at 5–6.

Accordingly, the Court remanded the case for consideration of whether a hostile environment had been created. The Court concluded that the district court's concern with whether Harris suffered psychological injury "may well have influenced its ultimate conclusion, especially given that the court found this to be a 'close case.'" *Id.* at 6.

Justice Scalia and Justice Ginsburg issued separate concurring opinions. In his concurrence, Justice Scalia suggested that although the Court refined the *Meritor* standard, little certitude has been added. His concurrence noted that even though the Court adopted an objective standard for determining whether a hostile environment has been created and listed factors to be evaluated, it did not suggest how much of each factor is required, nor did it isolate a single factor as determinative. However, Justice Scalia asserted that he knew of "no alternative to the course the Court today has taken . . . I know of no test more faithful to the inherently vague statutory language than the one the Court today adopts." *Harris* (Scalia, J., concurring), slip op. at 2.

In her concurring opinion, Justice Ginsburg framed the critical issue in hostile environment cases as "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Harris* (Ginsburg, J., concurring), slip op. at 1. Citing the Commission's Brief, Justice Ginsburg suggested that the major inquiry in hostile environment cases should be "whether the discriminatory conduct has unreasonably interfered with the plaintiff's work performance." *Id.* According to Justice Ginsburg, all the plaintiff need establish is that the harassing conduct "[made] it more difficult to do the job." *Id.* at 1–2.

## Analysis

The Court's decision in *Harris* reaffirmed *Meritor* and clarified, rather than altered, the elements necessary for proving hostile environment sexual harassment. The decision is fully consistent with the Commission's "Guidelines on Discrimination Because of Sex," 29 C.F.R. § 1604.11 and its Policy Guidance, "Current Issues of Sexual Harassment," EEOC

Policy Guidance No. N–915–050, CCH ¶8114 (March 19, 1990). Accordingly, *Harris* requires no change in Commission policy or in the way the Commission investigates charges.

The Court in *Harris* adopted the "totality of the circumstances" approach which the Commission had previously set forth in its "Guidelines on Discrimination Because of Sex" and in its Policy Guidance "Current Issues of Sexual Harassment." Thus, in evaluating welcomeness and whether conduct was sufficiently severe or pervasive to constitute a violation, investigators should continue to "look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred." 29 C.F.R. § 1604.11(b).

The Court also noted that the factors that indicate a hostile or abusive environment may include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance.[2] The factors cited by the Court parallel those enumerated in the Commission's Policy Guidance "Current Issues of Sexual Harassment." *See* "Current Issues of Sexual Harassment," at 14. Moreover, both the Court and the Commission have stressed that an employee is not required to show any single factor in order to succeed on a hostile environment cause of action. *See Harris,* slip op. at 5–6; "Current Issues of Sexual Harassment," at 17. Based on the foregoing, investigators should continue to evaluate charges by considering the factors listed in *Harris* as well as any additional factors that may be relevant in the particular case.

The Court's rejection of the psychological injury requirement is also consistent with the Commission's policy. The Commission explicitly rejects the notion that in order to prove a violation, the plaintiff must prove not only that a reasonable person would find the conduct sufficiently offensive to create a hostile work environment, but also that his/her psychological well-being was affected. While investigators may consider psychological injury as a factor in assessing whether a hostile environment has been created, they should keep in mind that neither this nor any other single factor is required to state a cause of action for hostile environment harassment.[3] *See generally* "Current Issues of Sexual Harassment," at 15, n.20.

The Court in *Harris* used the a "reasonable person" standard for assessing hostile environment claims. Previously, in its Policy Guidance on "Current Issues of Sexual Harassment," the Commission had adopted a "reasonable person" standard: "[i]n determining whether harassment is sufficiently severe or pervasive to create a hostile environment, the harasser's conduct should be evaluated from the objective standpoint of a 'reasonable person.'" "Current Issues of Sexual Harassment," at 14.

---

[2] In order to show that "[the alleged conduct] unreasonably interferes with . . . work performance," the employee need not show diminished performance but only that the alleged offensive conduct made it more difficult for him/her to do his/her job. *See Harris* (Ginsburg, J., concurring), slip op. at 1–2; *see also Harris,* slip op. at 4 ("even without regard to these tangible effects [such as detracting from employees' job performance], the very fact that the discriminatory conduct was so severe or pervasive that it created an environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of work place equality").

[3] Psychological injury may also be relevant for purposes of computing damages.

In defining the hypothetical "reasonable person," the Commission has emphasized that "[t]he reasonable person standard should consider the victim's perspective and not stereotyped notions of acceptable behavior." *Id.* at 15. In *Harris*, the Court did not elaborate on the definition of "reasonable person." The Court's decision is consistent with the Commission's view that a reasonable person is one with the perspective of the victim.[4] Thus, investigators should continue to consider whether a reasonable person in the victim's circumstances would have found the alleged behavior to be hostile or abusive.

*Example* — CP works in a thirty person advertising firm as a copywriter. CP is one of three female employees at the firm. After she had worked at the firm for about eight months, she was promoted to senior copywriter.

Following her promotion, two of her supervisors stopped by her office to inform her of her new responsibilities. During this visit, the supervisors insinuated that CP was promoted because the firm needed to show potential clients "some good bodies" and "some nice legs" in higher positions. They also asked CP if she had slept with the head of personnel in order to obtain her promotion.

Thereafter, these supervisors as well as some of CP's co-workers continued to taunt CP in front of other co-workers and sometimes before clients, suggesting that CP had been promoted because of her looks and because she was willing to succumb to the advances of clients and supervisors. CP complained to management and subsequently filed a charge with the Commission.

An investigator reviewing this charge should consider the behavior from the standpoint of the reasonable person in CP's position. A reasonable person in CP's position might take umbrage at the comments about "good bodies," "nice legs," or "sleeping one's way to a promotion" and thus might consider her co-workers' and supervisors' behavior to be hostile and offensive.

In *Harris* the Court stated that to violate Title VII, the challenged conduct must not only be sufficiently severe or pervasive objectively to offend a reasonable person, but also must be subjectively perceived as abusive by the charging party. *See Harris*, slip op. at 4. The Court noted that "[s]o long as the environment would reasonably be perceived, *and is perceived*, as hostile or abusive," Title VII would be violated. *Id.* at 5 (emphasis added). There is nothing novel in the notion that a charging party must subjectively perceive a hostile environment in order to assert a violation of Title VII. It is well-settled that a charging party's claim will fail if the allegedly offensive conduct is found to be "welcome".[5]

Under the Commission's current policy, an investigator must consider whether the alleged harassment was "unwelcome . . . verbal or physical conduct of a sexual nature. . . ." 29 C.F.R. § 1604.11(a); *see Meritor*, 477 U.S. at 2406 (requiring unwelcomeness analysis). Adopting the Eleventh Circuit's definition of unwelcome conduct, the Commission has stated that "conduct must be unwelcome 'in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive.'" "Current Issues of Sexual Harassment," at 7 (quoting *Henson v. City of Dundee*, 682 F2d 897, 903, 29 EPD ¶ 32,993 [29 FEP Cases 787] (11th Cir. 1982)). This policy requires investigators to examine whether the victim's conduct is consistent with an assertion that the alleged harassing behavior was both uninvited and offensive to the charging party. The second prong of the unwelcomeness inquiry, whether the employee considered the conduct offensive, is, in effect, synonymous with "subjectively perceiv[ing] the environment to be abusive." *Harris*, slip op. at 4.

In order to establish a subjective perception of abuse, the charging party must testify that s/he found the alleged conduct to be hostile or abusive at the time it occurred.[6] Unless the respondent produces evidence to the contrary, the subjective prong of the analysis will be satisfied.

*Example* — CP a woman, has worked for A Corporation for three years. When she first began working for A Corporation, she joined in when her co-workers and supervisors would have sexual discussions. She herself would make sexual comments and lewd references.

After she had worked for A Corporation for about a year, her supervisors allowed her co-workers to post sexually explicit pictures on their office walls and in the hallways. Even though CP had not been offended by her co-workers' bawdy remarks, she believed that the posting of pornographic pictures demeaned women. She complained to her supervisor who refused to ask the employees to remove the pictures. Shortly thereafter, more pictures were posted. After again receiving no response to her complaint, CP filed a charge.

Based on these facts, an investigator should find that the conduct was unwelcome, *i.e.*, that CP subjectively considered the pornographic pictures to be abusive. Her willingness to engage in sexual banter is not material to assessing her perception of the pictures.

Note that an investigator may consider the prevalence of sexual banter in analyzing whether a hostile environment was created for other employees.

Finally, the *Harris* decision reinforces the Commission's position that conduct that constitutes harassment on any of the bases covered by Title VII is equally unlawful as a discriminatory term, condition or privilege of employment. *See Harris*, slip op. at 4; *see also id.* at 2 (Ginsburg, J., concurring) (noting that harassment based on race, national origin, religion and gender is equally unlawful). The Commission

---

[4] For a more detailed discussion of this issue, *see* "Current Issues of Sexual Harassment," at 14. As explained there, although the reasonable person standard must take account of the victim's perspective, "Title VII does not serve 'as the vehicle for vindicating the petty slights suffered by the hypersensitive.'" *Id.* (quoting *Zabkowicz v. West Bend Co.*, 589 F.Supp. 780, 784, 35 EPD ¶ 34,766 [35 FEP Cases 610] (E.D. Wisc. 1984)).

[5] Note that even if a particular charging party has not been subjectively offended by the conduct in question, if a reasonable person would find the conduct offensive, the Commission itself may pursue relief for any other persons identified in the course of the investigation who subjectively found the environment to be hostile. *See, General Telephone Co. of Northwest, Inc. v. EEOC* 446 U.S. 318, 22 EPD ¶ 30,861 [22 FEP Cases 1196] (1980).

[6] It is the Commission's position that "[w]hen there is some indication of welcomeness or when the credibility of the parties is at issue, the charging party's claim will be considerably strengthened if she [or he] made a contemporaneous complaint or protest." "Current Issues of Sexual Harassment," at 7. However, while making a complaint or issuing a protest may be helpful to charging party's case, "it is not a necessary element of the claim." *Id.* at 8.

believes that *Harris* also applies to cases involving hostile environment harassment on the basis of age or disability. Accordingly, investigators should consider *Harris* applicable regardless of the antidiscrimination statute on which the charge is premised.[7]

**Charge Processing**

Investigators should continue to take the following steps when processing charges involving hostile environment harassment:

- Consider the totality of the circumstances — Examine, among other things, the nature of the conduct (i.e., whether it was verbal or physical), the context in which the

alleged incident(s) occurred, the frequency of the conduct, its severity and pervasiveness, whether it was physically threatening or humiliating, whether it was unwelcome, and whether it unreasonably interfered with an employee's work performance.

- Consider whether a reasonable person in the same or similar circumstances would find the challenged conduct sufficiently severe or pervasive to create an intimidating, hostile or abusive work environment. *See* "Current Issues of Sexual Harassment," at 14–15.

- Consider whether the charging party perceived the environment to be hostile or abusive, *i.e.*, whether the conduct was unwelcome. In making this analysis, the investigator should consider the charging party's behavior. *See* "Current Issues of Sexual Harassment," at 10.

For more detailed guidance, *see* Policy Guidance on "Current Issues of Sexual Harassment."

Date: March 8, 1994

Approved: /s/
Tony E. Gallegos, Chairman

---

[7] If one is subjected to taunts on the basis of race, national origin, etc., there is ordinarily no question that the comments are perceived as abusive and are therefore unwelcome. Nevertheless, before and after *Harris*, if the record shows that the comments are not unwelcome or perceived as hostile or offensive, the charging party will not prevail.

EEOC Compliance Manual
ISBN 0-89176-040-5

No. 289                                                                                            615:0101

# Enforcement Guidance on Vicarious Employer Liability
## For Unlawful Harassment by Supervisors

**U.S. Equal Employment Opportunity Commission**
Notice Number 915.002

1. *SUBJECT*: Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors

2. *PURPOSE*: This document provides guidance regarding employer liability for harassment by supervisors based on sex, race, color, religion, national origin, age, disability, or protected activity.

3. *EFFECTIVE DATE*: Upon receipt.

4. *EXPIRATION DATE*: As an exception to EEOC Order 205.001, Appendix B, Attachment 4, § a(5), this Notice will remain in effect until rescinded or superseded.

5. *ORIGINATOR*: Title VII/EPA/ADEA Division, Office of Legal Counsel.

6. *INSTRUCTIONS*: File after Section 615 of Volume II of the Compliance Manual.

Date 6/18/99

/s/ Ida L. Castro, Chairwoman

## Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors

### I. Introduction

In *Burlington Industries, Inc. v. Ellerth*, 118 S.Ct. 2257 [77 FEP Cases 1] (1998), and *Faragher v. City of Boca Raton*, 118 S.Ct. 2275 [77 FEP Cases 14] (1998), the Supreme Court made clear that employers are subject to vicarious liability for unlawful harassment by supervisors. The standard of liability set forth in these decisions is premised on two principles: 1) an employer is responsible for the acts of its supervisors, and 2) employers should be encouraged to prevent harassment and employees should be encouraged to avoid or limit the harm from harassment. In order to accommodate these principles, the Court held that an employer is always liable for a supervisor's harassment if it culminates in a tangible employment action. However, if it does not, the employer may be able to avoid liability or limit damages by establishing an affirmative defense that includes two necessary elements:

(a) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and

(b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

While the *Faragher* and *Ellerth* decisions addressed sexual harassment, the Court's analysis drew upon standards set forth in cases involving harassment on other protected bases. Moreover, the Commission has always taken the position that the same basic standards apply to all types of prohibited harassment.[1] Thus, the standard of liability set forth in the decisions applies to all forms of unlawful harassment. (See section II, below).

Harassment remains a pervasive problem in American workplaces. The number of harassment charges filed with the EEOC and state fair employment practices agencies has risen significantly in recent years. For example, the number of sexual harassment charges has increased from 6,883 in fiscal year 1991 to 15,618 in fiscal year 1998. The number of racial harassment charges rose from 4,910 to 9,908 charges in the same time period.

While the anti-discrimination statutes seek to remedy discrimination, their primary purpose is to prevent violations. The Supreme Court, in *Faragher* and *Ellerth*, relied on Commission guidance which has long advised employers to take all necessary steps to prevent harassment.[2] The new affirmative defense gives credit for such preventive efforts by an employer, thereby "implement[ing] clear statutory policy and complement[ing] the Government's Title VII enforcement efforts."[3]

The question of liability arises only after only after there is a determination that unlawful harassment occurred. Harassment does not violate federal law unless it involves discriminatory treatment on the basis of race, color, sex, religion, national origin, age of 40 or older, disability, or protected activity under the anti-discrimination statutes. Furthermore, the anti-discrimination statutes are not a "general civility code."[4] Thus federal law does not prohibit simple teasing, offhand comments, or isolated incidents that are not "extremely serious."[5] Rather, the conduct must be "so objectively offensive as to alter the 'conditions' of the victim's employment."[6] The conditions of employment are altered only if the harassment culminated in a tangible employment action or was sufficiently severe or pervasive to create a hostile work environment.[7] Existing Commission guidance on the standards for determining whether challenged conduct rises to the level of unlawful harassment remains in effect.

This document supersedes previous Commission guidance on the issue of vicarious liability for harassment by supervi-

---

[1] *See, e.g.*, 29 C.F.R. § 1604.11 n. 1 ("The principles involved here continue to apply to race, color, religion or national origin."); EEOC Compliance Manual Section 615.11(a) (BNA 615:0025) ("Title VII law and agency principles will guide the determination of whether an employer is liable for age harassment by its supervisors, employees, or non-employees").

---

[2] *See* 1980 Guidelines at 29 C.F.R. § 1604.11(f) and Policy Guidance on Current Issues of Sexual Harassment [615:0061], Section E, 8 FEP Manual 405:6699 (Mar. 19, 1990), *quoted in Faragher*, 118 S. Ct. at 2292 [77 FEP Cases 14].

[3] *Faragher*, 118 S. Ct. at 2292 [77 FEP Cases 14].

[4] *Oncale v. Sundowner Offshore Services, Inc.*, 118 S. Ct. 998, 1002 [76 FEP Cases 221] (1998).

[5] *Faragher*, 118 S.Ct. at 2283 [77 FEP Cases 14]. However, when isolated incidents that are not "extremely serious" come to the attention of management, appropriate corrective action should still be taken so that they do not escalate. *See* Section V(C)(1)(a) [615:0103], below.

[6] *Oncale*, 118 S. Ct. at 1003 [76 FEP Cases 221].

[7] Some previous Commission documents classified harassment as either "quid pro quo" or hostile environment. However, it is now more useful to distinguish between harassment that results in a tangible employment action and harassment that creates a hostile work environment, since that dichotomy determines whether the employer can raise the affirmative defense to vicarious liability. Guidance on the definition of "tangible employment action" appears in section IV(B) [615:0104], below.

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-940-5

sors.[8] The Commission's long-standing guidance on employer liability for harassment by co-workers remains in effect — an employer is liable if it knew or should have known of the misconduct, unless it can show that it took immediate and appropriate corrective action.[9] The standard is the same in the case of non-employees, but the employer's control over such individuals' misconduct is considered.[10]

## II. The Vicarious Liability Rule Applies to Unlawful Harassment on All Covered Bases

The Rule in *Ellerth* [77 FEP Cases 1] and *Faragher* [77 FEP Cases 14] regarding vicarious liability applies to harassment by supervisors based on race, color, sex (whether or not of a sexual nature[11]), religion, national origin, protected activity,[12] age, or disability.[13] Thus, employers should establish anti-harassment policies and complaint procedures covering *all* forms of unlawful harassment.[14]

## III. Who Qualifies as a Supervisor?

### A. Harasser in Supervisory Chain of Command

An employer is subject to vicarious liability for unlawful harassment if the harassment was committed by "a supervisor with immediate (or successively higher) authority over the employee."[15] Thus, it is critical to determine whether the person who engaged in unlawful harassment had supervisory authority over the complainant.

The federal employment discrimination statutes do not contain or define the term "supervisor."[16] The statutes make employers liable for the discriminatory acts of their "agents,"[17] and supervisors are agents of their employers. However, agency principles "may not be transferable in all their particulars" to the federal employment discrimination statutes.[18] The determination of whether an individual has sufficient authority to qualify as a "supervisor" for purposes of vicarious liability cannot be resolved by a purely mechanical application of agency law.[19] Rather, the purposes of the anti-discrimination statutes and the reasoning of the Supreme Court decisions on harassment must be considered.

The Supreme Court, in *Faragher* and *Ellerth*, reasoned that vicarious liability for supervisor harassment is appropriate because supervisors are aided in such misconduct by the

---

[8] The guidance in this document applies to federal sector employers, as well as all other employers covered by the statutes enforced by the Commission.

[9] 29 C.F.R. § 1604.11(d).

[10] The Commission will rescind Subsection 1604.11(c) of the 1980 Guidelines on Sexual Harassment, 29 C.F.R. § 1604.11(c). In addition, the following Commission guidance is no longer in effect: Subsection D of the 1990 Policy Statement on Current Issues in Sexual Harassment ("Employer Liability for Harassment by Supervisors"), EEOC Compliance Manual (BNA) N:4050-58 (3/19/90); and EEOC Compliance Manual Section 615.3(c) (BNA). The remaining portions of the 1980 Guidelines, the 1990 Policy Statement, and Section 615 of the Compliance Manual remain in effect. Other Commission guidance on harassment also remains in effect, including the Enforcement Guidance on *Harris v. Forklift Sys., Inc.*, EEOC Compliance Manual (BNA) N:4071 (3/8/94) and the Policy Guidance on Employer Liability for Sexual Favoritism, EEOC Compliance Manual (BNA) N:5051 (3/19/90).

[11] Harassment that is targeted at an individual because of his or her sex violates Title VII even if it does not involve sexual comments or conduct. Thus, for example, frequent, derogatory remarks about women could constitute unlawful harassment even if the remarks are not sexual in nature. See 1990 Policy Guidance on Current Issues of Sexual Harassment [615:0061], subsection C(4) ("sex-based harassment—that is, harassment not involving sexual activity or language may also give rise to Title VII liability . . . if it is 'sufficiently patterned or pervasive' and directed at employees because of their sex").

[12] "Protected activity" means opposition to discrimination or participation in proceedings covered by the anti-discrimination statutes. Harassment based on protected activity can constitute unlawful retaliation. See EEOC Compliance Manual Section 8 ("Retaliation") (BNA) 614:0001 (May 20, 1998).

[13] For cases applying *Ellerth* [77 FEP Cases 1] and *Faragher* [77 FEP Cases 14] to harassment on different bases, see *Hafford v. Seidner*, 167 F.3d 1074, 1080 (6th Cir. 1999) (religion and race); *Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1158 [78 FEP Cases 1322] (8th Cir. 1999) (age); *Allen v. Michigan Department of Corrections*, 165 F.3d 405, 411 [78 FEP Cases 1578] (6th Cir. 1999) (race); *Richmond-Hopes v. City of Cleveland*, No. 97-3595, 1998 WL 808222 at *9 (6th Cir. Nov. 16, 1998) (unpublished) (retaliation); *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1270 [78 FEP Cases 105] (10th Cir. 1998) (race); *Gotfryd v. Book Covers, Inc.*, No. 97 C 7696, 1999 WL 20925 at *5 (N.D. Ill. Jan. 7, 1999) (national origin). See also *Wallin v. Minnesota Department of Corrections*, 153 F.3d 681, 687 (8th Cir. 1998) (assuming without deciding that ADA hostile environment claims are modeled after Title VII claims), *cert. denied*, 119 S. Ct. 1141 (1999).

[14] The majority's analysis in both *Faragher* and *Ellerth* drew upon the liability standards for harassment on other protected bases. It is therefore clear that the same standards apply. See *Faragher*, 118 S. Ct. at 2283 [77 FEP Cases 14] (in determining appropriate standard of liability for sexual harassment by supervisors, Court "drew upon cases recognizing liability for discriminatory harassment based on race and national origin"); *Ellerth*, 118 S. Ct. at 2268 [77 FEP Cases 1] (Court imported concept of "tangible employment action" in race, age and national origin discrimination cases for resolution of vicarious liability in sexual harassment cases). See also cases cited in n. 13, above.

[15] *Ellerth*, 118 S. Ct. at 2270 [77 FEP Cases 1]; *Faragher*, 118 S. Ct. at 2293 [77 FEP Cases 14].

[16] Numerous statutes contain the word "supervisor," and some contain definitions of the term. See, e.g., 12 U.S.C. § 1813(r) (definition of "State bank supervisor" in legislation regarding Federal Deposit Insurance Corporation); 29 U.S.C. § 152(11) (definition of "supervisor" in National Labor Relations Act); 42 U.S.C. § 8262(2) (definition of "facility energy supervisor" in Federal Energy Initiative legislation). The definitions vary depending on the purpose and structure of each statute. The definition of the word "supervisor" under other statutes does not control, and is not affected by, the meaning of that term under the employment discrimination statutes.

[17] See 42 U.S.C. 2000e(a) (Title VII); 29 U.S.C. 630(b) (ADEA); and 42 U.S.C. § 12111(5)(A) (ADA) (all defining "employer" as including any agent of the employer).

[18] *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72 [40 FEP Cases 1822] (1986); *Faragher*, 118 S. Ct. at 2290 n.3 [77 FEP Cases 14]; *Ellerth*, 118 S. Ct. at 2266 [77 FEP Cases 1].

[19] See *Faragher*, 118 S. Ct. at 2288 [77 FEP Cases 14] (analysis of vicarious liability "calls not for a mechanical application of indefinite and malleable factors set forth in the Restatement . . . but rather an inquiry into the reasons that would support a conclusion that harassing behavior ought to be held within the scope of a supervisor's employment . . .") and at 2290 n.3 (agency concepts must be adapted to the practical objectives of the anti-discrimination statutes).

authority that the employers delegated to them.[20] Therefore, that authority must be of a sufficient magnitude so as to assist the harasser explicitly or implicitly in carrying out the harassment. The determination as to whether a harasser had such authority is based on his or her job function rather than job title (e.g., "team leader") and must be based on the specific facts.

An individual qualifies as an employee's "supervisor" if:

    a. the individual has authority to undertake or recommend tangible employment decisions affecting the employee; or

    b. The individual has authority to direct the employee's daily work activities.

### 1. Authority to Undertake or Recommend Tangible Employment Actions

An individual qualifies as an employee's "supervisor" if he or she is authorized to undertake tangible employment decisions affecting the employee. "Tangible employment decisions" are decisions that significantly change another employee's employment status. (For a detailed explanation of what constitutes a tangible employment action, see subsection IV(B), below.) Such actions include, but are not limited to, hiring, firing, promoting, demoting, and reassigning the employee. As the Supreme Court stated, "[t]angible employment actions fall within the special province of the supervisor."[21]

An individual whose job responsibilities include the authority to recommend tangible job decisions affecting an employee qualifies as his or her supervisor even if the individual does not have the final say. As the Supreme Court recognized in Ellerth, a tangible employment decision "may be subject to review by higher level supervisors."[22] As long as the individual's recommendation is given substantial weight by the final decisionmaker(s), that individual meets the definition of supervisor.

### 2. Authority to Direct Employee's Daily Work Activities

An individual who is authorized to direct another employee's day-to-day work activities qualifies as his or her supervisor even if that individual does not have the authority to undertake or recommend tangible job decisions. Such an individual's ability to commit harassment is enhanced by his or her authority to increase the employee's workload or assign undesirable tasks, and hence it is appropriate to consider such a person a "supervisor" when determining whether the employer is vicariously liable.

In Faragher, one of the harassers was authorized to hire, supervise, counsel, and discipline lifeguards, while the other harasser was responsible for making the lifeguards' daily work assignments and supervising their work and fitness training.[23] There was no question that the Court viewed them both as "supervisors," even though one of them apparently lacked authority regarding tangible job decisions.[24]

An individual who is temporarily authorized to direct another employee's daily work activities qualifies as his or her "supervisor" during that time period. Accordingly, the employer would be subject to vicarious liability if that individual commits unlawful harassment of a subordinate while serving as his or her supervisor.

On the other hand, someone who merely relays other officials' instructions regarding work assignments and reports back to those officials does not have true supervisory authority. Furthermore, someone who directs only a limited number of tasks or assignments would not qualify as a "supervisor." For example, an individual whose delegated authority is confined to coordinating a work project of limited scope is not a "supervisor."

### B. Harasser Outside Supervisory Chain of Command

In some circumstances, an employer may be subject to vicarious liability for harassment by a supervisor who does not have actual authority over the employee. Such a result is appropriate if the employee reasonably believed that the harasser had such power.[25] The employee might have such a belief because, for example, the chains of command are unclear. Alternatively, the employee might reasonably believe that a harasser with broad delegated powers has the ability to significantly influence employment decisions affecting him or her even if the harasser is outside the employee's chain of command.

If the harasser had no actual supervisory power over the employee, and the employee did not reasonably believe that the harasser had such authority, then the standard of liability for co-worker harassment applies.

## IV. Harassment by Supervisor That Results in a Tangible Employment Action

### A. Standard of Liability

An employer is always liable for harassment by a supervisor on a prohibited basis that culminates in a tangible employment action. No affirmative defense is available in such cases[26] The Supreme Court recognized that this result is appropriate because an employer acts through its supervisors,

---

[20] Faragher, 118 S. Ct. at 2290 [77 FEP Cases 14]; Ellerth, 118 S. Ct. at 2269 [77 FEP Cases 1].

[21] Ellerth, 118 S. Ct. at 2269 [77 FEP Cases 1].

[22] Ellerth, 118 S. Ct. at 2269 [77 FEP Cases 1].

[23] Faragher, 118 S. Ct. at 2280 [77 FEP Cases 14]. For a more detailed discussion of the harassers' job responsibilities, see Faragher, 864 F.Supp. 1552, 1563 [73 FEP Cases 1455], (S.D. Fla. 1994).

[24] See Grozdanich v. Leisure Hills Health Center, 25 F. Supp.2d 953, 973 (D. Minn. 1998) ("it is evident that the Supreme Court

views the term 'supervisor' as more expansive than as merely including those employees whose opinions are dispositive on hiring, firing, and promotion"; thus, "charge nurse" who had authority to control plaintiff's daily activities and recommend discipline qualified as "supervisor" and therefore rendered employer vicariously liable under Title VII for his harassment of plaintiff, subject to affirmative defense).

[25] See Ellerth, 118 S. Ct. at 2268 [77 FEP Cases 1] ("If, in the unusual case, it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one."); Llampallas v. Mini-Circuit Lab, Inc., 163 F.3d 1236, 1247 [78 FEP Cases 1104] (11th Cir. 1998) ("Although the employer may argue that the employee had no actual authority to take the employment action against the plaintiff, apparent authority serves just as well to impute liability to the employer for the employee's action.").

[26] Of course, traditional principles of mitigation of damages apply in these cases, as well as all other employment discrimination cases. See generally Ford Motor Co. v. EEOC, 458 U.S. 219 [29 FEP Cases 121] (1982).

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 3 87179-940-5

and a supervisor's undertaking of a tangible employment action constitutes an act of the employer.[27]

## B. Definition of "Tangible Employment Action"

A tangible employment action is "a significant change in employment status."[28] Unfulfilled threats are insufficient. Characteristics of a tangible employment action are:[29]

1. A tangible employment action is the means by which the supervisor brings the official power of the enterprise to bear on subordinates, as demonstrated by the following:

- it requires an official act of the enterprise;
- it usually is documented in official company records;
- it may be subject to review by higher level supervisors; and
- it often requires the formal approval of the enterprise and use of its internal processes.

2. A tangible employment action usually inflicts direct economic harm.

3. A tangible employment action, in most instances, can only be caused by a supervisor or other person acting with the authority of the company.

Examples of tangible employment actions include:[30]

- hiring and firing;
- promotion and failure to promote;
- demotion;[31]
- undesirable reassignment;
- a decision causing a significant change in benefits;
- compensation decisions; and
- work assignment.

Any employment action qualifies as "tangible" if it results in a significant change in employment status. For example, significantly changing an individual's duties in his or her existing job constitutes a tangible employment action regardless of whether the individual retains the same salary and benefits.[32]

Similarly, altering an individual's duties in a way that blocks his or her opportunity for promotion or salary increases also constitutes a tangible employment action.[33]

On the other hand, an employment action does not reach the threshold of "tangible" if it results in only an insignificant change in the complainant's employment status. For example, altering an individual's job title does not qualify as a tangible employment action if there is no change in salary, benefits, duties, or prestige, and the only effect is a bruised ego.[34] However, if there is a significant change in the status of the position because the new title is less prestigious and thereby effectively constitutes a demotion, a tangible employment action would be found.[35]

If a supervisor undertakes or recommends a tangible job action based on a subordinate's response to unwelcome sexual demands, the employer is liable and cannot raise the affirmative defense. The result is the same whether the employee rejects the demands and is subjected to an adverse tangible employment action or submits to the demands and consequently obtains a tangible job benefit.[36] Such harassment previously would have been characterized as "quid pro quo." It would be a perverse result if the employer is foreclosed from raising the affirmative defense if its supervisor denies a tangible job benefit based on an employee's rejection of unwelcome sexual demands, but can raise the defense if its supervisor grants a tangible job benefit based on submission to such demands. The Commission rejects such an analysis. In both those situations the supervisor undertakes a tangible employment action on a discriminatory basis. The Supreme Court stated that there must be a significant *change* in em-

---

[27] *Ellerth*, 118 S. Ct. at 2269 [77 FEP Cases 1]; *Faragher*, 118 S. Ct. 2284-85 [77 FEP Cases 14]. *See also Durham Life Insurance Co. v. Evans*, 166 F.3d 139, 152 [78 FEP Cases 1434] (3rd Cir. 1999) ("A supervisor can only take a tangible adverse employment action because of the authority delegated by the employer . . . and thus the employer is properly charged with the consequences of that delegation.").

[28] *Ellerth*, 118 S. Ct. at 2268 [77 FEP Cases 1].

[29] All listed criteria are set forth in *Ellerth*, 118 S. Ct. at 2269 [77 FEP Cases 1].

[30] All listed examples are set forth in *Ellerth* and/or *Faragher*. See *Ellerth*, 118 S. Ct. at 2268 and 2270 [77 FEP Cases 1]; *Faragher*, 118 S. Ct. at 2284, 2291, and 2293 [77 FEP Cases 14].

[31] Other forms of formal discipline would qualify as well, such as suspension. Any disciplinary action undertaken as part of a program of progressive discipline is "tangible" because it brings the employee one step closer to discharge.

[32] The Commission disagrees with the Fourth Circuit's conclusion in *Reinhold v. Commonwealth of Virginia*, 151 F.3d 172 [77 FEP Cases 1017] (4th Cir. 1998), that the plaintiff was not subjected to a tangible employment action where the harassing supervisor "dramatically increased her workload," *Reinhold*, 947 F.Supp. 919, 923 (E.D. Va. 1996), denied her the opportunity to attend a professional conference, required her to monitor and discipline a co-worker, and generally gave her undesirable assignments. The Fourth Circuit ruled that the plaintiff had not been subjected to a tangible employment action because she had not "experienced a change in her employment status akin to a demotion or a reas-

signment entailing significantly different job responsibilities." 151 F.3d at 175. It is the Commission's view that the Fourth Circuit misconstrued *Faragher* [77 FEP Cases 14] and *Ellerth* [77 FEP Cases 1]. While minor changes in work assignments would not rise to the level of tangible job harm, the actions of the supervisor in *Reinhold* were substantial enough to significantly alter the plaintiff's employment status.

[33] See *Durham*, 166 F.3d at 152-53 (assigning insurance salesperson heavy load of inactive policies, which had a severe negative impact on her earnings, and depriving her of her private office and secretary, were tangible employment actions); *Bryson v. Chicago State University*, 96 F.3d 912, 917 [71 FEP Cases 1577] (7th Cir. 1996) ("Depriving someone of the building blocks for . . . a promotion . . . is just as serious as depriving her of the job itself.").

[34] See *Flaherty v. Gas Research Institute*, 31 F.3d 451, 457 [65 FEP Cases 941] (7th Cir. 1994) (change in reporting relationship requiring plaintiff to report to former subordinate, while maybe bruising plaintiff's ego, did not affect his salary, benefits, and level of responsibility and therefore could not be challenged in ADEA claim), *cited in Ellerth*, 118 S. Ct. at 2269 [77 FEP Cases 1].

[35] See *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 [61 FEP Cases 1193] (7th Cir. 1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to the particular situation."), *quoted in Ellerth*, 118 S. Ct. at 2268-69 [77 FEP Cases 1].

[36] See *Nichols v. Frank*, 42 F.3d 503, 512-13 [66 FEP Cases 614] (9th Cir. 1994) (employer vicariously liable where its supervisor granted plaintiff's leave requests based on her submission to sexual conduct), *cited in Faragher*, 118 S. Ct. at 2285 [77 FEP Cases 14].

EEOC Compliance Manual
ISBN 0-87179-940-6

ployment status; it did not require that the change be adverse in order to qualify as tangible.[37]

If a challenged employment action is not "tangible," it may still be considered, along with other evidence, as part of a hostile environment claim that is subject to the affirmative defense. In *Ellerth* [77 FEP Cases 1], the Court concluded that there was no tangible employment action because the supervisor never carried out his threats of job harm. Ellerth could still proceed with her claim of harassment, but the claim was properly "categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct." 118 S. Ct. at 2265.

## C. Link Between Harassment and Tangible Employment Action

When harassment culminates in a tangible employment action, the employer cannot raise the affirmative defense. This sort of claim is analyzed like any other case in which a challenged employment action is alleged to be discriminatory. If the employer produces evidence of a non-discriminatory explanation for the tangible employment action, a determination must be made whether that explanation is a pretext designed to hide a discriminatory motive.

For example, if an employee alleged that she was demoted because she refused her supervisor's sexual advances, a determination would have to be made whether the demotion was *because* of her response to the advances, and hence because of her sex. Similarly, if an employee alleges that he was discharged after being subjected to severe or pervasive harassment by his supervisor based on his national origin, a determination would have to be made whether the discharge was *because* of the employee's national origin.

A strong inference of discrimination will arise whenever a harassing supervisor undertakes or has significant input into a tangible employment action affecting the victim,[38] because it can be "assume[d] that the harasser . . . could not act as an objective, non-discriminatory decisionmaker with respect to the plaintiff."[39] However, if the employer produces evidence of a non-discriminatory reason for the action, the employee will have to prove that the asserted reason was a pretext designed to hide the true discriminatory motive.

If it is determined that the tangible action was based on a discriminatory reason linked to the preceding harassment, relief could be sought for the entire pattern of misconduct culminating in the tangible employment action, and no affirmative defense is available.[40] However, the harassment preceding the tangible employment action must be severe or pervasive in order to be actionable.[41] If the tangible employment action was based on a non-discriminatory motive, then the employer would have an opportunity to raise the affirmative defense to a claim based on the preceding harassment.[42]

## V. Harassment by Supervisor That Does Not Result in a Tangible Employment Action

### A. Standard of Liability

When harassment by a supervisor creates an unlawful hostile environment but does not result in a tangible employment action, the employer can raise an affirmative defense to liability or damages, which it must prove by a preponderance of the evidence. The defense consists of two necessary elements:

    (a) the employer exercised reasonable care to prevent and correct promptly any harassment; and

    (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

### B. Effect of Standard

If an employer can prove that it discharged its duty of reasonable care and that the employee could have avoided all of the harm but unreasonably failed to do so, the employer will avoid all liability for unlawful harassment.[43] For example, if an employee was subjected to a pattern of disability-based harassment that created an unlawful hostile environment, but the employee unreasonably failed to complain to management before she suffered emotional harm and the employer exercised reasonable care to prevent and promptly correct the harassment, then the employer will avoid all liability.

If an employer cannot prove that it discharged its duty of reasonable care *and* that the employee unreasonably failed to avoid the harm, the employer will be liable. For example, if unlawful harassment by a supervisor occurred and the employer failed to exercise reasonable care to prevent it, the

---

[37] *See Ellerth*, 118 S. Ct. at 2268 [77 FEP Cases 1] and *Faragher*, 118 S. Ct. at 2284 [77 FEP Cases 14] (listed examples of tangible employment actions that included both positive and negative job decisions: hiring *and* firing; promotion *and* failure to promote).

[38] The link could be established even if the harasser was not the ultimate decision maker. *See, e.g., Shager v. Upjohn Co.*, 913 F.2d 398, 405 [53 FEP Cases 1522] (7th Cir. 1990) (noting that committee rather than the supervisor fired plaintiff, but employer was still liable because committee functioned as supervisor's "cat's paw", cited in *Ellerth*, 118 S. Ct. at 2269 [77 FEP Cases 1].

[39] *Llampallas*, 163 F.3d at 1247 [78 FEP Cases 1] ("[n]o affirmative defense is available . . . when the supervisor's harassment culminates in a tangible employment action . . ."); *Faragher*, 118 S. Ct. at 2293 (same) [77 FEP Cases 14]. *See also Durham*, 166 F.3d at 154 ("When harassment becomes adverse employment action, the employer loses the affirmative defense, even if it might have been

[40] available before."); *Lissau v. Southern Food Services, Inc.*, 159 F.3d 177, 184 [78 FEP Cases 503] (4th Cir. 1998) (the affirmative defense "is not available in a hostile work environment case when the supervisor takes a tangible employment action against the employee as part of the harassment") (Michael, J., concurring).

[41] *Ellerth*, 118 S. Ct. at 2265 [77 FEP Cases 1]. Even if the preceding acts were not severe or pervasive, they still may be relevant evidence in determining whether the tangible employment action was discriminatory.

[42] *See Lissau v. Southern Food Service, Inc.*, 159 F.3d at 182 [78 FEP Cases 503] (if plaintiff could not prove that her discharge resulted from her refusal to submit to her supervisor's sexual harassment, then the defendant could advance the affirmative defense); *Newton v. Caldwell Laboratories*, 156 F.3d 880, 883 (8th Cir. 1998) (plaintiff failed to prove that her rejection of her supervisor's sexual advances was the reason that her request for a transfer was denied and that she was discharged; her claim was therefore categorized as one of hostile environment harassment); *Fierro v. Saks Fifth Avenue*, 13 F.Supp.2d 481, 491 [79 FEP Cases 101] (S.D.N.Y. 1998) (plaintiff claimed that his discharge resulted from national origin harassment but court found that he was discharged because of embezzlement; thus, employer could raise affirmative defense as to the harassment preceding the discharge).

[43] *See Faragher*, 118 S. Ct. at 2292 [77 FEP Cases 14] ("If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care.").

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-940-5

employer will be liable even if the employee unreasonably failed to complain to management or even if the employer took prompt and appropriate corrective action when it gained notice.[44]

In most circumstances, if employers and employees discharge their respective duties of reasonable care, unlawful harassment will be prevented and there will be no reason to consider questions of liability. An effective complaint procedure "encourages employees to report harassing conduct before it becomes severe or pervasive,"[45] and if an employee promptly utilizes that procedure, the employer can usually stop the harassment before actionable harm occurs.[46]

In some circumstances, however, unlawful harassment will occur and harm will result despite the exercise of requisite legal care by the employer and employee. For example, if an employee's supervisor directed frequent, egregious racial epithets at him that caused emotional harm virtually from the outset, and the employee promptly complained, corrective action the employer could prevent further harm but might not correct the actionable harm that the employee already had suffered.[47] Alternatively, if an employee complained about

harassment before it became severe or pervasive, remedial measures undertaken by the employer might fail to stop the harassment before it reaches an actionable level, even if those measures are reasonably calculated to halt it. In these circumstances, the employer will be liable because the defense requires proof that it exercised reasonable legal care *and* that the employee unreasonably failed to avoid the harm. While a notice-based negligence standard would absolve the employer of liability, the standard set forth in *Ellerth* [77 FEP Cases 1] and *Faragher* [77 FEP Cases 14] does not. As the Court explained, vicarious liability sets a "more stringent standard" for the employer than the "minimum standard" of negligence theory.[48]

While this result may seem harsh to a law abiding employer, it is consistent with liability standards under the anti-discrimination statutes which generally make employers responsible for the discriminatory acts of their supervisors.[49] If, for example, a supervisor rejects a candidate for promotion because of national origin-based bias, the employer will be liable regardless of whether the employee complained to higher management and regardless of whether higher management had any knowledge about the supervisor's motivation.[50] Harassment is the only type of discrimination carried out by a supervisor for which an employer can avoid liability, and that limitation must be construed narrowly. The employer will be shielded from liability for harassment by a supervisor only if it proves that it exercised reasonable care in preventing and correcting the harassment *and* that the employee unreasonably failed to avoid all of the harm. If both parties exercise reasonable care, the defense will fail.

---

[44] *See, e.g., EEOC v. SBS Transit, Inc.,* No. 97-4164, 1998 WL 903833 at *1 (6th Cir. Dec. 18, 1998) (unpublished) (lower court erred when it reasoned that employer liability for sexual harassment is negated if the employer responds adequately and effectively once it has notice of the supervisor's harassment; that standard conflicts with affirmative defense which requires proof that employer "took reasonable care to *prevent* and correct promptly any sexually harassing behavior and that the plaintiff employee unreasonably failed to take advantage of preventative or corrective opportunities provided by the employer").

[45] *Ellerth,* 118 S.Ct. at 2270 [77 FEP Cases 1].

[46] *See Indest v. Freeman Decorating, Inc.,* 168 F3d 795, 803 (5th Cir. 1999) ("when an employer satisfies the first element of the Supreme Court's affirmative defense, it will likely forestall its own vicarious liability for a supervisor's discriminatory conduct by nipping such behavior in the bud") (Wiener, J., concurring in *Indest,* 164 F3d 258 [78 FEP Cases 1527] (5th Cir. 1999)). The Commission agrees with Judge Wiener's concurrence in *Indest* that the court in that case dismissed the plaintiff's claims on an erroneous basis. The plaintiff alleged that her supervisor made five crude sexual comments or gestures to her during a week-long convention. She reported the incidents to appropriate management officials who investigated the matter and meted out appropriate discipline. No further incidents of harassment occurred. The court noted that it was "difficult to conclude" that the conduct to which the plaintiff was briefly subjected created an unlawful hostile work environment. Nevertheless, the court went on to consider liability. It stated that *Ellerth* [77 FEP Cases 1] and *Faragher* [77 FEP Cases 14] do not apply where the plaintiff quickly resorted to the employer's grievance procedure and the employer took prompt remedial action. In such a case, according to the court, the employer's quick response exempts it from liability. The Commission agrees with Judge Wiener that *Ellerth* and *Faragher* do control the analysis in such cases, and that an employee's prompt complaint to management forecloses the employer from proving the affirmative defense. However, as Judge Wiener pointed out, an employer's quick remedial action will often thwart the creation of an unlawful hostile environment, rendering any consideration of employer liability unnecessary.

[47] *See Greene v. Dalton,* 164 F3d 671, 674 [79 FEP Cases 375] (D.C. Cir. 1999) (in order for defendant to avoid all liability for sexual harassment leading to rape of plaintiff "it must show not merely that [the plaintiff] inexcusably delayed reporting the alleged rape . . . but that, as a matter of law, a reasonable person in

[her] place would have come forward early enough to prevent [the] harassment from becoming 'severe or pervasive' ").

[48] *Ellerth,* 118 S.Ct. at 2267 [77 FEP Cases 1].

[49] Under this same principle, it is the Commission's position that an employer is liable for punitive damages if its supervisor commits unlawful harassment or other discriminatory conduct with malice or with reckless indifference to the employee's federally protected rights. (The Supreme Court will determine the standard for awarding punitive damages in *Kolstad v. American Dental Association,* 119 S.Ct. 401 (1998) (granting certiorari).) The test for imposition of punitive damages is the mental state of the harasser, not of higher-level officials. This approach furthers the remedial and deterrent objectives of the anti-discrimination statutes, and is consistent with the vicarious liability standard set forth in *Faragher* [77 FEP Cases 14] and *Ellerth* [77 FEP Cases 1].

[Editor's Note: In deciding the *Kolstad* case after this guidance was issued, the Supreme Court held that punitive damages may be awarded under Title VII without a showing that the employer engaged in conduct with some independent "egregious" quality. But an employer may not be vicariously liable for such damages when the discriminatory decisions of its managerial agents are contrary to the employer's own "good faith efforts" to comply with the statute, the court added (*Kolstad v. American Dental Ass'n,* 527 U.S. 526 [79 FEP Cases 1697] (1999))]

[50] Even if higher management proves that evidence it discovered after-the-fact would have justified the supervisor's action, such evidence can only limit remedies, not eliminate liability. *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 360-62 [66 FEP Cases 1192] (1995).

EEOC Compliance Manual
ISBN 0-87179-940-5

In some cases, an employer will be unable to avoid liability completely, but may be able to establish the affirmative defense as a means to limit damages.[61] The defense only limits damages where the employee reasonably could have avoided some but not all of the harm from the harassment. In the example above, in which the supervisor used frequent, egregious racial epithets, an unreasonable delay by the employee in complaining could limit damages but not eliminate liability entirely. This is because a reasonably prompt complaint would have reduced, but not eliminated, the actionable harm.[62]

### C. First Prong of Affirmative Defense: Employer's Duty to Exercise Reasonable Care

The first prong of the affirmative defense requires a showing by the employer that it undertook reasonable care to prevent and promptly correct harassment. Such reasonable care generally requires an employer to establish, disseminate, and enforce an anti-harassment policy and complaint procedure and to take other reasonable steps to prevent and correct harassment. The steps described below are not mandatory requirements—whether or not an employer can prove that it exercised reasonable care depends on the particular factual circumstances and, in some cases, the nature of the employer's workforce. Small employers may be able to effectively prevent and correct harassment through informal means, while larger employers may have to institute more formal mechanisms.[63]

There are no "safe harbors" for employers based on the written content of policies and procedures. Even the best policy and complaint procedure will not alone satisfy the burden of proving reasonable care if, in the particular circumstances of a claim, the employer failed to implement its process effectively.[64] If, for example, the employer has an adequate policy and complaint procedure and properly responded to an employee's complaint of harassment, but management ignored previous complaints by other employees about the same harasser, then the employer has not exercised reasonable care in preventing the harassment.[65] Similarly, if the employer has an adequate policy and complaint procedure

but an official failed to carry out his or her responsibility to conduct an effective investigation of a harassment complaint, the employer has not discharged its duty to exercise reasonable care. Alternatively, lack of a formal policy and complaint procedure will not defeat the defense if the employer exercised sufficient care through other means.

#### 1. Policy and Complaint Procedure

It generally is necessary for employers to establish, publicize, and enforce anti-harassment policies and complaint procedures. As the Supreme Court stated, "Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms." Ellerth, 118 S. Ct. at 2270 [77 FEP Cases 1]. While the Court noted that this "is not necessary in every instance as a matter of law,"[66] failure to do so will make it difficult for an employer to prove that it exercised reasonable care to prevent and correct harassment.[67] (See section V(C)(3), below, for discussion of preventive and corrective measures by small businesses.)

An employer should provide every employee with a copy of the policy and complaint procedure, and redistribute it periodically. The policy and complaint procedure should be written in a way that will be understood by all employees in the employer's workforce. Other measures to ensure effective dissemination of the policy and complaint procedure include posting them in central locations and incorporating them into employee handbooks. If feasible, the employer should provide training to all employees to ensure that they understand their rights and responsibilities.

An anti-harassment policy and complaint procedure should contain, at a minimum, the following elements:

- A clear explanation of prohibited conduct;
- Assurance that employees who make complaints of harassment or provide information related to such complaints will be protected against retaliation;
- A clearly described complaint process that provides accessible avenues of complaint;
- Assurance that the employer will protect the confidentiality of harassment complaints to the extent possible;

---

[61] See Faragher, 118 S.Ct. at 2293, and Ellerth, 118 S.Ct. at 2270 (affirmative defense operates either to eliminate liability or limit damages).

[62] See Faragher, 118 S.Ct. at 2292 ("if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided").

[63] See Section V(C)(3) for a discussion of preventive and corrective care by small employers.

[64] See Hurley v. Atlantic City Police Dept., No. 96-5634, 96-5633, 96-5661, 96-5738, 1999 WL 150301 [79 FEP Cases 808] (3d Cir. March 18, 1999) ("Ellerth [77 FEP Cases 1] and Faragher [77 FEP Cases 14] do not, as the defendants seem to assume, focus mechanically on the formal existence of a sexual harassment policy, allowing an absolute defense to a hostile work environment, claim whenever the employer can point to an anti-harassment policy of some sort"; defendant failed to prove affirmative defense where it issued written policies without enforcing them, painted over offensive graffiti every few months only to see it go up again in minutes, and failed to investigate sexual harassment as it investigated and punished other forms of misconduct).

[65] See Does v. Johnson Controls World Services, Inc., 168 F.3d 417, 422 [79 FEP Cases 1446] (11th Cir. 1999) (employer can be held liable despite its immediate and appropriate corrective action in response to harassment complaint if it had knowledge of the harassment prior to the complaint and took no corrective action).

[66] Ellerth, 118 S.Ct. at 2270 [77 FEP Cases 1].

[67] A union grievance and arbitration system does not fulfill this obligation. Decision making under such a system addresses the collective interests of bargaining unit members, while decision making under an internal harassment complaint process should focus on the individual complainant's rights under the employer's anti-harassment policy.
An arbitration, mediation, or other alternative dispute resolution process also does not fulfill the employer's duty of due care. The employer cannot discharge its responsibility to investigate complaints of harassment and undertake corrective measures by providing employees with a dispute resolution process. For further discussion of the impact of such procedures on the affirmative defense, see Section V(D)(1)(b), below.
Finally, a federal agency's formal, internal EEO complaint process does not, by itself, fulfill its obligation to exercise reasonable care. That process only addresses complaints of violations of the federal EEO laws, while the Court, in Ellerth, made clear that an employer should encourage employees "to report harassing conduct before it becomes severe or pervasive." Ellerth, 118 S.Ct. at 2270 [77 FEP Cases 1]. Furthermore, the EEO process is designed to assess whether the agency is liable for unlawful discrimination and does not necessarily fulfill the agency's obligation to undertake immediate and appropriate corrective action.

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-940-5

● A complaint process that provides a prompt, thorough, and impartial investigation; and

● Assurance that the employer will take immediate and appropriate corrective action when it determines that harassment has occurred.

The above elements are explained in the following subsections.

### a. Prohibition Against Harassment

An employer's policy should make clear that it will not tolerate harassment based on sex (with or without sexual conduct), race, color, religion, national origin, age, disability, and protected activity (*i.e.*, opposition to prohibited discrimination or participation in the statutory complaint process). This prohibition should cover harassment by *anyone* in the workplace — supervisors, co-workers, or non-employees.[58] Management should convey the seriousness of the prohibition. One way to do that is for the mandate to "come from the top," *i.e.*, from upper management.

The policy should encourage employees to report harassment *before* it becomes severe or pervasive. While isolated incidents of harassment generally do not violate federal law, a pattern of such incidents may be unlawful. Therefore, to discharge its duty of preventive care, the employer must make clear to employees that it will stop harassment before it rises to the level of a violation of federal law.

### b. Protection Against Retaliation

An employer should make clear that it will not tolerate adverse treatment of employees because they report harassment or provide information related to such complaints. An anti-harassment policy and complaint procedure will not be effective without such an assurance.[59]

Management should undertake whatever measures are necessary to ensure that retaliation does not occur. For example, when management investigates a complaint of harassment, the official who interviews the parties and witnesses should remind these individuals about the prohibition against retaliation. Management also should scrutinize employment decisions affecting the complainant and witnesses during and after the investigation to ensure that such decisions are not based on retaliatory motives.

### c. Effective Complaint Process

An employer's harassment complaint procedure should be designed to encourage victims to come forward. To that end, it should clearly explain the process and ensure that there are no unreasonable obstacles to complaints. A complaint procedure should not be rigid, since that could defeat the goal of preventing and correcting harassment. When an employee complains to management about alleged harassment, the employer is obligated to investigate the allegation regardless of whether it conforms to a particular format or is made in writing.

The complaint procedure should provide accessible points of contact for the initial complaint.[60] A complaint process is not effective if employees are always required to complain first to their supervisors about alleged harassment, since the supervisor may be a harasser.[61] Moreover, reasonable care in preventing and correcting harassment requires an employer to instruct all supervisors to report complaints of harassment to appropriate officials.[62]

It is advisable for an employer to designate at least one official outside an employee's chain of command to take complaints of harassment. For example, if the employer has an office of human resources, one or more officials in that office could be authorized to take complaints. Allowing an employee to bypass his or her chain of command provides additional assurance that the complaint will be handled in an impartial manner, since an employee who reports harassment by his or her supervisor may feel that officials within the chain of command will more readily believe the supervisor's version of events.

It also is important for an employer's anti-harassment policy and complaint procedure to contain information about the time frames for filing charges of unlawful harassment with the EEOC or state fair employment practice agencies and to explain that the deadline runs from the last

---

[58] Although the affirmative defense does not apply in cases of harassment by co-workers or non-employees, an employer cannot claim lack of knowledge as a defense to such harassment if it did not make clear to employees that they can bring such misconduct to the attention of management and that such complaints will be addressed. *See Perry v. Ethan Allen,* 115 F.3d 143, 149 [74 FEP Cases 1292] (2d Cir. 1997) ("When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it'"), *cited in Faragher,* 118 S.Ct. at 2289 [77 FEP Cases 14]. Furthermore, an employer is liable for harassment by a co-worker or non-employer if management knew or should have known of the misconduct, unless the employer can show that it took immediate and appropriate corrective action. 29 C.F.R. § 1604.11(d). Therefore, the employer should have a mechanism for investigating such allegations and undertaking corrective action, where appropriate.

[59] Surveys have shown that a common reason for failure to report harassment to management is fear of retaliation. *See, e.g.,* Louise F. Fitzgerald & Suzanne Swan, "Why Didn't She Just Report Him? The Psychological and Legal Implications of Women's Responses to Sexual Harassment," 51 *Journal of Social Issues* 117, 121-22 (1995) (citing studies). Surveys also have shown that a significant proportion of harassment victims are worse off after complaining. *Id.* at 123-24; *see also* Patricia A. Frazier, "Overview of Sexual Harassment From the Behavioral Science Perspective," paper presented at the American Bar Association National Institute on Sexual Harassment at B-17 (1998) (reviewing studies that show frequency of retaliation after victims confront their harasser or filed formal complaints).

[60] *See Wilson v. Tulsa Junior College,* 164 F.3d 534, 541 [78 FEP Cases 1189] (10th Cir. 1998) (complaint process deficient where it permitted employees to bypass the harassing supervisor by complaining to director of personnel services, but the director was inaccessible due to hours of duty and location in separate facility).
[61] *Faragher,* 118 S.Ct. at 2293 [77 FEP Cases 14] (in holding as matter of law that City did not exercise reasonable care to prevent the supervisors' harassment, Court took note of fact that City's policy "did not include any assurance that the harassing supervisors could be bypassed in registering complaints"); *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 72 [40 FEP Cases 1822] (1986).
[62] *See Wilson,* 164 F.3d at 541 (complaint procedure deficient because it only required supervisors to report "formal" as opposed to "informal" complaints of harassment); *Varner v. National Super Markets Inc.,* 94 F.3d 1209, 1213 [71 FEP Cases 1367] (8th Cir. 1996), *cert. denied,* 519 U.S. 1110 [73 FEP Cases 1354] (1997) (complaint procedure is not effective if it does not require supervisor with knowledge of harassment to report the information to those in position to take appropriate action).

date of unlawful harassment, not from the date that the complaint to the employer is resolved.[63] While a prompt complaint process should make it feasible for an employee to delay deciding whether to file a charge until the complaint to the employer is resolved, he or she is not required to do so.[64]

### d. Confidentiality

An employer should make clear to employees that it will protect the confidentiality of harassment allegations to the extent possible. An employer cannot guarantee complete confidentiality, since it cannot conduct an effective investigation without revealing certain information to the alleged harasser and potential witnesses. However, information about the allegation of harassment should be shared only with those who need to know about it. Records relating to harassment complaints should be kept confidential on the same basis.[65]

A conflict between an employee's desire for confidentiality and the employer's duty to investigate may arise if an employee informs a supervisor about alleged harassment, but asks him or her to keep the matter confidential and take no action. Inaction by the supervisor in such circumstances could lead to employer liability. While it may seem reasonable to let the employee determine whether to pursue a complaint, the employer must discharge its duty to prevent and correct harassment.[66] One mechanism to help avoid such conflicts would be for the employer to set up an informational phone line which employees can use to discuss questions or concerns about harassment on an anonymous basis.[67]

---

[63] It is particularly important for federal agencies to explain the statute of limitations for filing formal EEO complaints, because the regulatory deadline is only 45 days and employees may otherwise assume they can wait whatever length of time it takes for management to complete its internal investigation.

[64] If an employer actively misleads an employee into missing the deadline for filing a charge by dragging out its investigation and assuring the employee that the harassment will be rectified, then the employer would be "equitably estopped" from challenging the delay. See Currier v. Radio Free Europe/Radio Liberty, Inc., 159 F.3d 1363, 1368 [78 FEP Cases 513] (D.C. Cir. 1998) ("an employer's affirmatively misleading statements that a grievance will be resolved in the employee's favor can establish an equitable estoppel"); Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1531 [60 FEP Cases 295] (11th Cir. 1992) (tolling is appropriate where plaintiff was led by defendant to believe that the discriminatory treatment would be rectified); Miller v. Beneficial Management Corp., 977 F.2d 834, 845 [65 FEP Cases 31] (3d Cir. 1992) (equitable tolling applies where employer's own acts or omission has lulled the plaintiff into foregoing prompt attempt to vindicate his rights).

[65] The sharing of records about a harassment complaint with prospective employers of the complainant could constitute unlawful retaliation. See Compliance Manual Section 8 ("Retaliation"), subsection IID(2), 614:0005 (BNA) (5/20/98).

[66] One court has suggested that it may be permissible to honor such a request, but that when the harassment is severe, an employer cannot just stand by, even if requested to do so. Torres v. Pisano, 116 F.3d 625 [73 FEP Cases 1771] (2d Cir.), cert. denied, 118 S.Ct. 563 [76 FEP Cases 1472] (1997).

[67] Employers may hesitate to set up such a phone line due to concern that it may create a duty to investigate anonymous complaints, even if based on mere rumor. To avoid any confusion as to whether an anonymous complaint through such a phone line triggers an investigation, the employer should make clear that the person who takes the calls is not a management official and can only answer questions and provide information. An investigation

### e. Effective Investigative Process

An employer should set up a mechanism for a prompt, thorough, and impartial investigation into alleged harassment. As soon as management learns about alleged harassment, it should determine whether a detailed fact-finding investigation is necessary. For example, if the alleged harasser does not deny the accusation, there would be no need to interview witnesses, and the employer could immediately determine appropriate corrective action.

If a fact-finding investigation is necessary, it should be launched immediately. The amount of time that it will take to complete the investigation will depend on the particular circumstances.[68] If, for example, multiple individuals were allegedly harassed, then it will take longer to interview the parties and witnesses.

It may be necessary to undertake intermediate measures before completing the investigation to ensure that further harassment does not occur. Examples of such measures are making scheduling changes so as to avoid contact between the parties; transferring the alleged harasser; or placing the alleged harasser on non-disciplinary leave with pay pending the conclusion of the investigation. The complainant should not be involuntarily transferred or otherwise burdened, since such measures could constitute unlawful retaliation.

The employer should ensure that the individual who conducts the investigation will objectively gather and consider the relevant facts. The alleged harasser should not have supervisory authority over the individual who conducts the investigation and should not have any direct or indirect control over the investigation. Whoever conducts the investigation should be well-trained in the skills that are required for interviewing witnesses and evaluating credibility.

#### i. Questions to Ask Parties and Witnesses

When detailed fact-finding is necessary, the investigator should interview the complainant, the alleged harasser, and third parties who could reasonably be expected to have relevant information. Information relating to the personal lives of the parties outside the workplace would be relevant only in unusual circumstances. When interviewing the parties and witnesses, the investigator should refrain from offering his or her opinion.

---

will proceed only if a complaint is made through the internal complaint process or if management otherwise learns about alleged harassment.

[68] See, e.g., Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996) [70 FEP Cases 562] (employer's response prompt where it began investigation on the day that complaint was made, conducted interviews within two days, and fired the harasser within ten days); Steiner v. Showboat Operating Co., 25 F.3d 1459, 1464 [65 FEP Cases 58] (9th Cir. 1994) (employer's response to complaints inadequate despite eventual discharge of harasser where it did not seriously investigate or strongly reprimand supervisor until after plaintiff filed charge with state FEP agency), cert. denied, 513 U.S. 1082 [66 FEP Cases 1888] (1995); Saxton v. AT&T, 10 F.3d 526, 535 [63 FEP Cases 625] (7th Cir. 1993) (investigation prompt where it was begun one day after complaint and a detailed report was completed two weeks later); Nash v. Electrospace Systems, Inc., 9 F.3d 401, 404 [63 FEP Cases 765] (5th Cir. 1993) (prompt investigation completed within one week); Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 319 [58 FEP Cases 152] (7th Cir. 1992) (adequate investigation completed within four days).

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-940-5

The following are examples of questions that may be appropriate to ask the parties and potential witnesses. Any actual investigation must be tailored to the particular facts.

### Questions to Ask the Complainant:

• Who, what, when, where, and how: *Who* committed the alleged harassment? *What* exactly occurred or was said? *When* did it occur and is it still ongoing? *Where* did it occur? *How often* did it occur? *How* did it affect you?

• How did you react? What response did you make when the incident(s) occurred or afterwards?

• How did the harassment affect you? Has your job been affected in any way?

• Are there any persons who have relevant information? Was anyone present when the alleged harassment occurred? Did you tell anyone about it? Did anyone see you immediately after episodes of alleged harassment?

• Did the person who harassed you harass anyone else? Do you know whether anyone complained about harassment by that person?

• Are there any notes, physical evidence, or other documentation regarding the incident(s)?

• How would you like to see the situation resolved?

• Do you know of any other relevant information?

### Questions to Ask the Alleged Harasser:

• What is your response to the allegations?

• If the harasser claims that the allegations are false, ask why the complainant might lie.

• Are there any persons who have relevant information?

• Are there any notes, physical evidence, or other documentation regarding the incident(s)?

• Do you know of any other relevant information?

### Questions to Ask Third Parties:

• What did you see or hear? When did this occur? Describe the alleged harasser's behavior toward the complainant and toward others in the workplace.

• What did the complainant tell you? When did s/he tell you this?

• Do you know of any other relevant information?

• Are there other persons who have relevant information?

#### ii. Credibility Determinations

If there are conflicting versions of relevant events, the employer will have to weigh each party's credibility. Credibility assessments can be critical in determining whether the alleged harassment in fact occurred. Factors to consider include:

• **Inherent plausibility:** Is the testimony believable on its face? Does it make sense?

• **Demeanor:** Did the person seem to be telling the truth or lying?

• **Motive to falsify:** Did the person have a reason to lie?

• **Corroboration:** Is there witness testimony (such as testimony by eye-witnesses, people who saw the person soon after the alleged incidents, or people who discussed the incidents with him or her at around the time that they occurred) or physical evidence (such as written documentation) that corroborates the party's testimony?

• **Past record:** Did the alleged harasser have a history of similar behavior in the past?

None of the above factors are determinative as to credibility. For example, the fact that there are no eye-witnesses to the alleged harassment by no means necessarily defeats the complainant's credibility, since harassment often occurs behind closed doors. Furthermore, the fact that the alleged harasser engaged in similar behavior in the past does not necessarily mean that he or she did so again.

#### iii. Reaching a Determination

Once all of the evidence is in, interviews are finalized, and credibility issues are resolved, management should make a determination as to whether harassment occurred. That determination could be made by the investigator, or by a management official who reviews the investigator's report. The parties should be informed of the determination.

In some circumstances, it may be difficult for management to reach a determination because of direct contradictions between the parties and a lack of documentary or eye-witness corroboration. In such cases, a credibility assessment may form the basis for a determination, based on factors such as those set forth above.

If no determination can be made because the evidence is inconclusive, the employer should still undertake further preventive measures, such as training and monitoring.

#### f. Assurance of Immediate and Appropriate Corrective Action

An employer should make clear that it will undertake immediate and appropriate corrective action, including discipline, whenever it determines that harassment has occurred in violation of the employer's policy. Management should inform both parties about these measures.[69]

Remedial measures should be designed to stop the harassment, correct its effects on the employee, and ensure that the harassment does not recur. These remedial measures need not be those that the employee requests or prefers, as long as they are effective.

In determining disciplinary measures, management should keep in mind that the employer could be found liable if the harassment does not stop. At the same time, management may have concerns that overly punitive measures may subject the employer to claims such as wrongful discharge, and may simply be inappropriate.

To balance the competing concerns, disciplinary measures should be proportional to the seriousness of the

---

[69] Management may be reluctant to release information about specific disciplinary measures that it undertakes against the harasser, due to concerns about potential defamation claims by the harasser. However, many courts have recognized that limited disclosures of such information are privileged. For cases addressing defenses to defamation claims arising out of alleged harassment, *see Duffy v. Leading Edge Products,* 44 F.3d 308, 311 [67 FEP Cases 97] (5th Cir. 1995) (qualified privilege applied to statements accusing plaintiff of harassment); *Garziano v. E.I. DuPont de Nemours & Co.,* 818 F.2d 380 [43 FEP Cases 1790] (5th Cir. 1987) (qualified privilege protects employer's statements to harasser); *Stockley v. AT&T,* 687 F.Supp. 764 [47 FEP Cases 28] (E.D.N.Y. 1988) (statements made in course of investigation into sexual harassment charges protected by qualified privilege).

offense.[70] If the harassment was minor, such as a small number of "off-color" remarks by an individual with no prior history of similar misconduct, then counseling and an oral warning might be all that is necessary. On the other hand, if the harassment was severe or persistent, then suspension or discharge may be appropriate.[71]

Remedial measures should not adversely affect the complainant. Thus, for example, if it is necessary to separate the parties, then the harasser should be transferred (unless the complainant prefers otherwise.)[72] Remedial responses that penalize the complainant could constitute unlawful retaliation and are not effective in correcting the harassment.[73]

Remedial measures also should correct the effects of the harassment. Such measures should be designed to put the employee in the position s/he would have been in had the misconduct not occurred.

### Examples of Measures to Stop the Harassment and Ensure that it Does Not Recur:

- oral[74] or written warning or reprimand;
- transfer or reassignment;
- demotion;
- reduction of wages;
- suspension;
- discharge;
- training or counseling of harasser to ensure that s/he understands why his or her conduct violated the employer's anti-harassment policy; and
- monitoring of harasser to ensure that harassment stops.

### Examples of Measures to Correct the Effects of the Harassment:

- restoration of leave taken because of the harassment;
- expungement of negative evaluation(s) in employee's personnel file that arose from the harassment;
- reinstatement;
- apology by the harasser;
- monitoring treatment of employee to ensure that s/he is not subjected to retaliation by the harasser or others in the work place because of the complaint; and
- correction of any other harm caused by the harassment (e.g., compensation for losses).

#### 2. Other Preventive and Corrective Measures

An employer's responsibility to exercise reasonable care to prevent and correct harassment is not limited to implementing an anti-harassment policy and complaint procedure. As the Supreme Court stated, "the employer has a greater opportunity to guard against misconduct by supervisors than by common workers; employers have greater opportunity and incentive to screen them, train them, and monitor their performance." *Faragher*, 118 S.Ct. at 2291 [77 FEP Cases 14].

An employer's duty to exercise due care includes instructing all of its supervisors and managers to address or report to appropriate officials complaints of harassment regardless of whether they are officially designated to take complaints[75] and regardless of whether a complaint was framed in a way that conforms to the organization's particular complaint procedures.[76] For example, if an employee files an EEOC charge alleging unlawful harassment, the employer should launch an internal investigation even if the employee did not complain to management through its internal complaint process.

Furthermore, due care requires management to correct harassment regardless of whether an employee files an internal complaint, if the conduct is clearly unwelcome. For example, if there are areas in the workplace with graffiti containing racial or sexual epithets, management should eliminate the graffiti and not wait for an internal complaint.[77]

An employer should ensure that its supervisors and managers understand their responsibilities under the organization's anti-harassment policy and complaint procedure. Periodic training of those individuals can help achieve that result. Such training should explain the types of conduct that

---

[70] *Mockler v. Multnomah County*, 140 F.3d 808, 813 [76 FEP Cases 890] (9th Cir. 1998).

[71] In some cases, accused harassers who were subjected to discipline and subsequently exonerated have claimed that the disciplinary action was discriminatory. No discrimination will be found if the employer had a good faith belief that such action was warranted and there is no evidence that it undertook less punitive measures against similarly situated employees outside his or her protected class who were accused of harassment. In such circumstances, the Commission will not find pretext based solely on an after-the-fact conclusion that the disciplinary action was inappropriate. See *Waggoner v. City of Garland Tex.*, 987 F.2d 1160, 1165 [61 FEP Cases 889] (5th Cir. 1993) (where accused harasser claims that disciplinary action was discriminatory, "[t]he real issue is whether the employer reasonably believed the employee's allegation [of harassment] and acted on it in good faith, or to the contrary, the employer did not actually believe the co-employee's allegation but instead used it as a pretext for an otherwise discriminatory dismissal").

[72] See *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 [65 FEP Cases 58] (9th Cir. 1994) (employer remedial action for sexual harassment by supervisor inadequate where it twice changed plaintiff's shift to get her away from supervisor rather than changed his shift or work area), *cert. denied*, 513 U.S. 1082 [66 FEP Cases 1888] (1995).

[73] See *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 [53 FEP Cases 1547] (7th Cir. 1990) ("a remedial measure that makes the victim of sexual harassment worse off is ineffective *per se*").

[74] An oral warning or reprimand would be appropriate only if the misconduct was isolated and minor. If an employer relies on oral warnings or reprimands to correct harassment, it will have difficulty proving that it exercised reasonable care to prevent and correct such misconduct.

[75] See *Varner*, 94 F.3d at 1213 [71 FEP Cases 1367] (complaint procedure is not effective if it does not require supervisor with knowledge of harassment to report the information to those in position to take appropriate action), *cert. denied*, 117 S. Ct. 946 [73 FEP Cases 1354] (1997); *accord Wilson v. Tulsa Junior College*, 164 F.3d at 541 [78 FEP Cases 1189].

[76] See *Wilson*, 164 F.3d at 541 [78 FEP Cases 1189] (complaint procedure deficient because it only required supervisors to report "formal" as opposed to "informal" complaints of harassment).

[77] See, e.g., *Splunge v. Shoney's, Inc.*, 97 F.3d 488, 490 [73 FEP Cases 859] (11th Cir. 1996) (where harassment of plaintiffs was so pervasive that higher management could be deemed to have constructive knowledge of it, employer was obligated to undertake corrective action even though plaintiffs did not register complaints); *Fall v. Indiana Univ. Bd. of Trustees*, 12 F.Supp.2d 870, 882, [79 FEP Cases 121 ] (N.D. Ind. 1998) (employer has constructive knowledge of harassment by supervisors where it "was so broad in scope and so permeated the workplace that it must have come to the attention of someone authorized to do something about it").

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-940-5

violate the employer's anti-harassment policy; the seriousness of the policy; the responsibilities of supervisors and managers when they learn of alleged harassment; and the prohibition against retaliation.

An employer should keep track of its supervisors' and managers' conduct to make sure that they carry out their responsibilities under the organization's anti-harassment program.[78] For example, an employer could include such compliance in formal evaluations.

Reasonable preventive measures include screening applicants for supervisory jobs to see if any have a record of engaging in harassment. If so, it may be necessary for the employer to reject a candidate on that basis or to take additional steps to prevent harassment by that individual.

Finally, it is advisable for an employer to keep records of all complaints of harassment. Without such records, the employer could be unaware of a pattern of harassment by the same individual. Such a pattern would be relevant to credibility assessments and disciplinary measures.[79]

### 3. Small Businesses

It may not be necessary for an employer of a small workforce to implement the type of formal complaint process described above. If it puts into place an effective, informal mechanism to prevent and correct harassment, a small employer could still satisfy the first prong of the affirmative defense to a claim of harassment.[80] As the Court recognized in *Faragher* [77 FEP Cases 14], an employer of a small workforce might informally exercise sufficient care to prevent harassment.[81]

For example, such an employer's failure to disseminate a written policy against harassment on protected bases would not undermine the affirmative defense if it effectively communicated the prohibition and an effective complaint procedure to all employees at staff meetings. An owner of a small business who regularly meets with all of his or her employees might tell them at monthly staff meetings that he or she will not tolerate harassment and that anyone who experiences harassment should bring it "straight to the top."

If a complaint is made, the business, like any other employer, must conduct a prompt, thorough, and impartial investigation and undertake swift and appropriate corrective action where appropriate. The questions set forth in Section V(C)(1)(e)(i), above, can help guide the inquiry and the factors set forth in Section V(C)(1)(e)(ii) should be considered in evaluating the credibility of each of the parties.

### D. Second Prong of Affirmative Defense: Employee's Duty to Exercise Reasonable Care

The second prong of the affirmative defense requires a showing by the employer that the aggrieved employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid

harm otherwise." *Faragher*, 118 S.Ct. at 2293 [77 FEP Cases 14]; *Ellerth*, 118 S.Ct. at 2270 [77 FEP Cases 1].

This element of the defense arises from the general theory "that a victim has a duty 'to use such means as are reasonable under the circumstances to avoid or minimize the damages' that result from violations of the statute." *Faragher*, 18 S.Ct. at 2292 [77 FEP Cases 14], *quoting Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 n.15 [29 FEP Cases 121] (1982). Thus an employer who exercised reasonable care as described in subsection V(C), above, is not liable for unlawful harassment if the aggrieved employee could have avoided all of the actionable harm. If some but not all of the harm could have been avoided, then an award of damages will be mitigated accordingly.[82]

A complaint by an employee does not automatically defeat the employer's affirmative defense. If, for example, the employee provided no information to support his or her allegation, gave untruthful information, or otherwise failed to cooperate in the investigation, the complaint would not qualify as an effort to avoid harm. Furthermore, if the employee unreasonably delayed complaining, and an earlier complaint could have reduced the harm, then the affirmative defense could operate to reduce damages.

Proof that the employee unreasonably failed to use any complaint procedure provided by the employer will normally satisfy the employer's burden.[83] However, it is important to emphasize that an employee who failed to complain does not carry a burden of proving the reasonableness of that decision. Rather, the burden lies with the employer to prove that the employee's failure to complain was unreasonable.

### 1. Failure to Complain

A determination as to whether an employee unreasonably failed to complain or otherwise avoid harm depends on the particular circumstances and information available to the employee *at that time*.[84] An employee should not necessarily be expected to complain to management immediately after the first or second incident of relatively minor harassment. Workplaces need not become battlegrounds where every minor, unwelcome remark based on race, sex, or another protected category triggers a complaint and investigation. An employee might reasonably ignore a small number of incidents, hoping that the harassment will stop without resort to the complaint process.[85] The employee may directly say to the harasser that s/he wants the misconduct to stop, and then wait to see if that

---

[78] In *Faragher*, the City lost the opportunity to establish the affirmative defense in part because "its officials made no attempt to keep track of the conduct of supervisors." *Faragher*, 118 S. Ct. at 2293 [77 FEP Cases 14].

[79] See subsections V(C)(1)(e)(ii) and V(C)(2), above.

[80] If the owner of the business commits unlawful harassment, then the business will automatically be found liable under the alter ego standard and no affirmative defense can be raised. *See* Section VI, below .

[81] *Faragher*, 118 S.Ct. at 2293 [77 FEP Cases 14].

[82] *Faragher*, 118 S. Ct. at 2292 [77 FEP Cases 14] ("If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.").

[83] *Ellerth*, 118 S. Ct. at 2270 [77 FEP Cases 1]; *Faragher*, 118 S. Ct. at 2293 [77 FEP Cases 14]. *See also Scrivner v. Socorro Independent School District*, 169 F.3d 969, 971 [79 FEP Cases 429] (5th Cir. 1999) (employer established second prong of defense where harassment began during summer, plaintiff misled investigators inquiring into anonymous complaint by denying that harassment occurred, and plaintiff did not complain about the harassment until the following March).

[84] The employee is not required to have chosen "the course that events later show to have been the best." Restatement (Second) of Torts § 918, comment c.

[85] *See Corcoran v. Shoney's Colonial, Inc.*, 24 F. Supp.2d 601, 606 [78 FEP Cases 311] (W.D. Va. 1998) ("Though unwanted sexual remarks have no place in the work environment, it is far from

EEOC Compliance Manual
ISBN 0-87179-949-5

is effective in ending the harassment before complaining to management. If the harassment persists, however, then further delay in complaining might be found unreasonable.

There might be other reasonable explanations for an employee's delay in complaining or entire failure to utilize the employer's complaint process. For example, the employee might have had reason to believe that:[86]

- using the complaint mechanism entailed a risk of retaliation;
- there were obstacles to complaints; and
- the complaint mechanism was not effective.

To establish the second prong of the affirmative defense, the employer must prove that the belief or perception underlying the employee's failure to complain was unreasonable.

#### a. Risk of Retaliation

An employer cannot establish that an employee unreasonably failed to use its complaint procedure if that employee reasonably feared retaliation. Surveys have shown that employees who are subjected to harassment frequently do not complain to management due to fear of retaliation.[87] To assure employees that such a fear is unwarranted, the employer must clearly communicate and enforce a policy that no employee will be retaliated against for complaining of harassment.

#### b. Obstacles to Complaints

An employee's failure to use the employer's complaint procedure would be reasonable if that failure was based on unnecessary obstacles to complaints. For example, if the process entailed undue expense by the employee,[88] inaccessible points of contact for making complaints,[89] or unnecessarily intimidating or burdensome requirements, failure to invoke it on such a basis would be reasonable.

An employee's failure to participate in a mandatory mediation or other alternative dispute resolution process also does not constitute unreasonable failure to avoid harm. While an employee can be expected to cooperate in the employer's investigation by providing relevant information, an employee can never be required to waive rights, either substantive or procedural, as an element of his or her exercise of reasonable

care.[90] Nor must an employee have to try to resolve the matter with the harasser as an element of exercising due care.

#### c. Perception That Complaint Process Was Ineffective

An employer cannot establish the second prong of the defense based on the employee's failure to complain if that failure was based on a reasonable belief that the process was ineffective. For example, an employee would have a reasonable basis to believe that the complaint process is ineffective if the procedure required the employee to complain initially to the harassing supervisor. Such a reasonable basis also would be found if he or she was aware of instances in which coworkers' complaints failed to stop harassment. One way to increase employees' confidence in the efficacy of the complaint process would be for the employer to release general information to employees about corrective and disciplinary measures undertaken to stop harassment.[91]

#### 2. Other Efforts to Avoid Harm

Generally, an employer can prove the second prong of the affirmative defense if the employee unreasonably failed to utilize its complaint process. However, such proof will not establish the defense if the employee made other efforts to avoid harm.

For example, a prompt complaint by the employee to the EEOC or a state fair employment practices agency while the harassment is ongoing could qualify as such an effort. A union grievance could also qualify as an effort to avoid harm.[92] Similarly, a staffing firm worker who is harassed at the client's workplace might report the harassment either to the staffing firm or to the client, reasonably expecting that either would act to correct the problem.[93] Thus the worker's failure to complain to one of those entities would not bar him or her from subsequently bringing a claim against it.

With these and any other efforts to avoid harm, the timing of the complaint could affect liability or damages. If the employee could have avoided some of the harm by complaining earlier, then damages would be mitigated accordingly.

### VI. Harassment by "Alter Ego" of Employer

#### A. Standard of Liability

An employer is liable for unlawful harassment whenever the harasser is of a sufficiently high rank to fall "within that class . . . who may be treated as the organization's proxy"

---

uncommon for those subjected to such remarks to ignore them when they are first made.").

[86] *See Faragher*, 118 S. Ct. at 2292 [77 FEP Cases 14] (defense established if plaintiff unreasonably failed to avail herself of "a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense"). *See also* Restatement (Second) of Torts § 918, comment e (tort victim "is not barred from full recovery by the fact that it would have been reasonable for him to make expenditures or subject himself to pain or risk, but it is only when he is unreasonable in refusing or failing to take action to prevent further loss that his damages are curtailed").

[87] *See* n.59, above.

[88] *See Faragher*, 118 S. Ct. at 2292 [77 FEP Cases 14] (employee should not recover for harm that could have been avoided by utilizing a proven, effective complaint process that was available "without undue risk or expense").

[89] *See Wilson*, 164 F.3d at 541 [78 FEP Cases 1189] (complaint process deficient where official who could take complaint was inaccessible due to hours of duty and location in separate facility).

[90] *See* Policy Statement on Mandatory Binding Arbitration of Employment Discrimination Disputes as a Condition of Employment, EEOC Compliance Manual (BNA) (7/10/97).

[91] For a discussion of defamation claims and the application of a qualified privilege to an employer's statements about instances of harassment, *see* n.69, above.

[92] *See Watts v. Kroger Company*, 170 F.3d 505, 510 (5th Cir. 1999) (plaintiff made effort "to avoid harm otherwise" where she filed a union grievance and did not utilize the employer's harassment complaint process; both the employer and union procedures were corrective mechanisms designed to avoid harm).

[93] Both the staffing firm and the client may be legally responsible, under the anti-discrimination statutes, for undertaking corrective action. *See* Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms, EEOC Compliance Manual (BNA) N:3317 (12/3/97).

Copyright © 2002 by The Bureau of National Affairs, Inc.
ISBN 0-87179-940-5

*Faragher*, 118 S. Ct. at 2284 [77 FEP Cases 14].[94] In such circumstances, the official's unlawful harassment is imputed automatically to the employer.[95] Thus the employer cannot raise the affirmative defense, even if the harassment did not result in a tangible employment action.

## B. Officials Who Qualify as "Alter Egos" or "Proxies"

The Court, in *Faragher* [77 FEP Cases 14], cited the following examples of officials whose harassment could be imputed automatically to the employer:

- president [96]

- owner [97]
- partner [98]
- corporate officer

*Faragher*, 118 S. Ct. at 2284 [77 FEP Cases 14].

## VII. Conclusion

The Supreme Court's rulings in *Ellerth* [77 FEP Cases 1] and *Faragher* [77 FEP Cases 14] create an incentive for employers to implement and enforce strong policies prohibiting harassment and effective complaint procedures. The rulings also create an incentive for employees to alert management about harassment before it becomes severe and pervasive. If employers and employees undertake these steps, unlawful harassment can often be prevented, thereby effectuating an important goal of the anti-discrimination statutes.

---

[94] *See also Ellerth*, 118 S. Ct. at 2267 [77 FEP Cases 1] (under agency principles an employer is indirectly liable "where the agent's high rank in the company makes him or her the employer's alter ego"); *Harrison v. Eddy Potash, Inc.*, 158 F.3d 1371, 1376 (10th Cir. 1998) ("the Supreme Court in Burlington [77 FEP Cases 1] acknowledged an employer can be held vicariously liable under Title VII if the harassing employee's 'high rank in the company makes him or her the employer's alter ego'").

[95] *Faragher*, 118 S. Ct. at 2284 [77 FEP Cases 14].

[96] The Court noted that the standards for employer liability were not at issue in the case of *Harris v. Forklift Systems*, 510 U.S. 17 [63 FEP Cases 225] (1993), because the harasser was the president of the company. *Faragher*, 118 S.Ct. at 2284 [77 FEP Cases 14].

[97] An individual who has an ownership interest in an organization, receives compensation based on its profits, and participates in managing the organization would qualify as an "owner" or "partner." *Serapion v. Martinez*, 119 F.3d 982, 990 [74 FEP Cases 601] (1st Cir. 1997), *cert. denied*, 118 S.Ct. 690 [78 FEP Cases 416] (1998).

[98] *Id.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMY WIGINTON, KRISTINE MORAN, NORMA PLANK FETHLER, as Successor in Interest to Dondi Plank, ANDREA COREY and OLIVIA KNAPP, individually and on behalf of all persons similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 02 CV 6832 Judge Andersen Magistrate Judge Ashman |
| v. | ) ) | |
| CB RICHARD ELLIS, INC., | ) ) | |
| Defendant. | ) | |

**[PROPOSED] FINAL ORDER AND JUDGMENT AS TO CLASS CLAIMS GRANTING FINAL APPROVAL TO PROPOSED CLASS ACTION SETTLEMENT, APPROVING THE IMPLEMENTATION OF THE TIER PROGRAM, AND APPROVING CLASS COUNSELS' APPLICATION FOR ATTORNEYS FEES AND LITIGATION EXPENSES AND SERVICE AWARDS TO CLASS REPRESENTATIVES**

This Court having considered: (a) the Consent Decree dated October 4, 2007, including all Exhibits thereto (the "Decree") between the Plaintiffs and Defendant CB Richard Ellis, Inc. ("CBRE"); (b) the proposed Tier Program; and (c) Class Counsels' application for attorneys' fees and reimbursement of litigation expenses and incentive awards for the Class Representatives; and having held a hearing on January 2, 2008, and having considered all of the submissions and arguments with respect thereto, and otherwise being fully informed, and good cause appearing therefore,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that:

1.     This Final Order and Judgment incorporates herein and makes a part hereof, the Decree, including the Exhibits thereto. Unless otherwise provided herein, the terms defined in

**EXHIBIT E - 1**

the Decree shall have the same meanings for purposes of this Final Order and Judgment.

2.    The Court has personal jurisdiction over all Class Representatives, Class Members and Defendant CBRE for purposes of this Settlement only, and has subject matter jurisdiction to approve and enforce the Agreement.

3.    Based on the record before the Court, including all submissions in support of the Settlement set forth in the Decree, objections and responses thereto, as well as the Decree, the Court hereby certifies the following nationwide Class (the "Class") for settlement purposes only:

> All female employees who were or have been employed by CBRE at any time during the period from January 1, 1999 to the Date of Preliminary Approval.

In so holding, the Court finds that the prerequisites of FED. R. CIV. P. 23(a), (b)(2), and (b)(3) have been satisfied for certification of the nationwide Class for settlement purposes only: the Class is sufficiently numerous that joinder of all members is impracticable; there are questions of law and fact common to the Class; the claims and defenses of the Class Representatives are typical of the claims and defenses of the members of the Class; the Class Representatives have fairly and adequately protected the interests of the Class with regard to the consolidated claims of the Class; the equitable relief afforded by the Settlement Agreement is appropriate for class certification under Rule 23(b)(2); the common questions of law and fact predominate over questions affecting only individual Class Members, rendering the Class sufficiently cohesive to warrant a nationwide class settlement under Rule 23(b)(3); and settlement is a fair and efficient resolution of the Litigation.

In making all of the foregoing findings, the Court has exercised its discretion in certifying the settlement Class.

4.    The record shows that Notice has been given to the Class in the manner approved

by the Court in its Preliminary Approval Order of October 4, 2007  [Docket No. ___]. The Court finds that such Notice:  (i) constitutes reasonable and the best practicable notice; (ii) constitutes notice that was  reasonably calculated, under the circumstances, to apprise members of the Class of the terms of the Settlement, and Class Members' right to object to and appear at the settlement fairness hearing held on January 9, 2008 at 9:30 a.m. (the "Fairness Hearing") or exclude themselves from the Class, (iii) constitutes due, adequate, and sufficient notice to all persons or entities entitled to receive notice; and (iv) meets the requirements of due process and FED. R. CIV. P. 23.

     5.      No individuals, other than those listed on Exhibit A hereto, have excluded themselves from the Class.  This Order shall have no force or effect on the persons listed on Exhibit A hereto.

     6.      The Court finds that extensive arm's-length negotiations have taken place in good faith between Lead Class Counsel and Defendant CBRE's Counsel resulting in the Settlement and Decree.

     7.      Pursuant to FED. R. CIV. P. 23(e), the Court hereby finally approves in all respects the Settlement set forth in the Decree ("the Settlement") and finds that the Settlement, the Decree, and the Tier Program as set forth in Section IX of the Decree, are, in all respects, fair, reasonable and adequate, and in the best interest of the Class.

     8.      The parties are hereby directed to implement and consummate the Settlement according to the terms and provisions of the Decree.

     9.      The Released Claims (as defined in Paragraph 2.27 of the Decree) against CBRE on behalf of the Class are hereby dismissed with prejudice and without costs to any party, except as otherwise provided herein.

10.     Upon the Effective Date of the Agreement, the Settlement Class shall release and forever discharge CBRE (as defined in Paragraph 2.3 of the Decree) from the Released Claims (as defined in Paragraph 2.27 of the Decree).

11.     Nothing in this Final Order and Judgment, the Settlement, or the Decree is or shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by CBRE.

12.     Class Counsel have moved pursuant to FED. R. CIV. P. 23(h), 54(d) and 52(a) for an award of attorneys' fees and reimbursement of expenses. Pursuant to Rule 23(h)(3) and 52(a) this Court makes the following findings of fact and conclusions of law:

(a)     that the Settlement confers a substantial benefit on the Class;

(b)     that the value conferred on the Class is immediate and readily quantifiable. Upon this Judgment becoming final, each Class Member who has submitted a valid Claim Form has the potential to receive a cash payment that represents a significant portion of the alleged financial harm alleged to have been incurred as a result of CBRE's alleged conduct;

(c)     that Class Counsel vigorously and effectively pursued the Class Members' claims before this Court in this highly complex case;

(d)     that the Settlement was reached following extensive negotiation between Lead Class Counsel and Defendant CBRE's Counsel, and was negotiated in good-faith and in the absence of collusion;

(e)     that during the prosecution of the Litigation, Class Counsel incurred expenses at least in the amount of $550,000, which included costs for expert witnesses and other expenses which the Court finds to be reasonable and necessary to the representation of the Class;

(f)     that Class Members were advised in the Notice approved by the Court that Class Counsel intended to apply for an award of attorneys' fees and costs in a combined amount of $3,400,000, to be paid directly by CBRE separate and apart from the Tier Program;

(g)     that Title VII provides for the payment of attorneys fees and costs and that counsel who recover a common benefit for persons other than himself or his client is entitled to a reasonable attorneys' fee. *See, e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Blum v. Stenson*, 465 U.S. 866, 900 n.16 (1984); and

(h)     that the fees and costs described above will be paid separately from and will not reduce the amount of monetary relief available to satisfy the Class Members.

Accordingly, Class Counsel are hereby awarded $3,400,000, as their award of fees and costs which the Court finds to be fair and reasonable, and which amount shall be paid to Class Counsel by CBRE in accordance with the terms of the Agreement. The attorneys' fees and expenses awarded by the Court shall be allocated among Class Counsel by Lead Class Counsel.

13.     Class Representatives are hereby granted the following service awards, which shall be paid by CBRE in accordance with the terms of the Agreement: Amy Wiginton $125,000; Kristine Moran $100,000; Andrea Corey $75,000; Norma Plank Fethler, as successor in interest to Dondi Plank $25,000; Olivia Knapp $25,000.

14.     The Court retains continuing and exclusive jurisdiction over all matters relating to administration, consummation, enforcement and interpretation of the Decree and of this Final Order and Judgment, to protect and effectuate this Final Order and Judgment, and for any other necessary purpose. Defendant CBRE, Class Representatives and each member of the Class are hereby deemed to have irrevocably submitted to the exclusive jurisdiction of this Court, for the purpose of any suit, action, proceeding or dispute arising out of or relating to the Decree or the

**EXHIBIT E - 5**

CHI 11323917.1

applicability of the Decree, and only for such purposes. Solely for purposes of such suit, action or proceeding, to the fullest extent they may effectively do so under applicable law, the parties hereto are deemed to have irrevocably waived and agreed not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of this Court, or that this Court is, in any way, an improper venue or an inconvenient forum.

15.     In the event that the Settlement does not become effective according to the terms of the Decree, this Order and Final Judgment shall be rendered null and void as provided by the Decree, shall be vacated and, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Decree.

16.     No Class Member, either directly, representatively, or in any other capacity (other than a Class Member who validly and timely elected to be excluded from the Class), shall commence, continue or prosecute against CBRE any action or proceeding in any court or tribunal asserting any of the Released Claims defined in the Decree, and are hereby permanently enjoined from so proceeding.

17.     The Consent Decree and this Order shall remain in effect for a period of two (2) years from the Effective Date of the Decree.

18.     This action shall be dismissed with prejudice, and without costs to the Parties, except (i) as otherwise expressly provided for in the Consent Decree, including, but not limited to, this Court's retention of jurisdiction to administer, effectuate, and enforce the provisions of the Consent Decree, and (ii) so far as the individual claims of Kristine Moran under the Pregnancy Discrimination Act and Olivia Knapp for retaliation are severed for further proceedings.

**EXHIBIT E - 6**

SO ORDERED, ADJUDGED AND DECREED, this ____ day of _____ _____,
2007.


_____ _____ _____  _____ _____

Wayne R. Andersen
United States District Judge

## JOINT PUBLICITY STATEMENT

Class Counsel and CB Richard Ellis Group, Inc. announce that they have reached a settlement in the lawsuit *Amy Wiginton et al. v. CB Richard Ellis, Inc.*, No. 02 CV 6832, in which five former female employees sought to certify a nationwide class of current and former female employees alleging sexual harassment. On October 4, 2007, the Honorable Judge Wayne Andersen of the U.S. District Court for the Northern District of Illinois Eastern Division granted preliminary approval to the settlement agreement prior to ruling on whether to certify the Class. At the parties' request, Judge Andersen certified a Settlement Class comprised of all current and former female employees of the company from January 1, 1999 to October 4, 2007.

The court approved a "process-based" settlement under which individuals from the class are invited to submit claims to an independent and neutral Special Master. Claimants who can demonstrate to the satisfaction of the Special Master that they were subjected to unlawful harassment will be entitled to monetary awards. Claims are subject to certain monetary caps depending on a claimant's elections regarding the extent of the process in which they wish to participate and the level of confidentiality their claim will be afforded. The final payout by the company will be based on the number of submitted claims and the awards made by the Special Master depending on the merits of each claim. Specifically, the settlement consists of the following elements:

- Payments to individual claimants based on results of the claims process where there is a finding of unlawful sexual harassment;

- Service payments to each of the five class representatives for the time and effort they contributed to the prosecution of the litigation;

**EXHIBIT F - 1**

- A charitable contribution to the Commercial Real Estate Women (CREW) Network for the purpose of establishing scholarships to promote the entry or advancement of women in the real estate services industry; and

- Attorneys' fees and costs to the Plaintiffs' counsel.

Additionally, under the terms of the settlement agreement, the company agreed to several human resources measures. These activities include amending or tightening existing harassment policies, implementing enhanced training for all employees, increasing supervisor accountability to address sexually inappropriate conduct in the workplace, enhancing record-keeping practices, and conducting two annual reviews of settlement compliance by a court appointed monitor. CBR Richard Ellis has been implementing many of these measures for a number of years and believes that its anti-harassment policies are best in class in the commercial real estate industry.

As part of the settlement agreement, CB Richard Ellis admitted no wrongdoing in the matter. The company determined that settling the case rather than facing the continued cost and disruption of fighting a potential class action was in the best interest of the company and its shareholders, and would allow CB Richard Ellis to move forward with its continued commitment to a workplace free of harassment. Class Counsel and the Plaintiffs determined that the agreement is in the best interests of current and former female employees of the company, because it affords class members the opportunity to submit claims for monetary awards and provides for the implementation of polices and practices that will help maintain a work environment that is safe and free from harassment.

**EXHIBIT F - 2**

Plaintiffs and the Class are represented by Elizabeth A. Fegan of Hagens Berman Sobol Shapiro LLP and Kenneth A. Wexler of Wexler Toriseva Wallace LLP, and CB Richard Ellis is represented by Brenda H. Feis of Seyfarth Shaw LLP.

**EXHIBIT F - 3**

## WOMEN SCHOLARS PROGRAM OVERVIEW

Pursuant to the Consent Decree in *Wiginton et al. v. CB Richard Ellis, Inc.*, No. 02 CV 6832 (N.D. Ill.) ("Litigation"), a donation of $400,000 will be funded by CBRE, for which CBRE shall be entitled to whatever tax deductions it may be eligible, and donated under the auspices of the settlement in the Litigation to Commercial Real Estate Women (CREW) Network. The funds will be used to help women achieve parity in opportunity, influence and power within the commercial real estate industry. The Women Scholars Program is intended to encourage the rise of women who have chosen to pursue an education in real estate for the purpose of building a career in commercial real estate.

The components of the program are as follows:

- $400,000 will be placed in an interest-bearing account to fund the Scholars Program
- 100% of the accumulated interest on the account will go toward funding additional scholarships
- 10 scholarships in the amount of $10,000 each will be awarded annually over the next four years to junior and/or senior undergraduate students concentrating in the real estate area
- Each scholarship recipient will be guaranteed a brokerage-specific 8-12 week internship assignment in a commercial real estate brokerage firm, and will be assigned a mentor to provide guidance and direction.
  - o For purposes of this provision, the internships shall be spread evenly, to the extent reasonably possible, among firms that are CREW members.

### EXHIBIT G - 1

    o   Each firm participating in the internship and mentoring program shall be responsible for its own expenses associated with such internships and mentoring. Alternatively, CREW may, in its discretion, subsidize these expenses from the $400,000 fund described above.

**Student Selection Process / Eligibility Criteria**

Student applications will be evaluated by a Committee to be appointed by CREW. The Committee shall be comprised of members from multiple commercial property brokerage firms. CBRE shall not have a controlling vote on the Committee.

Junior or Senior Female undergraduate student enrolled in an accredited Real Estate Program to be determined by CREW are eligible to apply (Appendix A contains examples of accredited programs).

After reviewing the application documents, the Committee will select the eligible scholarship candidates. Selection will be made based on grade point average, motivation, and leadership.

**EXHIBIT G - 2**